**Docket No. 2023-1687**

*In the*

# United States Court of Appeals

*For the*

# Federal Circuit

MITEK SYSTEMS, INC.,

*Plaintiff-Appellant,*

v.

UNITED SERVICES AUTOMOBILE ASSOCIATION,

*Defendant-Appellee.*

*Appeal from the United States District Court for the Eastern District of Texas*
*Case No. 2:20-cv-00115-JRG · Judge Rodney Gilstrap*

## NON-CONFIDENTIAL OPENING BRIEF OF PLAINTIFF-APPELLANT MITEK SYSTEMS, INC.

DAVID EISEMAN
BRIAN E. MACK
JONATHAN TSE
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, California 94111
(415) 875-6600 Telephone
davideiseman@quinnemanuel.com
brianmack@quinnemanuel.com
jonathantse@quinnemanuel.com

*Attorneys for Plaintiff-Appellant,*
*Mitek Systems, Inc.*

June 13, 2023

    PRINTED ON RECYCLED PAPER 

## REPRESENTATIVE PATENT CLAIM

Claim 1 of the '571 Patent purports to claim:

A non-transitory computer-readable medium comprising computer-readable instructions for depositing a check that, when executed by a processor, cause the processor to:

> monitor an image of the check in a field of view of a camera of a mobile device with respect to a monitoring criterion using an image monitoring and capture module of the mobile device;

> capture the image of the check with the camera when the image of the check passes the monitoring criterion; and

> provide the image of the check from the camera to a depository via a communication pathway between the mobile device and the depository.

Appx273.

FORM 9. Certificate of Interest

<div align="right">Form 9 (p. 1)<br>March 2023</div>

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number**   23-1687

**Short Case Caption**   Mitek Systems, Inc. v. United States Automobile Association

**Filing Party/Entity**   Mitek Systems, Inc.

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date:   June 13, 2023

Signature:   /s/ Brian E. Mack

Name:   Brian Mack

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.  ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☑ None/Not Applicable |
| Mitek Systems, Inc. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☐     None/Not Applicable          ☐     Additional pages attached

| | | |
|---|---|---|
| Quinn Emanuel Urquhart & Sullivan, LLP | Jonathan Tse | |
| | | |
| | | |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑  Yes (file separate notice; see below)     ☐  No     ☐  N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑     None/Not Applicable          ☐     Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

STATEMENT OF RELATED CASES ................................................................... vii

PRELIMINARY STATEMENT ........................................................................1

JURISDICTIONAL STATEMENT ...................................................................5

STATEMENT OF THE ISSUES.........................................................................5

STATEMENT OF THE CASE...........................................................................6

      A.    Mitek's Technology & Business ..........................................................6

      B.    USAA & Its Patents ...........................................................................7

      C.    USAA's Patent Enforcement Campaign ...............................................8

            1.    Demand Letter Campaign ...........................................................8

            2.    Wells Fargo Litigation ................................................................8

            3.    PNC Bank Litigation................................................................10

            4.    BBVA Bank Litigation .............................................................11

            5.    Truist Bank Litigation ..............................................................11

      D.    The Proceedings Below..................................................................11

SUMMARY OF ARGUMENT .......................................................................13

STANDARD OF REVIEW .............................................................................15

ARGUMENT ................................................................................................15

I.     THE DISTRICT COURT COMMITTED LEGAL ERROR IN
      DETERMINING THAT USAA MOUNTED A FACTUAL ATTACK
      ON MITEK'S REASONABLE POTENTIAL FOR
      INFRINGEMENT AND INDEMNIFICATION LIABILITY
      CLAIMS ................................................................................................15

II.     THE DISTRICT COURT COMMITTED LEGAL ERROR BY
        FAILING TO GIVE PROPER WEIGHT TO THE CAPABILITIES
        OF MITEK'S MISNAP SOFTWARE AND INDIRECTLY
        ATTACKING THE MERITS OF THE CASE ...................................... 18

III.    THE DISTRICT COURT COMMITTED LEGAL ERROR IN
        APPLYING INCORRECT LEGAL FRAMEWORKS FOR
        DECLARATORY JUDGMENT STANDING .......................................... 24

        A.     The District Court Improperly Held Mitek To Higher Standard
               Than The Reasonable Potential Standard Under A Totality Of
               The Circumstances ................................................................... 24

        B.     The District Court Erred In Failing To Apply An Objective
               Standard When Determining The Reasonable Potential For
               Mitek's Declaratory Judgment Standing ................................... 27

IV.     MITEK HAS ESTABLISHED MULTIPLE, INDEPENDENT
        BASES FOR DECLARATORY JUDGMENT STANDING ...................... 33

        A.     Mitek Has Established A Reasonable Potential Of Direct
               Infringement Claims ................................................................ 33

        B.     Mitek Has Established A Reasonable Potential Of Induced
               Infringement Claims ................................................................ 37

        C.     Mitek Has Established A Reasonable Potential Of Contributory
               Infringement Claims ................................................................ 43

        D.     Mitek Has Established A Reasonable Potential Of
               Indemnification Liability .......................................................... 47

V.      THE DISTRICT COURT ABUSED ITS DISCRETION BY
        DECLINING DECLARATORY JUDGMENT JURISDICTION ............... 51

        A.     The District Court Committed Factual And Legal Errors In
               Declining Jurisdiction .............................................................. 53

        B.     The District Court Failed To Give Proper Weight To Facts That
               Show Why Intervention Is Not The Most Effective Or Efficient
               Avenue For Mitek .................................................................... 56

CONCLUSION AND STATEMENT OF RELIEF SOUGHT ............................... 60

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

## <u>Cases</u>

*Alcon Research Ltd. v. Barr Labs., Inc.*,
  745 F.3d 1180 (Fed. Cir. 2014) ........................................................15

*Arkema Inc. v. Honeywell Int'l, Inc.*,
  706 F.3d 1351 (Fed. Cir. 2013) ........................................................26

*Arris Grp., Inc. v. British Telecomms. PLC*,
  639 F.3d 1368 (Fed. Cir. 2011) .................................................*passim*

*Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.*,
  846 F.2d 731 (Fed. Cir. 1988) .........................................................52

*Asia Vital Components Co. v. Asetek Danmark*,
  837 F.3d 1249 (Fed. Cir. 2016) ...................................................27, 35

*Barry v. Medtronic, Inc.*,
  914 F.3d 1310 (Fed. Cir. 2019) ........................................................39

*Capo, Inc. v. Dioptics Med. Prod., Inc.*,
  387 F.3d 1352 (Fed. Cir. 2004) .....................................28, 35, 52, 53

*Caraco Pharm. Lab'ys, Ltd. v. Forest Lab'ys, Inc.*,
  527 F.3d 1278 (Fed. Cir. 2008) ........................................................25

*Choice Inc. v. Texas v. Greenstein*,
  691 F.3d 710 (5th Cir. 2012) ...........................................................17

*Commc'ns Test Design, Inc. v. Contec, LLC*,
  952 F.3d 1356 (Fed. Cir. 2020) ........................................................55

*Commil USA, LLC v. Cisco Sys., Inc.*,
  575 U.S. 632 (2015)........................................................................40

*Elecs. for Imaging, Inc. v. Coyle*,
  394 F.3d 1341 (Fed. Cir. 2005) .............................................30, 31, 49

*EMC Corp. v. Norand Cop.*,
  89 F.3d 807 (Fed. Cir. 1996) ...........................................................55

*Evolved Wireless, LLC v. HTC Corp.*,
  840 F. App'x 586 (Fed. Cir. 2021) ...................................................59

*Fantasy Sports Props. v. Sportsline.com, Inc.*,
  287 F.3d 1108 (Fed. Cir. 2002) ...........................................19, 20, 22

*Finjan, Inc. v. Secure Computing Corp.*,
  626 F.3d 1197 (Fed. Cir. 2010) .................................................20, 22

*Gen-Probe Inc. v. Vysis, Inc.*,
  359 F.3d 1376 (Fed. Cir. 2004), *abrogated by MedImmune, Inc. v.*
  *Genentech, Inc.*, 549 U.S. 118 (2007) ...............................................25

*Hewlett-Packard Co. v. Acceleron LLC*,
  587 F.3d 1358 (Fed. Cir. 2009) .................................................28, 59

*i4i Ltd. P'ship v. Microsoft Corp.*,
  598 F.3d 831 (Fed. Cir. 2010) ...................................................44, 46

*INVT SPE LLC v. Int'l Trade Comm'n*,
  46 F.4th 1361 (Fed. Cir. 2022) ........................................................20

*Lucent Techs., Inc. v. Gateway, Inc.*,
  580 F.3d 1301 (Fed. Cir. 2009) .......................................................58

*MedImmune, Inc. v. Genentech, Inc.*,
  549 U.S. 118 (2007) ........................................................................24

*Microchip Tech. Inc. v. Chamberlain Grp., Inc.*,
  441 F.3d 936 (Fed. Cir. 2006) ........................................................50

*Micron Tech., Inc. v. Mosaid Techs., Inc.*,
  518 F.3d 897 (Fed. Cir. 2008) .........................................15, 25, 52

*Microsoft Corp. v. DataTern, Inc.*,
  755 F.3d 899 (Fed. Cir. 2014) ...............................................*passim*

*Microsoft Corp. v. GeoTag, Inc.*,
  No. CV 11-175-RGA, 2014 WL 4312167 (D. Del. Aug. 29, 2014),
  *aff'd on other grounds*, 817 F.3d 1305 (Fed. Cir. 2016) ..............28, 36

*Minn. Min. and Mfg. Co. v. Norton Co.*,
  929 F.2d 670 (Fed. Cir. 1991) ........................................................54

*Mitek Sys., Inc. v. United Servs. Automobile Assoc.*,
  34 F.4th 1335 (Fed. Cir. 2022) ...............................................*passim*

*Mitek Sys., Inc. v. USAA*,
  No. 19-CV-07223-EMC, 2020 WL 1922635
  (N.D. Cal. Apr. 21, 2020) ...............................................................12

*Mitek Systems, Inc. v. USAA*,
  No. 2:20-cv-00115, Dkt. 70 (E.D. Tex. May 27, 2021) ....................12

*In re Mobile Telecommunications Techs., LLC,*
    247 F. Supp. 3d 456 (D. Del. 2017) ................................................. 46

*Montez v. Dep't of Navy,*
    392 F.3d 147 (5th Cir. 2004) ...................................................... 17, 48

*NetFuel, Inc. v. Cisco Sys. Inc.,*
    438 F. Supp. 3d 1031 (N.D. Cal. 2020) ............................................ 20

*Prasco, LLC v. Medicis Pharm. Corp.,*
    537 F.3d 1329 (Fed. Cir. 2008) ............................................. 27, 28, 29

*Quanta Computer, Inc. v. LG Elecs., Inc.,*
    553 U.S. 617 (2008) ..................................................................... 59

*In re S. Recycling, L.L.C.,*
    982 F.3d 374 (Fed. Cir. 2020) ...................................................... 17

*SafeNet, Inc. v. Uniloc USA, Inc.,*
    No. 6:15-CV-97-RWS-KNM, 2015 WL 10793747
    (E.D. Tex. Aug. 19, 2015) .................................................... *passim*

*SanDisk Corp. v. STMicroelectronics, Inc.,*
    480 F.3d 1372 (Fed. Cir. 2007) ............................................ 51, 52, 54

*Script Sec. Sols. LLC v. Logitech Inc.,*
    No. 2:16-cv-01400-JRG-RSP, 2017 WL 10242574
    (E.D. Tex. Nov. 8, 2017) ............................................................ 58

*Toshiba Corp. v. Imation Corp.,*
    681 F.3d 1358 (Fed. Cir. 2012) ................................................... 42

*USAA v. BBVA USA,*
    No. 2:21-cv-311, Dkt. 1 (E.D. Tex. Aug. 16, 2021) ............................ 11

*USAA v. PNC Bank N.A.,*
    No. 2:20-cv-00319-JRG, Dkt. 1 (E.D. Tex. Sept. 30, 2020) ................... 10

*USAA v. Truist Bank v. USAA,*
    No. 2:22-cv-291, Dkt. 1 (E.D. Tex. July 7, 2022) .............................. 11

*USAA v. Wells Fargo Bank,*
    No. 2:18-cv-00245-JRG .............................................................. 8, 9

*Vita-Mix Corp. v. Basic Holding, Inc.,*
    581 F.3d 1317 (Fed. Cir. 2009) ................................................... 34

*Williamson v. Tucker,*
    645 F.2d 404 (5th Cir. 1981) ...................................................... 17

v

## Statutes

28 U.S.C. § 1291 ........................................................................................5

28 U.S.C. § 1404(a) ..................................................................................12

35 U.S.C. § 271 .......................................................................................34

35 U.S.C. § 271(b) ...................................................................................22

## Rules

Fed. R. Civ. P. 12(b)(1) ...........................................................................12

Fed. R. Civ. P. 24(a) ................................................................................57

Fed. R. Civ. P. 24(b) ................................................................................57

Fed. R. Civ. P. 45 ............................................................................9, 10, 11

## Other Authorities

7C Wright & Miller, Fed. Prac. & Proc. Civ. § 1918 (3d ed.) ................................57

10B Wright & Miller, Fed. Prac. & Proc. Civ. § 2751 (4th ed.) ............................52

## STATEMENT OF RELATED CASES

In accordance with Federal Circuit Rule 47.5, counsel for Mitek Systems, Inc. states that the same civil action was previously appealed in *Mitek Systems, Inc. v. United Services Automobile Association*, No. 2021-1989, before Justices Dyk, Taranto, and Cunningham.  34 F.4th 1334 (Fed. Cir. May 20, 2022).  Counsel for Mitek Systems, Inc. is not aware of any case pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal.

## PRELIMINARY STATEMENT

This case is back before the Court after being remanded for a "finer parsing of the issues and more particularized determinations" regarding Mitek Systems, Inc.'s ("Mitek") standing to bring this declaratory judgment action. Despite this Court's conclusion in the prior appeal that the allegations in Mitek's complaint are sufficient to show an actual infringement controversy between United Services Automobile Association ("USAA") and Mitek's customers who use Mitek's MiSnap™ ("MiSnap") software, the district court once again dismissed Mitek's action for declaratory judgment of noninfringement regarding the very same software for lack of standing. In doing so, the district court made numerous factual and legal errors. The district court incorrectly determined that USAA properly mounted a factual challenge, improperly attempted to resolve the ultimate merits of any perceived infringement or indemnity liability claim, and failed to appreciate the capability of MiSnap and its central role in USAA's repeated infringement allegations against Mitek's customers. The district court also improperly examined Mitek's purported subjective belief when it should have applied an objective "reasonable potential" standard under the totality of the circumstances. Further, the district court imposed a now-discarded heightened standard requiring express and direct threats of infringement from the patentee. Viewed under the correct standard, Mitek has multiple, independent bases for declaratory judgment standing.

1

It is well-settled patent law that for software systems to infringe system and computer-readable medium claims, it is the programmed capability of the accused software that is relevant.  The district court, however, erred when it focused on the actual use of Mitek's MiSnap software by Mitek's customers, which is more appropriate for method claims not at issue here.  The district court also mistakenly presumed that Mitek would not be able to show how its customers actually implemented MiSnap in their banking applications.  But this showing is unnecessary because it is undisputed that Mitek's many customers use MiSnap and their mobile devices to transmit check images for deposit—a use case that falls squarely within USAA's broad infringement allegations.  Mitek, the developer of the MiSnap software, has all the evidence it needs to vindicate its software against USAA's spurious claims of infringement and finally put an end to USAA's harassment of Mitek's customers.

As articulated by this Court in its earlier decision, the proper standard to establish standing for this declaratory judgment action is whether there is a reasonable potential for infringement claims or for indemnification liability under a totality of the circumstances.  Applying the proper standard, Mitek has shown much more than a reasonable potential that USAA could bring infringement claims against Mitek based on the uncontroverted evidence relating to the purpose and testing of MiSnap and USAA's own trial infringement demonstratives in both the Wells Fargo

and PNC suits that evince the centrality of MiSnap to USAA's infringement allegations. Mitek has also shown a reasonable potential for indemnification liability through its submission of numerous indemnity demands and the underlying indemnity agreements; the district court's attempt to resolve the ultimate merits of these otherwise colorable indemnification demands is inappropriate at the motion to dismiss stage and cannot be used to deprive Mitek of declaratory judgment standing.

The district court also adopted an impermissibly narrow view of declaratory judgment standing and committed several legal and factual errors described below that further underscore the need for reversal.

*For direct infringement*, the district court improperly required harm as an element of infringement, incorrectly found the confidentiality of Mitek's testing to undermine the reasonable potential for direct infringement claims, and gave undue weight to USAA's perceived preference for litigation against Mitek's customers.

*For induced infringement*, the district court improperly required USAA to have accused MiSnap for every claim element, refused to examine the materiality of certain claim limitations over others, and erred in requiring specific intent for each claim element.

*For contributory infringement*, the district court conflated one possible noninfringing use with a "substantial" noninfringing use, failed to analyze the

3

materiality of MiSnap to USAA's infringement allegations, and incorrectly faulted Mitek for not providing evidence of infringing uses from later-filed cases.

*And for indemnification liability*, the district court incorrectly deemed the existence of alleged carve-out provisions in the indemnification agreements to be fatal, unduly relied on Mitek's subjective belief articulated in one statement regarding patents not at issue here, and erroneously concluded there was no reasonable potential for indemnification liability with respect to Truist at the time of filing this action because Truist had not yet been sued. Applying the proper standard, Mitek has shown a reasonable potential for claims of direct and indirect infringement as well as indemnification liability under a totality of the circumstances.

The district court also abused its discretion by declining to accept jurisdiction. Mitek's declaratory judgment action furthers multiple, legitimate purposes of the Declaratory Judgment Act ("DJA"), such as alleviating the expense and uncertainty of repeated, serial litigation and the delayed adjudication of infringement claims involving Mitek's software. By the same token, the district court failed to identify any requisite "well-founded reasons" to decline jurisdiction in view of the legitimate objectives of the DJA furthered by Mitek's action. The district court's complaints regarding unwieldiness and third-party evidence are illusory because Mitek has all the evidence it needs to establish its software cannot infringe the Patents-in-Suit

under any possible use case or customization. Nor did the district court explain under the correct standard why intervention is a more effective or efficient solution.

For all these reasons, the district court's dismissal of Mitek's declaratory judgment action should be reversed.

## JURISDICTIONAL STATEMENT

The district court entered final judgment on February 23, 2023. Appx5-66. Mitek timely appealed on March 23, 2023. Appx2597-2599. Because this is an appeal from the final decision of a United States District Court, this Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.     Whether the district court committed legal error by failing to give proper weight to the capabilities of Mitek's MiSnap software when evaluating whether there was a reasonable potential for infringement claims or indemnification liability.

2.     Whether the district court committed legal error by applying different standards than a reasonable potential under a totality of the circumstances in assessing Mitek's declaratory judgment standing.

3.     Whether, under a totality of the circumstances, Mitek possesses declaratory judgment standing based on a reasonable potential for direct and indirect infringement claims in view of the central nature of MiSnap to USAA's infringement

allegations, Mitek's own testing of its software, and Mitek's provision of documentation and instructions to alleged direct infringers regarding how to configure and use MiSnap.

4.      Whether, under a totality of the circumstances, Mitek possesses declaratory judgment standing based on the receipt of numerous colorable indemnification demands in response to USAA's litigation campaign.

5.      Whether the district court abused its discretion by declining declaratory judgment jurisdiction.

## STATEMENT OF THE CASE

### A.      Mitek's Technology & Business

Plaintiff-Appellant Mitek is a Delaware corporation with its principal place of business in San Diego, California.  Appx81.  Mitek innovates mobile-imaging software solutions that use mobile phones for check deposit, bill payment, and identity verification, and launched its remote deposit product for mobile phones, Mobile Deposit®, in January 2008.  Appx87.  Since then, Mitek has continued to develop its remote check deposit solution, and currently licenses MiSnap, a patented mobile-capture software development kit, to financial institutions for incorporation into their mobile banking applications.  Appx88.  Mitek's technology is covered by more than 50 United States patents issued to Mitek.  Appx546.

More than 6,400 financial institutions have purchased a license to Mitek's mobile deposit technology, including 99 of the top 100 United States banks. *Id.* Mitek licenses its mobile deposit technology either through third-party financial services solutions providers or directly to banks. Appx547-548.

## B.    USAA & Its Patents

Defendant USAA is a Texas reciprocal inter-insurance exchange and unincorporated association with its principal place of business in San Antonio, Texas. Appx81.

USAA owns the rights to four patents relevant here: United States Patent Nos. 8,699,779 ("the '779 Patent"); 9,336,517 ("the '517 Patent"); 9,818,090 ("the '090 Patent"); and 8,977,571 ("the '571 Patent") (collectively, "the Patents-in-Suit"). Appx87. The Patents-in-Suit are generally directed toward "System[s] and Method[s] for Alignment" or "Image and Criterion Monitoring" of a "Check During Mobile Deposit." *Id.*; Appx184-305.

Based on these patents, USAA asserts that *it*—not Mitek—"invented the technology now known as 'mobile remote deposit capture'" and "was the first bank to offer its customers the ability to deposit checks through a smartphone application." Appx314. Mitek fervently disagrees.

7

In mid-2009, USAA launched a mobile check deposit product called "Deposit@Home®," which competes with Mitek's Mobile Deposit® offerings. Appx87-88.

## C.     USAA's Patent Enforcement Campaign

### 1.     Demand Letter Campaign

Beginning in early 2017, USAA launched an aggressive patent licensing and enforcement campaign asserting the Patents-in-Suit, sending more than 1,000 patent licensing demand letters to financial institutions across the United States.  Appx81-82.  The majority of the targets of USAA's campaign are Mitek's customers, to which Mitek currently licenses MiSnap.  Appx82.  In Mitek's prior appeal, this Court "concluded that the allegations in Mitek's complaint concerning USAA's letter campaign and the attached example letter, viewed in light of the Wells Fargo litigation, are sufficient to show a controversy between USAA and Mitek's customers who received letters." *Mitek Sys., Inc. v. United Servs. Automobile Assoc.* ("*Mitek I*"), 34 F.4th 1335, 1345 (Fed. Cir. 2022).

As a direct result of USAA's enforcement campaign, Mitek has received, and continues to receive, demands for indemnification from its customers.  Appx83-84.

### 2.     Wells Fargo Litigation

In June 2018, USAA sued Wells Fargo Bank ("Wells Fargo") for infringement of the Patents-in-Suit in the Eastern District of Texas. *USAA v. Wells*

*Fargo Bank*, No. 2:18-cv-00245-JRG (the "Wells Fargo litigation"). Appx135-183. The case was assigned to the Chief Judge Rodney Gilstrap.

USAA's complaint in the Wells Fargo litigation directly referenced Mitek's technology, including mentioning MiSnap by name, as part of USAA's infringement allegations. Appx82-83. USAA's complaint also implicitly accused Mitek of both inducement and contributory infringement because it alleged that Wells Fargo's incorporation of MiSnap into its mobile banking application infringed the Patents-in-Suit. Appx83. USAA served a Fed. R. Civ. P. 45 subpoena on Mitek, and over Mitek's objections, obtained documents, source code, and testimony from Mitek regarding the operation of MiSnap. Appx685-706.

USAA's trial presentation in the Wells Fargo litigation made clear how prominently Mitek's technology is featured in USAA's infringement case. Appx1727-1937. Nearly every single direct- and cross-examination conducted by USAA discussed Mitek's technology, and USAA repeatedly mentioned Mitek in its closing argument. Appx554-680. USAA's direct examination of its infringement expert is the most striking example: through its expert, USAA asserted that Wells Fargo "worked in collaboration with Mitek on [its] app," that Mitek's software is used to practice the key "monitor" and "capture" limitations in USAA's patents, that Mitek's customer-facing documentation supported infringement, and that the

9

compelled testimony of Mitek's witnesses supported infringement.  Appx567-568; Appx739; Appx756; Appx763-779; Appx781.

USAA received a favorable jury verdict in the Wells Fargo litigation. Appx820-822.  Following the jury's verdict and after Mitek filed its complaint for declaratory judgment of non-infringement, USAA and Wells Fargo settled all litigation between them related to the Patents-in-Suit.  Appx1019.

### 3.    PNC Bank Litigation

With the Wells Fargo litigation settled, USAA next targeted another Mitek customer, PNC Bank, National Association ("PNC"), by suing PNC for alleged infringement of the '571 and '779 Patents in the Eastern District of Texas in September of 2020. *USAA v. PNC Bank N.A.*, No. 2:20-cv-00319-JRG, Dkt. 1 (E.D. Tex. Sept. 30, 2020); Appx1019-1020.  Unsurprisingly, USAA served another Rule 45 subpoena on Mitek in connection with this new case seeking Mitek source code and other infringement evidence related to MiSnap.  Appx1023-1037.  PNC and its third-party integrators, NCR Corporation ("NCR") and Finastra, sent several indemnity demands to Mitek arising from USAA's PNC lawsuit.  Appx2011-2172; Appx2176-2179; Appx2600-2601; Appx2176-2177; Appx2178-2179.

At trial in the PNC litigation, USAA again relied on MiSnap source code to support its infringement theory regarding key claim limitations of the '571 Patent, including the "monitor" and "capture" limitations.    Appx1888-1932.    USAA

received a favorable jury verdict in the PNC litigation, which is currently being appealed. *See PNC*, Dkt. 710; Appx 2545.

### 4.    BBVA Bank Litigation

On August 16, 2021, USAA next sued BBVA USA ("BBVA"), another Mitek customer. *USAA v. BBVA USA*, No. 2:21-cv-311, Dkt. 1 (E.D. Tex. Aug. 16, 2021). There, USAA asserted the '571 and '779 Patents (among others) and also served a Rule 45 subpoena on Mitek seeking infringement evidence relating to MiSnap. *Id.* During the pendency of the case, BBVA itself sent an indemnity demand to Mitek but was eventually acquired by PNC. Appx19; Appx2173-2175.

### 5.    Truist Bank Litigation

USAA filed a patent infringement action against another Mitek customer, Truist Bank ("Truist"), on July 29, 2022 in the Eastern District of Texas. *USAA v. Truist Bank*, No. 2:22-cv-291, Dkt. 1 (E.D. Tex. July 7, 2022). USAA accused Truist of infringing the '090 Patent and other patents and, similar to the prior three lawsuits, also served a Rule 45 subpoena on Mitek requesting infringement evidence relating to MiSnap. *Id..* The case is still ongoing but Truist and its third-party integrator, NCR, have already sent indemnity demands to Mitek. Appx2237-2279; Appx2428-2444.

### D.    The Proceedings Below

After witnessing USAA's infringement presentation at the Wells Fargo trial and the central role MiSnap played, on November 1, 2019, Mitek filed a complaint

11

against USAA in the Northern District of California, seeking a declaratory judgment that Mitek does not infringe any claim of the Patents-in-Suit. Appx80-94. In light of USAA's infringement allegations, Mitek sought a declaration on behalf of itself, and all MiSnap licensees who had yet to be sued, that the use of MiSnap is non-infringing. Appx80-81. USAA moved to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction, or alternatively, to transfer the case to the Eastern District of Texas pursuant to 28 U.S.C. § 1404(a). Appx306-329.

This case was transferred to the Eastern District of Texas, and assigned to Chief Judge Gilstrap. *Mitek Sys., Inc. v. USAA*, No. 19-CV-07223-EMC, 2020 WL 1922635 (N.D. Cal. Apr. 21, 2020). On April 28, 2021, the district court entered an order dismissing Mitek's complaint for lack of subject matter jurisdiction due to lack of standing, and alternatively, that even if standing existed it would exercise its discretion to decline jurisdiction. *Mitek Systems, Inc. v. USAA*, No. 2:20-cv-00115, Dkt. 69 (E.D. Tex. Apr. 28, 2021).

On May 27, 2021, Mitek appealed the decision to this Court. *Mitek Systems, Inc. v. USAA*, No. 2:20-cv-00115, Dkt. 70 (E.D. Tex. May 27, 2021). On May 20, 2022, this Court entered an order vacating the district court's dismissal order for lack of subject matter jurisdiction and remanding the case to the district court. Appx5-66. In particular, this Court explained that the "issues raised by Mitek's asserted

12

bases of jurisdiction…require finer parsing of the issues and more particularized determinations than we have before us, both from the parties and from the district court." *Mitek I*, 34 F.4th at 1342.

After this Court remanded the case, the district court requested that the parties brief twelve issues arising from *Mitek I*. Appx1078-1080. The parties engaged in two rounds of briefing. Appx1081-2444. On February 23, 2023, the district court entered an order dismissing the case for a lack of subject matter jurisdiction and exercising its discretion to decline jurisdiction even if there were subject matter jurisdiction. Appx5-66. Mitek timely filed a Notice of Appeal on March 23, 2023. Appx1074.

## SUMMARY OF ARGUMENT

1.    The district court incorrectly determined that USAA properly mounted a factual challenge, as USAA's identified categories of disputed facts are not controverted and directed toward the sufficiency of evidence to meet the reasonable potential standard under a totality of the circumstances—a facial challenge. Any factual challenge USAA has adequately mounted is intertwined with the merits of the case and should be adjudicated by the jury after the district court accepts jurisdiction. And in relying on the parties' submitted evidence in their post-remand briefing, the district court declined to make any forfeiture determinations on such

evidence, meaning all the supplemental evidence is available for *de novo* review by this Court.

2.     The district court erred by concluding that Mitek lacks standing to bring this declaratory judgment action. The district court's analysis improperly focused on the actual operation of MiSnap by Mitek's customers rather than MiSnap's programmed capabilities. The district court also held Mitek to a higher standard— the now-discarded pre-*MedImmune* standard—as well as the improper subjective, rather than objective, standard. Finally, the district court committed several legal and factual errors in analyzing Mitek's reasonable potential for infringement and indemnification liability. Analyzing the undisputed facts and uncontroverted allegations in this case under the correct standard, Mitek has established that it has standing based on both the reasonable potential for infringement claims and the reasonable potential for indemnification liability.

3.     The district court's alternative decision—to decline jurisdiction even if it existed—was an abuse of discretion. The district court improperly faulted Mitek for not intervening in the Wells Fargo litigation, failed to adequately consider the objectives of the DJA that would be served by Mitek's declaratory judgment action, and ignored compelling reasons why intervention is a less effective and less efficient remedy than bringing this declaratory judgment action.

## STANDARD OF REVIEW

Whether the district court had subject matter jurisdiction is a question this Court reviews *de novo. Microsoft Corp. v. DataTern, Inc.*, 755 F.3d 899, 903 (Fed. Cir. 2014). Questions of law and the interpretation of case law are reviewed *de novo. Alcon Research Ltd. v. Barr Labs., Inc.*, 745 F.3d 1180, 1190 (Fed. Cir. 2014). The question of whether the district court applied the proper legal test is a question of law and is reviewed *de novo. Id.* at 1190-92. The district court's decision to decline jurisdiction is reviewed for an abuse of discretion. *Micron Tech., Inc. v. Mosaid Techs., Inc.*, 518 F.3d 897, 905 (Fed. Cir. 2008).

## ARGUMENT

## I.    THE DISTRICT COURT COMMITTED LEGAL ERROR IN DETERMINING THAT USAA MOUNTED A FACTUAL ATTACK ON MITEK'S REASONABLE POTENTIAL FOR INFRINGEMENT AND INDEMNIFICATION LIABILITY CLAIMS

The district court incorrectly determined that USAA mounted factual attacks to Mitek's reasonable potential for infringement and indemnification liability claims. The categories of "disputed" facts identified by USAA are either undisputed or intertwined with the underlying merits of this declaratory judgment action. Even if a factual attack was properly mounted, the district court made clear that no forfeiture applies to evidence submitted during the post-remand briefing.

This Court previously determined in *Mitek I*:

[T]he district court was unclear in identifying whether it was treating the Rule 12(b)(1) motion as a facial challenge or as a factual challenge,

15

in whole or in part, and the parties themselves have been unclear about this. We hold that further proceedings are needed in order for the case-or-controversy determination to be made and that, subject to forfeiture determinations we leave initially to the district court, the proceedings should include additional fact-finding proceedings.

34 F.4th at 1342. In its subsequent order, the district court expressly determined that "USAA mounted a factual attack both as to Mitek's reasonable apprehension of a lawsuit by USAA and as to Mitek's reasonable apprehension that it would be subject to an indemnification obligation based on USAA's lawsuits brought against third parties." Appx38-39. In so ruling, the district court apparently credited USAA's identification of "various 'categories' of disputed facts" at the hearing. Appx38-39. But none of these "categories" include facts that are actually in dispute. For example, for the first three categories—"whether Mitek actually apprehended suit" in 2019, "Mitek's state of mind during the intervening time period," and "which aspects of [MiSnap] are used by customers" as opposed to "customizable" or "optional" aspects—Mitek does not dispute the underlying "evidence" cited by USAA but rather disputes its relevance and sufficiency as to Mitek's standing in this action. Appx38-39; Appx1629-1632; Appx2321-2323. As for the fourth category, whether Mitek had received indemnity demands at the time this action was filed, Mitek has submitted uncontroverted evidence of at least one indemnity demand stemming from USAA's letter-writing campaign prior to Mitek's filing of this action. Appx38-39; Appx1613-1614. As a result, USAA's motion to dismiss falls

squarely in the second category articulated by *Choice Inc. v. Texas v. Greenstein*, 691 F.3d 710, 714 (5th Cir. 2012)—"(2) the complaint supplemented by undisputed facts evidenced in the record"—and should have been treated as a facial challenge that is reviewed *de novo* by this Court.[1]

Moreover, both of the factual attacks found by the district court—"Mitek's reasonable apprehension of a lawsuit by USAA" and "Mitek's reasonable apprehension that it would be subject to an indemnification obligation based on USAA's lawsuits brought against third parties" (Appx38-39)—are improper, indirect attacks on the underlying merits of the case. *See, e.g., Montez v. Dep't of Navy*, 392 F.3d 147, 150 (5th Cir. 2004) ("[W]here issues of fact are central both to subject matter jurisdiction and the claim on the merits…the trial court must assume jurisdiction and proceed to the merits"); *Williamson v. Tucker*, 645 F.2d 404, 415 (5th Cir. 1981) (noting that the Supreme Court has held that the merits of a case should not be challenged indirectly through a challenge to a district court's jurisdiction).  The district court committed error when it resolved the underlying

---

[1]  Even if USAA had properly mounted a factual challenge, the district court's findings are still clearly erroneous as discussed below. *In re S. Recycling, L.L.C.*, 982 F.3d 374, 379 (Fed. Cir. 2020) ("Where…the district court has expressly relied on its resolution of disputed jurisdictional facts, 'those findings are reviewed for clear error.'") (citation omitted); *see infra*, Argument, §§IV.A-D.

merits of the case—whether MiSnap infringes the Patents-in-Suit—without first accepting jurisdiction.

Finally, it is clear from the district court's order that it did not make any forfeiture determination for the evidence submitted by the parties in their post-remand briefing. Indeed, the district court expressly relied on the parties' post-remand evidence in its order. Appx38 n.20 (citing to Mitek's IPR filings, Mitek's SEC statement, and deposition and trial transcripts from the Wells Fargo and/or PNC cases); *see also, e.g.*, Appx48-55 (citing to Mitek's indemnification agreements). Therefore, the evidence the parties submitted during their post-remand briefing, including the declaration from Fred Fernandez ("Fernandez declaration"), USAA's trial demonstratives from the Wells Fargo and PNC trials, and the numerous indemnity demands and underlying agreements, should be considered by this Court when assessing Mitek's standing under *de novo* review.

## II. THE DISTRICT COURT COMMITTED LEGAL ERROR BY FAILING TO GIVE PROPER WEIGHT TO THE CAPABILITIES OF MITEK'S MISNAP SOFTWARE AND INDIRECTLY ATTACKING THE MERITS OF THE CASE

The district court gave undue weight to the customizability of MiSnap by Mitek's customers. Appx40; Appx42-43; Appx56; Appx61; Appx64. But software by its very nature is customizable, and if this were the correct standard, then no software provider would ever be able to establish declaratory judgment jurisdiction. Plus, USAA alleges that Mitek's customers—including Wells Fargo, PNC, BBVA,

and now Truist—infringe some or all of the Patents-in-Suit despite their specific customizations, rendering customization immaterial to USAA's infringement allegations. Appx135-183; Appx2015-2048; *BBVA*, No. 2:21-cv-311-JRG, Dkt. 1; *Truist*, No. 2:22-cv-291, Dkt. 1. By focusing on customizability, the district court ignored the programmed capabilities of MiSnap that are always present in the software, and this was legal error.

It is axiomatic that in assessing infringement claims, "the language of the claims, as well as the nature of the accused product, dictates whether an infringement has occurred." *Fantasy Sports Props. v. Sportsline.com, Inc.,* 287 F.3d 1108, 1118 (Fed. Cir. 2002). In *Mitek I*, this Court expressly recognized this tenet, instructing the district court on remand to analyze the "patent claims at issue and the alleged facts concerning Mitek and its customers in light of those elements." 34 F.4th at 1343. Despite these clear instructions, the district court failed to give proper weight to the programmed capabilities of the MiSnap software in light of the type of patent claims at issue.

The Patents-in-Suit all contain system or computer-readable medium (CRM) claims.[2] Appx1239-1359. For such claims, "an accused device may be found to

---

[2] Only one Patent-in-Suit, the '090 Patent, also includes an independent method claim. Appx1268-1269. None of the remaining Patents-in-Suit contain a method claim. Appx1299; Appx1328-1329; Appx1358-1359.

infringe if it is reasonably capable of satisfying the claim limitations, even though it may also be capable of noninfringing modes of operation." *NetFuel, Inc. v. Cisco Sys. Inc.*, 438 F. Supp. 3d 1031, 1037 (N.D. Cal. 2020) (quoting *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1204 (Fed. Cir. 2010)).  For computer and software claims in particular, this Court has recognized that such claims "typically use functional language to…define and delimit otherwise generic or interchangeable general purpose computer hardware, which can be programmed to perform an unlimited array of functions"—as a result, this Court has "frequently construed such functional language as not requiring actual performance of those operative steps for infringement purposes." *INVT SPE LLC v. Int'l Trade Comm'n*, 46 F.4th 1361, 1372-73 (Fed. Cir. 2022) (finding that this Court has "not required [software] claims to adhere to a specific grammatical form to find that the claim is drawn to capability"); *Fantasy Sports*, 287 F.3d at 1118.  As such, the "critical inquiry [is] whether the accused functionality was already contained in the underlying software such that it only had to be 'activated,' or whether the user needed to alter the code to enable the computer to use the accused functionality." *NetFuel*, 438 F. Supp. at 1038 (alteration in original); *see also Finjan*, 626 F.3d at 1205 (finding "no evidence that customers needed to modify the underlying code to unlock any software modules").

20

On remand here, rather than focusing on the programmed capabilities of MiSnap as required when assessing alleged infringement of system and CRM claims, the district court gave undue weight to the irrelevant observation that certain features of MiSnap are customizable by its users. Appx40; Appx42; Appx55; Appx57; Appx61; Appx64. For example, for direct infringement, the district court determined that "Mitek would not be able to present evidence on any of the claim elements that admittedly do not stem from the Mitek products when *the end-users would not be a party to this action*." Appx40 (emphasis added). Similarly, for indirect infringement, indemnification liability, and exercising discretion to decline jurisdiction[3], the district court erred in framing the inquiry as whether the "unadulterated MiSnap software implemented by third party banks" meets the claimed elements. Appx40; Appx42; Appx55-57; Appx61; Appx64. That is not the correct test. Since the "API and MiSnap Library remain the same for all users of MiSnap using the same version of the MiSnap SDK," *i.e.*, same versions of MiSnap

---

[3] For example, the district court made the irrelevant observation that "[i]t is undisputed that most, if not all, customers *do not use the unadulterated MiSnap software* that would be at issue in any declaratory judgment action." Appx61 (emphasis added). In declining to accept jurisdiction, the district court further erred in finding that "Mitek's lawsuit would not actually resolve the issue of whether the end-user banks infringe and therefore, whether Mitek induces or contributes to their purported infringement." Appx64.

21

have the same capabilities (Appx1644)[4], whether or how customers customize MiSnap in their banking applications is irrelevant to the "reasonable potential" inquiry.

The district court's undue focus on the customizability of MiSnap by Mitek's customers effectively required Mitek to show the ***actual operation*** of MiSnap, the very pitfall this Court previously warned against. *See Mitek I*, 34 F.4th at 1344 ("[T]he district court's primary task…will be to ascertain the ***alleged role*** of the Mitek technology in the banks' applications and the ***alleged role*** that the Mitek technology plays in infringement claims.") (emphasis added). In *Mitek I*, this Court cautioned that "the reference [to customization] does not show that, without the customer's choices, Mitek's product itself is not within the claim coverage." *Id.* at 1343 (finding that the "need for such customization does not exclude Mitek liability for inducement under 35 U.S.C. § 271(b)….[s]o too of any possibility of contributory infringement if MiSnap is not suitable for substantial non-infringing uses"). This Court has previously rejected a showing of "actual operability" for non-method software claims. *Finjan*, 626 F.3d at 1204-05 (affirming a verdict of infringement after finding that "it is undisputed that software for performing the

---

[4]   Nowhere in its opinion did the district court ever expressly refer to the Fernandez declaration that Mitek submitted, which is uncontroverted and critical to Mitek's standing.

claimed functions existed in the products when sold—in the same way that an automobile engine for propulsion exists in a car even when the care is turned off"); *see also Fantasy Sports*, 287 F.3d at 1118 (determining that software "written in such a way as to enable a user of that software to utilize the function…without having to modify that code" was sufficient for infringement of system claim).

Finally, even if the evidence USAA submitted regarding customization can be considered a factual attack on Mitek's jurisdictional allegations, as discussed above, it is essentially an improper, indirect attack on the merits of the case. *See supra*, Argument, § I. For example, the issue of whether MiSnap may be within the claim coverage of the Patents-in-Suit without significant customization by a Mitek customer goes to the very relief Mitek is seeking here, *i.e.*, a declaration that MiSnap does not infringe the Patents-in-Suit. The factfinder will need to make determinations as to which claim elements, if any, are missing from MiSnap and whether customizations are even necessary to bring software within the scope of the claim coverage. Tellingly, the district court made no attempt to explain why such an inquiry can be separated from the merits of Mitek's declaratory judgment action and could be resolved by the district court prior to accepting jurisdiction.

Because the district court failed to properly consider the capability of MiSnap based on the nature of the claims of the Patents-in-Suit, incorrectly required Mitek

23

to show actual operation of MiSnap by its users, and improperly resolved the merits of Mitek's case, this Court should reverse the district court's dismissal order below.

## III. THE DISTRICT COURT COMMITTED LEGAL ERROR IN APPLYING INCORRECT LEGAL FRAMEWORKS FOR DECLARATORY JUDGMENT STANDING

The district court also erred by effectively holding Mitek to the now-discarded pre-*MedImmune* standard and applying a subjective, rather than objective, standard when assessing declaratory judgment jurisdiction. Even under the incorrect subjective standard, Mitek has legitimate reasons to fear a lawsuit from USAA unless and until it receives a covenant not to sue or license from USAA, which USAA has expressly refused to provide. Appx2559-2560.

### A. The District Court Improperly Held Mitek To Higher Standard Than The Reasonable Potential Standard Under A Totality Of The Circumstances

In assessing Mitek's standing with respect to infringement claims, the district court placed undue weight on the fact that USAA had not made an express infringement threat against Mitek. But an express threat is no longer required to show standing under the Supreme Court's decision in *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007).

Prior to *MedImmune*, this Court required a reasonable apprehension of suit in order to establish declaratory judgment standing based on the following guidelines: "There must be both (1) an explicit threat or other action by the patentee, which

creates a reasonable apprehension on the part of the declaratory judgment plaintiff that it will face an infringement suit, and (2) present activity which could constitute infringement or concrete steps taken with the intent to conduct such activity." *Gen-Probe Inc. v. Vysis, Inc.*, 359 F.3d 1376, 1380 (Fed. Cir. 2004), *abrogated by MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007). In *MedImmune*, the Supreme Court "rejected a general requirement of a reasonable apprehension of suit." *Mitek I*, 34 F.4th at 1342 n.3.

Post-*MedImmune*, the justiciability inquiry is now "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Caraco Pharm. Lab'ys, Ltd. v. Forest Lab'ys, Inc.*, 527 F.3d 1278, 1290 (Fed. Cir. 2008); *Micron*, 518 F.3d at 902 ("[T]he now more lenient legal standard facilitates or enhances the availability of declaratory judgment jurisdiction in patent cases."). Indeed, in *Mitek I*, this Court expressly recognized the relaxing of the *MedImmune* standard, stating that "reasonable apprehension of suit" is no longer a "general requirement" but instead "one of multiple ways that a declaratory judgment plaintiff can satisfy the more general all-the-circumstances test to establish jurisdiction." 34 F.4th at 1343 n.3.

The district court incorrectly determined that Mitek had no standing for its declaratory judgment action in part because USAA had not made any express

infringement threats against Mitek.  Appx43; Appx46-47.  For example, the district court relied on the fact that "USAA does not accuse Mitek of direct infringement, and…also does not accuse Mitek of induced infringement."  Appx46-47; Appx43 (also finding that USAA "never asserted" "direct infringement [against Mitek] based on internal testing").  This Court's binding post-*MedImmune* precedent, however, confirms that express infringement accusations or threats by the patentee are no longer required for declaratory judgment standing.  *See, e.g.*, *Arkema Inc. v. Honeywell Int'l, Inc.*, 706 F.3d 1351, 1357 (Fed. Cir. 2013) ("A specific threat of infringement litigation by the patentee is not required to establish jurisdiction."); *Arris Grp., Inc. v. British Telecomms. PLC*, 639 F.3d 1368, 1379 (Fed. Cir. 2011) ("[A]n express accusation [of infringement] is unnecessary.").

The district court also misinterpreted Mitek's statement to the PTAB in support of its erroneous finding.  Appx45.  There, Mitek sent an email to the PTAB requesting a Precedential Opinion Panel review of its decision that Mitek's IPR petitions regarding two of the Patents-in-Suit (the '571 and '779 Patents) that were discretionarily denied as "unfair follow-on petitions to Wells Fargo's."  Appx2602-2604.  In supporting its ability to challenge the validity of two of the four Patents-in-Suit, Mitek merely stated that USAA "has never accused or even threatened Mitek of infringement of the challenged patents" like USAA had accused Mitek's customer, Wells Fargo, which had already challenged the validity of the Patents-in-

Suit. *Id.* In other words, Mitek was pointing out to the PTAB that USAA had never expressly accused or threatened Mitek of infringement so Mitek should be able to file its own validity challenges. The PTAB disagreed and barred Mitek's IPR challenges, leaving the instant declaratory judgment action as the only means for Mitek to vindicate its software. If anything, the PTAB's discretionary denial of Mitek's IPR petitions should ***support*** its standing here, not be used to deny it.

Since an express infringement accusation or threat by USAA against Mitek is no longer a requirement post-*MedImmune*, the district court committed error when it relied on the fact that USAA did not expressly accuse Mitek of infringing the Patents-in-Suit.

## B. The District Court Erred In Failing To Apply An Objective Standard When Determining The Reasonable Potential For Mitek's Declaratory Judgment Standing

The district court compounded its error of applying the pre-*MedImmune* standing test by also applying a subjective, rather than objective, standard in determining whether Mitek established a reasonable potential of facing infringement claims or indemnification liability. Appx48.

It is a "bedrock rule" that determining case or controversy must be based on an "objective standard." *Asia Vital Components Co. v. Asetek Danmark ("AVC")*, 837 F.3d 1249, 1253 (Fed. Cir. 2016). "[I]t is the ***reality*** of the threat of…injury that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions."

*Prasco, LLC v. Medicis Pharm. Corp.*, 537 F.3d 1329, 1338-39 (Fed. Cir. 2008) (emphasis in original). Specifically, the test for "reasonable potential" for declaratory judgment standing is based on the "objective words and actions of the patentee[,]" which are "controlling." *Hewlett-Packard Co. v. Acceleron LLC*, 587 F.3d 1358, 1363 (Fed. Cir. 2009). This objective standard "focuses on whether the ***patentee*** manifested the intention to enforce the patent, and would be reasonably expected to enforce the patent against the declaratory plaintiff" (*Capo, Inc. v. Dioptics Med. Prod., Inc.*, 387 F.3d 1352, 1355 (Fed. Cir. 2004) (emphasis added)) or "what an ***objective supplier*** would infer based upon the underlying customer suit" (*Microsoft Corp. v. GeoTag, Inc.*, No. CV 11-175-RGA, 2014 WL 4312167, at *3 (D. Del. Aug. 29, 2014) (emphasis added), *aff'd on other grounds*, 817 F.3d 1305 (Fed. Cir. 2016)).

For Mitek's standing related to potential infringement claims, the district court improperly relied on what it perceived to be Mitek's subjective intent in filing its declaratory judgment action. For example, the district court surmised that Mitek is attempting to "thwart USAA's efforts to enforce its patents" and that "derailing USAA's litigation strategy is the real motivation behind Mitek's declaratory judgment action." Appx37 n.19; Appx40 n.21 (stating that it is "not persuaded that Mitek's actions are driven by a reasonable apprehension of suit from USAA, or any reasonable fear of indemnity demands by the banks"). Although the district court

points to Mitek's lack of intervention in the first Wells Fargo lawsuit as support for

Mitek's alleged lack of standing (Appx47-48), this Court already determined that it

did "not see how the decision not to intervene in the first suit on the patents counts

materially against a finding of a reasonable apprehension of suit." *Mitek I*, 34 F.4th

at 1343.  Even if the district court were correct—it is not—"it is the ***reality*** of the

threat of…injury that is relevant to the standing inquiry, not the plaintiff's subjective

apprehensions." *Prasco*, 537 F.3d at 1338-39 (emphasis in original).  The district

court's lack of standing finding based on its perception of Mitek's subjective beliefs

fails to apply the requisite, objective standard and therefore is in error.

For Mitek's standing related to potential indemnification liability, the district

court relied exclusively on Mitek's subjective belief stated in its 10-Q filing for the

period ending in December 31, 2020.  Appx1218.  There, Mitek stated that it "does

not believe it is obligated to indemnify NCR corporation or end-users of NCR

Corporation resulting from the patent infringement allegations by USAA."[5]

Appx1218.  The district court summarily found "this statement to the SEC to be, in

effect, a disclaimer of any true apprehension of suit, which statement Mitek cannot

now walk back."  Appx60.  The district court, however, improperly conflated

---

[5]   Mitek's statement to the SEC that the district court relies on was based on
the indemnity requests it received for patents ***not asserted*** in Mitek's declaratory
judgment action, making the statement irrelevant here.  Appx1218.

29

Mitek's statement to the SEC evincing its subjective, but reasonable, position with

what an *objective* supplier would reasonably believe based on USAA's *objective*

conduct.  Appx38; Appx48; Appx57-58.

Indeed, if subjective confidence in one's position was the standard, it would

swallow the kind of "uncertainty" recognized by the DJA.  For example, this Court

previously stated:

> The proper inquiry should not have been whether a party is "certain"
> that its legal position and defense theories are sound, because litigation
> is rarely "certain," even if one is confident of one's position. … If
> "certainty" in one's position were to preclude invocation of the
> [Declaratory Judgment] Act, then the Act would fail to achieve its
> purpose of promoting resolution of disputes, as parties threatened with
> unjustified litigation, even if they are "certain" that they will prevail,
> must incur other uncertainties.

*Elecs. for Imaging, Inc. v. Coyle*, 394 F.3d 1341, 1346–47 (Fed. Cir. 2005).  In *Elecs.*

*for Imaging*, the district court initially dismissed a declaratory judgment action in

part because EFI had "assured itself that [the patentee's] claims of patent

infringement were, in EFI view, meritless, EFI had no ultimate uncertainty regarding

its liability to [the patentee]."  394 F.3d at 1346.  This Court disagreed, finding that

"'[u]ncertainty' in the context of the Act refers to the reasonable apprehension

created by a patentee's threats and the looming specter of litigation that results from

those threats."  *Id.* at 1347.  This Court further explained:

> When a party is threatened as EFI has been, there are other
> uncertainties, including whether there will be legal proceedings at all,
> not just whether one will prevail.  There is the uncertainty whether one

> will have to incur the expense and inconvenience of litigation, and how it will affect the threatened party's customers, suppliers, and shareholders.

*Id.* at 1346. Like in *Elecs. for Imaging*, the district court here failed to apply the objective standard and therefore erred in assigning any weight to Mitek's subjective belief regarding its potential to face infringement claims and indemnification liability.

And even under the incorrect subjective standard, the record evidence shows that Mitek still has legitimate reasons to fear that USAA may assert the Patents-in-Suit against Mitek based on its MiSnap software. USAA has shown that it has to rely on Mitek source code, documents, and witness testimony to prove that Mitek's customers allegedly infringe (Appx135-183; Appx2015-2048; *BBVA*, No. 2:21-cv-311-JRG, Dkt. 1; *Truist*, No. 2:22-cv-291, Dkt. 1), yet USAA continues to refuse to provide a covenant not to sue or a license to Mitek. Appx58 (finding that "USAA [has] not affirmatively grant[ed] Mitek an express covenant not to sue"). Indeed, USAA counsel's statements at the February 14, 2023 dismissal hearing makes clear that USAA is reserving its right to sue Mitek at any time:

> [DISTRICT COURT]: Ms. Glasser, you're representing USAA and it's the one that's brought these actions against the banks. Why haven't you given Mitek a covenant not to sue and we'll be done with this?
>
> MS. GLASSER: I just don't see any room for agreement with the parties on this. Fundamentally, we don't know everything they're doing. We don't know everything their customers are doing. … We have no basis to know that one way or the other. All we can do is

> proceed, and in good faith when we determine that we have a competitor, as we have done three times, to bring a suit against. … So I think the idea that the parties would never be able to have a meeting of the minds about which elements Mitek doesn't do, which ones they do, which ones they might, all of that, I think that's something – I'm always happy to talk with opposing counsel, and I'm sure our client is as well, but I think ultimately there is almost zero potential for some sort of meeting of the minds in a recitation of which elements are yes, which are no, and which are maybe.

Appx2559-2560.  These statements by USAA's counsel are remarkably similar to

the patentee's position in *Arris*:

> When questioned as to why, given its professed position on Arris' infringement liability, BT did not simply grant Arris a covenant not to sue, BT replied: "Why should BT give them a covenant not to sue, when for all BT knows maybe they are out there inducing infringement unbeknownst to BT? ... BT doesn't need to forfeit a potential future right ... to dispel [a suit for declaratory judgment].

639 F.3d at 1381.  As a result, this Court determined in *Arris* that the patentee's

"refusal to grant [the supplier] a covenant not to sue provides a level of additional

support for our finding that an actual controversy exists." *Id.*  If USAA actually has

no intention of suing Mitek for infringement of the Patents-in-Suit and wants to

avoid litigation against Mitek on those patents, then USAA should be willing to

provide Mitek with a covenant not to sue or a license to the Patents-in-Suit.  USAA's

refusal to do so has left Mitek with no choice but to file its declaratory judgment

action to clear the air as to MiSnap once and for all.

## IV.  MITEK HAS ESTABLISHED MULTIPLE, INDEPENDENT BASES FOR DECLARATORY JUDGMENT STANDING

The district court committed other factual and legal errors that require reversal of its dismissal order finding a lack of standing.  Assessed under the proper rubric and the expanded record after remand, Mitek has established multiple, independent bases for standing, including a reasonable potential for direct infringement claims, a reasonable potential for indirect infringement claims, and a reasonable potential for indemnification liability.

### A.    Mitek Has Established A Reasonable Potential Of Direct Infringement Claims

The district court erred in at least three ways in concluding that Mitek had no standing for its direct infringement claim, as it:  (1) improperly required harm as an element of infringement; (2) incorrectly found the confidentiality of Mitek's testing to be relevant; and (3) gave too much credit to USAA's perceived preference for litigation against Mitek's customers.  Under the expanded record on remand, Mitek has established much more than a "reasonable potential" that USAA could bring claims for direct infringement directly against Mitek at least for Mitek's own MiSnap-related design, testing, and verification services that would fall within USAA's broad infringement allegations.

*First*, the district court determined that "[a]s to Mitek's claim of direct infringement liability by way of its own internal testing, the Court does not see how

33

any such testing, even if it might meet all elements of all asserted claims, ***causes any harm to USAA***." Appx43 (emphasis added). But harm is not an element of infringement in 35 U.S.C. § 271. Further, USAA does not dispute the uncontroverted allegations related to Mitek's own MiSnap testing (Appx1645, ¶ 10), which is a cognizable basis to establishing infringement under 35 U.S.C. § 271. *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1326 (Fed. Cir. 2009) (crediting testimony of accused infringer's employee that his testing of the accused products "under certain circumstances" would infringe).

Looking at representative claim 1 of the '571 patent as an example, MiSnap constitutes "computer-readable instructions" that USAA alleged (and still alleges) performs the "monitor" and "capture" limitations of the claim. Appx273. The only claim element that USAA cited to that was allegedly performed by a non-Mitek mobile phone or bank software was the final "provide" limitation that just requires the image of the check to be transmitted by the mobile device. Appx1855-1859. Because it is uncontroverted based on the expanded record that Mitek tests the "complete mobile deposit system," including monitoring and acquiring check images using MiSnap and transmitting the images to "mobile deposit servers" using the phones' built-in communications circuitry, the reasonable potential for direct infringement claims is manifest. Appx1643-1646.

*Second*, the district court's determination that the confidentiality of Mitek's testing weighed against Mitek's standing is wrong as a matter of law. During post-remand briefing, Mitek submitted under seal a declaration from Mitek employee, Mr. Fred Fernandez, that provided information related to Mitek's testing of MiSnap. Appx1645 ¶ 10. These testing facts are uncontroverted, and USAA did not dispute any of them. The district court, however, appeared to rely on the confidential nature of Mitek's testing in finding Mitek's lack of standing for direct infringement claim. Appx42. But "[i]t is *irrelevant* whether [USAA] had adequately investigated the basis of its threats" as long as the objective standard is met, as discussed above. *Capo*, 387 F.3d at 1356 (emphasis added); *see supra*, Argument, § III.B. *AVC* confirms the district court's error here, as this Court further explained that the "question of jurisdiction *does not turn on [the patentee's] knowledge of the specific [supplier] products*…instead, the question is whether, under all the circumstances, [the patentee's] actions can be reasonably inferring as demonstrating intent to enforce a patent." 837 F.3d at 1254 (emphasis added). Thus, the district court should not have given any weight to USAA's lack of knowledge of Mitek's internal testing or the level of confidentiality that Mitek designated such information.[6]

---

[6] USAA's argument that Mitek's testing is somehow secret, unknown to everyone at USAA (except its outside counsel), and therefore could not have formed the basis for a direct infringement claim, is not credible. Appx2284-2285. Common sense dictates that software companies test all facets of their software. Even Mitek's public webpage advertises "hosted and on-premises deployment options," meaning

*Third*, the district court also erred by finding USAA's perceived litigation strategy of only suing Mitek's customers as purportedly undermining the reasonable potential for a direct infringement claim.  Appx40 n.21; Appx48-49; Appx58; Appx62 n.29; Appx65-66.  But there is nothing stopping USAA from changing course at any moment and suing Mitek.  Despite USAA's strategic choices, the "uncertainty" created by USAA's "objective words and actions" in suing Mitek's customers still exists to this day and there is nothing preventing USAA from suing Mitek tomorrow.[7]  These additional errors committed by the district court in analyzing the reasonable potential of direct infringement claims further weigh in favor of reversal.

Applying the correct standard of reasonable potential of infringement claims under a totality of the circumstances, USAA could have sued Mitek as the supplier of MiSnap just like it sued Mitek's customers.  *See GeoTag*, 2014 WL 4312167, at *2 (determining no "legal impediment to allowing a declaratory judgment" in such a scenario).  Mitek submitted uncontroverted allegations in the Fernandez

---

that Mitek can and does host the back-end Mobile Deposit server that receives the check image.  *See* "Mobile Deposit," *available at* https://www.miteksystems.com/mobile-deposit (last accessed June 13, 2023).

[7]  The district court is also incorrect that any "case or controversy did not continue to exist after the settlement with Wells Fargo." Appx48-49.  USAA's decision to continue to assert a subset of the Patents-in-Suit against Mitek's customers in subsequent lawsuits actually heightens the "uncertainty" meant to be addressed by the DJA. *Id.*; *see supra*, Argument, § III.B.

declaration that it tests and installs MiSnap "on real-world phones primarily in San Diego" "as part of its development and testing of its software," brings it within the claim coverage of the Patents-in-Suit.   Appx1644-1645, ¶¶ 5-10.   As a result, USAA's "objective words and actions" in suing Mitek's customers on at least a subset of the Patents-in-Suit give rise to at least a reasonable potential of a direct infringement claim against Mitek under a totality of the circumstances.[8]

**B.     Mitek Has Established A Reasonable Potential Of Induced Infringement Claims**

The district court committed at least three additional legal errors in finding that Mitek had no standing for an induced infringement claim because it:   (1) improperly required that USAA accuse MiSnap of infringing every element of every asserted claim; (2) refused to examine the materiality of MiSnap to the Patents-in-Suit's key claim limitations; and (3) erred in requiring specific intent for each claim element.   Because Mitek has established in the expanded record below (Appx1617-1622; Appx2223-2224; Appx2298-2300; Appx 2345-2348) that there is a reasonable potential for induced infringement claims against Mitek, this Court should find that

---

[8] The district court's reliance on *DataTern* for this point (Appx48-49) is misguided, because Mitek is not merely pointing out USAA's "litigiousness" against Mitek's customers—which has not abated—and contrary to *DataTern*, Mitek has provided record evidence that it "might somehow be next." *DataTern*, 755 F.3d at 906-07.

Mitek has standing on this alternative basis and reverse the district court's dismissal order.

*First*, the district court found no declaratory judgment standing for a potential induced infringement claim because "USAA has ***never*** alleged that MiSnap meets every element of every asserted claim and has ***never*** cited to Mitek documentation in its claim charts as evidence of infringement of every element of every asserted claim." Appx46 (emphasis in original). This Court, however, has never applied such a strict test. This Court and various district courts are clear that "there may be an implicit assertion that the supplier has indirectly infringed the patent" if the supplier's product is a "***material*** component" of the customer's alleged direct infringement. *Arris*, 639 F.3d at 1375-76 (emphasis added); *SafeNet, Inc. v. Uniloc USA, Inc.*, No. 6:15-CV-97-RWS-KNM, 2015 WL 10793747, at *9–10 (E.D. Tex. Aug. 19, 2015) (finding declaratory judgment standing where the supplier's product was accused of "embodying ***numerous elements*** of the asserted claims," including "***at least one essential element***") (emphasis added), *report and recommendation adopted,* No. 6:15-CV-97-RWS-KNM, 2015 WL 7272196 (E.D. Tex. Nov. 17, 2015). Further, *DataTern*—the case the district court primarily relies on (Appx45-46)—only examined whether the declaratory judgment plaintiff provided "documentation for several ***key*** claim limitations" that are "at the center of the parties' dispute over infringement" and actually did not require ***every*** element be

38

accused against the supplier's product as the district court does here. 755 F.3d at 905-06, 906 n.3 (emphasis added).

*Second*, the district court also made clear that it did not conduct any analysis as to relative importance or criticality of the claim limitations at issue. Appx43 n.22 (refusing to "engage in some subjective ranking of the steps required to meet the claims. All steps are required to be met and thus every step is equally necessary and important"). This is contrary to cases such as *Arris* and *SafeNet*, where the Federal Circuit and district court, respectively, analyzed whether the supplier's product was accused against the "key" or "essential" claim elements. *Arris*, 639 F.3d at 1375-76; *SafeNet*, 2015 WL 10793747, at *10. Thus, in refusing to conduct this analysis here, the district court incorrectly applied a more stringent, and therefore improper, test when assessing Mitek's potential for an induced infringement claim.

*Third*, the district court erroneously relied on USAA's argument that Mitek must demonstrate ***specific intent*** for ***every*** claim element to show standing for an induced infringement claim. Appx42-43 ("The specific intent required for indirect infringement, according to USAA, must 'relate to all elements as opposed to one or two or even a majority of elements.'"). Not so. For induced infringement, this Court has only required the patentee to show that "the alleged infringer possessed the requisite intent to induce infringement" (*Barry v. Medtronic, Inc.*, 914 F.3d 1310, 1334 (Fed. Cir. 2019)), which "requires knowledge that the induced acts constitute

patent infringement." *Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. 632, 637 (2015) (citation omitted). Even this Court in *DataTern* found that "[p]roviding instructions to use a product in an infringing manner is evidence of the required mental state for inducing infringement." 755 F.3d at 905. The district court's argument here at best rises and falls with Mitek's standing for potential direct infringement claim.

Applying the correct standard, Mitek has adequately shown that it has standing because of a reasonable potential for an induced infringement claim under a totality of the circumstances. Mitek has shown that MiSnap plays a central role in USAA's infringement allegations against Mitek's customers, especially the automatic capture functionality that allegedly performs the "monitor" and "capture" limitations of the claims. *Arris*, 639 F.3d at 1376-77 (determining that the customer's use of the supplier's products was "central to [the patentee's infringement contentions"); Appx135-183; Appx2015-2048; *BBVA*, No. 2:21-cv-311-JRG, Dkt. 1; *Truist*, No. 2:22-cv-291, Dkt. 1. In contrast to *DataTern*, USAA relied ***exclusively*** on Mitek documents and source code to show these key claim limitations in both the Wells Fargo and PNC trials. Appx1618-1620; Appx1762-1763; Appx1772; Appx1813-1854; Appx1905; Appx1910-1911; Appx1923. "For [USAA] to say that it has no controversy with [Mitek], when [MiSnap] forms a

central basis of its infringement theory in the [lawsuits against Mitek's customers], is disingenuous." *SafeNet*, 2015 WL 10793747, at *10.

In the first Wells Fargo trial, for example, USAA alleged that two of the three limitations of claim 1 of the '571 Patent and four out of seven limitations of claim 1 of the '090 Patent were allegedly performed by MiSnap. Appx1618. USAA's allegations at the first Wells Fargo trial regarding MiSnap allegedly performing the majority of claim limitations in two of the Patents-in-Suit (*id.*) is ***merely the floor, not the ceiling***, of MiSnap's functionality. As for the remaining limitations, the district court simply assumes without evidence that MiSnap cannot meet them. Appx42. For example, in connection with the claim limitations of the '090 Patent that USAA did not directly accuse MiSnap of meeting in the first Wells Fargo trial (*see* Appx1873), *i.e.*, the "image capture device," "a presentation device," and "a processor in communication with the image capture device and the presentation device," the undisputed evidence related to Mitek's own testing of MiSnap on real-world phones (*see* Appx1645, ¶ 10) brings the testing within USAA's infringement allegations of those additional claim limitations.[9] Even for the final transmitting step for the '517 Patent discussed by the district court (Appx42-43), Mitek provided

---

[9]    In addition, as discussed above, Mitek also offers a "hosted" option for its software where Mitek itself would run the "back-end" Mobile Deposit server while the mobile device runs MiSnap on the "front end." *See supra* n.6. This setup would result in Mitek's software allegedly performing even additional claim limitations.

record evidence that demonstrates that Mitek allegedly encouraged the transmission of an image capture from a mobile device to "Mitek's image processing servers" (Appx2346-2347 (citing Appx1840)), which the district court inappropriately disregarded.    Appx42-43.    For example, the MiSnap Programmer's Guide and Developer's Guide describe "how to configure and use each feature, including the auto-capture functionality and the various parameters used for check image acquisition." Appx1645, ¶ 9.  They also provide "guidance on integrating MiSnap across Android and iOS device" so that a check image can be successfully acquired and transmitted to the Mobile Deposit server processing. *Id.*  Had the district court properly analyzed the claim limitations, it would have determined that USAA's infringement allegations rely on MiSnap satisfying ***all*** the key limitations of the claims of the Patents-in-Suit.[10]  Appx1644-1645, ¶¶ 6, 8.

In addition, the record evidence establishes that Mitek provides various guides, manuals, and instructions to its customers that explain, among other things, how to configure and use all the relevant functionalities, such as auto-capture. Appx1622; , Appx1645, ¶ 9; Appx1727-1932; Appx2358-2401.  As in *SafeNet*, Mitek has "provid[ed] customers with the necessary components and instructions,"

---

[10]    To be sure, even if this Court determines there are substantial non-infringing uses for MiSnap, "[t]he existence of a substantial non-infringing use does not preclude a finding of inducement." *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1364 (Fed. Cir. 2012) (citation omitted).

which is sufficient, under a reasonable potential standard, as "evidence of the required mental state for inducing infringement." *SafeNet, Inc.*, 2015 WL 10793747, at *9–10 (finding controversy for induced infringement); Appx1618-1620; Appx1645, ¶ 9; Appx1727-1932, Appx2358-2401.

Taking the facts altogether under a totality of the circumstances, Mitek has at least shown a reasonable potential for an induced infringement claim.

### C.    Mitek Has Established A Reasonable Potential Of Contributory Infringement Claims

The district court also erred in dismissing Mitek's declaratory judgment action based on its contributory infringement claim because it: (1) improperly conflated possible noninfringing use with "substantial noninfringing use"; (2) failed to analyze the materiality of MiSnap to key claim elements of the Patents-in-Suit; and (3) incorrectly blamed Mitek for not providing evidence of infringing use in later-filed cases. Because Mitek has established in the expanded record below (Appx1623-1624; Appx2223-2224; Appx2298-2300; Appx 2345-2349) that there is a reasonable potential for contributory infringement claims against Mitek, this Court should reverse the district court and find that Mitek has standing on this alternative basis.

*First*, the district court determined in a conclusory manner that the customizability of certain infringing features[11] into noninfringing uses was

---

[11]    Although Mitek focused primarily on the auto-capture functionality in its post-remand briefing, the same arguments apply to the other features USAA

dispositive of showing a "substantial noninfringing use." Appx44-45. The mere fact that an infringing feature may be disabled or removed altogether into a noninfringing use by no means automatically makes such noninfringing use "substantial." "In assessing whether an asserted noninfringing use was 'substantial,' [one may] consider not only the use's frequency, but also the use's practicality, the invention's intended purpose, and the intended market." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 851 (Fed. Cir. 2010). The district court inexplicably gave no weight to the undisputed evidence in the record, including USAA's own trial demonstrative in the first Wells Fargo trial, that "Mitek primarily developed MiSnap" for the auto-capture feature (Appx1644, ¶ 5), and that the vast majority (94%) of customers did not actually use the non-infringing mode, manual capture. Appx44-45 (citing to Appx1161); Appx1876; *see also* Appx1772 (disclosing that Mitek's auto-capture technology is "innovative" and "[o]ffered by [f]our of the [t]op [f]ive [r]etail [b]anks"); Appx1738 (relying on an industry document to show that "Chase slipped from the top 10 due to areas such as manual capture," "therefore auto-capture must now be treated as a must-have feature").

*Second*, as discussed above with respect to induced infringement, the district court's refusal to assess, this time in connection with contributory infringement, the

---

identified, including the "alignment guide" and "feedback" functionality. Appx44 (citing Appx2524-2527); Appx1644-1645, ¶¶ 7, 8.

materiality of MiSnap to USAA's infringement allegations for the key claim limitations of the Patents-in-Suit, such as the "monitor" and "capture" limitations, was in error. *See supra*, Argument, § IV.B (citing Appx43 n.22); *Arris*, 639 F.3d at 1376-77 (reversing dismissal based on lack of standing for contributory infringement after determining that the customer's use of the supplier's products was "central to [the patentee's] infringement contentions").

*Third*, the district court also improperly faulted Mitek for not providing evidence of "similar substantial use of its documentation to prove infringement" in later-filed cases against Mitek's customers.[12] Appx47-48. The trial demonstratives from the PNC trial are clear that USAA continued to rely on Mitek documents and source code to prove its infringement theories for at least the one Patent-in-Suit (*i.e.*, the '571 Patent) that was presented to the jury at the PNC trial. Appx1905; Appx1910-1911; Appx1923-1924. In addition, the district court ignored that the allegations of infringement in the complaints against each of Mitek's customers all mirrored each other, which is sufficient to establish subject matter jurisdiction.

---

[12] Mitek has not had access to any designated material under the Protective Order in the PNC, BBVA, or Truist cases, including infringement contentions or expert infringement reports. The complaints filed in each action and USAA's public jury presentation are therefore Mitek's only source of knowledge into USAA's infringement allegations. This is why Mitek filed its declaratory judgment action within *days* after USAA's infringement expert took the stand in the Wells Fargo case.

Appx1628; *In re Mobile Telecommunications Techs., LLC*, 247 F. Supp. 3d 456, 461 (D. Del. 2017) ("Such repeated references identifying DJ Plaintiffs' products as infringing may give rise to a 'substantial controversy' about whether those products infringe the patents-in-suit.").

Applying the correct standard, Mitek has established at least a reasonable potential of a contributory infringement claim under a totality of the circumstances. It is undisputed that Mitek "***primarily developed*** MiSnap to provide 'touch-free auto-capture' functionality for document acquisition, so that documents may be acquired automatically from a video frame processing method without the user having to manually press any buttons or keys on their mobile device during the image acquisition process." Appx1644, ¶ 5 (emphasis added). The record evidence further shows that the key auto-capture functionality that is the subject of the claims of the Patents-in-Suit is used 94% of the time (Appx1161 at 41:20-24; Appx1885) and using MiSnap in manual capture mode would "deprive[] users of the very benefit [MiSnap] was intended to provide" (*i4i*, 598 F.3d at 851), *i.e.*, the ability "to automatically acquire an image of high quality and usability" for "a more efficient and higher quality remote check depositing capability." Appx1643-1644, ¶ 4. The centrality of MiSnap to USAA's infringement allegations is crystallized in its complaints against Mitek customers (Appx135-183; Appx2015-2048; *BBVA*, No. 2:21-cv-311-JRG, Dkt. 1; *Truist*, No. 2:22-cv-291, Dkt. 1) and USAA's trial

46

demonstratives in the Wells Fargo and PNC trials. *See supra*, Argument, § IV.B. USAA has also subpoenaed Mitek for documents, source code, and deposition testimony related to MiSnap in each of its litigations against Mitek customers. *See SafeNet*, 2015 WL 10793747, at *10; Appx685-706; Appx1023-1037. Taken altogether, these facts give rise to at least a reasonable potential for a contributory infringement claim.

### D.    Mitek Has Established A Reasonable Potential Of Indemnification Liability

The district court's finding of no declaratory judgment standing for indemnification liability is predicated on several legal and factual errors because it: (1) determined in a conclusory manner that the mere existence of carve-out provisions in the indemnification agreements to be fatal; (2) unduly relied on Mitek's SEC statement regarding indemnification liability as dispositive of Mitek's standing; and (3) incorrectly determined that Mitek had no standing at the time of filing based on its potential indemnification liability with respect to Truist because Truist was not sued until years later. Mitek has supplemented the record on remand (*see* Appx1626-1629; Appx2225-2227; Appx2303-2304; Appx2349-2351) with numerous indemnification demands from its customers—all resulting from USAA's patent infringement actions against Mitek's customers—as well as the underlying agreements giving rise to the indemnification demands. This showing is more than adequate to support yet another, alternative basis for standing.

47

*First*, the district court improperly adjudicated the ultimate merits of the indemnification obligations between Mitek, on the one hand, and third-party integrators and/or banks, on the other hand by finding the mere existence of some limited carve-out provisions in the indemnification agreements to be fatal to Mitek's standing. Appx50-54, 56. But it is undisputed that Mitek's customers cannot modify or alter the underlying MiSnap source code because it is delivered to the customers in API form (Appx1644-1645, ¶¶ 6-8) and the district court makes no showing why such carve-outs undermine all reasonable potential for indemnification liability. Appx56. Indeed, during the hearing, the district court admitted that "[w]e can argue about whether the carve-outs apply or don't apply" and that "at a minimum we have factual issues about what was supplied, what was modified, what was added to…. And those are going to vary from bank to bank to bank." Appx2493; Appx2495-2496. Therefore, it was improper for the district court to adjudicate the ultimate merits of the otherwise colorable indemnification demand from multiple Mitek customers at the motion to dismiss stage because this is within the province of the jury after a full trial. *See, e.g.*, *Montez,* 392 F.3d at 151.

*Second*, the district court inappropriately found Mitek's SEC statement as dispositive of showing Mitek's lack of standing for indemnification liability. Appx57-58. As discussed above, Mitek's SEC statement related to its subjective belief of its indemnification liability during the PNC case on patents not at issue here

48

(*see supra*, Argument, § III.B; Appx58) and cannot detract from its contemplated "uncertainty" regarding its indemnification liability. *Elecs. for Imaging*, 394 F.3d at 1346.

*Third*, the district court also erred in finding that Mitek could not have apprehended indemnification liability from Truist at the time of filing since Truist was only sued years later. Appx56-57. The district court overlooks that Mitek entered into the agreement with Truist containing the indemnification provision ***well before*** the filing of its declaratory judgment action, which supports Mitek's reasonable potential for indemnification liability at the time of filing. Appx2239-2257. That the reasonable potential for indemnification liability was borne out by USAA actually suing Truist years later merely underscores the legitimacy of Mitek's reasonable potential for indemnification liability.[13]

Under the correct standard based on a totality of circumstances, Mitek has established standing based on a reasonable potential for indemnification liability

---

[13] The district court also notes that "[a]side from the Truist Bank Agreement, Mitek has no direct and substantial legal relationship with any of its customers who received a letter from, or were sued by, USAA." Appx57. The district court ignores, however, that the extent of USAA's letter writing campaign is in USAA's possession, and USAA has refused to provide that information to Mitek in this case. Appx2226 & n.15. USAA's use of this information as a sword and shield is manifestly unfair and should not be given any weight. In addition, the observation that Mitek's indemnification obligations may sometimes flow through a third-party financial services integrator (Appx32 n.17) does not lessen the reasonable potential for Mitek's ultimate liability.

under a totality of the circumstances. As an initial matter, the Federal Circuit has already determined that Mitek's customers who received USAA's letters already have standing. *Mitek I*, 34 F.4th at 1345. On remand, Mitek has sufficiently addressed the second half of its indemnity-based assertion and submitted substantial evidence (including numerous demands for indemnification and the underlying agreements) backing up its reasonable potential for indemnification liability. Appx1626-1629; Appx2225-2227; Appx2303-2304; Appx2349-2351.

The Federal Circuit previously found that "existence of an indemnity agreement" (*Microchip Tech. Inc. v. Chamberlain Grp., Inc.*, 441 F.3d 936, 943 (Fed. Cir. 2006)) or "merit of the customer request" was relevant. *DataTern*, 755 F.3d at 904. Notably, Mitek has submitted ample relevant evidence to substantiate its claim, including at least one indemnity request to Mitek before the filing (Appx1716-1719), indemnity requests from Mitek customers that USAA actually sued (Appx2173-2175; Appx2238), related indemnity requests from third-party integrators (Appx1720-1721; Appx2011-2012; Appx2014; Appx2602-2603; Appx2176-2177; Appx2178-2179; Appx2429), as well as the underlying agreements (all of which were entered into before the filing of Mitek's declaratroy judgment complaint) containing the indemnification provisions (from which the indemnity requests stem). Appx1651-1715; Appx2239-2257; Appx2402-2423; Appx2424-2427. The various indemnification provisions of varying scope also

support Mitek's reasonable potential for indemnification liability.   Appx50-54; Appx56.   This evidence is overwhelmingly more than "a customer request to indemnify" that the Federal Circuit in *DataTern* determined was insufficient to establish standing for indemnification liability.  755 F.3d at 904.

The indemnity request from Truist provides the clearest example of Mitek's reasonable potential for indemnification liability.   Truist is the direct target of USAA's latest litigation and as a result, sent an indemnity request to Mitek, attaching the indemnification agreement from which its indemnity request stems.  Appx2238-2251.  Although the district court identifies an alleged carve-out provision, it is undisputed that Mitek customers, such as Truist, cannot modify the source code of the MiSnap SDK.  Appx1643-1646.  Short of actually conceding indemnification liability—which this Court has expressly recognized is not required (*Mitek I*, 34 F.4th at 1346)—it is difficult to imagine clearer evidence sufficient to support standing based on indemnification liability.

Taking all the facts and circumstances together, Mitek has sufficiently shown at least a reasonable potential for indemnification liability.

## V.    THE DISTRICT COURT ABUSED ITS DISCRETION BY DECLINING DECLARATORY JUDGMENT JURISDICTION

"When there is an actual controversy and a declaratory judgment would settle the legal relations in dispute and afford relief from uncertainty or insecurity, in the usual circumstance the declaratory judgment is not subject to dismissal." *SanDisk*

*Corp. v. STMicroelectronics, Inc.*, 480 F.3d 1372, 1383 (Fed. Cir. 2007) (citation

omitted).  It is clear that:

> The remedy made available by the Declaratory Judgment Act…relieves
> potential defendants from the ***Damoclean threat of impending
> litigation which a harassing adversary might brandish, while
> initiating suit at his leisure—or never.*** It permits actual controversies
> to be settled before they ripen into violations of law or a breach of
> contractual duty and it helps ***avoid a multiplicity of actions*** by affording
> an ***adequate, expedient, and inexpensive*** means for declaring in one
> action the rights and obligations of litigants.

10B Wright & Miller, Fed. Prac. & Proc. Civ. § 2751 (4th ed.) (emphasis added).

To be sure, a court's discretion to decline jurisdiction in a declaratory judgment

action is "not absolute" (*Micron*, 518 F.3d at 903), and exercising such discretion

"must be supported by a sound basis for refusing to adjudicate an actual

controversy." *SanDisk*, 480 F.3d at 1383.  When the declaratory judgment action

serves the objectives of the Declaratory Judgment Act, "dismissal is ***rarely proper***."

*Micron*, 518 F.3d at 902 (emphasis added); *Capo*, 387 F.3d at 1355.

USAA's lawsuits against Mitek customers are well beyond the "Damoclean

threat with a sheathed sword" the DJA was enacted to address (*Arrowhead Indus.

Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731, at 734-35 (Fed. Cir. 1988))—USAA

here has already rattled its saber several times.  Appx135-183; Appx2015-2048;

*BBVA*, No. 2:21-cv-311-JRG, Dkt. 1; *Truist*, No. 2:22-cv-291, Dkt. 1.  Having failed

to identify any "well-founded reasons" for declining to accept jurisdiction of Mitek's

declaratory judgment action (*Mitek I*, 34 F.4th at 1347 (quoting *Capo*, 387 F.3d at

1355)), the district court has abused its discretion in declining jurisdiction and should be reversed.

## A.    The District Court Committed Factual And Legal Errors In Declining Jurisdiction

The district court committed several legal and factual errors in exercising its discretion to decline jurisdiction, because it:  (1) improperly focused on the purported unwieldiness associated with Mitek's ability to show the actual operation rather than capability of MiSnap; (2) failed to consider that Mitek's declaratory judgment action addressed at least the objectives of "uncertainty" and "delay in adjudication" contemplated by the DJA; and (3) identified reasons that are not considered "well-founded."

*First*, the district court's "concern that Mitek would not be able to present evidence on any of the claim elements that admittedly do not stem from the Mitek products when the end-users would not be a party to this action" (Appx40) is misguided because the claims at issue simply require analysis of the programmed capability, not actual operation, of MiSnap. *See supra*, Argument, § II.  To be sure, Mitek has in its possession all the evidence it needs to show its own software does not infringe the Patents-in-Suit under any usage by its customers.  The district court's contentions that it "sees no path by which Mitek can litigate this case without extensive involvement by end-user banks" is misguided for the same reason. Appx64; *see supra*, Argument, § II.

*Second*, the district court erred in failing to conclude that Mitek's declaratory judgment action serves at least the objectives of resolving "uncertainty" and "delayed adjudication" provided by the DJA. *SanDisk*, 480 F.3d at 1383; *Minn. Min. and Mfg. Co. v. Norton Co.*, 929 F.2d 670, 674 (Fed. Cir. 1991) ("In promulgating the Declaratory Judgment Act, Congress intended to prevent avoidable damages from being incurred by a person ***uncertain*** of his rights and threated with damage by ***delayed adjudication***.") (emphasis added).

Mitek availed itself of the DJA and filed its declaratory judgment action for the sole purpose of clearing the air and establishing that MiSnap does not infringe the four Patents-in-Suit. Although the district court perceived a dual purpose of taking aim at "derailing USAA's litigation strategy" (Appx37 n.19), it is actually USAA's litigation strategy against Mitek's customers that fostered the very uncertainty and delayed adjudication that Mitek seeks to redress here. The district court's claim that "Mitek would have been sued long ago" "[i]f there were ***any*** real case or controversy between Mitek and USAA" is textbook hindsight bias and belies the legitimacy of its determination that intervention is a better route. Appx65 (emphasis in original). The DJA imposes no timing requirement to filing suit and simply provides a party with a mechanism to stop accruing inconvenience and expense as the result of a plaintiff's vexatious litigation campaign against its customers, which Mitek is attempting to do here.

*Third*, the reasons the district court identified for exercising its discretion to decline jurisdiction rest on faulty premises and are not akin to reasons the Federal Circuit has previously found to be "well-founded." *See, e.g., Commc'ns Test Design, Inc. v. Contec, LLC*, 952 F.3d 1356, 1362 (Fed. Cir. 2020) (anticipatory filing in bad faith where the declaratory judgment plaintiff forced the other party to defer filing its complaint only for the declaratory judgment plaintiff to file in its own backyard); *EMC Corp. v. Norand Cop.*, 89 F.3d 807, 813-14 (Fed. Cir. 1996) (upholding discretionary decision to decline jurisdiction where "the declaratory judgment complaint [w]as a tactical measure filed in order to improve [declaratory judgment plaintiff's] posture in the ongoing negotiations"). The district court determined that "Mitek's lawsuit would not actually resolve the issue of whether the end-user banks infringe and, therefore, whether Mitek induces or contributes to their purported infringement" (Appx64), but as discussed above, the nature of the claims simply look at the capability, not actual operation, of MiSnap and therefore does not require extensive discovery or joinder of third parties. *See supra*, Argument, § II. And while the district court expressed concerned about "whether any findings made as to Mitek alone would have any applicability or estoppel effect upon the end-users" (Appx64), a decision of non-infringement as the capability of MiSnap would at least bear on and have an estoppel effect on USAA from litigating the same issues on the same Patents-in-Suit against Mitek's customers. Appx2553-2554.

55

Had the district court properly considered the facts and law in this case, it would have found that the objectives of the DJA would be well-served by Mitek's declaratory judgment action. The district court already agreed that "Mitek *is* likely in the best position to defend its own software" (Appx60) (emphasis in original), and acknowledged that claim preclusion would apply to Mitek's customers should the declaratory judgment action go forward and Mitek prevails. *Id.* Accepting jurisdiction provides Mitek its only reasonable mechanism to resolve the uncertainty surrounding whether MiSnap infringes the Patents-in-Suit, prevent any further delay in adjudication, and clear the air once and for all so Mitek's customers can continue to use MiSnap without fear of being USAA's next litigation victim.

**B.    The District Court Failed To Give Proper Weight To Facts That Show Why Intervention Is Not The Most Effective Or Efficient Avenue For Mitek**

In determining that Mitek's intervention in the "next litigation, if any" was more effective or efficient than its declaratory judgment action (Appx60-62), the district court failed to provide the requested analysis on at least two issues identified by this Court and did not properly consider the disadvantages and speculative nature of intervention.

Specifically, the district court failed to address the issues of "whether Mitek could intervene in such actions and under what circumstances" and "whether intervention would provide Mitek adequate relief from the harms the Declaratory

Judgment Act recognizes as basis for such relief" (*Mitek I*, 34 F.4th at 1347) or otherwise show that, having dismissed Mitek's declaratory judgment action, Mitek would even be successful in intervening in the "next litigation, if any," either in the Eastern District of Texas or another jurisdiction.  Even if there is another litigation, Mitek must satisfy the four requirements for mandatory intervention under Rule 24(a) or seek permissive intervention under Rule 24(b), which itself is uncertain and discretionary.  Appx1636-1640; Appx 2306-2307  And if USAA brings suit in another jurisdiction, the path for Mitek's intervention is even murkier.

The district court also failed to even address, much less give proper weight, to the numerous disadvantages and prejudicial effects associated with intervention. Appx1637-1638.  For example, even if Mitek were able to successfully intervene, it would be bound by existing orders and deadlines (*see, e.g.*, *Script Sec. Sols. LLC v. Logitech Inc.*, No. 2:16-cv-01400-JRG-RSP, 2017 WL 10242574, at *3 (E.D. Tex. Nov. 8, 2017) (holding that the intervenor "must agree to be bound by all existing orders in this action, including the court's pre-trial schedule and discovery limits")), and be required to waive venue (7C Wright & Miller, Fed. Prac. & Proc. Civ. § 1918 (3d ed.) ("The intervenor cannot question venue. By voluntarily entering the action the intervenor has waived the privilege not to be required to engage in litigation in that forum.")).

Mitek would also be exposed to inordinate expense and potential liability by intervening in each serial lawsuit. *First*, Mitek would likely have to concede an indemnification obligation and shoulder each bank's liability in order to intervene, something this Court has already indicated is not necessary or appropriate. *Mitek I*, 34 F.4th at 1346. *Second*, Mitek would have to expend significantly more attorney's fees and other litigation costs to serially defend itself in multiple successive lawsuits than would be expended in bringing a single declaratory judgment action. *Third*, Mitek would have to abandon its placement at the table of the proper hypothetical negotiation in favor of the named defendants, who are much larger entities (banks) with deeper pockets and would have allegedly first infringed at a later time than Mitek. It is fundamental that parties at the hypothetical negotiation would agree on a license that would fairly compensate the willing licensor without bankrupting the willing licensee. *See, e.g.*, *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324-25 (Fed. Cir. 2009) (explaining that the hypothetical negotiation "attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began"). Under the district court's regime, any license to the Patents-in-Suit (which Mitek would also likely shoulder if it intervenes and assumes an indemnity obligation) would cost orders of magnitude more than a properly negotiated license between Mitek and USAA at the time of the supplier's first alleged infringement. The excessive expense and potential liability

resulting from serial intervention is, by itself, enough to deter Mitek from voluntarily intervening and militates against the district court from declining jurisdiction.[14]  In deciding that intervention was a better option than Mitek's declaratory judgment action, the district court failed to appreciate how and to what extent these disadvantages and prejudices to Mitek impact the effectiveness and efficiency of intervention compared to its declaratory judgment action.

By foreclosing Mitek's option to pursue its declaratory judgment action, Mitek's ability to clear the air of MiSnap's role in the alleged infringement of the Patents-in-Suit will be entirely at the mercy of USAA's litigation strategy and "restricted to an *in terrorem* choice" the DJA was designed to alleviate.  *Hewlett-Packard*, 587 F.3d at 1362 ("Before the Act, competitors victimized by that tactic were rendered helpless and immobile so long as the patent owner refused to grasp

---

[14]   The district court also appears to fundamentally misunderstand the law on patent damages and exhaustion, which would prevent USAA from seeking a recovery from Mitek's customers based on any alleged infringement stemming from MiSnap on the Patents-in-Suit after Mitek had obtained a license to the Patents-in-Suit. Appx59; Appx2353.  In a similar situation, the Federal Circuit determined: "If Qualcomm, Defendants' chipset supplier, had a valid license to practice the '373 patent, Evolved's right to sue Defendants for infringement of the '373 patent is exhausted by that license, since they purchased licensed products from an authorized source (viz., Qualcomm)." *Evolved Wireless, LLC v. HTC Corp.*, 840 F. App'x 586, 590 (Fed. Cir. 2021) (citing *Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617, 638 (2008)).   At a minimum, the *Georgia-Pacific* factors and hypothetical negotiation would look markedly different as between Mitek and USAA than between big banks and USAA.

the nettle and sue."). Mitek will have to wait until "the next litigation, if any" and hope that at least one of the Patents-in-Suit is asserted. Had the district court properly considered the disadvantages of intervention as well as Mitek's inability to resolve the uncertainty surrounding USAA's litigation campaign, it should have found that Mitek's declaratory judgment action was more effective and efficient than intervention.

## **CONCLUSION AND STATEMENT OF RELIEF SOUGHT**

This Court should reverse the district court's dismissal of this case.

DATED: June 13, 2023                QUINN EMANUEL URQUHART &
                                    SULLIVAN, LLP


                                    By  */s/ David Eiseman*
                                        David Eiseman
                                        Brian E. Mack
                                        Jonathan Tse
                                        50 California Street, 22nd Floor
                                        San Francisco, CA 94111-4788
                                        (415) 875-6600
                                        davideiseman@quinnemanuel.com
                                        brianmack@quinnemanuel.com
                                        jonathantse@quinnemanuel.com

                                        *Counsel for Mitek Systems, Inc.*

# **CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), the undersigned certifies that this brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B).

1.    Exclusive of the exempted portions of the brief, as provided in Fed. R. App. Proc. 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b), this brief includes 13,706 words.

2.    This brief has been prepared in proportionally spaced typeface using Microsoft Word 2013 in 14 point Times New Roman font.  As permitted by Fed. R. App. Proc. 32(a)(7)(C), the undersigned has relied upon the word count of this word-processing system in preparing this certification.


Dated:  June 13, 2023                    */s/ Brian E. Mack*
                                          Brian E. Mack
                                          QUINN EMANUEL URQUHART &
                                          SULLIVAN, LLP
                                          50 California Street, 22nd Floor
                                          San Francisco, CA 94111-4788

                                          *Counsel for Mitek Systems, Inc.*

# ADDENDUM

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| MITEK SYSTEMS, INC., | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | CIVIL ACTION NO. 2:20-CV-00115-JRG |
| v. | § | |
| | § | **FILED UNDER SEAL** |
| UNITED SERVICES AUTOMOBILE | § | |
| ASSOCIATION, | § | |
| | § | |
| | § | |
| *Defendant.* | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is the briefing filed by Plaintiff Mitek Systems, Inc. ("Mitek") and Defendant United Services Automobile Association ("USAA") subsequent to the Federal Circuit's remand in this case. (*See* Dkt. Nos. 80, 82, 90, 95, 100, 103, 105, 108, 111.) Additionally, the Court held a hearing on these matters on February 14, 2023. (Dkt. Nos. 119, 120.)

### I.    THE COMPLAINT

On November 1, 2019, Mitek filed a Complaint for Declaratory Judgment of Non-Infringement (the "Complaint") against USAA in the Northern District of California. (Dkt. No. 1; *see also generally* Case No. 3:19-cv-07223-EMC (N.D. Cal. 2019).) In the Complaint, Mitek sought a "determination that Mitek does not infringe any valid or enforceable claim" of United States Patent Nos. 8,699,779 (the "'779 patent"), 9,336,517 (the "'517 patent"), 9,818,090 (the "'090 patent"), and 8,977,571 (the "'571 patent") (collectively, the "Asserted Patents"). (Dkt. No. 1, ¶ 1.) Mitek argued that, starting in 2017, USAA "launched an aggressive patent licensing and enforcement campaign" by sending "over 1,000 patent licensing demand letters to financial [institutions] across the country, most of which are Mitek customers." (*Id.*, ¶¶ 2, 8.) "[A]t least

some of these letters included one or more 'claim charts' detailing Mitek's customers' infringement of one or more" of the Asserted Patents, as well as a "Patent List" identifying one or more of the Asserted Patents.[1] (*Id.*, ¶ 8.) In June of 2018, USAA sued Wells Fargo Bank ("Wells Fargo") for patent infringement in this District (the "Wells Fargo Case"). (*Id.*, ¶ 11; *see generally* Case No. 2:18-cv-00245 (E.D. Tex. 2018).) Mitek contends that the Amended Complaint in the Wells Fargo Case "specifically referenced Mitek's technology" and "implicitly accused Mitek of encouraging and contributing to the infringement of each of the [Asserted Patents] by supplying its MiSnap technology to financial institutions for incorporation within their mobile banking applications." (Dkt. No. 1, ¶¶ 11–12.) USAA used "documents and source code from Mitek and deposition testimony from several Mitek witnesses regarding the operation of MiSnap" in the Wells Fargo Case. (*Id.*, ¶ 12.) Mitek contends that "USAA alleges that Wells Fargo Bank specifically encourages its customers to use the accused Mitek's [*sic*] MiSnap and related remote deposit technology in an infringing manner." (*Id.*, ¶ 30.) According to Mitek, "USAA also alleged in the Wells Fargo [Case] that the accused Mitek technology being used by Wells Fargo has no substantial non-infringing use." (*Id.*, ¶ 12.)

Mitek contends that it has "various contractual relationships with its customers, including OEM Agreements, relating to MiSnap and Mitek's Mobile Deposit product offering." (Dkt. No. 1, ¶ 13.) "These agreements include indemnification provisions relating to actual or alleged patent infringement by Mitek's technology." (*Id.*) In its Complaint, Mitek alleged that, in response to

---

[1] Despite this representation, Mitek attached only one such letter to its Complaint, which contained one claim chart for a non-Asserted Patent. (Dkt. No. 1-1.) The claim chart detailed only four claims from such non-Asserted Patent, and the "Patent List" referred simply to a "number of USAA's issued US patents" covering a "myriad of features related to remote check deposit technology." (*Id.*)

USAA's letter campaign, it "received demands for indemnification from its customers and suppliers pursuant to these agreements." (*Id.*)[2]

## II.    THE MOTION TO DISMISS

On January 15, 2020, USAA moved to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction or, in the alternative, to transfer the case to this Court (the "Motion to Dismiss or Transfer"). (Dkt. No. 19; *see also* Case No. 3:19-cv-07223-EMC at ECF 19.) Attached to USAA's Motion to Dismiss were various documents and transcripts from the Wells Fargo Case. (*See generally* Dkt. Nos. 19-2, 19-3, 19-4, 19-5, 19-6, 19-7, 19-8, 19-9, 19-10, 19-11, 19-12, 26-1, 26-3, 26-4, 39-2.)[3]

In its Motion to Dismiss or Transfer, USAA argued that "Mitek does not contend it anticipates any legal action from USAA[,]" but instead "argues that it perceives a 'cloud' over it because of USAA's litigation with third-party Wells Fargo[.]" (Dkt. No. 19 at 1.) Mitek filed its Complaint "approximately seventeen months after the USAA-Wells Fargo litigation was filed" and only after the "jury trial was already underway." (*Id.*)

USAA argued that the Wells Fargo Case demonstrated that Mitek could not have anticipated imminent litigation by USAA. (*See, e.g.*, Dkt. No. 19 at 5.) First, USAA contended that Mitek "assisted Wells Fargo during the litigation" and therefore was aware that "USAA made clear that Wells Fargo itself developed and control[led] the infringing Wells Fargo Mobile Deposit

---

[2] Mitek did not attach any such indemnification agreements to its Complaint. Rather, Mitek merely attached one letter from USAA to Mission Federal Credit Union with a claim chart for a non-Asserted Patent and an incomplete list of USAA's issued patents. (Dkt. No. 1-1.) Such is insufficient evidence of a purported letter "campaign" that might have given rise to a reasonable apprehension of suit of the Asserted Patents.

[3] In response to USAA's Motion to Dismiss. Mitek submitted with its Opposition a declaration from Mitek's Chief Executive Officer, excerpts from various transcripts in the Wells Fargo Case, demonstratives used at trial in the Wells Fargo Case, and news articles. (*See generally* Dkt. Nos. 24, 24-1, 24-3, 24-4, 24-5, 24-6, 24-7, 24-8, 24-9, 24-10, 24-11, 24-12, 24-13, 24-14, 24-15, 24-16, 24-17, 24-18, 24-19, 24-20, 24-21, 24-22.)

Appx7

Case 2:20-cv-00115-JRG  Document 121 *SEALED*  Filed 02/23/23  Page 4 of 62 PageID #: 4078

system." (*Id.*) At trial, USAA presented evidence that Wells Fargo has "full control over customizing" certain portions of the application that "incorporated code from Mitek," and that "Mitek's corporate representative[] testified at trial and agreed that it is 'up to the banks or the user to decide' how to implement Mitek's products." (*Id.*) (citations omitted). USAA argued that the record at trial shows Mitek's representative "made clear that MiSnap libraries are only part of the accused functionality and that, in addition to the Wells Fargo created code, the mobile device's operating system also supplies elements." (*Id.* at 6.)

USAA also noted that although Mitek was "fully aware of" and "even participated in" the Wells Fargo Case, "Mitek elected not to seek to intervene as a party and did not indemnify Wells Fargo." (Dkt. No. 19 at 7.) "Wells Fargo made clear that it had no indemnity agreement with Mitek that could cover any aspect of the USAA-Wells Fargo litigation." (*Id.*) Accordingly, USAA claimed that the "primary basis on which Mitek relies for jurisdiction, the USAA-Wells Fargo Litigation, does not constitute an 'immediate injury or threat of injury' to Mitek." (*Id.* at 8; *see also id.* ("Mitek does not allege that it is responsible for Wells Fargo's infringement, and the factual record is clear that Mitek supplied just one component of the overall infringing system that Wells Fargo itself designed, implemented, and runs.").)

USAA argued that the Wells Fargo Case was "not a case where one entity makes an infringing product, and its customers are then sued for doing nothing more than purchasing and using it." (Dkt. No. 19 at 8.) Instead, Wells Fargo created and customized its own system and Mitek "alleges only that it sells software that Wells Fargo uses 'at least in part'" in the infringing system. (*Id.* (citing Dkt. No. 1, ¶ 11).)

USAA also argued that its letter campaign to Mitek customers fell short of demonstrating a justiciable controversy. (Dkt. No. 19 at 11.) USAA noted that the only example of such a letter

4

that Mitek provided with the Complaint was a letter sent to Mission Federal Credit Union that included one claim chart for a patent that is not one of the Asserted Patents. (*Id.*) USAA alleged that "[t]he letter contains no allegation of infringement against Mitek" and "makes no reference to Mitek at all." (*Id.* at 12.) Further, USAA argued that as to the letters from which Mitek "received demands for indemnification," Mitek did not allege "that it has any legal obligation to indemnify any recipient of any USAA letter." (*Id.*) Indeed, USAA noted that Mitek did not indemnify the one entity against whom—at the time the Complaint was filed—USAA had actually filed infringement claims on the Asserted Patents (*i.e.*, Wells Fargo). (*Id.* at 13.) On April 21, 2020, the Northern District of California transferred the case to this Court without ruling on the dismissal portion of the Motion. (Case No. 3:19-cv-07223-EMC at ECF 45.)

### III. THE COURT'S ORDER DISMISSING THE COMPLAINT

This Court held a hearing on the dismissal portion of the Motion on July 15, 2020. (Dkt. No. 56; *see also* Dkt. No. 58.) The Court granted the Motion on April 28, 2021. (Dkt. No. 69) (the "Order"). In its Order, the Court found that the "most reasonable course of action to address Mitek's apprehension of litigation brought on by the Wells Fargo Case would have been for Mitek to intervene in that litigation." (*Id.* at 3.) The Court noted that "Mitek was fully aware of the Wells Fargo Case and USAA's allegations against its MiSnap product therein—indeed, Mitek participated in the Wells Fargo trial by providing a corporate representative who testified by deposition and in-person at trial." (*Id.* at 4.) Despite such awareness, "Mitek elected not to seek to formally intervene in the Wells Fargo Case, where it could have best pursued the declaratory relief it now seeks." (*Id.*) Based on this, the Court was "persuaded that Mitek sitting on its hands during the Wells Fargo Case and neglecting to intervene is probative (and perhaps the best indicator) as to [] any actual apprehension Mitek felt with regard to litigation by USAA." (*Id.*)

Appx9

The Court found that the evidence indicates that the Wells Fargo Case "gave Mitek every reason to think that USAA does *not* intend to pursue any claim for patent infringement against Mitek[,]" because the trial testimony in the Wells Fargo Case indicated that "without significant customization by Wells Fargo, the Mitek MiSnap product does not infringe" the Asserted Patents. (Dkt. No. 69 at 4.)

As to the Mission Federal Credit letter attached to Mitek's Complaint, the Court noted that the letter "neither threatens litigation nor calls out any particular patent as being infringed[,]…fails to provide claim charts [for any of the Asserted Patents], and does not indicate that any infringement analysis has occurred." (Dkt. No. 69 at 7.) Neither did the letter "specifically call out Mitek [or] identify particular products as allegedly infringing." (*Id.*) The Court found that the letters referred to throughout Mitek's Complaint, as well as the Mission Federal Credit letter, did not create a justiciable controversy. (*Id.* at 6.)

While "suits against customers combined with demands for present indemnification obligations may be sufficient to convey standing when combined with viable indemnification obligations, mere requests for indemnification may fall short." (Dkt. No. 69 at 7 (*Microsoft Corp. v. DataTern, Inc.*, 755 F.3d 899, 904 (Fed. Cir. 2014)).) The Court found that Mitek had not pled that any such indemnification obligation existed, and ███████████████████████████

████████████████████████████

Finally, the Court stated that "[e]ven if the Court's determination that subject matter jurisdiction is lacking were later set aside, the Court would similarly and for the same reasons exercise its discretion and decline to exercise jurisdiction over Mitek's declaratory judgment action." (Dkt. No. 69 at 9.) Mitek appealed the Court's ruling on May 27, 2021. (*See* Dkt. No. 70.)

## IV.    THE FEDERAL CIRCUIT'S OPINION

On May 20, 2022, the Court of Appeals for the Federal Circuit affirmed in part and vacated in part this Court's April 28, 2021 Order and remanded the case for further proceedings consistent with their opinion. *Mitek Systems, Inc. v. United Services Automobile Association*, 34 F.4th 1334 (Fed. Cir. May 20, 2022) (the "Federal Circuit's Opinion"). The Federal Circuit opined that the "parties have debated the case-or-controversy issue at too high a level of generality." *Id.* at 1342. As a threshold issue, the Federal Circuit found that both the parties and this Court were "unclear" in identifying whether the Motion to Dismiss should be treated as a facial or factual challenge. *Id.* The Federal Circuit found that USAA appeared to have taken "the steps required to mount a factual attack that entitled it to a resolution of at least some factual disputes, not just to a decision on the sufficiency of the complaint when combined with undisputed facts." *Id.* at 1344.

As to Mitek's argument for jurisdiction based on "its potential liability for infringement," the Federal Circuit found that the district court "did not determine that USAA had disclaimed any interest in suing Mitek or had made a strategic decision (*e.g.*, that all actions for infringement of the [Asserted Patents] should be against banks and other Mitek customers, not Mitek) that a suit against Mitek was not reasonably possible." *Id.* The court also disagreed with this Court's weighing of Mitek's failure to intervene in the Wells Fargo Case and, without analysis of Mitek's intervention choice, the Federal Circuit "d[id] not see how the decision not to intervene in the first suit on the patents counts materially against a finding of a reasonable apprehension of suit." *Id.* at 1342–43. Moreover, the Federal Circuit held that the district court should conduct an analysis of the "separate types of infringement (notably, direct infringement, inducement of infringement, and contributory infringement) of the claims of the [Asserted Patents], and of the bearing on any infringement of such claims of the fact stressed by the district court—namely, that bank customers

Appx11

customize Mitek's software." *Id.* at 1343; *see also id.* ("[T]he reference [to customization] does not show that, without the customer's choices, Mitek's product itself is not within the claim coverage.") According to the Federal Circuit, the "need for such customization does not exclude Mitek liability for inducement under 35 U.S.C. § 271(b)...[s]o too of any possibility of contributory infringement if MiSnap is not suitable for substantial non-infringing uses." *Id.*

The Federal Circuit also noted that certain other issues should be considered on remand if not forfeited, including "issues concerning events and evidence that post-date the filing of this declaratory judgment action on November 1, 2019." *Id.* at 1344.

## V.    THE COURTS POST-REMAND ORDER

In light of the Federal Circuit's Opinion, the Court ordered the parties to submit additional briefing and declarations to answer certain questions raised in the Federal Circuit's Opinion. (Dkt. No. 76.) The parties were instructed to brief issues including, but not limited to, the following:

- Whether the Motion was a facial or a factual challenge, in whole or in part, and why;
- If the Motion was a factual challenge, whether the conditions for a factual challenge were met;
- For any factual challenges, the necessity for the parties to present further evidence including, but not limited to, evidence concerning post-complaint events such as the case against PNC Bank N.A. ("PNC") (*United Services Automobile Association v. PNC Bank N.A.*, Case No. 2:20-cv-319 (E.D. Tex. Sep. 30, 2020)) (the "PNC -319 Case") and any associated indemnification demands by PNC;
- The effect, if any, of Mitek's failure to intervene in the case against Wells Fargo (*United Services Automobile Association v. Wells Fargo Bank, N.A.*, Case No. 2:18-cv-245 (E.D. Tex. June 7, 2018)) (the "Wells Fargo Case");
- The effect, if any, of customer customization of the Mitek MiSnap product on direct, induced, and contributory infringement of the Asserted Patents;
- The effect, if any, of substantial non-infringing uses of the Mitek MiSnap product;
- If a case or controversy existed at the time of filing the Complaint, whether it ceased to exist after USAA's settlement with Wells Fargo and why;
- If a case or controversy existed at the time of filing the Complaint, whether it extended beyond Mitek's potential liability involving Wells Fargo and why;

- The role, if any, of Mitek's MiSnap technology in banking applications generally and in allegations of infringement of the Asserted Patents;

- Given the Federal Circuit's finding that USAA's letters to Mitek's customers created a case or controversy between USAA and those customers, whether there was a reasonable potential of Mitek's indemnification liability, including information about the character of any actual indemnity demands and the precise scope of any indemnification agreements;

- Whether the Court should exercise its discretion under the Declaratory Judgment Act to decline to hear the declaratory judgment action and, if so, why; and

- Whether there exists a better or alternative remedy to a declaratory judgment action, including whether Mitek could or should have intervened in customer suits, whether such intervention would have given Mitek adequate relief, whether such intervention would have been more effective than a declaratory judgment action, and whether the scope of litigation for such intervention would have been greater or less than the scope of litigation in a declaratory judgment action.

(*Id.* at 2.)

## VI.    LEGAL STANDARD

The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 126 (2007) (quoting 28 U.S.C. § 2201(a)). "When considering a declaratory judgment action, a district court must engage in a three-step inquiry." *Orix Credit All., Inc. v. Wolfe*, 212 F.3d 891, 895 (5th Cir. 2000). The court must ask (1) "whether an 'actual controversy' exists between the parties" in the case; (2) whether it has authority to grant declaratory relief; and (3) whether "to exercise its broad discretion to decide or dismiss a declaratory judgment action." *Id.*

"In assessing jurisdiction, the district court is to accept as true the allegations and facts set forth in the complaint." *Choice Inc. of Tex. v. Greenstein*, 691 F.3d 710, 714 (5th Cir. 2012). Where subject matter jurisdiction is being assessed based on the complaint, the court must determine "whether the facts alleged, under all the circumstances, show that there is a substantial controversy,

9

Case 2:20-cv-00115-JRG   Document 121 *SEALED*   Filed 02/23/23   Page 10 of 62 PageID #: 4084

between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune*, 549 U.S. at 127. The inquiry focuses on whether the dispute is "definite and concrete, touching the legal relations of parties having adverse legal interests." *Id.* (citations omitted).

"A declaratory judgment plaintiff must plead facts sufficient to establish jurisdiction at the time of the complaint, and post-complaint facts cannot create jurisdiction where none existed at the time of filing." *Microsoft Corp. v. DataTern, Inc.*, 755 F.3d 899, 906 (Fed. Cir. 2014). A case or controversy must also remain present throughout the course of the suit. *See Preiser v. Newkirk*, 422 U.S. 395, 401–02 (1975). In making this determination, the court may rely on pleaded and undisputed facts or on findings that resolve factual disputes. Pursuant to Fifth Circuit precedent:

> [T]he district court is to accept as true the allegations and facts set forth in the complaint. Additionally, the district court is empowered to consider matters of fact which may be in dispute. The district court consequently has the power to dismiss for lack of subject matter jurisdiction on any one of three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.

*Greenstein*, 691 F.3d at 714 (citations and quotations omitted). The Fifth Circuit has said that a challenge is "factual" rather than "facial" "if the defendant 'submits affidavits, testimony, or other evidentiary materials.'" *Superior MRI Services, Inc. v. Alliance Healthcare Services, Inc.*, 778 F.3d 502, 504 (5th Cir. 2015) (citations omitted). "To defeat a factual attack, a plaintiff 'must prove the existence of subject-matter jurisdiction by a preponderance of the evidence' and is 'obliged to submit facts through some evidentiary method to sustain his burden of proof.'" *Id.* (citations omitted).

## VII.   THE PARTIES' POST REMAND BRIEFING

The Court now turns to and addresses each issue as outlined in the parties' post-remand briefing. (*See, e.g.,* Dkt. Nos. 80, 82, 90, 95, 100, 103, 105, 108, 111.)

Appx14

a.    **Whether the Motion Was a Facial or Factual Challenge**

USAA contends that the Motion "raised both facial and factual challenges to Mitek's pleadings." (Dkt. No. 80 at 1.) Specifically, USAA argues that "Mitek admits that it alleged no facts supporting that USAA ever alleged, explicitly or implicitly, that MiSnap performs *all* limitations of any claim." (Dkt. No. 108 at 1) (emphasis added). USAA contends that Mitek's admission is "facially insufficient" to allege any claim of direct infringement by MiSnap. (*Id.*)

Mitek notes that a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference of the legal sufficiency of the allegations." (Dkt. No. 103 at 1 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).) Accordingly, Mitek contends that it pled sufficient facts "to show under all the circumstances…a substantial controversy between the parties with respect to both infringement and indemnification liability to warrant the issuance of a declaratory judgment" and argues that "[n]othing more is required to support standing here." (Dkt. No. 103 at 1 (citing *MedImmune*, 549 U.S. at 127)) (internal quotations omitted).

Mitek contends that "USAA has not raised a legitimate factual challenge to any of the jurisdictional allegations in the Complaint." (Dkt. No. 82 at 2, 20.) Rather, Mitek argues that the "evidence USAA submitted in response to Mitek's jurisdictional allegations pertains to undisputed facts or goes to the significance of those undisputed facts to the jurisdictional inquiry—neither of which are proper factual challenges eligible for resolution by the Court." (*Id.* at 2.) Mitek contends that "USAA's submission of evidence from the [Wells Fargo] Case indicating that Mitek customers can customize MiSnap does not raise a factual dispute [as to] any of Mitek's uncontroverted allegations" because "Mitek does not dispute that its customers can and do customize their banking applications when integrating the MiSnap product." (*Id.* at 20.) To the extent USAA argues that "the MiSnap SDK can never fall 'within the claim coverage' without

11

significant customization by its customer," Mitek contends that "USAA has provided no evidence supporting this contention." (*Id.*)

Mitek also argues that USAA failed to factually challenge Mitek's allegations regarding its indemnification agreements and demands for indemnification stemming from the same. (Dkt. No. 82 at 21.) According to Mitek, the "only evidence USAA has submitted pertains specifically to Wells Fargo, which is irrelevant as Mitek's declaratory judgment action is on behalf of all yet-to-be-sued customers and not Wells Fargo, who has already been sued." (*Id.* at 21–22.) Mitek does not dispute that it "did not indemnify Wells Fargo and that Wells Fargo did not request indemnification from Mitek" even "despite Mitek's OEM agreement with Fiserv." (*Id.* at 22.)

###    i.    If the Motion Was a Factual Challenge, Whether the Conditions for a Factual Challenge Were Met

USAA argues that Mitek's allegation that it had a "real and substantial apprehension of imminent litigation between Mitek and USAA" was "insufficient on a facial challenge," but notes that USAA introduced evidentiary materials to rebut Mitek's allegation. (Dkt. No. 80 at 1.) Thus, to meet the requirements for a factual challenge, USAA contends it "merely needed to submit evidence extraneous to the Complaint." (*Id.* (citing *Superior MRI*, 778 F.3d at 504 ("An attack is 'factual' rather than 'facial' if the defendant 'submits affidavits, testimony, or other evidentiary materials.'")).) Such "extraneous evidence" included "Mitek's own statements to the PTAB directly contradicting that Mitek anticipated imminent suit from USAA, in which Mitek admitted that USAA never made any explicit or implicit accusation of infringement." (Dkt. No. 80 at 2.) USAA also submitted testimony from the Wells Fargo Case that "included specific testimony, from both Mitek and USAA, that Wells Fargo had full control over whether its system practices all elements of the asserted claims." (*Id.*)

12

Mitek raised an additional theory of jurisdiction based on "demands for indemnification from its customers and suppliers." (Dkt. No. 80 at 2 (citing Dkt. No. 1, ¶ 13).) USAA contends that, while this theory was "deficient on its face," USAA also challenged the factual basis for this theory with evidence that "Mitek does not believe it has indemnity obligations relative to these USAA patents." (Dkt. No. 80 at 3.) As an example, ██████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████ USAA also cited Mitek's 10-Q filing with the Securities and Exchange Commission ("SEC"), "which affirmatively states that Mitek does not believe it has indemnity obligations with respect to the patent infringement allegations by USAA." (*Id.* (citing Dkt. No. 66-2 at 20 ("Mitek does not believe it is obligated to indemnify NCR Corporation or end-users of NCR Corporation resulting from the patent infringement allegations by USAA.")).)

Mitek argues that even if USAA's evidence can be considered a factual attack on Mitek's jurisdictional allegations, it is an "improper, indirect attack on the merits of the case." (Dkt. No. 82 at 22.) As an example, Mitek argues that the "issue of whether MiSnap may be within the claim coverage of the [Asserted Patents] without significant customization by a Mitek customer goes to the very relief Mitek is seeking here, *i.e.*, a declaration" that MiSnap does not infringe the Asserted Patents. (*Id.*) Mitek contends that such determination must be made by the factfinder, and "USAA makes no attempt to explain why such an inquiry can be separated from the merits of Mitek's declaratory judgment action and should be resolved by the Court prior to accepting jurisdiction." (*Id.*)

13

ii.     **The Necessity for the Parties to Present Further Evidence Regarding Factual Challenges Including Post-Complaint Events Such as USAA's Case Against PNC and Any Indemnification Demands by PNC**

USAA contends that Mitek "cannot present evidence regarding post-complaint events in an attempt to meet its burden of showing jurisdiction at the time of suit." (Dkt. No. 80 at 4.) However, USAA notes that Mitek bears the burden of demonstrating that jurisdiction continues to exist and contends that in this case, post-complaint events have "extinguish[ed] jurisdiction." (*Id.*) The post-complaint events that USAA points to include the settlement of the Wells Fargo suit upon which Mitek's Complaint was substantially based and the "five-year passage of time since USAA allegedly sent the letters on which Mitek's [C]omplaint secondarily relied." (*Id.*)

Mitek contends that "the events that occurred after Mitek filed its Complaint demonstrate even more clearly that there continues to remain an Article III controversy for both of Mitek's independent bases for standing at the time of the filing to this day." (Dkt. No. 82 at 17–18.) Indeed, Mitek contends that its "reasonable apprehension of suit and reasonable potential for indemnification liability has only increased—rather than decreased—since the time Mitek filed its Complaint." (*Id.*)

iii.    **Whether Any Case or Controversy Ceased to Exist After USAA's Settlement with Wells Fargo**

USAA contends that post-complaint events have "extinguish[ed] jurisdiction," including the settlement of the Wells Fargo Case upon which Mitek's Complaint was substantially based. (Dkt. No. 80 at 4.) USAA also argues that its *own* conduct since the termination of the Wells Fargo Case has "extinguished" any apprehension of imminent suit that may have existed:

> Mitek's Complaint relied heavily on USAA's suit against Wells Fargo, which involved the four [Asserted Patents], and what Mitek refers to as one of it [*sic*] 'largest customers.' The Wells Fargo litigation settled in 2021. Neither Wells Fargo, nor USAA, nor anyone else ever brought suit against Mitek or suggested that Mitek owes any liability based on the Wells Fargo infringement or the

14

settlement agreement. Nor has USAA (or Wells Fargo) sued Mitek or threatened suit.

(*Id.* at 21.) According to USAA, "[t]hese facts and the long passage of time all further support the absence of any justiciable controversy between USAA and Mitek." (*Id.* at 22 (citing *Cepheid v. Roche Molecular Sys., Inc.*, 2013 WL 184125, at *12 (N.D. Cal. Jan. 17, 2013) ("[T]he passage of time without any indication from Defendants or other circumstances implying that Defendants intend to enforce the...patent against Plaintiff weighs against finding a justiciable controversy.")).)

USAA notes that the "only other litigation activity with any overlap" of the Asserted Patents has been USAA's litigation with PNC (*i.e.*, the PNC -319 Case) and its suit against Truist Bank (Case. No. 2:22-cv-00291 (E.D. Tex. 2022)) (the "Truist Bank Case"). (*Id.*) USAA's allegations against both PNC and Truist Bank stem largely from patent families from 2006, which Mitek described in its 10-Q filing as "irrelevant to Mitek, stating that they involve 'broad banking processes and not Mitek's specific mobile deposit features.'" (*Id.* at 21–22 (citing Dkt. No. 66-2 at 21).)

Mitek notes that the litigation activity referenced by USAA was against three other MiSnap customers: PNC, BBVA USA ("BBVA"), and Truist Bank. (Dkt. No. 82 at 18.)[4] Certain of the Asserted Patents overlap between those cases and the Wells Fargo Case. (*Id.*) Mitek alleges that the "infringement allegations for the [Asserted Patents] contained in the PNC, BBVA, and Truist [Bank] complaints are virtually identical to the infringement allegations contained in the Wells Fargo complaint." (*Id.*) In addition, Mitek contends that "PNC (through its financial services

---

[4] The Court notes that in 2021, PNC acquired BBVA during the pendency of the PNC -319 Case. (*See, e.g.*, https://pnc.mediaroom.com/2021-06-01-PNC-Completes-Acquisition-of-BBVA-USA.)

providers (NCR and Finastra)) and BBVA have made actual indemnity requests to Mitek…because of USAA's lawsuits." (*Id.*)[5]

### iv.    Whether Any Case or Controversy Extended Beyond Mitek's Potential Liability Involving Wells Fargo

USAA notes the post-complaint litigation with PNC and Truist Bank and contends that "[n]othing in the past five years has given rise to any reasonable belief on behalf of Mitek that USAA's litigation activity is focused on anything other than obtaining reasonable compensation from banks who compete with USAA by using USAA's patented technology (not limited to the patents in this case) to build their mobile deposit systems." (Dkt. No. 80 at 9, 22.) USAA states that it "has not brought suit against Mitek or done anything to suggest that it intends to do so." (Dkt. No. 108 at 5.) "Indeed," USAA contends, "the fact that USAA has only sued competitor banks strongly suggests that its litigation strategy involves 'suing software users, not suppliers,'" which the "Federal Circuit has observed… 'cuts against Mitek's arguments that it might somehow be next.'" (*Id.* (citing *DataTern*, 755 F.3d at 907)) (citations and quotations omitted).

Mitek argues that "[e]ven though USAA has not yet made an infringement claim against Mitek directly, USAA has still not provided Mitek with a covenant not to sue or other assurances that would negate Mitek's reasonable apprehension of suit." (Dkt. No. 82 at 18.)[6] Mitek contends that "[n]othing prevents USAA from continuing to pursue its 'aggressive enforcement strategy' and filing suit against any one of Mitek's remaining thousands of other customers (or Mitek itself)." (*Id.* (citing *DataTern*, 755 F.3d at 906–907 (finding that such strategy, "even in the absence of direct threats against the declaratory plaintiff, may also support jurisdiction.")).)

---

[5] The Court notes that the indemnification requests by PNC and BBVA are not addressed in further detail in the parties' briefing. No specifics are provided by Mitek beyond this general conclusion.

[6] Mitek states that USAA has "[t]ellingly" not "disclaimed any interest in suing Mitek." (Dkt. No. 111 at 1.)

16

**b.      The Effect of Mitek's Failure to Intervene in the Wells Fargo Case**

USAA contends that Mitek's failure to intervene in the Wells Fargo Case confirms the lack of declaratory judgment jurisdiction here. (Dkt. No. 80 at 17.) USAA argues that if "Mitek genuinely faced liability based on USAA's suit against Wells Fargo (as would be necessary to find declaratory judgment jurisdiction), intervention of right was available." (*Id.* at 18.)[7] The Wells Fargo Case was pending for seventeen months before Mitek filed the instant action. (*Id.* at 18–19.) "If USAA had alleged that Mitek itself was infringing, or Mitek had any indemnification obligation to Wells Fargo, that would constitute an 'interest relating' to the subject of the action." (*Id.* at 19 (citing *Team Worldwide Corp. v. Wal-Mart Stores, Inc.*, 2017 WL 6059303, at *4 (E.D. Tex. Dec. 7. 2017)).) Therefore, USAA argues, "that Mitek did not seek intervention…is strong evidence that it did not believe that it faced liability, for infringement or indemnification, in connection with the Wells Fargo litigation." (Dkt. No. 80 at 19.) The same is especially true, according to USAA, because "Mitek entered into a common interest agreement with Wells Fargo on issues of invalidity and coordinated with Wells Fargo with respect to invalidity during the litigation." (*Id.*) Therefore, "Mitek *chose* not to intervene and instead to assist Wells Fargo." (*Id.* at 20) (emphasis added).

Mitek responds that it "could not have intervened as a right under Rule 24(a) unless it conceded indemnification liability, which it is neither required nor willing to do." (Dkt. No. 82 at 29 (citing *Mitek*, 34 F.4th at 1346).) Mitek similarly argues that it "could not have intervened permissively in the [Wells Fargo] Case under Rule 24(b)" because "[u]p until USAA's jury trial presentation, Mitek could not reasonably anticipate how central its software product, MiSnap, was

---

[7] USAA also argues that Mitek's decision not to intervene as of right, "but instead to wait until the Wells Fargo litigation was nearly complete to file a separate declaratory judgment suit," might also indicate that "Mitek's goal was not to produce judicial efficiency, but rather to disrupt the judicial process and seek a do-over of the Wells Fargo [C]ase." (Dkt. No. **80** at 19.)

to USAA's infringement allegations against Wells Fargo." (Dkt. No. 82 at 1; *see also id.* at 29.) Mitek states that because it was not signed on to the protective order in the Wells Fargo Case, it "did not have access to any confidential discovery, including USAA's expert infringement reports." (Dkt. No. 82 at 29–30.) It was "[i]mmediately after" USAA's infringement expert testified in the Wells Fargo Case that Mitek filed the instant Complaint "to refute USAA's claims that MiSnap satisfies a majority of the claim limitations" of the Asserted Patents. (*Id.*)

USAA disputes Mitek's assertion that it could not have known of USAA's infringement theories until the jury trial because "Mitek was a substantial participant in the Wells Fargo litigation," Mitek had a "common interest agreement with Wells Fargo," and Mitek's "corporate representative 'jointly prepared' with Wells Fargo for his deposition and trial testimony." (Dkt. No. 108 at 9–10.) USAA contends that "Wells Fargo's defenses focused on non-infringement…so clearly Mitek was not ignorant of USAA's infringement theories until the trial was almost complete." (*Id.* at 10.)

c.    **The Role of Mitek's Technology in Banking Applications Generally and in Allegations of Infringement**

USAA argues that the "evidence demonstrates that USAA and Mitek have both consistently taken the position that whether a bank infringes, *i.e.*, practices all elements of the claims, is 'up to the bank or user to decide,' based on decisions, modifications, and customization by the banks." (Dkt. No. 80 at 13–14.) Since each of the Asserted Patents has "multiple elements that are either entirely unrelated to Mitek's product or are customization decisions by banks," USAA contends that "Mitek has not pled, and cannot demonstrate," any reasonable possibility of infringement claims against Mitek. (*Id.* at 12, 14.)

18

i.      **The Effect of End-User Customization of the MiSnap Product on Direct,
         Induced, and Contributory Infringement**

### 1. Direct Infringement

USAA contends that "publicly available information confirms" that each of the Asserted

Patents "has multiple elements that are either entirely unrelated to Mitek's product or are

customization decisions by banks, which make their own decisions about what design and

functionality is commercially viable for their business objectives." (Dkt. No. 80 at 10.) USAA

contends that "[t]his is dispositive because there can be no risk of direct infringement absent any

allegation or evidence that MiSnap practices 'every limitation of the asserted claims.'" (Dkt. No.

90 at 2 (citing *Kamyr, Inc. v. Clement*, 135 F.3d 775 (Fed. Cir. 1998)).)

Such "elements" of the Asserted Patents that are either "unrelated to Mitek's product or

are customization decisions by banks" include automatic capture of a check, presentation of

"feedback information describing an instruction for satisfying the monitoring criterion," providing

the "image of the check from the camera to a depository," and alignment guide features. (Dkt. No.

80 at 10–12.) According to USAA, these features are selectively used by banks and end-users, and

"Mitek has never alleged that it actively encourages banks to meet all of these elements, even

under USAA's theories of infringement." (Dkt. No. 80 at 10.)[8] USAA also did not cite to Mitek's

manuals to prove infringement of such features. (*Id.* at 12.) USAA contends that whether it "relied

on evidence regarding MiSnap as part of its overall evidence for *some* elements of the claims

practiced by Wells Fargo in Wells Fargo's mobile deposit app is irrelevant" to show direct

infringement. (*Id.* at 13 (citing *DataTern*, 755 F.3d at 905)) (emphasis in original).

---

[8] Mitek responds that ████████████████████████████████████████
████████████████████████████ (emphasis in original).

Case 2:20-cv-00115-JRG   Document 121 *SEALED*   Filed 02/23/23   Page 20 of 62 PageID #: 4094

USAA argues that Mitek's Complaint makes only a "conclusory allegation" that Mitek apprehended litigation by USAA and contends that "Mitek does not allege that USAA ever accused any Mitek product of infringement, ever threatened suit, or ever made any allegation that any Mitek product, absent significant customization and integration with other components, satisfies all elements of any claim." (Dkt. No. 80 at 6.)

Mitek argues it is "well established" that "where a patent holder accuses customers of direct infringement based on the sale or use of a supplier's equipment, the supplier has standing to commence a declaratory judgment action if (a) the supplier is obligated to indemnify its customers from infringement liability, or (b) there is a controversy between the patentee and the supplier as to the supplier's liability for induced or contributory infringement based on the alleged acts of direct infringement by its customers." (Dkt. No. 82 at 7 (citing *Arris Grp., Inc. v. Brit. Telecomms. PLC*, 639 F.3d 1368, 1375 (Fed. Cir. 2011)).) Mitek contends that the "record evidence establishes at least a 'reasonable potential' of suit for direct infringement, inducement, *and* contributory infringement—only one of which is required to establish standing—based on the



(Dkt. No. 82 at 1–2) (emphasis in original).

First, Mitek argues that its "reasonable potential of suit stems from



(Dkt. No. 82 at 7.) "In view of USAA's apparent interpretation" of the asserted claims, and USAA's "extensive reliance on Mitek testimony, documents, and source code to show infringement at the [trials in the] Wells Fargo [Case] and PNC [-319 Case]," Mitek argues that there is "much more than a

Case 2:20-cv-00115-JRG   Document 121 *SEALED*   Filed 02/23/23   Page 21 of 62 PageID #: 4095

'reasonable potential' that infringement claims could be brought against Mitek for all three types of infringement." (*Id.*)

At trial in the Wells Fargo Case, Mitek contends that USAA alleged that a "majority of the asserted limitations, *i.e.*, two of the three limitations of claim 1 of the '571 patent and four out of seven limitations of claim 1 of the '090 patent, are performed by MiSnap." (Dkt. No. 82 at 8.) Mitek also claims that USAA showcased MiSnap, its source code, and testimony from Mitek employees during opening statements and during USAA's claim-by-claim infringement analysis. (*Id.* at 8–10.) Accordingly, Mitek contends that "[b]ased on the extensive Mitek evidence USAA presented to the Wells Fargo jury for a majority of the asserted claim limitations, there was at least a 'reasonable potential' at the time of filing (and still persists today) that USAA could bring both direct and indirect infringement claims against Mitek." (*Id.* at 10.)

Mitek further contends that it had, and still has, a "reasonable apprehension of suit for direct infringement



" (Dkt. No. 82 at 10–11.)[9] As part of such testing, Mitek contends

(*Id.* at 11; *see also id.*

USAA argued that since certain claim limitations require a "transmission via a communication pathway between the mobile device and the

_____

[9] USAA responds that "[i]t is undisputed that USAA never accused any Mitek testing of infringement." (Dkt. No. 108 at 1.)

depository," Mitek could not perform this limitation on its own. (*See, e.g.*, Dkt. No. 80 at 11–12.)

Mitek concedes that "MiSnap alone would not strictly perform this limitation," but argues that

████████████████████████████████████████(Dkt. No. 82 at 16.)

## 2. Indirect Infringement

USAA further contends that Mitek's allegation that USAA sued Wells Fargo for infringement "based at least in part on technology provided to Wells Fargo Bank by Mitek" is "facially insufficient to show an allegation that Mitek actively encouraged Wells Fargo to commit *all* elements of infringement." (Dkt. No. 80 at 7–8) (emphasis added).[10] In fact, USAA argues that "Mitek concedes that many claim elements are either unrelated to Mitek's technology or the result of a bank's own customization and design decisions." (*Id.* at 8.) "That an infringing system was made using components from another entity," according to USAA, "is commonplace, not a basis for induced infringement, and not grounds for a declaratory judgment suit." (*Id.*)

USAA argues that at the trial in the Wells Fargo Case, days after Mitek filed the instant Complaint, "Mitek's corporate representative confirmed under oath that it is 'up to the banks or the user to decide' how the Mitek product is used." (Dkt. No. 80 at 9 (citing Dkt. No. 19-2 at 65:22–66:20).) USAA's own expert "similarly testified that Wells Fargo had 'full control' over certain features of its deposit system and developed it internally," and Wells Fargo's corporate representative agreed. (Dkt. No. 80 at 9 (citing Dkt. No. 19-4 at 41:10–15).)

Mitek contends that USAA could "reasonably bring claims of inducement against Mitek" based on ███████████████████████████████████████████████████

---

[10] Mitek disputes this assertion and contends that "USAA has refused to produce its claim charts on the [Asserted Patents], which *very likely* demonstrate that USAA has extensively relied on Mitek's documents and/or source code for at least the vast majority of claim limitations." (Dkt. No. 111 at 4, n.3; *see also id.* at 5) (emphasis added).

22

Appx26



(Dkt. No. 82 at 12.)

Mitek contends that "many" such documents were shown to the jury in the Wells Fargo Case. (*Id.*)

Mitek also claims that "USAA could allege that Mitek allegedly induced its customers to infringe the [Asserted Patents] with knowledge that the induced acts constitute patent infringement based on Mitek's awareness" of the Asserted Patents from the Wells Fargo Case. (Dkt. No. 82 at 12.)[11] Mitek contends that "USAA's observations regarding possible end-user customization are irrelevant to inducement" since the ███████████████████████████████ ████████ (*Id.* at n.13.) Indeed, "[r]egardless of customization," Mitek contends that █████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████ *Id.* at 15; *see also id.* ████████████████████████████████████████████ ████████████████

According to Mitek, it "primarily developed MiSnap to provide 'touch-free auto-capture' functionality for document acquisition so that documents may be acquired automatically from a video frame processing method and without the user having to manually press any buttons or keys on their mobile device during the image acquisition process." (Dkt. No. 82 at 13.) Mitek notes that it is "undisputed that Mitek supplies its software (*i.e.*, the MiSnap SDK) to its customers either

---

[11] USAA responds that it has never accused Mitek "of encouraging anyone to do anything, let alone to practice 'all the elements of infringement,' as is required for inducement." (Dkt. No. 103 at 3 (citing *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 692 F.3d 1301, 1305 (Fed. Cir. 2012)).)

23

Case 2:20-cv-00115-JRG    Document 121 *SEALED*    Filed 02/23/23    Page 24 of 62 PageID #:  4098

directly or through third-party integrators." (*Id.*) Based on the jury presentation in the Wells Fargo Case, Mitek contends that USAA "could argue that MiSnap is a 'material part' of the claimed inventions" because "USAA argued to the Wells Fargo jury that Mitek performed the majority of the asserted limitations." (*Id.*) Accordingly, Mitek argues tha ████████████████████ ██████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████ (*Id.* (citing *Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617, 633 (2008)).)

### ii.    The Effect of Any Substantial Non-Infringing Uses of the Mitek Product

USAA contends that Mitek's Complaint is deficient as to its "conclusory assertion" of indirect infringement, since an "essential element" of contributory infringement is that the product is not "suitable for substantial non-infringing use," but "USAA has never alleged that Mitek's products are unsuited to non-infringing uses." (Dkt. No. 80 at 7 (citing 35 U.S.C. § 271(c)).) Moreover, USAA argues the record evidence shows that "end-users can customize and use Mitek's software libraries in many ways, including non-infringing ways." (Dkt. No. 108 at 2.)

Mitek responds that it ██████████████████████████████████████████ ███████████████████████████████████ which Mitek contends is "all that is required at this stage in litigation." (Dkt. No. 103 at 4 (citing Dkt. No. 1, ¶ 12).) Mitek also contends that USAA could "reasonably argue that MiSnap has no substantial non-infringing uses" because ████████████████████████████████████████████████████ (Dkt. No. 82 at 14.) At trial in the Wells Fargo Case, Mitek contends the jury "heard about the many advantages and benefits of the claimed invention over non-infringing uses" such that a "factfinder could reasonably find that any non-infringing uses, such as MiSnap's manual capture mode, are not 'substantial' because they 'deprived users of the very benefit [MiSnap] was intended to

provide...*i.e.*, the ability to automatically acquire check images thereby providing its users 'with

a more efficient and higher quality remote check depositing capability.'" (*Id.* (citing *i4i Ltd. P'Ship*

*v. Microsoft Corp.*, 598 F.3d 831, 851 (Fed. Cir. 2010)); *see also* Dkt. No. 103 at 5 ("[H]ere, Mitek

offered more than a vague one-liner and actually recommended the allegedly infringing features.

As USAA's own trial demonstratives used at the Wells Fargo trial show, Mitek widely touted its

auto-capture solution in many consumer-facing documents[.]").)[12]

### d.    Whether There Was a Reasonable Potential of Mitek's Indemnification Liability

The Federal Circuit held that while Mitek need not "concede" the validity of an indemnity

demand, "allegations of 'bare indemnity demands' are insufficient to establish jurisdiction." *Mitek*

*Sys.*, 34 F.4th at 1346. USAA contends that Mitek must plead and prove the "existence of an

indemnity agreement with a specific entity who itself has been accused of infringing" the Asserted

Patents and "that such entity made an indemnity demand to Mitek that has 'merit,' *i.e.*, created a

'reasonable potential' of Mitek's indemnification liability." (Dkt. No. 80 at 14 (citing *Mitek Sys.*,

34 F.4th at 1346).)

USAA argues that Mitek's Complaint "generically alleges" that it has contractual

agreements with "unidentified 'customers' that include indemnification provisions relating to

actual or alleged patent infringement by Mitek's technology." (Dkt. No. 80 at 15 (citing Dkt. No.

1, ¶ 13).) USAA contends that Mitek's Complaint omits certain crucial information, including the

names of the alleged customers, whether any of those customers received a letter from USAA or

have any reason to anticipate a suit from USAA, whether such customers sought indemnity related

---

[12] Mitek also notes that "whether a use is non-infringing or substantial is intertwined with the merits of the case, and USAA has not explained how such facts can be separated and adjudicated at the pleading stage without the Court accepting jurisdiction." (Dkt. No. 111 at 6.)

25

Case 2:20-cv-00115-JRG   Document 121 *SEALED*   Filed 02/23/23   Page 26 of 62 PageID #: 4100

specifically to the Asserted Patents, and whether there is merit to any such indemnification positions. (Dkt. No. 80 at 15.)[13]

According to USAA,  and instead indicates that (Dkt. No. 80 at 15–16 (citing Dkt. No. 24-1, ¶ 7); *see also* Dkt. No. 80 at 16 ("Mitek is not even in privity with banks that could allegedly infringe."); Dkt. No. 82 at 3.) USAA notes that the entities actually accused of infringing USAA's patents "do not have indemnity contracts with Mitek," including Wells Fargo. (Dkt. No. 80 at 16.) Wells Fargo "represented that it was not aware of the 'existence of any indemnity and insuring agreements' that could be implicated by USAA's suit…and 'never requested that Mitek indemnify it for any claims that USAA is bringing." (*Id.* (citing Dkt. No. 19-6 at 8; Dkt. No. 25-6 at 117:22–25).)[14] After Mitek's Complaint was filed, USAA sued PNC, but USAA notes that "PNC also does not appear to have any indemnity contract with Mitek." (Dkt. No. 80 at 16.) Indeed, "Mitek contends only that …well after Mitek's [C]omplaint," and Mitek "does not allege that )(*Id.*; *see also* Dkt. No. 66-2 at 21 (Mitek "does not believe it is obligated to indemnify NCR

---

[13] Mitek responds that to assess such information at the pleading stage "would have required Mitek to undertake discovery from hundreds of entities without subpoenas or court orders, obtain permissions and consent from customers, and file a redacted complaint, all of which would have delayed Mitek's filing to USAA's benefit while USAA already possesses the majority of the information it purportedly seeks—the identity of each Mitek customer to which it sent a letter. Moreover, Mitek was not required to plead any of these facts to establish declaratory judgment standing premised on Mitek's indemnity-based assertion of a case or controversy." (Dkt. No. 103 at 6–7.)

[14] Mitek contends that the "observation that one customer chose not to seek indemnification from Mitek notwithstanding an indemnification provision does not negate the reasonable potential for Mitek's indemnification liability on behalf of its many other customers.                                              " (Dkt. No. 103 at 8.) USAA contends that the evidence actually shows that

Corporation or end-users of NCR Corporation resulting from the patent infringement allegations by USAA.").)

Mitek contends that the "reasonable potential" of indemnification liability stemmed from "Mitek's agreements with third-party financial services providers, the actual indemnification demands it has already received from its customers, and USAA's serial lawsuits against MiSnap customers," including Wells Fargo, PNC, BBVA, and Truist Bank. (Dkt. No. 82 at 2.) Mitek admits that many of its customers ███████ ██ ██ ██ ██ ███ but claims that ███ ████ ███ ████ (*Id.* at 3.) Mitek contends that it ███ ██ ███ ██ (*Id.*)[15]

One such agreement is the "███ ███ ██ ██ ███ ██ ███ ████ (Dkt. No. 82 at 3.)

Pursuant ███ ███ ██ ██ ███ ██ ███ ████ ███ ███ ████

_____

[15] USAA alleges that "each agreement submitted by Mitek has ███ ███ ██ (Dkt. No. 108 at 6.) Mitek responds that ███ ███ ██ puts and argues that "USAA's attempt to litigate" the scope of Mitek's indemnification liability "is irrelevant at the pleading stage as to whether Mitek has met its burden of showing standing." (Dkt. No. 111 at 7.) The Court notes that Mitek has not stated whether the indemnification agreements it *has* provided (*e.g.,* with JHA) are representative of other agreements.

Appx31

 (*Id.* at

3–4.)[16]

USAA initiated its letter campaign in 2017 by sending "patent enforcement and licensing

letters to over 1,000 of Mitek's customers (mostly banks) that license MiSnap." (Dkt. No. 82 at

4.) "As a direct consequence of USAA's letter writing campaign," Mitek contends that its

customers "sent indemnity requests to Mitek." (*Id.*; *see also id.* at 4–5 (referencing indemnification

notices from ▇▇▇▇▇▇▇.) After the letter campaign, Mitek contends that USAA sued four

MiSnap licensees including Wells Fargo, PNC, BBVA, and Truist Bank. (*Id.* at 5–6.) In the PNC

-319 Case, Mitek contends that "PNC made indemnity requests to its former and current integrators

(Finastra and NCR, respectively), which in turn submitted indemnity requests to Mitek." (*Id.*)[17]

Mitek notes that the Wells Fargo Case involved all of the Asserted Patents, while the other three

cases involved typically one, but at most two, of the Asserted Patents. (*Id.*)

Mitek notes that the Federal Circuit has "already concluded that the allegations in Mitek's

Complaint concerning USAA's letter campaign and the attached example letter, viewed in light of

the Wells Fargo litigation, are sufficient to show a controversy between USAA and Mitek's

customers who received letters." (Dkt. No. 82 at 16.) Such finding "means a case or controversy

exists between USAA and the *hundreds* of Mitek customers who received USAA's threatening

letters[.]" (*Id.* at 17) (emphasis in original).

---

[16] Mitek notes ▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (Dkt. No. 82 at 3–4.)

[17] USAA notes that such letters were sent after Mitek filed the instant Complaint. (Dkt. No. 108 at 6.) Mitek responds
that ▇▇▇▇▇▇ "representative of letters Mitek received before the filing of its Complaint and demonstrates not
only that at least one banking customer ▇▇ received a letter from USAA, but also that indemnification liability would
ultimately flow to Mitek." (Dkt. No. 111 at 6.)

Appx32

Without conceding indemnification liability, Mitek argues that there is "at least a reasonable potential" of Mitek's indemnification liability when the Federal Circuit's finding is paired with Mitek's agreements with third-party financial services providers, the indemnification provisions therein, and the actual demand letters received from ███████(Dkt. No. 82 at 17.) USAA disputes Mitek's characterization of the Federal Circuit's Opinion because the "letters sent to certain banks contained 'just enough' to create a controversy between USAA and those specific bank[s]" but they "did not create a controversy with third parties who are not banks and whom USAA never interacted with." (Dkt. No. 90 at 7 (citing *Mitek*, 34 F.4th at 1345).)

USAA contends that "Mitek does not allege that USAA (1) sent a letter to ███ (2) sued ███ (3) threatened to sue ███ (4) sued any entity relating to ███ for infringement, or (5) that Mitek would have had any liability to ███ in any event." (Dkt. No. 108 at 6.) USAA contends that such omissions are "fatal" because "an agreement to defend or indemnify a third person does not provide the actual controversy…when there is no actual controversy involving the indemnitee." (*Id.* (citing *BP Chemicals Ltd. v. Union Carbide Corp.*, 4 F.3d 975, 981 (Fed. Cir. 1993)).) Indeed, USAA argues that "Mitek does not contend that ███ has ever communicated with USAA, much less been accused of infringement." (Dkt. No. 90 at 5.) ████████████

████████████████████████

████████████ (*Id.*)

USAA contends that "Mitek has never taken the position that it was obligated to indemnify ████████████ especially since ████████████

████████████████████████

████████████████████████

████████████ (Dkt. No. 90 at 6.)

Case 2:20-cv-00115-JRG   Document 121 *SEALED*   Filed 02/23/23   Page 30 of 62 PageID #: 4104

USAA notes that it is "undisputed that banks who use Mitek's products combine them with, for example, the bank's own software and equipment." (*Id.* at 7.)

### e.    Whether the Court Should Exercise Its Discretion Under the Declaratory Judgment Act to Decline to Hear the Declaratory Judgment Action

USAA contends that Mitek's proposed declaratory judgment action would be "extraordinarily inefficient" since alternative remedies exist. (Dkt. No. 80 at 23.) Such is because all of Mitek's theories of liability "hinge on whether and to what extent downstream users infringe," despite Mitek's acknowledgment that "its technology practices 'only some (but not all) of the limitations of any claim.'" (*Id.* at 25 (citing Dkt. No. 66-1 at 1).) USAA contends that allegations against each "customer" would require a "highly individualized inquiry" into "whether each product and version thereof offered by each customer, since patent issuance in 2015, infringes" the Asserted Patents, "what Mitek knew about the customer's activities and when," and "what instructions Mitek gave each customer with respect to each product and version." (Dkt. No. 80 at 25.) Such inquiry would be required for the "over 6,400 financial institutions [that] have licensed Mitek's mobile deposit technology." (*Id.* at 24 (citing Dkt. No. 24-1, ¶ 2); *see also id.* at 25 ("Notably, Mitek made exactly this point in opposing transfer of this action from the Northern District of California, *i.e.*, that each user's activity is unique and requires separate analysis.").)

USAA contends that even if such inquiry were possible, it would be inefficient compared to alternative solutions. (Dkt. No. 80 at 25–26 ("Critically, absent joinder of each entity, whoever they may be, it is possible that the declaratory judgment action will not resolve any underlying controversy between USAA and those entities.").)[18] USAA finally argues that "it does not appear

---

[18] USAA argues that this is the "exact type of scenario" in which the Federal Circuit has held that "declining jurisdiction is appropriate" because "the declaratory action would not resolve all of the issues raised, since none of the licensees is party to [the] action." (Dkt. No. 80 at 27 (citing *BP Chemicals*, 4 F.3d at 981).)

Case 2:20-cv-00115-JRG    Document 121 *SEALED*    Filed 02/23/23    Page 31 of 62 PageID #: 4105

that Mitek could satisfy a judgment relating to infringement by end-user banks" because the verdicts against PNC and Wells Fargo amount to "more than Mitek's entire market capitalization." (*Id*. at 26.)

Mitek argues that its declaratory judgment action is "consistent with the purposes of the Declaration [*sic*] Judgment Act and would be more effective and efficient than Mitek's intervention in every serial lawsuit USAA files against Mitek's customers." (Dkt. No. 82 at 2.) Mitek also argues that a declaratory judgment action "by Mitek on behalf of itself and its customers" would be "streamlined and narrower than USAA's customer suits." (*Id*. at 25.) As an example, Mitek proposes that the Court "limit Mitek's non-infringement arguments to MiSnap features that are present in all MiSnap implementations used by all Mitek customers" such that Mitek's non-infringement arguments "would have universal applicability across all of its customers" and discovery might be taken "without needing to delve into how each customer customizes various aspects of MiSnap." (*Id*. at 26.)

Mitek also argues that this declaratory judgment suit "will not require joinder of Mitek's customers" because Mitek "possesses all the evidence needed to prove non-infringement based on common elements within Mitek's MiSnap SDK." (Dkt. No. 103 at 10–11.) Such would "resolve all future suits against MiSnap users if the jury finds non-infringement of the common elements used in all instantiations within the Mitek SDK." (*Id*. at 11.)

USAA responds that none of these "allegedly 'common issues' regarding end-users [are issues] that Mitek could adjudicate alone." (Dkt. No. 108 at 8.) USAA also notes that Mitek's "primary arguments are based on alleged indirect infringement liability (a required element of which is underlying infringement by a third party) and derivative liability to a third party via

31

indemnity, which would permit Mitek at most to seek a "declaration of its customer's nonliability because of non-infringement or invalidity." (*Id.* at 8–9.)

USAA also argues that Mitek's proposed "narrow" declaratory judgment action focused on "common issues" would be "procedurally improper." (Dkt. No. 90 at 8.) USAA contends Mitek does not indicate how the parties and the Court would "determine at the outset what 'features' are present in all MiSnap implementations" because such would "presumably require discovery from every end-user of MiSnap, a group that Mitek has indicated includes more than 6,000 entities, none of whom appear to be in contractual privity with Mitek." (*Id.*)

USAA also contends that "[l]itigating about just some subset of one or more 'features' would not resolve any actual controversy" and that "litigating about all attributes of MiSnap in an action between just Mitek and USAA likely could not resolve any actual controversy with banks who implement systems unless the banks are joined as parties." (Dkt. No. 90 at 9.) USAA posits that the "banks would presumably argue that they are not bound by the findings in an action between only USAA and Mitek" and even if Mitek prevailed, "that could not immunize implementations by end-users against future claims by USAA if the implementation is infringing." (*Id.*)

### i.     Whether There Exists a Better or Alternative Remedy to a Declaratory Judgment Action

USAA contends that intervention in USAA's suits against banks, "to the extent Mitek reasonably establishes that any such suit implicates its rights, presents a far superior alternative" to a declaratory judgment action. (Dkt. No. 80 at 23.) This is so, according to USAA, because without Mitek joining its unidentified "customers" in the suit, such suit "could neither entirely resolve any potential future dispute between USAA and any bank, nor afford USAA with the opportunity to obtain complete relief for any underlying acts of direct infringement." (*Id.* at 24.)

32

Case 2:20-cv-00115-JRG   Document 121 *SEALED*   Filed 02/23/23   Page 33 of 62 PageID #: 4107

USAA contends that Mitek "could have intervened" in USAA's suits against financial institutions if it had a "genuine legal interest in these disputes as it claims." (Dkt. No. 80 at 28 ("If Mitek itself were accused of infringement or is an indemnitor, then it would have the right to intervene.").) Such intervention "would have given Mitek adequate relief" and would be "more effective than a declaratory judgment action," according to USAA, "especially from the perspective of promoting judicial economy." (*Id.*; *see also id.* at 29 ("[T]he scope of litigation for such intervention would have been…less than the scope of litigation in a declaratory judgment action.").) USAA also argues that "Mitek's declaratory judgment suit is unlikely to be binding on any bank who is not a party, or binding on USAA as to the question of whether such bank has committed infringement." (*Id.* at 29.)

Mitek argues that "intervention would be inadequate and fall short of providing Mitek the relief it seeks here on behalf of all yet-to-be-sued customers." (Dkt. No. 82 at 2.) Mitek further contends that "serial intervention cannot provide Mitek adequate relief" and would "require Mitek to continue to accrue liability while being unduly bound to USAA's strategic decisions." (*Id.* at 26–27.) The purpose of the instant Complaint, according to Mitek, is to "preempt any further lawsuits against Mitek's customers" and Mitek contends that "[w]aiting until USAA decides to sue other Mitek customers and requiring Mitek to intervene robs Mitek of such relief." (*Id.* at 27.)[19] Such intervention would also "require Mitek to waive its choice of venue" and would "expose Mitek to disproportionate liability" tied to "the use of each bank's banking application by

---

[19] Mitek never addresses why it is entitled to thwart USAA's efforts to enforce its patents, or why that is proper relief under the Declaratory Judgment Act. This does make it clear that derailing USAA's litigation strategy is the real motivation behind Mitek's declaratory judgment action.

potentially millions of bank customers, as opposed to the licensing fee Mitek receives for licensing MiSnap to that bank." (*Id.* at 27–28.)

## VIII.   ANALYSIS

### a.   Whether the Motion was a Facial or Factual Challenge

The Federal Circuit's Opinion found that "[i]t appears that USAA took the steps required to mount a factual attack that entitled it to a resolution of at least some factual disputes[.]" *Mitek*, 34 F.4th at 1344. At the post-remand hearing, USAA stated that it "believes that it has presented both a facial and a factual attack" to Mitek's Complaint. (Dkt. No. 120 at 5:17–22.) Upon further review of the record, the Court finds that USAA has met the conditions to mount a factual challenge by relying not only on Mitek's pleadings and the undisputed facts within the same, but also by presenting evidence external to Mitek's Complaint that raised disputes about the accuracy of certain allegations within Mitek's Complaint.[20]

At the hearing, USAA argued that various "categories" of disputed facts were developed in the briefing. (Dkt. No. 120 at 5:23–9:3.) First, USAA contends that there is a dispute as to "whether Mitek actually apprehended suit back in 2019 based upon the facts presented at the Wells Fargo trial and in the letters which are identified in the Complaint." (*Id.* at 5:23–6:2.) Second, USAA argues that even if there was any apprehension of suit by Mitek in 2019, there is a dispute as to "what Mitek's state of mind has been during the intervening time period" and the "reasonableness of any beliefs that [Mitek] held" in 2019 based on Mitek's statements to this Court, to the Federal Circuit, to the PTAB, and to the SEC. (*Id.* at 6:3–11.) Third, USAA argues

---

[20] This external evidence includes filings made by Mitek in IPR2020-00975 and IPR2020-00976 (Dkt. No. 80-3), excerpts from the transcript of the jury trial in the Wells Fargo Case (Dkt. Nos. 80-4, 80-5, 80-6, 80-7, 80-11), deposition transcripts (Dkt. No. 80-8), Mitek's 10-Q filed with the SEC (Dkt. No. 80-9), declarations (Dkt. No. 80-10), and excerpts from the transcript of the jury trial in the PNC -319 Case (Dkt. No. 80-12).

34

Case 2:20-cv-00115-JRG   Document 121 *SEALED*   Filed 02/23/23   Page 35 of 62 PageID #: 4109

that there is a factual dispute as to "which aspects of the Mitek products are used by customers," which of those aspects are "customizable," and which of those aspects are "optional." (*Id.* at 6:12–16.) Relatedly, USAA disputes Mitek's factual assertion that USAA "ever made any allegation that Mitek has intentionally induced infringement by a customer." (*Id.*) Finally, USAA argues that, at the threshold in time when the Complaint in was filed 2019, Mitek had "absolutely no indemnity demands…from any of those entities who received letters" from USAA. (*Id.* at 7:10–13.)

The Court finds that USAA mounted a factual attack both as to Mitek's reasonable apprehension of a lawsuit by USAA and as to Mitek's reasonable apprehension that it would be subject to an indemnification obligation based on USAA's lawsuits brought against third parties. As detailed below, the evidence submitted with the parties' post-remand briefing establishes that no case or controversy existed between USAA and Mitek at the time Mitek filed the instant Complaint.

**b.    Whether Mitek Reasonably Apprehended an Infringement Suit**

At the hearing, Mitek explained that what it provides as the MiSnap SDK is a "software library" that has features which can be customized, turned on, or turned off. (Dkt. No. 120 at 24:6–12.) Mitek contends that what it purports to litigate by way of this case is "whether the MiSnap library includes functionality that could ever infringe" the Asserted Patents "under any use case by any customer." (*Id.* at 24:13–19.) According to Mitek, certain "core" features of the MiSnap library "remain the same for all users of MiSnap SDK," including auto-capture. (*Id.* at 24:20–25:2.) Mitek contends that these common, core features are relevant to the system and computer readable medium claims at issue in the Asserted Patents. (*Id.* at 25:3–11.)

Mitek argues generally that any focus on customization of the MiSnap software is a "red herring" because Mitek's goal is to determine whether the elements of MiSnap common to each

35

Case 2:20-cv-00115-JRG    Document 121 *SEALED*    Filed 02/23/23    Page 36 of 62 PageID #: 4110

of its customers' applications infringe the Asserted Patents. (Dkt. No. 120 at 25:3–11.) If there is a finding of infringement by MiSnap resulting from such process, Mitek contends that it "will get a reasonable license that covers all of its customers[,] and the *Georgia Pacific* factors and the damages analysis between Mitek and USAA looks a lot different than the damages analysis between big banks with deep pockets." (*Id.* at 26:3–17.)[21]

The Court noted at the hearing that "at no point" does USAA contend that "Mitek's products read on and meet every element of the claims." (Dkt. No. 120 at 27:8–11.) The Court questioned Mitek as to how, if a declaratory judgment action were to go forward, Mitek would "step into the shoes of thousands of banks…to show…what each one does or does not do either to modify, amend, or change this software so that the remaining elements are met." (*Id.* at 27:8–28:13.) In other words, the Court expressed concern that Mitek would not be able to present evidence on any of the claim elements that admittedly do not stem from the Mitek products when the end-users would not be a party to this action. (*Id.*)

In response, Mitek argued



---

[21] This telling statement reveals that Mitek's underlying motivation is to thwart USAA's litigation strategy and attempt to force a one-time recovery using a reduced damages model. The Court is not persuaded that Mitek's actions are driven by a reasonable apprehension of suit from USAA, or any reasonable fear of indemnity demands by the banks.



Mitek additionally argued that

USAA disputed Mitek's notion that customization of MiSnap is "irrelevant" or a "red herring." (Dkt. No. 120 at 45:8–47:23.) USAA argued at the hearing that there are "at least four different elements, most of which [are] present in either all or most" of the Asserted Patents, which require a decision to be made by the end-user as to its implementation. (*Id.* at 45:8–15.) The first such element is automatic capture. USAA argued that at trial in the Wells Fargo Case, the Mitek corporate representative "expressly state[d] that whether you do auto-capture at all is up to the bank or the user." (*Id.* at 45:16–20.) USAA contended that, while it is post-Complaint evidence, the events of the trial in the PNC -319 Case provided an illustration of "how much discretion the bank has" in terms of the use of auto-capture in the application. (*Id.* at 45:21–46:13.)

Case 2:20-cv-00115-JRG    Document 121 *SEALED*    Filed 02/23/23    Page 38 of 62 PageID
#: 4112

USAA also argued that other features that are either fully customizable or are unrelated to the Asserted Patents include the alignment guide, which the trial in the PNC -319 Case showed can be turned off or manipulated; feedback instructions, which the Wells Fargo Case demonstrated can be changed or turned off; and control over the depository and server elements, which are completely in possession of the bank. (Dkt. No. 120 at 46:14–47:23.)

USAA argued that based on Mitek's "own testimony under oath that a customer makes the decision about at least one, and in most instances more than one, required element of the claim," the "implicit" accusation of indirect infringement that Mitek seems to suggest "falls apart" because one cannot "indirectly infringe by telling someone to perform four out of seven elements." (Dkt. No. 120 at 49:5–15.) The specific intent required for indirect infringement, according to USAA, must "relate to all elements as opposed to one or two or even a majority of elements." (*Id.*)

Mitek also argued that ███████████████████████████████████████████
████████████████████████████ (*See generally* Dkt. No. 82 at 10–11.) However, at the hearing, USAA stated that it has never seen any evidence of internal testing by Mitek and based on what USAA has learned from certain "attorneys' eyes only" submissions from Mitek counsel, such testing is "incredibly cursory." (Dkt. No. 120 at 47:24–48:12.)

The Court noted at the hearing, and reiterates here, that it is clear that the "unadulterated MiSnap software implemented by third party banks" does not meet certain elements of the asserted claims, and "those missing elements can't just be swept under the carpet because its old technology." (Dkt. No. 120 at 31:18–32:20.) There must be *evidence* that those elements are met by the third-party banks, but Mitek itself does not possess such evidence. (*Id.* at 32:14–15.) Mitek's evidence ███████████████████████████████ ██████████████████████ ██

Appx42

████████████ is not enough to prove inducement, as additional evidence would still be required to show that the customer does indeed perform the transmitting step.

As to Mitek's claim of direct infringement liability by way of its own internal testing, the Court does not see how any such testing, even if it might meet all elements of all asserted claims, causes any harm to USAA. Indeed, USAA claims not to have seen any evidence regarding when or how Mitek tests its products and argued at the hearing that there were "insufficiencies" in Mitek's testing arguments. (Dkt. No. 120 at 48:3–12.) Notably, Mitek did not allege in its Complaint that any of its own testing might give rise to an apprehension of suit for direct infringement. (*See generally* Dkt. No. 1.) Instead, Mitek makes conclusory allegations that it has a "real and substantial apprehension of imminent litigation between Mitek and USAA for direct infringement, inducement, and contributory infringement" of the Asserted Patents based on the allegations made in the Wells Fargo Case. (*See, e.g., id.* at ¶¶ 12, 30–33.) The Court finds that Mitek's claim that it apprehends a suit for direct infringement based on internal testing—raised for the first time in Mitek's post-remand briefing and never asserted by USAA—is insufficient to demonstrate a reasonable potential for a suit against Mitek for direct infringement of the Asserted Patents.

The Court finds that based on the parties' own admissions about how the MiSnap product works, how it is implemented by end-user banks, and the evidence presented at trial in the Wells Fargo Case, Mitek could not have reasonably apprehended a suit for direct infringement of the Asserted Patents at the time the Complaint was filed.[22]

---

[22] The Court declines Mitek's invitation to engage in some subjective ranking of the steps required to meet the claims. All steps are required to be met and thus every step is equally necessary and important. This statement effectively concedes that some step, or steps, are missing from the Mitek products.

Case 2:20-cv-00115-JRG    Document 121 *SEALED*    Filed 02/23/23    Page 40 of 62 PageID #: 4114

The Court also finds that there is a factual dispute between the parties regarding the existence and scope of non-infringing uses of the MiSnap product, which is an element of contributory infringement. 35 U.S.C. § 271(c). Mitek pleads in its Complaint that "[o]n information and belief, USAA…alleges that the accused Mitek's [*sic*] MiSnap and related remote deposit technology have no substantial non-infringing uses." (*See, e.g.*, Dkt. No. 1, ¶¶ 30–33.) At the hearing, USAA argued that not only was the statement in Mitek's Complaint "fully conclusory," and therefore facially insufficient, but also that "there is quite a substantial factual record about the non-infringing uses." (Dkt. No. 120 at 9:4–19.) USAA notes the non-infringing uses discussed in the PNC -319 Case, where "PNC felt strongly it had developed a non-infringing use and USAA agreed some of [PNC's] use cases were, indeed, not infringing." (*Id*. at 10:1–16.) USAA argued that the same factual dispute exists as to whether such non-infringing uses are "substantial." (*Id*.)

At the hearing, the Court asked USAA to identify the potential non-infringing uses that exist for the MiSnap software. (Dkt. No. 120 at 49:17–24.) In response, USAA named many of the features that it contends are fully customizable—*i.e.*, manual capture, manipulation or cessation of the alignment guide, and the customer's choice to eliminate all feedback. (*Id*. at 49:25–52:13.)

Mitek's argument focused almost exclusively on the alleged "manual capture" non-infringing use. At the hearing, and in its briefing, Mitek argued that the "entire purpose of MiSnap is to provide auto-capture functionality." (Dkt. No. 120 at 59:3–7.) Manual capture, according to Mitek, ███████████████████████████████████ ████████████████ (*Id*. at 59:21–16.) Therefore, Mitek contends that such an "occasional"

use, which is contrary to the "invention's intended purpose," cannot make manual capture a "substantial non-infringing use." (*Id.*)

Considering the evidence presented and USAA's explicit statements that MiSnap is fit for substantial non-infringing uses, which statements are based on USAA's experience at trial in both the Wells Fargo and PNC -319 Cases, the Court resolves this factual dispute by finding that Mitek could not have reasonably apprehended a claim of contributory infringement by USAA when the Complaint was filed.

The Court also queried the parties about the potential for inducement claims. At the hearing, Mitek cited *Arris Group, Inc. v. British Telecomms., PLC* for the proposition that if a patent owner alleges direct infringement against customers, there exists an implicit accusation of infringement against the supplier. (Dkt. No. 120 at 89:18–90:19 (citing 639 F.3d 1368 (Fed. Cir. 2011)).) However, Mitek's reliance on this principle does not square with its explicit statement to the PTAB that, despite two of its customers having been sued base at least in part on their use of MiSnap, "[USAA] has never accused or even threatened Mitek of infringement of the challenged patent." (Dkt. No. 66-1 at 1.)

Indeed, "[t]o the extent that [Mitek] argue[s] that they have a right to bring the declaratory judgment action solely because their customers have been sued for direct infringement, they are incorrect." *DataTern*, 755 F.3d at 904 ("DataTern has accused customers using Appellees' software packages of infringing the asserted method claims, but there are no arguments that there is a case or controversy between DataTern and Appellees on direct infringement.").

Further, to the extent Mitek argues that USAA's "suits against its customers automatically give rise to a case or controversy regarding induced infringement," Mitek is also incorrect. *Id.* In *DataTern*, the Federal Circuit held that the claim charts used in customer lawsuits supported a

Case 2:20-cv-00115-JRG   Document 121 *SEALED*   Filed 02/23/23   Page 42 of 62 PageID #: 4116

finding of declaratory judgment jurisdiction only where the claim charts cited to supplier documents "for *each* claim element." *Id*. at 905 (emphasis added). The court held that such claim charts could "be read to allege that Microsoft is encouraging the exact use which DataTern asserts amounts to direct infringement." *Id*. As to the asserted patents in *DataTern* for which the patent owner did *not* cite to Microsoft's documents for every limitation in the claim chart, the court found that the claim charts merely alleged direct infringement of the patent based on the alleged infringers use of Microsoft's product, but did "not impliedly assert that Microsoft induced that infringement" because "simply selling a product capable of being used in an infringing manner is not sufficient to create a substantial controversy regarding inducement." *Id*. The same was true for contributory infringement, where the *DataTern* court found that the claim charts did "not imply or suggest that Microsoft's [product] is not 'a staple article or commodity of commerce suitable for substantial non-infringing use'…or that Microsoft knew that it was 'especially made or adapted for use in an infringement' of DataTern's patents." *Id*. at 906 (quoting 35 U.S.C. § 271(c).)

The Court finds that the facts of *DataTern* are on point with this case. Like in *DataTern*, USAA has *never* alleged that MiSnap meets every element of every asserted claim and has *never* cited to Mitek documentation in its claim charts as evidence of infringement of every element of every asserted claim. The parties agree that USAA does not accuse Mitek of direct infringement, and as in *DataTern*, USAA also does not accuse Mitek of induced infringement. As to contributory infringement, there has never been a suggestion, in claim charts or otherwise, that MiSnap is not suitable for substantial non-infringing uses or that Mitek knew its software was "especially made or adapted for use in an infringement" of USAA's patents. Indeed, USAA has *expressly* said the opposite—*i.e.*, that MiSnap has several substantial non-infringing uses. (Dkt. No. 120 at 9:7–10:16.)

Accordingly, and applying *DataTern*, the Court finds that USAA's allegations, arguments, and claim charts from the Wells Fargo Case, which cited to Mitek documentation as evidence of infringement for only some of many claim limitations, did not give rise to a case or controversy between USAA and Mitek as to direct, induced, or contributory infringement.

    c.    **Even if a Case or Controversy Existed at the Time of the Complaint, Whether it Extended Beyond Liability to Wells Fargo or was Extinguished After the Wells Fargo Suit**

"Although it is the situation at the time suit was filed that establishes the existence *vel non* of an actual controversy, subsequent events can reinforce the correctness of the conclusion." *BP Chems.*, 4 F.3d at 980 (citations omitted). The Court finds that post-Complaint evidence, although not dispositive of whether a case or controversy existed at the time Mitek filed its Complaint, both supports the Court's determination that Mitek's apprehension of suit in 2019 was unreasonable and also demonstrates that any case or controversy that *might* have existed at the time of filing was not ongoing, but was extinguished after USAA's settlement with Wells Fargo.

Mitek repeatedly argued that USAA relied on evidence of MiSnap in the Wells Fargo Case to show infringement of a "majority of the limitations" of the asserted claims. (Dkt. No. 120 at 87:2–21.) Mitek claimed that the same gave it a "reasonable apprehension of suit," because USAA showed the jury "Mitek technical documents, including the Mitek programmers guide, the Mitek developers guide, and marketing materials." (*Id.*) It is undisputed that USAA cited to Mitek's documents and software to prove infringement in the Wells Fargo Case, but it is also undisputed that USAA has never claimed that MiSnap infringes *every* element of the asserted claims.

Since the Wells Fargo Case, there have been two cases against PNC, including the case against BBVA (which PNC acquired), and one currently pending case against Truist Bank. (*See generally* Case Nos. 2:20-cv-319, 2:21-cv-246, 2:21-cv-311, 2:22-cv-193, 2:22-cv-029.) Unlike the Wells Fargo Case, where Mitek focused on USAA's use of Mitek evidence to show

infringement, Mitek has never shown this Court any similar substantial use of its documentation

to prove infringement in any of the later-filed cases against Mitek customers. Further, █████

█████ ████ ██████ ████ ██████ ████ ███ ███████ ████ ████████

██████████ ████ ████ █████ █████ ███████ ███████ ███ Mitek has

not intervened in any of those cases. At the hearing, Mitek admitted that its failure to intervene

was due to the pending declaratory judgment action, which Mitek believed was "first in line"

before the customer suits. (Dkt. No. 120 at 37:14–25.)

Even accepting Mitek's strategy as proper, after the Wells Fargo Case, and even after PNC

was sued by USAA in the PNC -319 Case, Mitek made a statement to the PTAB that USAA never

made any explicit or implicit accusation of infringement as to Mitek. (Dkt. No. 120 at

38:25–40:18.) Mitek also made a statement to the Securities and Exchange Commission in its 10-Q

filing that Mitek did not believe it had an obligation to indemnify NCR or its end-users as a result

of USAA's case against PNC. (Dkt. No. 66-2 at 20; *see also* Dkt. No. 120 at 55:22–58:9.) When

pressed on this statement at the hearing, Mitek essentially argued that its statement to the SEC was

Mitek's "subjective belief" at the time the statement was made, but the same did not mean that an

indemnification obligation did *not* exist. (Dkt. No. 120 at 55:22–58:9.) The Court notes it is

precisely Mitek's "subjective belief" that matters, *i.e.*, did it reasonably fear being sued for

indemnity? Mitek's statement to the SEC makes it clear that (at least after the Wells Fargo

settlement) such a fear did not exist.

The Court finds that Mitek's post-Complaint conduct, especially conduct that took place

after USAA's settlement with Wells Fargo, demonstrates that if a case or controversy existed at

the time of the Complaint, such case or controversy did not continue to exist after the settlement

with Wells Fargo. In each subsequent lawsuit against Mitek customers, fewer of the Asserted

Patents have been litigated and use of evidence related to MiSnap has decreased. Indeed, Mitek acknowledges that it did not participate in the subsequent trials as it did in the Wells Fargo Case, either by entering into common interest agreements, assisting with non-infringement defenses, or providing a corporate representative to testify. Further, ███████████████████████ ███████████████████████████ Mitek made statements to government agencies that it believed it was not obligated to indemnify them. Finally, the defendants that USAA chose to sue in its subsequent lawsuits evidenced USAA's own stated strategy of suing competitor banks rather than the supplier. All of this taken together leads the Court to find that any reasonable apprehension of suit by Mitek did not continue based on the events that took place after the settlement of the Wells Fargo Case.

### d. Whether There was a Reasonable Potential of Indemnification Liability

Mitek contends that it reasonably apprehended indemnification liability based on a letter campaign by USAA and various indemnification agreements entered into between Mitek and third-party financial service providers and certain banks. The indemnification agreements, which are discussed in greater detail *infra*, were "made between Mitek and the banks and Mitek and the financial services providers years before the Wells Fargo lawsuit" and therefore before the Complaint was filed. (Dkt. No. 120 at 15:6–12.)

It is undisputed that, beginning in 2017, USAA sent "patent enforcement and licensing letters to over 1,000 of Mitek's customers (mostly banks) that license MiSnap." (Dkt. No. 82 at 4.) The Federal Circuit has "already concluded that the allegations in Mitek's Complaint concerning USAA's letter campaign and the attached example letter, viewed in light of the Wells Fargo litigation, are sufficient to show a controversy between USAA and Mitek's customers who received letters." (Dkt. No. 82 at 16 (citing *Mitek*, 34 F.4th at 1345).)

45

Case 2:20-cv-00115-JRG   Document 121 *SEALED*   Filed 02/23/23   Page 46 of 62 PageID #: 4120

Out of the thousands of demand letters received by Mitek customers, Mitek chose to attach only one such letter to its Complaint. (Dkt. No. 1-1; *see also* Dkt. No. 120 at 16:8–17:10.) Mitek contends that the existence of the letters from USAA to Mitek's customers led Mitek to believe that USAA would "be suing one bank after another bank in a serial fashion," and that USAA's ultimate lawsuit against Wells Fargo somehow demonstrated that the demand letters "came to fruition." (Dkt. No. 120 at 15:6–16:7.)

The Court acknowledges that each of Mitek's customers who received a letter from USAA about the Asserted Patents has a case or controversy with USAA. *Mitek*, 34 F.4th at 1345. However, Mitek has not shown how those letters to its customers, standing alone, create any reasonable apprehension of indemnification liability—or, for that matter, any imminent apprehension of suit—on Mitek's part.

However, Mitek contends that the customer letters in combination with its indemnification agreements with third-party financial services providers establish a reasonable likelihood that Mitek would be subject to indemnification liability based on suits brought by USAA. (*See, e.g.*, Dkt. No. 120 at 16:15–25; *see also id.* at 22:25–23:4.) Yet, the Court finds that Mitek could not have reasonably believed it would be subject to indemnification liability based on the agreements with third-party financial services providers attached to Mitek's briefing. The



(Dkt. No. 120 at 17:11–23:4.)

Appx50



Appx51



***

48



At the hearing, Mitek noted that it has ████████████████████████████████████

████████████████████████████ (Dkt. No. 120 at 12:6–13:11; *see also id.* at 14:9–18.)

However, counsel for Mitek repeatedly represented that, unlike the agreements with third-party

financial services providers ███████████████████████████████████████████

████████████████████████████████████████████████████████████████████

---

[23] As noted in section VII.a.iii. *supra,* BBVA has been acquired by PNC.

Appx53



***

Although "these agreements were made between Mitek and the banks…years before the Wells Fargo lawsuit," Mitek conceded that at the time the Complaint was filed, there were no cases pending against BBVA or Truist Bank. (Dkt. No. 120 at 14:19–15:22.) Mitek contends it does not use such agreements to supply jurisdiction, but merely argues that the agreements with Truist Bank

and BBVA "heighten[]" Mitek's reasonable apprehension of indemnification liability. (Dkt. No. 120 at 86:1–11.)[24]

USAA argues that Mitek could not have had any reasonable apprehension of indemnification liability because Mitek "cannot stand in the shoes of any entity who supposedly has a reasonable apprehension [of being sued] because Mitek admittedly does not have an agreement with any of those entities." (Dkt. No. 120 at 99:2–12.) USAA argues that Mitek has not come forth with any agreements with the entities who received letters from USAA in 2017 and were subsequently sued. (*Id.*)

It is undisputed that all allegations of infringement have been against banks' use of MiSnap in their own applications with "significant customization [of MiSnap] and integration with other components." (Dkt. No. 80 at 6; *see also* Dkt. No. 82 at 3 ("Many of Mitek's customers license MiSnap through a third-party financial services provider, which Mitek works with to help integrate MiSnap into banking applications.")) (citations omitted). Indeed, Mitek admitted at the hearing that ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████(Dkt. No. 120 at 92:22–94:7.) It is also undisputed that there has never been any accusation that MiSnap infringes every element of every asserted claim in the Asserted Patents—Mitek admits that the Mitek evidence in the Wells Fargo Case was presented for a "majority," but not all, of the asserted limitations. (Dkt. No. 82 at 8; *see also* Dkt. No. 66-1 at 1

---

[24] USAA notes that Mitek's generalized "fear []" of indemnification liability cannot "open" this case up to 6,400 different end-user entities. (Dkt. No. 120 at 69:2–12.) Instead, USAA contends that Mitek must "identify particular entities that they stand in the shoes of via an indemnity obligation" at the time the Complaint was filed. (*Id.*)

("Mitek provides technology to Wells Fargo that allegedly performs only some (but not all) of the limitations of any claim of the challenged patent.").)

The Court finds that each of the indemnification agreements discussed above ███████ █████████████████ that prevent Mitek from having a non-frivolous argument that there is an attaching indemnification obligation based on the lawsuits brought by USAA thus far. (Dkt. No. 120 at 18:9–16.) There are also factual issues as to each of the 6,400 end-user banks regarding what was supplied by Mitek and what was modified by the banks or the third-party financial services providers. (*Id.* at 20:21–25.) "The agreement to defend or indemnify a third person does not provide the actual controversy whereby the defender or indemnitor may bring a declaratory action on its own behalf when there is no actual controversy involving the indemnitee. The indemnitors' standing in such case is derivative, not original and independent." *BP Chem.*, 4 F.3d at 981. Applying *BP Chem.* to these facts, Mitek's "interest, either as an indemnitor or based on possible liability for contributory infringement or inducement to infringe, is no more definite than that of its licensees." *Id.*

Mitek has identified only ████████████████████████████████ ██████████[25] The other agreements Mitek provided to the Court are indemnification agreements with a third-party financial services provider, who in turn has separate indemnification agreements with end-user banks. Mitek has not come forward with any case law to suggest that such a broken chain of indemnification can create a reasonable likelihood of indemnification liability from the end-user to the manufacturer with which it is not in privity. (Dkt. No. 120 at 79:4–16.) The Federal Circuit has held that "a manufacturer or seller of a product who is sued for

---

[25] The Court notes ███████████████████████████████████████████████████████

patent infringement typically is not in privity with a party, otherwise unrelated, who does no more than purchase and use the product." *Transclean Corp. v. Jiffy Lube Int'l, Inc.*, 474 F.3d 1298, 1306 (Fed. Cir. 2007). Aside from ██████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████ importantly writes out any reasonable apprehension of suit under these facts. Accordingly, the totality of the circumstances demonstrates that Mitek's lack of privity████ ████████████████████████████████████████████████████████████████ ████████—necessitates the Court's conclusion that Mitek could not have had a reasonable apprehension of indemnification liability at the time the Complaint was filed.

The Court also returns to Mitek's statement to the public via the SEC in its 10-Q filing that Mitek did not believe it had an obligation to indemnify NCR or its end-users as a result of USAA's case against PNC. (Dkt. No. 66-2 at 20; *see also* Dkt. No. 120 at 55:22–58:9.) The Federal Circuit held in *DataTern* that where the Appellee "concede[d]" that indemnification requests from its customers were not valid, the Court would not hold that such indemnification requests alone could create standing for a declaratory judgment action. *DataTern*, 755 F.3d at 904.[26] It is true that Mitek need not concede indemnification liability to establish a reasonable potential of indemnification liability. However, in certain instances, such as in its 10-Q filing, Mitek has expressly admitted its own state of mind and belief that an indemnification request from a customer was without merit. (Dkt. No. 66-2 at 20.) Such admission harkens to the situation in *DataTern*, where the Federal

---

[26] "If Appellees had an obligation to indemnify their customers, they would then have standing to bring suit. In that instance, Appellees would stand in the shoes of the customers and would be representing the interests of their customers because of their legal obligation to indemnify. But here there is no evidence of such an obligation and Appellees concede that no such obligation exists. Instead, Appellees seek to broaden our precedent quite substantially by arguing that a customer request to indemnify ought to give rise to standing, without regard, it appears, to the merit of the customer request. This cannot be." *DataTern*, 755 F.3d at 904.

Circuit declined to find declaratory judgment standing based on a non-meritorious indemnification request. The Court finds this statement to the SEC to be, in effect, a disclaimer of any true apprehension of suit, which statement Mitek cannot now walk back.

Accordingly, the Court finds that any indemnification agreements and demands stemming therefrom do not create a "reasonable potential" for Mitek's indemnification liability and therefore that no declaratory judgment jurisdiction exists based on Mitek's perceived potential for indemnification liability.

e. **Whether the Court Should Exercise its Discretion**

At the hearing, USAA argued that the Court should exercise its discretion to decline to accept declaratory judgment jurisdiction because "the allegation[s] that Mitek wishes to put forward in this case could never resolve any underlying alleged issue with a customer." (Dkt. No. 120 at 8:4–9:3.) USAA contends this is true for several reasons, the first of which is that since Mitek's Complaint was filed, there have been three disputes with actual Mitek customers, and the allegations in those cases were only substantially tied to Mitek in one instance—*i.e.*, the Wells Fargo Case— and the MiSnap software was "irrelevant" to the other cases. (*Id.*)

Counsel for Mitek argued that it is a "small software company" with ███████████████ ██████████████████████████████████████████████████████████████████ in USAA's litigations. (Dkt. No. 120 at 62:5–13.) Indeed, Mitek explicitly conceded that "USAA made the intentional strategic decision to sue the deep pockets" to "get a larger jury damages award." (*Id.*) Aside from USAA not affirmatively granting Mitek an express covenant not to sue, Mitek has not come forward with evidence that USAA has any intent to deviate from its strategy of suing only its competitor banks.

Mitek contends that if this declaratory judgment action were to go forward and Mitek was found to infringe the Asserted Patents, Mitek "will have a reasonable license at a reasonable royalty

54

Case 2:20-cv-00115-JRG   Document 121 *SEALED*   Filed 02/23/23   Page 55 of 62 PageID #: 4129

based on the *Georgia Pac.fic* factors between Mitek sitting at the table and USAA sitting at the table, rather than in the Wells Fargo [C]ase [where] it was Wells Fargo sitting at the table and USAA sitting at the table." (Dkt. No. 120 at 41:22–42:3.) Mitek believes that it is the "party that's entitled to the license" to the Asserted Patents because Mitek "provide[s] the software to [its] customers." (*Id.* at 67:10–18.)

Mitek represents that it "currently licenses MiSnap to over 6,400 financial institutions." (Dkt. No. 82 at 3.) If MiSnap were found to infringe the Asserted Patents, Mitek would certainly then assert a right to sublicense the same to its customers. (*See, e.g.*, Dkt. No. 120 at 72:16– 73:3 ("[Mitek's] vision is some small damages and they pay it. And they said in their brief I think, well, that would mean everyone would get a license. Civil Procedure 101, that's just wrong."); *see also id.* at 76:4–14 ("Mitek is really going for where they are liable and they pay a small damages amount, that doesn't get anybody else off the hook; that just puts [USAA] into a situation where [they] have to take a look, as in the *SynQor* case, about what was included, what was satisfied, and what was not.").) Mitek seemingly ignores, in its discussion of the hypothetical negotiation and the *Georgia Pac.fic* factors, that it would have to negotiate the important right to sublicense its "infringing" software to its thousands of customers. Such would rightly cost Mitek a great deal of money, and likely a much larger sum than Mitek anticipates as part of any "reasonable license" that Mitek is "willing to accept." (*See, e.g.*, Dkt. No. 120 at 26:3–17.)

USAA contends that what Mitek hopes to achieve is a "declaration that their customers' use is not infringing" as well as a "declaration that [Mitek is] not responsible for indirect infringement" because they "didn't have an intent to cause any infringement." (Dkt. No. 120 at 69:13–20; *see also id.* at 72:3–10.) To obtain such a declaration, USAA believes that Mitek plans to raise the "timing of capture" defense that was presented at trial in the Wells Fargo Case. (*Id.* at

69:21–71:10.) USAA contends that one of the problems with a suit that would "sweep across and supposedly apply to all customers" is that of the three customers who have already been sued, only one raised the "timing of capture" defense—*i.e.*, Wells Fargo. (*Id.*) USAA argues that the defense raised by Wells Fargo was inapplicable to Wells Fargo and contends that the defense is "clearly not some universally applicable argument when PNC itself did not even put it forward." (*Id.*) USAA contends that since PNC was found infringing in the PNC -319 Case, Mitek's argument that "nobody here that uses Mitek software can be an infringer" is incorrect. (*Id.*)

Mitek argues that if this action goes forward, USAA will have a "full and fair opportunity to litigate" whether MiSnap infringes the Asserted Patents such that if "Mitek prevails and it is determined that MiSnap does not infringe" the Asserted Patents, USAA "should not be able to get a second bite at the apple going after Mitek's customers for the same acts of infringement based on MiSnap[.]" (Dkt. No. 120 at 78:18–79:3.) Mitek also contends that the Court should entertain the declaratory judgment action to "avoid… serial harassing suits" and because "Mitek feels very strongly that it is in the best position to defend its own software" as it was Mitek who wrote the software and knows the various modes and configurations. (*Id.* at 64:17–25; *see also id.* at 65:18–66:6.)[27]

The Court agrees that Mitek *is* likely in the best position to defend its own software. However, the Court finds that the declaratory judgment action as proposed by Mitek is not the best *way* to defend its software. Rather, the Court continues to believe that the best means by which

---

[27] Mitek concedes that presenting a "drastically" lower damages model than would be asserted against an end-user bank might be "one of the considerations" that Mitek made in bringing this declaratory judgment action but argues that it believes a "license should have been taken by the manufacturer of the software" and not necessarily by "the people with the deepest pockets." (Dkt. No. 120 at 66:22–67:18.) Mitek believes it is the "party that's entitled to the license" because it is Mitek that "provide[s] the software to [it's] customers." (*Id.*) However, Mitek admits that Mitek and USAA have never had any licensing discussions or exchanged any quotes. (*Id.* at 67:19–68:1.)

Mitek can defend its software *as that software is used by banks* is to intervene, either as of right

or permissively, in the next litigation, if any, brought by USAA against a Mitek customer which

asserts the Asserted Patents.[28] Moreover, Mitek's assertion that going forward with this

declaratory judgment action will foreclose USAA from re-litigating infringement against banks

using Mitek software is misplaced. It is undisputed that most, if not all, customers do not use the

unadulterated MiSnap software that would be at issue in any declaratory judgment action. Rather,

banks can, and indeed do, customize MiSnap to fit their own needs, whether that includes

modification of the MiSnap software itself or combining the MiSnap software with software

created by the bank or their third-party financial services providers. Therefore, a determination of

whether a component of Mitek's software, sold as-is, infringes the Asserted Patents will have no

bearing and no estoppel effect on whether a modified version of the same component is infringing.

Intervention would provide an avenue for Mitek to obtain the determination it seeks:

whether its unadulterated MiSnap software, without any customization by the end-user bank,

infringes any element of any asserted claim. It is clear that Mitek has an interest in any lawsuit that

accuses its customers of patent infringement based, even in part, on use of Mitek's product.

However, this is not to say that such interest rises to the level of a "case or controversy."

Intervention in customer suits would also provide Mitek with the relief it seeks related to indirect

infringement without the need to take third-party discovery or join additional parties. The Court

acknowledges that Mitek provides its MiSnap software to over 6,000 banks. However, the Court

finds it incredibly unlikely that USAA plans to sue all 6,000 plus banks for infringement of the

Asserted Patents when, in the last five years, it has only sued four of them. Further, USAA's focus

---

[28] Mitek admits that it has "nothing to say about other USAA" patents. (Dkt. No. 120 at 66:1–6.)

57

Case 2:20-cv-00115-JRG    Document 121 *SEALED*    Filed 02/23/23    Page 58 of 62 PageID #: 4132

on enforcing the Asserted Patents seems to be decreasing with each subsequent lawsuit.[29] Accordingly, the Court does not believe that, under these facts, continuing intervention would prove nearly as detrimental to Mitek as it anticipates.

Mitek argued in its briefing and at the hearing that the "very first time" it learned of the role of the Mitek software in the Wells Fargo Case was during the trial itself. (Dkt. No. 82 at 1; *see also* Dkt. No. 120 at 35:5–17.) Such is because Mitek was not "signed onto the operative protective order" in the Wells Fargo Case and therefore lacked access to USAA's infringement contentions and expert reports. (Dkt. No. 120 at 35:5–17; *see also id.* at 55:13–15.)[30] However, it is clear to the Court that Mitek had substantial insight into the Wells Fargo litigation and the infringement allegations therein well before the actual trial.[31]

In connection with the Wells Fargo Case, Mitek entered into a common interest agreement with Wells Fargo (the "CIA") on October 11, 2018—nearly *13 months* before the trial in the Wells Fargo Case. (Dkt. No. 120 at 44:4–10; *see also id.* at 52:20–53:14, 58:10–17.) Mitek's corporate representative was deposed in July of 2019, such deponent having been chosen by Wells Fargo pursuant to the CIA. (Dkt. No. 120 at 43:25–44:3; *see also id.* at 52:20–4.) USAA represents that the "reason there was a lot of talk about Mitek" during the Wells Fargo Case "was that Wells Fargo and Mitek collectively made a decision that their sole non-infringement defense would be [] one

---

[29] Each of these four suits have been brought in this Court, giving this Court an up-close opportunity to observe USAA's methods and strategies—none of which leads this Court to believe the perceived risk to Mitek is real or practical. As to Mitek's espoused fear that USAA is suddenly going to sue them and somehow deviate from their proven litigation strategy, no serious fisherman tries to catch the quarter-pound bream when the eleven-pound bass is in the same lake.

[30] The Court notes that according to Mitek, it filed its own IPR petitions against USAA during the pendency of the Wells Fargo Case. (Dkt. No. 120 at 38:12–24.) Mitek claims that such petitions were denied because the PTAB accepted USAA's arguments that Mitek was "closely intertwined with Wells Fargo" in connection with the infringement case in this Court. (*Id.*)

[31] "Mitek's involvement in the Wells Fargo [Case] was the result of a subpoena issued by [USAA]." (Dkt. No. 66-1 at 1.)

issue about the timing of capture and that they would rely exclusively on Mitek to put on that one narrow non-infringement defense." (Dkt. No. 120 at 54:2–55:3.)

Mitek argued at the hearing that because Wells Fargo never made an indemnification request to Mitek, Mitek did not believe it could intervene as of right. (Dkt. No. 120 at 37:4–13; *see also id.* at 63:11–64:16.) Mitek's counsel admitted that Mitek "could have permissively asked to intervene" but contends that by the time Mitek "realized that MiSnap was so essential in the [Wells Fargo] infringement case," it was too close to trial and Mitek did not believe the Court would allow a permissive intervention at that time. (*Id.* at 64:3–8.) Rather, Mitek contends that it "would have had to intervene at the very beginning" of the case. (*Id.* at 64:9–16.)

The Court finds it odd that Mitek claims it "did not know" or "could not have known" about the extent of the MiSnap-related evidence until the jury trial in the Wells Fargo Case. At the hearing, the Court noted that the facts regarding the same do not "support of the notion of being surprised in the middle of trial." (Dkt. No. 120 at 61:1–14.) Indeed, Mitek's Complaint in the declaratory judgment action cites to the Amended Complaint in the Wells Fargo Case regarding USAA's allegations of encouragement and/or inducement, *and* Mitek witnesses were deposed in the Wells Fargo Case. Through both the involvement of Mitek witnesses and through the CIA— signed nearly thirteen months before trial—Mitek was clearly aware of the Asserted Patents and, in assisting with the non-infringement defenses, was aware of at least some of USAA's infringement theories. If Mitek had any fear that its product might have met the limitations of the Asserted Patents, such fear would have arisen through its work on the non-infringement case and through its witness depositions, and *not* mid-trial.[32] In other words, if Mitek had suspicions about

---

[32] This is especially so because Mitek backtracked during the hearing by stating that it *did* have "some insight" as to what was going on during the Wells Fargo Case and might have permissively intervened a "few weeks before" trial if

Case 2:20-cv-00115-JRG    Document 121 *SEALED*    Filed 02/23/23    Page 60 of 62 PageID #: 4134

its own liability, it could have certainly inquired in some meaningful way, even despite the protective order. It did not.

As a practical matter, the Court sees no path by which Mitek can litigate this case without extensive involvement by end-user banks, either through third-party discovery or through joining additional parties. The parties agree that USAA has never alleged that MiSnap meets every element of every asserted claim such that Mitek could be accused of directly infringing the Asserted Patents. As to indirect infringement, with Mitek as the sole allegedly infringing entity being party to the suit, investigation would still be required as to whether the end-user banks or third-party financial services providers are direct infringers, whether Mitek directed or encouraged some or all elements of such infringement, whether those entities modified the MiSnap software and, if so, whether such modification was made at the direction of Mitek's documentation, and more. Mitek's intent to induce infringement, or lack thereof, would need to be evaluated as to each end-user bank if Mitek's request, *i.e.*, a declaration *on behalf of its customers* that Mitek does not infringe and that Mitek did not have an intent to induce infringement, is granted.

In the end, Mitek's proposed action involves an unwieldly number of purportedly impacted licensees that would not be party to the suit. Consequently, Mitek's lawsuit would not actually resolve the issue of whether the end-user banks infringe and, therefore, whether Mitek induces or contributes to their purported infringement. It is also unclear whether any findings made as to Mitek alone would have any applicability or estoppel effect upon the end-users. "A court may decline to exercise declaratory judgment jurisdiction if it would not afford relief from the uncertainty, insecurity, and controversy giving rise to the proceedings." *BP Chem.*, 4 F.3d at 981

---

Mitek thought the Court would have granted such relief. (Dkt. No. 120 at 63:5–64:8.) The Court noted that "we'll never know the answer to that question because [Mitek] never asked." (*Id.* at 78:9–17.)

Case 2:20-cv-00115-JRG   Document 121 *SEALED*   Filed 02/23/23   Page 61 of 62 PageID #: 4135

(affirming the district court's decision to decline to exercise declaratory judgment jurisdiction where the action "would not resolve all of the issues raised, since none of the licensees is party to this action.").

Even if the Court's resolution of the disputed facts and issues contained herein is somehow flawed, the Court would still, based on the reasons and realities noted above, exercise its discretion in declining to accept declaratory judgment jurisdiction in this case. If there were *any* real case or controversy between Mitek and USAA which would now justify the Court's major dedication of time and resources, Mitek would have been sued long ago. Moreover, USAA's briefing spells out its approach: "the fact that USAA has only sued competitor banks strongly suggests that its litigation strategy involves suing software users, not suppliers[.]" (Dkt. No. 108 at 5.) Additionally, Mitek does not appear to have the financial resources to make it a viable, let alone attractive, defendant when there exist multi-billion-dollar banks that are equally capable of defending a lawsuit brought by USAA. (*See generally* Dkt. No. 80 at 26 ("[I]t does not appear that Mitek could satisfy a judgment relating to infringement by end-user banks…[.]The verdicts against PNC and Wells Fargo alone exceed…Mitek's entire market capitalization.").) Unless Congress changes the law, it remains the patent holder's decision which alleged infringer to sue.[33]

The Court again looks to the Federal Circuit's decision in *DataTern* for guidance. There, while the court was "sympathetic to Microsoft's arguments that DataTern's litigiousness supports the existence of a controversy between Microsoft and DataTern," the court noted that "DataTern's litigation strategy appears to involve suing software users, not software suppliers." *DataTern*, 755

---

[33] Congress did change this by enacting § 299 of the America Invents Act, but that only dictates that each defendant (*i.e.*, alleged infringer) is entitled to a separate trial. 35 U.S.C. § 299. It does not permit someone in Mitek's posture to force USAA to abandon its predetermined litigation strategy.

Appx65

F.3d at 906–907. USAA has stated as much here, which leads the Court to believe that USAA's strategy "cuts against" Mitek's argument that "[Mitek] might somehow be next or that litigiousness against direct infringers alone ought to create a substantial controversy regarding inducement." *Id.* at 907.

## IX. CONCLUSION

Accordingly, under the totality of the circumstances, viewing the evidence of record, and deciding the disputed facts addressed herein, the Court holds that it does not possess declaratory judgment jurisdiction in this case. Moreover, the Court holds that even if it is wrong and it *does* possess declaratory judgment jurisdiction in this case, the Court elects to exercise its discretion to decline to accept jurisdiction in this action for the reasons shown herein. As a result, **IT IS ORDERED** that this action for Declaratory Judgment as brought by Mitek is **DISMISSED**.

The parties are directed to jointly prepare a redacted version of this Order for public viewing and to file the same on the Court's docket as an attachment to a Notice of Redaction within five (5) business days of this Order.

**So ORDERED and SIGNED this 23rd day of February, 2023.**

RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE

Appx66

US008699779B1

(12) **United States Patent** (10) Patent No.: **US 8,699,779 B1**
Prasad et al. (45) Date of Patent: **Apr. 15, 2014**

(54) **SYSTEMS AND METHODS FOR ALIGNMENT OF CHECK DURING MOBILE DEPOSIT**

(75) Inventors: **Bharat Prasad**, San Antonio, TX (US);
**Minya Liang**, San Antonio, TX (US);
**Reynaldo Medina**, San Antonio, TX (US)

(73) Assignee: **United Services Automobile Association (USAA)**, San Antonio, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 815 days.

(21) Appl. No.: **12/549,443**

(22) Filed: **Aug. 28, 2009**

(51) Int. Cl.
*G06K 9/00* (2006.01)

(52) U.S. Cl.
USPC ........................................... **382/137**

(58) Field of Classification Search
USPC ........................................... 382/137
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,005,282 A | 10/1961 | Christiansen |
| 3,341,820 A | 9/1967 | Grillmeier, Jr. et al. |
| 3,576,972 A | 5/1971 | Wood |
| 3,593,913 A | 7/1971 | Bremer |
| 3,620,553 A | 11/1971 | Donovan |
| 3,648,242 A | 3/1972 | Grosbard |
| 3,800,124 A | 3/1974 | Walsh |
| 3,816,943 A | 6/1974 | Henry |
| 4,002,356 A | 1/1977 | Weidmann |
| 4,060,711 A | 11/1977 | Buros |
| 4,070,649 A | 1/1978 | Wright, Jr. et al. |

| | | | |
|---|---|---|---|
| 4,128,202 A | 12/1978 | Buros |
| 4,136,471 A | 1/1979 | Austin |
| 4,205,780 A | 6/1980 | Burns |
| 4,264,808 A | 4/1981 | Owens |
| 4,305,216 A | 12/1981 | Skelton |
| 4,321,672 A | 3/1982 | Braun |
| 4,433,436 A | 2/1984 | Carnes |
| 4,454,610 A | 6/1984 | Sziklai |
| RE31,692 E | 10/1984 | Tyburski et al. |
| 4,523,330 A | 6/1985 | Cain |
| 4,636,099 A | 1/1987 | Goldston |
| 4,640,413 A | 2/1987 | Kaplan |

(Continued)

FOREIGN PATENT DOCUMENTS

EP        0 984 410 A1      3/2000

OTHER PUBLICATIONS

Mitek Systems, "ImageNet Mobile Deposit", San Diego, California, 2 pages.

(Continued)

*Primary Examiner* — Tom Y Lu
(74) *Attorney, Agent, or Firm* — Brinks Gilson & Lione

(57) **ABSTRACT**

An alignment guide may be provided in the field of view of a camera associated with a mobile device used to capture an image of a check. When the image of the check is within the alignment guide in the field of view, an image may be taken by the camera and provided from the mobile device to a financial institution. The alignment guide may be adjustable at the mobile device. The image capture may be performed automatically by the camera or the mobile device as soon as the image of the check is determined to be within the alignment guide. The check may be deposited in a user's bank account based on the image. Any technique for sending the image to the financial institution may be used.

**23 Claims, 9 Drawing Sheets**



US 8,699,779 B1
Page 2

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,644,144 A | 2/1987 | Chandek |
| 4,722,444 A | 2/1988 | Murphy |
| 4,722,544 A | 2/1988 | Weber |
| 4,727,435 A | 2/1988 | Otani et al. |
| 4,774,663 A | 9/1988 | Musmanno |
| 4,790,475 A | 12/1988 | Griffin |
| 4,806,780 A | 2/1989 | Yamamoto |
| 4,837,693 A | 6/1989 | Schotz |
| 4,890,228 A | 12/1989 | Longfield |
| 4,927,071 A | 5/1990 | Wood |
| 4,934,587 A | 6/1990 | McNabb |
| 4,960,981 A | 10/1990 | Benton |
| 4,975,735 A | 12/1990 | Bright |
| 5,022,683 A | 6/1991 | Barbour |
| 5,053,607 A | 10/1991 | Carlson |
| 5,146,606 A | 9/1992 | Grondalski |
| 5,157,620 A | 10/1992 | Shaar |
| 5,159,548 A | 10/1992 | Caslavka |
| 5,191,525 A | 3/1993 | LeBrun |
| 5,193,121 A | 3/1993 | Elischer et al. |
| 5,220,501 A | 6/1993 | Lawlor |
| 5,227,863 A | 7/1993 | Bilbrey et al. |
| 5,229,589 A | 7/1993 | Schneider |
| 5,237,159 A | 8/1993 | Stephens |
| 5,257,320 A | 10/1993 | Etherington et al. |
| 5,265,008 A | 11/1993 | Benton |
| 5,321,816 A | 6/1994 | Rogan |
| 5,347,302 A | 9/1994 | Simonoff |
| 5,350,906 A | 9/1994 | Brody |
| 5,373,550 A | 12/1994 | Campbell |
| 5,419,588 A | 5/1995 | Wood |
| 5,432,467 A | 6/1995 | Graef |
| 5,444,794 A | 8/1995 | Uhland, Sr. |
| 5,475,403 A | 12/1995 | Havlovick et al. |
| 5,504,538 A | 4/1996 | Tsujihara |
| 5,504,677 A | 4/1996 | Pollin |
| 5,528,387 A | 6/1996 | Kelly et al. |
| 5,577,179 A | 11/1996 | Blank |
| 5,583,759 A | 12/1996 | Geer |
| 5,590,196 A | 12/1996 | Moreau |
| 5,594,225 A | 1/1997 | Botvin |
| 5,598,969 A | 2/1997 | Ong |
| 5,602,936 A | 2/1997 | Green |
| 5,610,726 A | 3/1997 | Nonoshita |
| 5,611,028 A | 3/1997 | Shibasaki |
| 5,630,073 A | 5/1997 | Nolan |
| 5,631,984 A | 5/1997 | Graf et al. |
| 5,668,897 A | 9/1997 | Stolfo |
| 5,673,320 A | 9/1997 | Ray |
| 5,677,955 A | 10/1997 | Doggett |
| 5,678,046 A | 10/1997 | Cahill et al. |
| 5,679,938 A | 10/1997 | Templeton |
| 5,680,611 A | 10/1997 | Rail |
| 5,691,524 A | 11/1997 | Josephson |
| 5,699,452 A | 12/1997 | Vaidyanathan |
| 5,734,747 A | 3/1998 | Vaidyanathan |
| 5,737,440 A | 4/1998 | Kunkler |
| 5,748,780 A | 5/1998 | Stolfo |
| 5,751,842 A | 5/1998 | Riach |
| 5,784,503 A | 7/1998 | Bleecker, III et al. |
| 5,830,609 A | 11/1998 | Warner |
| 5,832,463 A | 11/1998 | Funk |
| 5,838,814 A | 11/1998 | Moore |
| 5,863,075 A | 1/1999 | Rich |
| 5,870,456 A | 2/1999 | Rogers |
| 5,870,724 A | 2/1999 | Lawlor |
| 5,870,725 A | 2/1999 | Bellinger et al. |
| 5,878,337 A | 3/1999 | Joao |
| 5,893,101 A | 4/1999 | Balogh et al. |
| 5,897,625 A | 4/1999 | Gustin |
| 5,898,157 A | 4/1999 | Mangili et al. |
| 5,901,253 A | 5/1999 | Tretter |
| 5,903,878 A | 5/1999 | Talati |
| 5,903,881 A | 5/1999 | Schrader |
| 5,910,988 A | 6/1999 | Ballard |

| | | |
|---|---|---|
| 5,917,931 A | 6/1999 | Kunkler |
| 5,924,737 A | 7/1999 | Schrupp |
| 5,926,548 A | 7/1999 | Okamoto |
| 5,930,778 A | 7/1999 | Geer |
| 5,937,396 A | 8/1999 | Konya |
| 5,940,844 A | 8/1999 | Cahill |
| 5,982,918 A | 11/1999 | Mennie |
| 5,987,439 A | 11/1999 | Gustin et al. |
| 6,012,048 A | 1/2000 | Gustin et al. |
| 6,014,454 A | 1/2000 | Kunkler |
| 6,021,202 A | 2/2000 | Anderson |
| 6,021,397 A | 2/2000 | Jones |
| 6,029,887 A | 2/2000 | Furuhashi |
| 6,030,000 A | 2/2000 | Diamond |
| 6,032,137 A | 2/2000 | Ballard |
| 6,038,553 A | 3/2000 | Hyde |
| 6,053,405 A | 4/2000 | Irwin, Jr. et al. |
| 6,073,119 A | 6/2000 | Bornemisza-Wahr |
| 6,085,168 A | 7/2000 | Mori |
| 6,097,834 A | 8/2000 | Krouse |
| 6,097,845 A | 8/2000 | Ng et al. |
| 6,097,885 A | 8/2000 | Rayner |
| 6,105,865 A | 8/2000 | Hardesty |
| 6,141,339 A | 10/2000 | Kaplan et al. |
| 6,145,738 A | 11/2000 | Stinson et al. |
| 6,151,426 A | 11/2000 | Lee |
| 6,159,585 A | 12/2000 | Rittenhouse |
| 6,170,744 B1 | 1/2001 | Lee |
| 6,188,506 B1 | 2/2001 | Kaiserman |
| 6,189,785 B1 | 2/2001 | Lowery |
| 6,192,165 B1 | 2/2001 | Irons |
| 6,195,694 B1 | 2/2001 | Chen et al. |
| 6,199,055 B1 | 3/2001 | Kara |
| 6,236,009 B1 | 5/2001 | Emigh et al. |
| 6,243,689 B1 | 6/2001 | Norton |
| 6,278,983 B1 | 8/2001 | Ball |
| 6,282,826 B1 | 9/2001 | Richards |
| 6,293,469 B1 | 9/2001 | Masson et al. |
| 6,304,860 B1 | 10/2001 | Martin |
| 6,314,452 B1 | 11/2001 | Dekel |
| 6,317,727 B1 | 11/2001 | May |
| 6,328,207 B1 | 12/2001 | Gregoire et al. |
| 6,330,546 B1 | 12/2001 | Gopinathan et al. |
| 6,339,658 B1 | 1/2002 | Moccagatta |
| 6,363,164 B1 | 3/2002 | Jones et al. |
| 6,390,362 B1 | 5/2002 | Martin |
| 6,397,196 B1 | 5/2002 | Kravetz |
| 6,408,084 B1 | 6/2002 | Foley |
| 6,411,725 B1 | 6/2002 | Rhoads |
| 6,411,737 B2 | 6/2002 | Wesolkowski et al. |
| 6,411,938 B1 | 6/2002 | Gates et al. |
| 6,413,305 B1 | 7/2002 | Mehta |
| 6,417,869 B1 | 7/2002 | Do |
| 6,425,017 B1 | 7/2002 | Dievendorff |
| 6,429,952 B1 | 8/2002 | Olbricht |
| 6,439,454 B1 | 8/2002 | Masson et al. |
| 6,449,397 B1 | 9/2002 | Che-Chu |
| 6,450,403 B1 | 9/2002 | Martens et al. |
| 6,463,220 B1 | 10/2002 | Dance et al. |
| 6,464,134 B1 | 10/2002 | Page |
| 6,470,325 B1 | 10/2002 | Leemhuis |
| 6,505,178 B1 | 1/2003 | Flenley |
| 6,546,119 B2 | 4/2003 | Ciolli et al. |
| 6,574,609 B1 | 6/2003 | Downs |
| 6,578,760 B1 | 6/2003 | Otto |
| 6,587,837 B1 | 7/2003 | Spagna |
| 6,606,117 B1 * | 8/2003 | Windle .......................... 348/239 |
| 6,609,200 B2 | 8/2003 | Anderson |
| 6,611,598 B1 | 8/2003 | Hayosh |
| 6,614,930 B1 | 9/2003 | Agnihotri et al. |
| 6,643,416 B1 | 11/2003 | Daniels |
| 6,654,487 B1 | 11/2003 | Downs, Jr. |
| 6,661,910 B2 | 12/2003 | Jones et al. |
| 6,672,452 B1 | 1/2004 | Alves |
| 6,682,452 B2 | 1/2004 | Quintus |
| 6,695,204 B1 | 2/2004 | Stinson |
| 6,711,474 B1 | 3/2004 | Treyz et al. |
| 6,726,097 B2 | 4/2004 | Graef |
| 6,728,397 B2 | 4/2004 | Mcneal |

# US 8,699,779 B1

Page 3

(56)        **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,738,496 B1 | 5/2004 | Van Hall |
| 6,742,128 B1 | 5/2004 | Joiner |
| 6,745,186 B1 | 6/2004 | Testa et al. |
| 6,754,640 B2 | 6/2004 | Bozeman |
| 6,755,340 B1 | 6/2004 | Voss |
| 6,763,226 B1 | 7/2004 | McZeal |
| 6,781,962 B1 | 8/2004 | Williams |
| 6,786,398 B1 | 9/2004 | Stinson |
| 6,789,034 B1 | 9/2004 | Makhlouf |
| 6,796,491 B2 | 9/2004 | Nakajima |
| 6,806,903 B1 | 10/2004 | Okisu et al. |
| 6,813,733 B1 | 11/2004 | Li |
| 6,829,704 B2 | 12/2004 | Zhang |
| 6,844,885 B2 | 1/2005 | Anderson |
| 6,856,965 B1 | 2/2005 | Stinson |
| 6,863,214 B2 | 3/2005 | Garner et al. |
| 6,870,947 B2 | 3/2005 | Kelland |
| 6,883,140 B1 | 4/2005 | Acker |
| 6,898,314 B1 | 5/2005 | Kung et al. |
| 6,902,105 B2 | 6/2005 | Koakutsu |
| 6,913,188 B2 | 7/2005 | Wong |
| 6,931,591 B1 | 8/2005 | Brown |
| 6,934,719 B2 | 8/2005 | Nally |
| 6,957,770 B1 | 10/2005 | Robinson |
| 6,961,689 B1 | 11/2005 | Greenberg |
| 6,970,843 B1 | 11/2005 | Forte |
| 6,973,589 B2 | 12/2005 | Wright |
| 6,983,886 B2 | 1/2006 | Natsukari et al. |
| 6,993,507 B2 | 1/2006 | Meyer |
| 6,996,263 B2 | 2/2006 | Jones et al. |
| 6,999,943 B2 | 2/2006 | Johnson |
| 7,003,040 B2 | 2/2006 | Yi |
| 7,004,382 B2 | 2/2006 | Sandru |
| 7,010,155 B2 | 3/2006 | Koakutsu et al. |
| 7,010,507 B1 | 3/2006 | Anderson |
| 7,016,704 B2 | 3/2006 | Pallakoff |
| 7,039,048 B1 | 5/2006 | Monta |
| 7,058,036 B1 | 6/2006 | Yu |
| 7,062,099 B2 | 6/2006 | Li et al. |
| 7,062,456 B1 | 6/2006 | Riehl et al. |
| 7,062,768 B2 | 6/2006 | Kubo |
| 7,072,862 B1 | 7/2006 | Wilson |
| 7,076,458 B2 | 7/2006 | Lawlor et al. |
| 7,086,003 B2 | 8/2006 | Demsky |
| 7,092,561 B2 | 8/2006 | Downs, Jr. |
| 7,104,443 B1 | 9/2006 | Paul et al. |
| 7,113,925 B2 | 9/2006 | Waserstein |
| 7,114,649 B2 | 10/2006 | Nelson |
| 7,139,594 B2 | 11/2006 | Nagatomo |
| 7,140,539 B1 | 11/2006 | Crews |
| 7,163,347 B2 | 1/2007 | Lugg |
| 7,178,721 B2 | 2/2007 | Maloney |
| 7,181,430 B1 | 2/2007 | Buchanan et al. |
| 7,184,980 B2 | 2/2007 | Allen-Rouman et al. |
| 7,197,173 B2 | 3/2007 | Jones et al. |
| 7,200,255 B2 | 4/2007 | Jones |
| 7,204,412 B2 | 4/2007 | Foss, Jr. |
| 7,216,106 B1 | 5/2007 | Buchanan |
| 7,219,082 B2 | 5/2007 | Forte |
| 7,219,831 B2 | 5/2007 | Murata |
| 7,249,076 B1 | 7/2007 | Pendleton |
| 7,252,224 B2 | 8/2007 | Verma |
| 7,257,246 B1 | 8/2007 | Brodie et al. |
| 7,266,230 B2 | 9/2007 | Doran |
| 7,290,034 B2 | 10/2007 | Budd |
| 7,299,970 B1 | 11/2007 | Ching |
| 7,299,979 B1 | 11/2007 | Phillips |
| 7,313,543 B1 | 12/2007 | Crane |
| 7,314,163 B1 | 1/2008 | Crews et al. |
| 7,321,874 B2 | 1/2008 | Dilip |
| 7,321,875 B2 | 1/2008 | Dilip |
| 7,325,725 B2 | 2/2008 | Foss, Jr. |
| 7,328,190 B2 | 2/2008 | Smith et al. |
| 7,330,604 B2 | 2/2008 | Wu et al. |
| 7,336,813 B2 | 2/2008 | Prakash et al. |

| | | | |
|---|---|---|---|
| 7,343,320 B1 | 3/2008 | Treyz |
| 7,349,566 B2 | 3/2008 | Jones et al. |
| 7,356,505 B2 | 4/2008 | March |
| 7,377,425 B1 | 5/2008 | Ma |
| 7,379,978 B2 | 5/2008 | Anderson |
| 7,385,631 B2 | 6/2008 | Maeno |
| 7,386,511 B2 | 6/2008 | Buchanan |
| 7,391,897 B2 | 6/2008 | Jones |
| 7,391,934 B2 | 6/2008 | Goodall et al. |
| 7,392,935 B2 | 7/2008 | Byrne |
| 7,401,048 B2 | 7/2008 | Rosedale |
| 7,403,917 B1 | 7/2008 | Larsen |
| 7,406,198 B2 | 7/2008 | Aoki et al. |
| 7,421,107 B2 | 9/2008 | Lugg |
| 7,421,410 B2 | 9/2008 | Schechtman et al. |
| 7,433,098 B2 | 10/2008 | Klein et al. |
| 7,437,327 B2 | 10/2008 | Lam |
| 7,440,924 B2 | 10/2008 | Buchanan |
| 7,447,347 B2 | 11/2008 | Weber |
| 7,455,220 B2 | 11/2008 | Phillips |
| 7,455,221 B2 | 11/2008 | Sheaffer |
| 7,460,108 B2 | 12/2008 | Tamura |
| 7,461,779 B2 | 12/2008 | Ramachandran |
| 7,461,780 B2 | 12/2008 | Potts |
| 7,471,818 B1 | 12/2008 | Price |
| 7,475,040 B2 | 1/2009 | Buchanan |
| 7,477,923 B2 | 1/2009 | Wallmark |
| 7,480,382 B2 | 1/2009 | Dunbar |
| 7,480,422 B2 | 1/2009 | Ackley et al. |
| 7,489,953 B2 | 2/2009 | Griffin |
| 7,490,242 B2 | 2/2009 | Torres |
| 7,497,429 B2 | 3/2009 | Reynders |
| 7,503,486 B2 | 3/2009 | Ahles |
| 7,505,759 B1 | 3/2009 | Rahman |
| 7,506,261 B2 | 3/2009 | Satou |
| 7,509,287 B2 | 3/2009 | Nutahara |
| 7,512,564 B1 | 3/2009 | Geer |
| 7,519,560 B2 | 4/2009 | Lam |
| 7,520,420 B2 | 4/2009 | Phillips |
| 7,520,422 B1 | 4/2009 | Robinson et al. |
| 7,536,354 B1 | 5/2009 | deGroeve |
| 7,536,440 B2 | 5/2009 | Budd |
| 7,539,646 B2 | 5/2009 | Gilder |
| 7,540,408 B2 | 6/2009 | Levine |
| 7,542,598 B2 | 6/2009 | Jones |
| 7,545,529 B2 | 6/2009 | Borrey et al. |
| 7,548,641 B2 | 6/2009 | Gilson et al. |
| 7,566,002 B2 | 7/2009 | Love et al. |
| 7,571,848 B2 | 8/2009 | Cohen |
| 7,587,066 B2 | 9/2009 | Cordery et al. |
| 7,587,363 B2 | 9/2009 | Cataline |
| 7,590,275 B2 | 9/2009 | Clarke et al. |
| 7,599,543 B2 | 10/2009 | Jones |
| 7,599,888 B2 | 10/2009 | Manfre |
| 7,602,956 B2 | 10/2009 | Jones |
| 7,606,762 B1 | 10/2009 | Heit |
| 7,609,873 B2 | 10/2009 | Foth et al. |
| 7,619,721 B2 | 11/2009 | Jones |
| 7,620,231 B2 | 11/2009 | Jones |
| 7,620,604 B1 | 11/2009 | Bueche, Jr. |
| 7,630,518 B2 | 12/2009 | Frew et al. |
| 7,644,037 B1 | 1/2010 | Ostrovsky |
| 7,644,043 B1 | 1/2010 | Minowa |
| 7,647,275 B2 | 1/2010 | Jones |
| 7,668,363 B2 | 2/2010 | Price |
| 7,672,940 B2 | 3/2010 | Viola |
| 7,676,409 B1 | 3/2010 | Ahmad |
| 7,680,735 B1 | 3/2010 | Loy |
| 7,689,482 B2 | 3/2010 | Lam |
| 7,697,776 B2 | 4/2010 | Wu et al. |
| 7,698,222 B1 | 4/2010 | Bueche, Jr. |
| 7,702,588 B2 | 4/2010 | Gilder et al. |
| 7,734,545 B1 | 6/2010 | Fogliano |
| 7,743,979 B2 | 6/2010 | Fredman |
| 7,753,268 B1 | 7/2010 | Robinson et al. |
| 7,761,358 B2 | 7/2010 | Craig et al. |
| 7,766,244 B1 | 8/2010 | Field |
| 7,769,650 B2 | 8/2010 | Bleunven |
| 7,792,752 B1 | 9/2010 | Kay |

## US 8,699,779 B1

Page 4

(56)          **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 7,792,753 B1 | 9/2010 | Slater et al. |
| 7,810,714 B2 | 10/2010 | Murata |
| 7,812,986 B2 | 10/2010 | Graham et al. |
| 7,818,245 B2 | 10/2010 | Prakash et al. |
| 7,856,402 B1 | 12/2010 | Kay |
| 7,873,200 B1 | 1/2011 | Oakes, III et al. |
| 7,876,949 B1 | 1/2011 | Oakes, III et al. |
| 7,885,451 B1 | 2/2011 | Walls et al. |
| 7,885,880 B1 | 2/2011 | Prasad et al. |
| 7,894,094 B2 | 2/2011 | Nacman et al. |
| 7,896,232 B1 | 3/2011 | Prasad et al. |
| 7,900,822 B1 | 3/2011 | Prasad et al. |
| 7,903,863 B2 | 3/2011 | Jones et al. |
| 7,904,386 B2 | 3/2011 | Kalra et al. |
| 7,912,785 B1 | 3/2011 | Kay |
| 7,949,587 B1 | 5/2011 | Morris et al. |
| 7,950,698 B2 | 5/2011 | Popadic et al. |
| 7,953,441 B2 | 5/2011 | Lors |
| 7,962,411 B1 | 6/2011 | Prasad et al. |
| 7,970,677 B1 | 6/2011 | Oakes, III et al. |
| 7,974,899 B1 | 7/2011 | Prasad et al. |
| 7,978,900 B2 * | 7/2011 | Nepomniachtchi et al. .. 382/137 |
| 7,996,314 B1 | 8/2011 | Smith et al. |
| 7,996,315 B1 | 8/2011 | Smith et al. |
| 7,996,316 B1 | 8/2011 | Smith et al. |
| 8,001,051 B1 | 8/2011 | Smith et al. |
| 8,045,784 B2 | 10/2011 | Price et al. |
| 8,046,301 B1 | 10/2011 | Smith et al. |
| 8,204,293 B2 | 6/2012 | Csulits et al. |
| 8,235,284 B2 | 8/2012 | Prasad et al. |
| 8,320,657 B1 | 11/2012 | Burks et al. |
| 8,538,826 B1 | 1/2013 | Medina, III et al. |
| 8,422,758 B1 | 4/2013 | Bueche, Jr. |
| 2001/0004235 A1 | 6/2001 | Maloney |
| 2001/0014881 A1 | 8/2001 | Drummond |
| 2001/0018739 A1 | 8/2001 | Anderson |
| 2001/0027994 A1 | 10/2001 | Hayashida |
| 2001/0037299 A1 | 11/2001 | Nichols et al. |
| 2001/0042171 A1 | 11/2001 | Vermeulen |
| 2001/0042785 A1 | 11/2001 | Walker |
| 2001/0043748 A1 | 11/2001 | Wesolkowski |
| 2001/0047330 A1 | 11/2001 | Gephart |
| 2001/0054020 A1 | 12/2001 | Barth et al. |
| 2002/0001393 A1 | 1/2002 | Jones |
| 2002/0016763 A1 | 2/2002 | March |
| 2002/0016769 A1 | 2/2002 | Barbara et al. |
| 2002/0032656 A1 | 3/2002 | Chen |
| 2002/0038289 A1 | 3/2002 | Lawlor et al. |
| 2002/0052841 A1 | 5/2002 | Guthrie |
| 2002/0052853 A1 | 5/2002 | Munoz |
| 2002/0065786 A1 | 5/2002 | Martens et al. |
| 2002/0072974 A1 | 6/2002 | Pugliese |
| 2002/0075524 A1 | 6/2002 | Blair |
| 2002/0084321 A1 | 7/2002 | Martens |
| 2002/0087467 A1 | 7/2002 | Mascavage, III et al. |
| 2002/0107809 A1 | 8/2002 | Biddle et al. |
| 2002/0116329 A1 | 8/2002 | Serbetcioglu |
| 2002/0116335 A1 | 8/2002 | Star |
| 2002/0118891 A1 | 8/2002 | Rudd |
| 2002/0120562 A1 | 8/2002 | Opiela |
| 2002/0129249 A1 | 9/2002 | Maillard et al. |
| 2002/0133409 A1 | 9/2002 | Sawano et al. |
| 2002/0138522 A1 | 9/2002 | Muralidhar |
| 2002/0147798 A1 | 10/2002 | Huang |
| 2002/0150279 A1 | 10/2002 | Scott |
| 2002/0152160 A1 | 10/2002 | Allen-Rouman et al. |
| 2002/0152161 A1 | 10/2002 | Aoike |
| 2002/0152164 A1 | 10/2002 | Dutta |
| 2002/0152165 A1 | 10/2002 | Dutta et al. |
| 2002/0152169 A1 | 10/2002 | Dutta et al. |
| 2002/0159648 A1 | 10/2002 | Alderson et al. |
| 2002/0171820 A1 | 11/2002 | Okamura |
| 2002/0178112 A1 | 11/2002 | Goeller |
| 2002/0186881 A1 | 12/2002 | Li |
| 2002/0188564 A1 | 12/2002 | Star |
| 2002/0195485 A1 | 12/2002 | Pomerleau et al. |
| 2003/0005326 A1 | 1/2003 | Flemming |
| 2003/0023557 A1 | 1/2003 | Moore |
| 2003/0038227 A1 | 1/2003 | Sesek |
| 2003/0055756 A1 | 3/2003 | Allan |
| 2003/0055776 A1 | 3/2003 | Samuelson |
| 2003/0074315 A1 | 4/2003 | Lam |
| 2003/0075596 A1 | 4/2003 | Koakutsu |
| 2003/0075916 A1 | 4/2003 | Gorski |
| 2003/0081824 A1 | 5/2003 | Mennie |
| 2003/0093367 A1 | 5/2003 | Allen-Rouman et al. |
| 2003/0093369 A1 | 5/2003 | Ijichi et al. |
| 2003/0102714 A1 | 6/2003 | Rhodes et al. |
| 2003/0105688 A1 | 6/2003 | Brown |
| 2003/0105714 A1 | 6/2003 | Alarcon-Luther et al. |
| 2003/0132384 A1 | 7/2003 | Sugiyama et al. |
| 2003/0139999 A1 | 7/2003 | Rowe |
| 2003/0159046 A1 | 8/2003 | Choi et al. |
| 2003/0167225 A1 | 9/2003 | Adams |
| 2003/0191615 A1 | 10/2003 | Bailey |
| 2003/0191869 A1 | 10/2003 | Williams |
| 2003/0200174 A1 | 10/2003 | Star |
| 2003/0212904 A1 | 11/2003 | Randle et al. |
| 2003/0217005 A1 | 11/2003 | Drummond et al. |
| 2003/0225705 A1 | 12/2003 | Park et al. |
| 2003/0233278 A1 | 12/2003 | Marshall |
| 2003/0233318 A1 | 12/2003 | King et al. |
| 2004/0010466 A1 | 1/2004 | Anderson |
| 2004/0012496 A1 | 1/2004 | De Souza |
| 2004/0013284 A1 | 1/2004 | Yu |
| 2004/0024626 A1 | 2/2004 | Bruijning |
| 2004/0024708 A1 | 2/2004 | Masuda |
| 2004/0030741 A1 | 2/2004 | Wolton et al. |
| 2004/0057697 A1 | 3/2004 | Renzi |
| 2004/0058705 A1 | 3/2004 | Morgan |
| 2004/0066031 A1 | 4/2004 | Wong |
| 2004/0069841 A1 | 4/2004 | Wong |
| 2004/0071333 A1 | 4/2004 | Douglas et al. |
| 2004/0076320 A1 | 4/2004 | Downs, Jr. |
| 2004/0078299 A1 | 4/2004 | Down-Logan |
| 2004/0080795 A1 | 4/2004 | Bean et al. |
| 2004/0080711 A1 | 5/2004 | Sandru |
| 2004/0093303 A1 | 5/2004 | Picciallo |
| 2004/0093305 A1 | 5/2004 | Kight |
| 2004/0103057 A1 | 5/2004 | Melbert et al. |
| 2004/0103296 A1 | 5/2004 | Harp |
| 2004/0109596 A1 | 6/2004 | Doran |
| 2004/0110975 A1 | 6/2004 | Osinski et al. |
| 2004/0117302 A1 | 6/2004 | Weichert |
| 2004/0122754 A1 | 6/2004 | Stevens |
| 2004/0133511 A1 | 7/2004 | Smith et al. |
| 2004/0138974 A1 | 7/2004 | Shimamura |
| 2004/0148235 A1 | 7/2004 | Craig |
| 2004/0158549 A1 | 8/2004 | Matena |
| 2004/0165096 A1 | 8/2004 | Maeno |
| 2004/0170259 A1 | 9/2004 | Park |
| 2004/0210515 A1 | 10/2004 | Hughes |
| 2004/0210523 A1 | 10/2004 | Gains et al. |
| 2004/0228277 A1 | 11/2004 | Williams |
| 2004/0236647 A1 | 11/2004 | Acharya |
| 2004/0236688 A1 | 11/2004 | Bozeman |
| 2004/0240722 A1 | 12/2004 | Tsuji et al. |
| 2004/0245324 A1 | 12/2004 | Chen |
| 2004/0247199 A1 | 12/2004 | Murai et al. |
| 2004/0248600 A1 | 12/2004 | Kim |
| 2004/0252679 A1 | 12/2004 | Williams |
| 2004/0260636 A1 | 12/2004 | Marceau |
| 2004/0267666 A1 | 12/2004 | Minami |
| 2005/0001421 A1 | 1/2005 | Luth et al. |
| 2005/0010108 A1 | 1/2005 | Rahn et al. |
| 2005/0021466 A1 | 1/2005 | Buchanan et al. |
| 2005/0033645 A1 | 2/2005 | Duphily |
| 2005/0033685 A1 | 2/2005 | Reyes |
| 2005/0033695 A1 | 2/2005 | Minowa |
| 2005/0035193 A1 | 2/2005 | Gustin et al. |
| 2005/0038746 A1 | 2/2005 | Latimer et al. |
| 2005/0038754 A1 | 2/2005 | Geist |
| 2005/0044042 A1 | 2/2005 | Mendiola |
| 2005/0044577 A1 | 2/2005 | Jerding |

**US 8,699,779 B1**

Page 5

(56) **References Cited**

**U.S. PATENT DOCUMENTS**

| | | | |
|---|---|---|---|
| 2005/0049950 A1 | 3/2005 | Johnson | |
| 2005/0071283 A1 | 3/2005 | Randle et al. | |
| 2005/0075969 A1 | 4/2005 | Nielson | |
| 2005/0075974 A1 | 4/2005 | Turgeon | |
| 2005/0078336 A1 | 4/2005 | Ferlitsch | |
| 2005/0080725 A1 | 4/2005 | Pick | |
| 2005/0082364 A1 | 4/2005 | Alvarez et al. | |
| 2005/0086140 A1 | 4/2005 | Ireland | |
| 2005/0086168 A1 | 4/2005 | Alvarez | |
| 2005/0091161 A1 | 4/2005 | Gustin | |
| 2005/0096992 A1 | 5/2005 | Geisel | |
| 2005/0097019 A1 | 5/2005 | Jacobs | |
| 2005/0097046 A1 | 5/2005 | Singfield | |
| 2005/0097050 A1 | 5/2005 | Orcutt | |
| 2005/0108164 A1 | 5/2005 | Salafia | |
| 2005/0108168 A1 | 5/2005 | Halpin | |
| 2005/0115110 A1 | 6/2005 | Dinkins | |
| 2005/0125338 A1 | 6/2005 | Tidwell et al. | |
| 2005/0125360 A1 | 6/2005 | Tidwell et al. | |
| 2005/0127160 A1 | 6/2005 | Fujikawa | |
| 2005/0131820 A1 | 6/2005 | Rodriguez | |
| 2005/0149436 A1 | 7/2005 | Elterich | |
| 2005/0168566 A1 | 8/2005 | Tada et al. | |
| 2005/0171899 A1 | 8/2005 | Dunn | |
| 2005/0171907 A1 | 8/2005 | Lewis | |
| 2005/0177499 A1 | 8/2005 | Thomas | |
| 2005/0177518 A1 | 8/2005 | Brown | |
| 2005/0182710 A1 | 8/2005 | Anderson | |
| 2005/0188306 A1 | 8/2005 | Mackenzie | |
| 2005/0205661 A1 | 9/2005 | Taylor | |
| 2005/0209961 A1 | 9/2005 | Michelsen | |
| 2005/0228733 A1 | 10/2005 | Bent | |
| 2005/0252955 A1 | 11/2005 | Sugai | |
| 2005/0267843 A1 | 12/2005 | Acharya et al. | |
| 2005/0268107 A1 | 12/2005 | Harris et al. | |
| 2005/0269412 A1 | 12/2005 | Chiu et al. | |
| 2005/0273368 A1 | 12/2005 | Hutten et al. | |
| 2005/0278250 A1 | 12/2005 | Zair | |
| 2005/0281448 A1 | 12/2005 | Lugg | |
| 2005/0281471 A1 | 12/2005 | LeConte | |
| 2005/0281474 A1 | 12/2005 | Huang | |
| 2005/0289030 A1 | 12/2005 | Smith | |
| 2005/0289182 A1 | 12/2005 | Pandian et al. | |
| 2006/0002426 A1 | 1/2006 | Madour | |
| 2006/0004660 A1 | 1/2006 | Pranger | |
| 2006/0025697 A1 | 2/2006 | Kurzweil | |
| 2006/0039628 A1 | 2/2006 | Li | |
| 2006/0039629 A1 | 2/2006 | Li et al. | |
| 2006/0041506 A1 | 2/2006 | Mason et al. | |
| 2006/0045322 A1 | 3/2006 | Yu | |
| 2006/0047593 A1 | 3/2006 | Naratil | |
| 2006/0053056 A1 | 3/2006 | Alspach-Goss | |
| 2006/0059085 A1 | 3/2006 | Tucker | |
| 2006/0064368 A1 | 3/2006 | Forte | |
| 2006/0080245 A1 | 4/2006 | Bahl | |
| 2006/0085357 A1 | 4/2006 | Pizarro | |
| 2006/0085516 A1 | 4/2006 | Farr et al. | |
| 2006/0102704 A1 | 5/2006 | Reynders | |
| 2006/0106691 A1 | 5/2006 | Sheaffer | |
| 2006/0106717 A1 | 5/2006 | Randle | |
| 2006/0110063 A1 | 5/2006 | Weiss | |
| 2006/0112013 A1 | 5/2006 | Maloney | |
| 2006/0115110 A1 | 6/2006 | Rodriguez et al. | |
| 2006/0115141 A1 | 6/2006 | Koakutsu et al. | |
| 2006/0118613 A1 | 6/2006 | McMann | |
| 2006/0124730 A1 | 6/2006 | Maloney | |
| 2006/0144924 A1 | 7/2006 | Stover | |
| 2006/0144950 A1 | 7/2006 | Johnson | |
| 2006/0161501 A1 | 7/2006 | Wasserstein | |
| 2006/0164682 A1 | 7/2006 | Lev | |
| 2006/0167818 A1 | 7/2006 | Wentker et al. | |
| 2006/0182331 A1 | 8/2006 | Gilson et al. | |
| 2006/0182332 A1 | 8/2006 | Weber | |
| 2006/0186194 A1 | 8/2006 | Richardson et al. | |
| 2006/0206506 A1 | 9/2006 | Fitzpatrick | |
| 2006/0208059 A1 | 9/2006 | Cable et al. | |
| 2006/0210138 A1 | 9/2006 | Hilton et al. | |
| 2006/0212391 A1 | 9/2006 | Norman et al. | |
| 2006/0214940 A1 | 9/2006 | Kinoshita | |
| 2006/0215204 A1 | 9/2006 | Miyamoto et al. | |
| 2006/0215230 A1 | 9/2006 | Borrey et al. | |
| 2006/0222260 A1 | 10/2006 | Sambongi et al. | |
| 2006/0229976 A1 | 10/2006 | Jung | |
| 2006/0229986 A1 | 10/2006 | Corder | |
| 2006/0238503 A1 | 10/2006 | Smith | |
| 2006/0242062 A1 | 10/2006 | Peterson | |
| 2006/0242063 A1 | 10/2006 | Peterson | |
| 2006/0249567 A1 | 11/2006 | Byrne | |
| 2006/0274164 A1 | 12/2006 | Kimura et al. | |
| 2006/0279628 A1 | 12/2006 | Fleming | |
| 2006/0282383 A1 | 12/2006 | Doran | |
| 2006/0291744 A1 | 12/2006 | Ikeda et al. | |
| 2007/0016796 A1 | 1/2007 | Singhal | |
| 2007/0019243 A1 | 1/2007 | Sato | |
| 2007/0022053 A1 | 1/2007 | Waserstein | |
| 2007/0027802 A1 | 2/2007 | VanDeburg et al. | |
| 2007/0031022 A1 | 2/2007 | Frew | |
| 2007/0038561 A1 | 2/2007 | Vancini et al. | |
| 2007/0041629 A1 | 2/2007 | Prakash et al. | |
| 2007/0050292 A1 | 3/2007 | Yarbrough | |
| 2007/0053574 A1 | 3/2007 | Verma et al. | |
| 2007/0058851 A1 | 3/2007 | Quine | |
| 2007/0063016 A1 | 3/2007 | Myatt | |
| 2007/0064991 A1 | 3/2007 | Douglas et al. | |
| 2007/0065143 A1 | 3/2007 | Didow et al. | |
| 2007/0075772 A1 | 4/2007 | Kokubo | |
| 2007/0076940 A1 | 4/2007 | Goodall et al. | |
| 2007/0076941 A1 | 4/2007 | Carreon et al. | |
| 2007/0077921 A1 | 4/2007 | Hayashi | |
| 2007/0080207 A1 | 4/2007 | Williams | |
| 2007/0082700 A1 | 4/2007 | Landschaft | |
| 2007/0084911 A1 | 4/2007 | Crowell | |
| 2007/0086642 A1 | 4/2007 | Foth | |
| 2007/0086643 A1 | 4/2007 | Spier | |
| 2007/0094088 A1 | 4/2007 | Mastie | |
| 2007/0094140 A1 | 4/2007 | Riney et al. | |
| 2007/0100748 A1 | 5/2007 | Dheer | |
| 2007/0110277 A1 | 5/2007 | Hayduchok et al. | |
| 2007/0118472 A1 | 5/2007 | Allen-Rouman et al. | |
| 2007/0122024 A1 | 5/2007 | Haas et al. | |
| 2007/0127805 A1 | 6/2007 | Foth et al. | |
| 2007/0129955 A1 | 6/2007 | Dalmia | |
| 2007/0136198 A1 | 6/2007 | Foth et al. | |
| 2007/0140545 A1 | 6/2007 | Rossignoli | |
| 2007/0140594 A1 | 6/2007 | Franklin | |
| 2007/0143208 A1 | 6/2007 | Varga | |
| 2007/0150337 A1 | 6/2007 | Hawkins et al. | |
| 2007/0156438 A1 | 7/2007 | Popadic | |
| 2007/0168265 A1 | 7/2007 | Rosenberger | |
| 2007/0171288 A1 | 7/2007 | Inoue | |
| 2007/0172107 A1 | 7/2007 | Jones et al. | |
| 2007/0172148 A1 | 7/2007 | Hawley | |
| 2007/0179883 A1 | 8/2007 | Questembert | |
| 2007/0183000 A1 | 8/2007 | Eisen et al. | |
| 2007/0183741 A1 | 8/2007 | Lerman et al. | |
| 2007/0194102 A1 | 8/2007 | Cohen | |
| 2007/0198432 A1 | 8/2007 | Pitroda et al. | |
| 2007/0203708 A1 | 8/2007 | Polcyn et al. | |
| 2007/0208816 A1 | 9/2007 | Baldwin et al. | |
| 2007/0217669 A1 | 9/2007 | Swift et al. | |
| 2007/0233585 A1 | 10/2007 | Simon et al. | |
| 2007/0235518 A1 | 10/2007 | Mueller et al. | |
| 2007/0235520 A1 | 10/2007 | Smith et al. | |
| 2007/0241179 A1 | 10/2007 | Davis | |
| 2007/0244782 A1 | 10/2007 | Chimento | |
| 2007/0246525 A1 | 10/2007 | Smith et al. | |
| 2007/0251992 A1 | 11/2007 | Sharma et al. | |
| 2007/0255652 A1 | 11/2007 | Tumminaro | |
| 2007/0255653 A1 | 11/2007 | Tumminaro | |
| 2007/0255662 A1 | 11/2007 | Tumminaro | |
| 2007/0258634 A1 | 11/2007 | Simonoff | |
| 2007/0268540 A1 | 11/2007 | Gaspardo et al. | |
| 2007/0271182 A1 | 11/2007 | Prakash et al. | |
| 2007/0278286 A1 | 12/2007 | Crowell et al. | |

**US 8,699,779 B1**

Page 6

(56)          **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2007/0288380 | A1 | 12/2007 | Starrs |
| 2007/0288382 | A1 | 12/2007 | Narayanan et al. |
| 2007/0295803 | A1 | 12/2007 | Levine et al. |
| 2007/0299928 | A1 | 12/2007 | Kohli et al. |
| 2008/0002911 | A1 | 1/2008 | Eisen |
| 2008/0021802 | A1 | 2/2008 | Pendleton |
| 2008/0040280 | A1 | 2/2008 | Davis et al. |
| 2008/0052182 | A1 | 2/2008 | Marshall |
| 2008/0059376 | A1 | 3/2008 | Davis |
| 2008/0063253 | A1 | 3/2008 | Wood |
| 2008/0068674 | A1 | 3/2008 | McIntyre |
| 2008/0071721 | A1 | 3/2008 | Wang |
| 2008/0080760 | A1 | 4/2008 | Ronca |
| 2008/0086420 | A1 | 4/2008 | Gilder et al. |
| 2008/0086421 | A1 | 4/2008 | Gilder |
| 2008/0091599 | A1 | 4/2008 | Foss |
| 2008/0097899 | A1 | 4/2008 | Jackson et al. |
| 2008/0103790 | A1 | 5/2008 | Abernethy |
| 2008/0103967 | A1 | 5/2008 | Ackert et al. |
| 2008/0113674 | A1 | 5/2008 | Baig |
| 2008/0114739 | A1 | 5/2008 | Hayes |
| 2008/0116257 | A1 | 5/2008 | Fickling |
| 2008/0117991 | A1 | 5/2008 | Peddireddy |
| 2008/0119178 | A1 | 5/2008 | Peddireddy |
| 2008/0133411 | A1 | 6/2008 | Jones et al. |
| 2008/0147549 | A1 | 6/2008 | Rathbun |
| 2008/0156438 | A1 | 7/2008 | Stumphauzer et al. |
| 2008/0162319 | A1 | 7/2008 | Breeden et al. |
| 2008/0162350 | A1 | 7/2008 | Allen-Rouman et al. |
| 2008/0162371 | A1 | 7/2008 | Rampell et al. |
| 2008/0177659 | A1 | 7/2008 | Lacey et al. |
| 2008/0180750 | A1 | 7/2008 | Feldman |
| 2008/0208727 | A1 | 8/2008 | McLaughlin et al. |
| 2008/0214180 | A1 | 9/2008 | Cunningham et al. |
| 2008/0219543 | A1 | 9/2008 | Csulits |
| 2008/0245869 | A1 | 10/2008 | Berkun et al. |
| 2008/0247629 | A1 | 10/2008 | Gilder |
| 2008/0247655 | A1 | 10/2008 | Yano |
| 2008/0249931 | A1 | 10/2008 | Gilder |
| 2008/0249951 | A1 | 10/2008 | Gilder et al. |
| 2008/0262953 | A1 | 10/2008 | Anderson |
| 2008/0275821 | A1 | 11/2008 | Bishop et al. |
| 2008/0316542 | A1 | 12/2008 | Mindrum et al. |
| 2009/0024520 | A1 | 1/2009 | Drory et al. |
| 2009/0046938 | A1 | 2/2009 | Yoder |
| 2009/0060396 | A1 | 3/2009 | Blessan et al. |
| 2009/0066987 | A1 | 3/2009 | Inokuchi |
| 2009/0108080 | A1 | 4/2009 | Meyer |
| 2009/0110281 | A1 | 4/2009 | Hirabayashi |
| 2009/0141962 | A1 | 6/2009 | Borgia et al. |
| 2009/0166406 | A1 | 7/2009 | Pigg et al. |
| 2009/0167870 | A1 | 7/2009 | Caleca et al. |
| 2009/0171819 | A1 | 7/2009 | Emde et al. |
| 2009/0171825 | A1 | 7/2009 | Roman |
| 2009/0173781 | A1 | 7/2009 | Ramachandran |
| 2009/0185738 | A1 | 7/2009 | Nepomniachtchi |
| 2009/0190823 | A1 | 7/2009 | Walters |
| 2009/0192938 | A1 | 7/2009 | Amos |
| 2009/0236413 | A1 | 9/2009 | Mueller et al. |
| 2009/0252437 | A1 | 10/2009 | Li |
| 2009/0254447 | A1 | 10/2009 | Blades |
| 2009/0281904 | A1 | 11/2009 | Pharris |
| 2009/0313167 | A1 | 12/2009 | Dujari |
| 2010/0007899 | A1 | 1/2010 | Lay |
| 2010/0027679 | A1 | 2/2010 | Sunahara et al. |
| 2010/0047000 | A1 | 2/2010 | Park et al. |
| 2010/0057578 | A1 | 3/2010 | Blair et al. |
| 2010/0061446 | A1 | 3/2010 | Hands et al. |
| 2010/0082470 | A1* | 4/2010 | Walach et al. ................ 705/35 |
| 2010/0165015 | A1 | 7/2010 | Barkley et al. |
| 2010/0226559 | A1 | 9/2010 | Najari et al. |
| 2010/0260408 | A1 | 10/2010 | Prakash et al. |
| 2010/0262522 | A1 | 10/2010 | Anderson et al. |
| 2010/0312705 | A1 | 12/2010 | Caruso et al. |
| 2011/0016084 | A1 | 1/2011 | Mundy et al. |
| 2011/0112967 | A1 | 5/2011 | Anderson et al. |
| 2011/0310442 | A1 | 12/2011 | Popadic et al. |
| 2013/0021651 | A9 | 1/2013 | Popadic et al. |

OTHER PUBLICATIONS

DeBello, James et al., "RDM and Mitek Systems to Provide Mobile Check Deposit". *Mitek Systems, Inc.*, San Diego, California and Waterloo, Ontario (Feb. 24, 2009),2 pages.

Nixon, Julie et al., "Fisery Research Finds Banks are Interested in Offering Mobile Deposit Capture as an", *Fiserv, Inc*, Brookfield, Wis.,(*Business Wire*), (Feb. 20, 2009),2 pages.

"Accept 'Customer Not Present' Checks," Accept Check Online, http://checksoftware.com, Cited in patent No. 7,900,822, as dated 2007 (1 pg).

"Adjusting Brightness and Contrast", www.eaglesoftware.com/adjustin.htm, retrieved on May 4, 2009 (4 pgs).

"Best practices for producing quality digital image files," Digital Images Guidelines, http://deepblue.lib.umich.edu/bitstream/2027.42/40247/1/Images-Best_Practice.pdf, downloaded 2007 (2 pgs).

"Chapter 7 Payroll Programs," Uniform Staff Payroll System, http://www2.oecn.k12.oh.us/www/ssdt/usps/usps_user_guide_005.html, Cited in patent No. 7,900,822, as dated 2007 (2 pgs).

"Check 21—The check is not in the post", RedTitan Technology 2004 http://www.redtitan.com/check21/htm (3 pgs).

"Check 21 Solutions," Columbia Financial International, Inc. http://www.columbiafinancial.us/check2l/solutions.htm, Cited in patent No. 7,900,822, as dated 2007 (8 pgs).

"Check Fraud: A Guide to Avoiding Losses", All Net, http://all.net/books/audit/checkfraud/security.htm, Cited in patent No. 7,900,822, as dated 2007 (1 pg).

"Compliance with Regulation CC", http://www/federalreserve.gov/Pubs/regcc/regcc.htm, Jan. 24, 2006 (6 pgs).

"Customer Personalized Bank Checks and Address Labels" Checks Your Way Inc., http://www.checksyourway.com/htm/web_pages/faq.htm, Cited in patent No. 7,900,822, as dated 2007 (6 pgs).

"Direct Deposit Application for Payroll", Purdue University, Business Office Form 0003, http://purdue.edu/payroll/pdf/directdepositapplication.pdf, Jul. 2007 (2 pgs).

"Direct Deposit Authorization Form", www.umass.edu/humres/library/DDForm.pdf, May 2003 (3 pgs).

"Direct Deposit," University of Washington, http://www.washington.edu/admin/payroll/directdeposit.html, Cited in patent No. 7,900,822, as dated 2007 (3 pgs).

"Electronic Billing Problem: The E-check is in the mail" American Banker-vol. 168, No. 95, May 19, 2003 (4 pgs).

"Frequently Asked Questions" Bank of America, http://www/bankofamerica.com/deposits/checksave/index.cfm?template-lc_faq_bymail, Cited in patent No. 7,900,822, as dated 2007 (2 pgs).

"Full Service Direct Deposit", www.nonprofitstaffing.com/images/upload/dirdepform.pdf. Cited in patent No. 7,900,822, as dated 2001, (2 pgs).

"How to Digitally Deposit a Check Image", Smart Money Daily, Copyright 2008 (5 pgs).

"ImageNet Mobile Deposit Provides Convenient Check Deposit and Bill Pay to Mobile Consumers," Miteksystems, 2008 (2 pgs).

"It's the easiest way to Switch banks", LNB, http://www.inbky.com/pdf/LNBswitch-kit10-07.pdf Cited in patent No. 7,996,316, as dated 2007 (7 pgs).

"Lesson 38—More Bank Transactions", Turtle Soft, http://www.turtlesoft.com/goldenseal-software-manual.lesson38.htm, Cited in patent No. 7,900,822, as dated 2007 (8 pgs).

"Middleware", David E. Bakken, Encyclopedia of Distributed Computing, Kluwer Academic Press, 2001 (6 pgs).

"Mitek Systems Announces Mobile Deposit Application for Apple iPhone," http://prnewswire.com/cgi-bin/stories/pl?ACCT=104&STORY=/www/story/10-01-..., Nov. 25, 2008 (2 pgs).

"Personal Finance", PNC, http://www.pnc.com/webapp/unsec/productsandservice.do?sitearea=/PNC/home/personal/account+services/quick+switch/quick+switch+faqs, Cited in patent No. 7,900,822, as dated 2007 (12 pgs).

"Refractive index" Wikipedia, the free encyclopedia; http://en.wikipedia.org/wiki/refractiveindex.htm Oct. 16, 2007 (4 pgs).

Appx190

US 8,699,779 B1

Page 7

(56)         **References Cited**

OTHER PUBLICATIONS

"Remote Deposit Capture", Plante & Moran, http://plantemoran. com/industries/fincial/institutions/bank/resources/ community+bank+advisor/2007+summer+issue/ remote+deposit+capture.htm, Cited in patent No. 7,900,822, as dated 2007 (3 pgs.).

"Remote Deposit" National City, http://www.nationalcity.com/ smallbusiness/cashmanagement/remotedeposit/default.asp; Cited in patent No. 7,900,822, as dated 2007 (1 pg).

"Save on ATM Fees", RedEye Edition, Chicago Tribune, Chicago, Il. Jun. 30, 2007 (2 pgs).

"Switching Made Easy," Bank of North Georgia, http://www. banknorthgeorgia.com/cmsmaster/documents/286/documents616. pdf, 2007 (7 pgs).

"Two Words Every Business Should Know: Remote Deposit," Canon,  http://www.rpsolutions.com/rpweb/pdfs/canon_rdc.pdf, 2005 (7 pgs).

"Virtual Bank Checks", Morebusiness.com, http://www.morebusi- ness.com/running_your_business/businessbits/d908484987.brc, Cited in patent No. 7,900,822, as dated 2007 (3 pgs).

"WallStreetGrapevine.com" Stocks on the Rise: JADG, BKYI, MITK; Mar. 3, 2008 (4 pgs).

"What is check Fraud", National Check Fraud Center, http://www. ckfraud.org/ckfraud.html , Cited in patent No. 7,900,822, as dated 2007 (12 pgs).

Affinity Federal Credit Union, "Affinity Announces Online Deposit," Aug. 4, 2005 (1 pg).

Albrecht, W. Steve, "Check Kiting: Detection, Prosecution and Pre- vention," The FBI Law Enforcement Bulletin, Nov. 1, 1993 (6 pgs).

Alves, Vander and Borba, Paulo; "Distributed Adapters Pattern: A Design for Object-Oriented Distributed Applications"; First Latin American Conference on Pattern Languages of Programming; Oct. 2001; pp. 132-142; Rio de Janeiro, Brazil (11 pgs).

Amber Avalona-Butler / Paraglide, "At Your Service: Best iPhone Apps for Military Lifestyle," Jul. 9, 2010 (2 pgs).

Anderson, Milton M. "FSML and Echeck", Financial Services Tech- nology Consortium, 1999 (17 pgs).

Archive Index Systems; Panini My Vision X-30 or VX30 or X30 © 1994-2008 Archive Systems, Inc. P./O. Box 40135 Bellevue, WA USA 98015 (2 pgs).

Associate of German Banks, SEPA 2008: Uniform Payment Instru- ments for Europe, Berlin, Cited in patent No. 7,900,822, as dated Jul. 2007, Bundesverbankd deutscher banker ev (42 pgs).

Automated Merchant Systems, Inc., "Electronic Check Conversion," http://www.automatedmerchant.com/electronic_check_conver- sion.cfm, 2006, downloaded Oct. 18, 2006 (3 pgs).

Bank Systems & Technology, Untitled Article, May 1, 2006, http:// www.banktech.com/showarticle.jhtml? articleID=187003126, "Are you Winning in the Payment World?" (4 pgs).

BankServ, "DepositNow: What's the difference?" Cited in patent No. 7,970,677, as dated 2006, (4 pgs).

BankServ, Product Overview, http://www.bankserv.com/products/ remotedeposit.htm, Cited in patent No. 7,970,677, as dated 2006, (3 pgs).

Blafore, Bonnie "Lower Commissions, Fewer Amenities", Better Investing, Madison Heights: Feb. 2003, vol. 52, Iss 6, (4 pgs).

BLM Technologies. "Case Study: Addressing Check 21 and RDC Error and Fraud Threats," Remote Deposit Capture News Articles from Jun. 11, 2007, Retrieved from http://www. remotedepositcapture.com/News/june_11_2007.htm on Feb 19, 2008 (5 pgs).

Blue Mountain Consulting, from URL: www.bluemountainconsult- ing.com, Cited in patent No. 7,900,822, as dated Apr. 26, 2006 (3 pgs).

Board of Governors of the federal reserve system, "Report to the Congress on the Check Clearing for the 21st Century Act of 2003" Apr. 2007, Submitted to Congress pursuant to section 16 of the Check Clearing for the 21st Century Act of 2003, (59 pgs).

Bruene, Jim; "Check Free to Enable In-Home Remote Check Deposit for Consumers and Small Business", NetBanker. Com, Financial

Insite. Inc., http://www.netbanker.com/2008/02/checkfree_to_ enableinhome_rem.html, Feb. 5, 2008 (3pgs.).

Bruene, Jim; "Digital Federal Credit Union and Four Others Offer Consumer Remote Deposit Capture Through EasCorp", NetBanker—Tracking Online Finance, www.netbanker.com/2008/ 04/digital_federal_credit_union_a.html, Apr. 13, 2008 (3 pgs).

Bruno, M., "Instant Messaging," Bank Technology News, Dec. 2002 (3 pgs).

Burnett, J. "Depository Bank Endorsement Requirements," BankersOnline.com, http://www.bankersonline.com/cgi-bin/ printview/printview.pl, Jan. 6, 2003 (3 pgs).

Canon, ImageFormula CR-25/CR-55, "Improve Your Bottom Line with Front-Line Efficiencies", 0117W117, 1207-55/25-1 OM-BSP, Cited in U.S. Pat. No. 7,949,587 as dated 2007. (4 pgs).

Carrubba, P. et al., "Remote Deposit Capture: A White Paper Addressing Regulatory, Operational and Risk Issues," NetDeposit Inc., 2006 (11 pgs).

Century Remote Deposit High-Speed Scanner User's Manual Release 2006, (Century Manual). Century Bank, 2006, (32 pgs).

Chiang, Chuck. The Bulletin, "Remote banking offered", http:// bendbulletin.com/apps/pbcs.d11/article?AID=/20060201/BIZ0102/ 602010327&templ..., May 23, 2008 (2 pgs).

CNN.conn/technology, "Scan, deposit checks from home", www. cnn.com/2008ITECH/biztech/02/07/check.scanning.ap/index.html. Feb. 7, 2008 (3 pgs).

Constanzo, Chris, "Remote Check Deposit: Wells Captures A New Checking Twist", Bank Technology News Article—May 2005, www. americanbanker.com/btn_article.html?id=20050502YQ5OFSYG (2 pgs).

Craig, Ben, "Resisting Electronic Payment Systems: Burning Down the House?", Federal Reserve Bank of Cleveland, Jul. 1999 (4 pgs). Creativepaymentsolutions.com, "Creative Payment Solutions— Websolution," www.creativepaymentsolution.com/cps/ financialservices/websolution/default.html, Copyright 2008, Cre- ative Payment Solutions, Inc. (1 pg).

Credit Union Journal, "The Ramifications of Remote Deposit Cap- ture Success", www.cuiournal.com/orintthis.html?id=20080411 EODZT57G, Apr. 14, 2008 (2 pgs).

Credit Union Journal, "AFCU Averaging 80 DepositHome Transac- tions Per Day", Credit Union Journal, Aug. 15, 2005 (1 pg).

DCU Member's Monthly—Jan. 2008, "PC Deposit—Deposit Checks from Home", http://www.mycreditunionnewsletter.com/ dcu/0108/page1.html, Copyright 2008 Digital Federal Credit Union (2 pgs).

De Jesus, A. et al., "Distributed Check Processing in a Check 21 Environment: An educational overview of the opportunities and chal- lenges associated with implementing distributed check imaging and processing solutions," Panini, 2004, pp. 1-22.

De Queiroz, Ricardo et al., "Mixed Raster Content (MRC) Model for Compound Image Compression", 1998 (14 pgs).

DeYoung, Robert; "The Financial Performance of Pure Play Internet Banks"; Federal Reserve Bank of Chicago Economic Perspectives; 2001; pp. 60-75; vol. 25, No. 1 (16pgs).

Dias, Danilo et al., "A Model for the Electronic Representation of Bank Checks", Brasilia Univ. Oct. 2006 (5 pgs).

Digital Transactions News, "An ACH-Image Proposal for Check Roils Banks and Networks" May 26, 2006 (3 pgs).

Dinan, R.F. et al., "Image Plus High Performance Transaction Sys- tem", IBM Systems Journal, 1990 vol. 29, No. 3 (14 pgs).

eCU Technologies, "Upost Remote Deposit Solution," Retrieved from the internet https://www.eutechnologies.com/products/upost. html, downloaded 2009 (1 pg).

EFT Network Unveils FAXTellerPlus, EFT Network, Inc., www. eftnetwork.com, Jan. 13, 2009 (2 pgs).

ElectronicPaymentProviders, Inc., "FAQs: ACH/ARC, CheckVerification/Conversion/Guarantee, RCK Check Re-Present- ment," http://www.useapp.com/faq.htm, downloaded Oct. 18, 2006 (3 pgs).

Federal Check 21 Act, "New Check 21 Act effective Oct. 28, 2004: Bank No Longer Will Return Original Cancelled Checks," Consumer Union's FAQ's and Congressional Testimony on Check 21, www. consumerlaw.org.initiatives/content/check21_content.html, Cited in patent No. 7,873,200, as dated Dec. 2005 (20 pgs).

# US 8,699,779 B1

Page 8

(56)     **References Cited**

OTHER PUBLICATIONS

Federal Reserve Board, "Check Clearing for the 21st Century Act", FRB, http://www.federalreserve.gov/paymentsystems/truncation/, Mar. 1, 2006 (1 pg).

Federal Reserve System, "12 CFR, Part 229 [Regulation CC; Docket No. R-0926]: Availability of Funds and Collection of Checks," Federal Registrar, Apr. 28, 1997, pp. 1-50.

Federal Reserve System, "Part IV, 12 CFR Part 229 [Regulation CC; Docket No. R-1176]: Availability of Funds and Collection of Checks; Final Rule," Federal Registrar, vol. 69, No. 149, Aug. 4, 2004, pp. 47290-47328.

Fest, Glen., "Patently Unaware" Bank Technology News, Apr. 2006, Retrieved from the Internet at URL:http://banktechnews.com/article. html?id=2006403T7612618 (5 pgs).

Fidelity Information Services, "Strategic Vision Embraces Major Changes in Financial Services Solutions: Fidelity's long-term product strategy ushers in new era of application design and processing," Insight, 2004, pp. 1-14.

Fisher, Dan M., "Home Banking in the 21st Century: Remote Capture Has Gone Retail", May 2008 (4 pgs).

Furst, Karen et al., "Internet Banking: Developments and Prospects", Economic and Policy Analysis Working Paper 2000-9. Sep. 2000 (60 pgs).

Garry, M., "Checking Options: Retailers face an evolving landscape for electronic check processing that will require them to choose among several scenarios," Supermarket News, vol. 53, No. 49, 2005 (3 pgs).

German Shegalov, Diplom-Informatiker, "Integrated Data, Message, and Process Recovery for Failure Masking in Web Services", Dissertation Jul. 2005 (146 pgs).

Gupta, Amar et al., "An Integrated Architecture for Recognition of Totally Unconstrained Handwritten Numerals", WP#3765, Jan. 1993, Productivity from Information Technology "Profit" Research Initiative Sloan School of Management (20 pgs).

Gupta, Maya R. et al., "OCR binarization and image pre-processing for searching historical documents," Pattern Recognition, vol. 40, No. 2, Feb. 2007, pp. 389-397.

Hale, J., "Picture this: Check 21 uses digital technology to speed check processing and shorten lag time," Columbus Business First, http://columbus.bizjournals.com/columbus/stories/2005/03/14focus1.html, downloaded 2007 (3 pgs).

Hartly, Thomas, "Banks Check Out New Image", Business First, Buffalo: Jul. 19, 2004, vol. 20, Issue 43, (3 pgs).

Heckenberg, D. "Using Mac OS X for Real-Time Image Processing" Oct. 8, 2003 (15 pgs).

Hildebrand, C. et al., "Electronic Money," Oracle, http://www.oracle.com/oramag/profit/05-feb/p15financial.html, 2005, downloaded Oct. 18, 2006 (5 pgs).

Hillebrand, G., "Questions and Answers About the Check Clearing for the 21st Century Act, 'Check 21." ConsumersUnion.org, http://www.consumersunion.org/finance/ckclear1002.htm, Jul. 27, 2004, downloaded Oct. 18, 2006 (6 pgs).

Image Master, "Photo Restoration: We specialize in digital photo restoration and photograph repair of family pictures", http://www.imphotorepair.com, Cited in patent No. 7,900,822, as downloaded Apr. 2007 (1 pg).

Investment Systems Company, "Portfolio Accounting System," 2000, pp. 1-32.

JBC, "What is a MICR Line?," eHow.com, retrieved from http://www.ehow.com/about_4684793_what-micr-line.html on May 4, 2009 (2 pgs).

Johnson, Jennifer J., Secretary of the Board; Federal Reserve System, 12 CFR Part 229, Regulation CC; Docket No. R 1176"Availability of Funds and Collection of Checks". Cited in patent No. 7,900,822, as dated 2009, (89 pgs).

Kendrick, Kevin B., "Check Kiting, Float for Purposes of Profit," Bank Security & Fraud Prevention, vol. 1, No. 2, 1994 (3 pgs).

Kiser, Elizabeth K.; "Modeling the Whole Firm: The Effect of Multiple Inputs and Financial Intermediation on Bank Deposit Rates," FEDS Working Paper No. 2004-07; Jun. 3, 2003; pp. 1-46 (46 pgs).

Knestout, Brian P. et al., "Banking Made Easy" Kiplinger's Personal Finance Washington, Jul. 2003, vol. 57, Iss 7 (5 pgs).

Kornai Andras et al., "Recognition of Cursive Writing on Personal Checks", Proceedings of International Workshop on the Frontiers in Handwritting Recognition, Cited in patent No. 7,900,822, as dated Sep. 1996, (6 pgs).

Levitin, Adam J., Remote Deposit Capture: A Legal and Transactional Overview, Banking Law Journal, p. 115, 2009 (RDC).

Masonson, L., "Check Truncation and ACH Trends—Automated Clearing Houses", healthcare financial management associate, http://www.findarticles.com/p/articles/mLm3276/is_n7_v47/ai_14466034/print, 1993 (2 pgs).

Matthews, Deborah, "Advanced Technology Makes Remote Deposit Capture Less Risky," Indiana Bankers Association, Apr. 2008 (2 pgs).

Metro 1 Credit Union, "Remote Banking Services," http://www\i.metro1cu.org/metro1cu/remote.html, downloaded Apr. 17, 2007 (4 pgs).

Mitek Systems: Mitek Systems Launches First Mobile Check Deposit and Bill Pay Application, San Diego, CA, Jan. 22, 2008 (3 pgs).

Mohl, Bruce, "Banks Reimbursing ATM Fee to Compete With Larger Rivals", Boston Globe, Boston, MA, Sep. 19, 2004 (3 pgs).

Moreau, T., "Payment by Authenticated Facsimile Transmission: a Check Replacement Technology for Small and Medium Enterprises," CONNOTECH Experts-conseils, Inc., Apr. 1995 (31 pgs).

Nelson, B. et al., "Remote deposit capture changes the retail landscape," Northwestern Financial Review, http://findarticles.com/p/articles/mi qa3799/is 200607/ai_n16537250, 2006 (3 pgs).

NetBank, Inc., "Branch Out: Annual Report 2004," 2004 (150 pgs).

NetBank, Inc., "Quick Post: Deposit and Payment Forwarding Service," 2005 (1 pg).

NetDeposit Awarded Two Patents for Electronic Check Process, NetDeposit, Jun. 18, 2007, (1 pg).

Online Deposit: Frequently Asked Questions, http://www.depositnow.com/faq.html, Copyright 2008 (1 pg).

Onlinecheck.com/Merchant Advisors, "Real-Time Check Debit", Merchant Advisors: Retail Check Processing Check Conversion, http://www.onlinecheck/wach/rcareal.htm, Cited in patent No. 7,900,822, as dated 2006 (3 pgs).

Oxley, Michael G. from committee on Financial Services; "Check Clearing for the 21st Century Act", 108th Congress, 1st Session House of Representatives report 108-132, Jun. 2003 (20 pgs).

Oxley, Michael G., from the committee of conference; "Check Clearing for the 21st Century Act" 108th Congress, 1st Session Senate report 108-291, Oct. 1, 2003 (27 pgs).

Palacios, Rafael et al., "Automatic Processing of Brazilian Bank Checks". Cited in patent No. 7,900,822, as dated 2002 (28 pgs).

Patterson, Scott "USAA Deposit@Home—Another WOW moment for Net Banking", NextCU.com, Jan. 26, 2007 (5 pgs).

Public Law 108-100, 108 Congress; "An Act Check Clearing for the 21st Century Act", Oct. 28, 2003, 117 STAT. 1177 (18 pgs).

Rao, Bharat; "The Internet and The Revolution in Distribution: A Cross-Industry Examination"; Technology in Society; 1999; pp. 287-306; vol. 21, No. 3 (20 pgs).

Remotedepositcapture,     URL:www.remotedepositcapture.com, Cited in patent No. 7,900,822, as dated 2006 (5 pgs).

RemoteDepositCapture.com, "PNC Bank to Offer Ease of Online Deposit Service Integrated with QuickBooks to Small Businesses", Remote Deposit Capture News Articles from Jul. 24, 2006, (2 pgs).

RemoteDepositCapture.com, Remote Deposit Capture News Articles from Jul. 6, 2006, "BankServ Announces New Remote Deposit Product Integrated with QuickBooks" (3 pgs).

Remotedepistcapture.com, LLC, "Remote Deposit Capture Overview," ROC Overview, http://remotedepositcapture.com/overview/RDC_overview.htm, Cited in patent No. 7,900,822, as dated Mar. 12, 2007 (4 pgs).

Richey, J. C. et al., "EE 4530 Check Imaging," Nov. 18, 2008 (10 pgs).

Ritzer, J.R. "Hinky Dinky helped spearhead POS, remote banking movement", Bank Systems and Equipment, vol. 21, No. 12, Dec. 1984 (1 pg).

US 8,699,779 B1

Page 9

(56)            References Cited

OTHER PUBLICATIONS

Rivlin, Alice M. et al., Chair, Vice Chair—Board of Governors, Committee on the Federal Reserve in the Payments Mechanism—Federal Reserve System, "The Federal Reserve in the Payments Mechanism", Jan. 1998 (41 pgs).

Rose, Sarah et al., "Best of the We: The Top 50 Financial Websites", Money, New York. Dec. 1999, vol. 28, Iss. 12 (8 pgs).

Shelby, Hon. Richard C. (Committee on Banking, Housing and Urban Affairs); "Check Truncation Act of 2003", calendar No. 168, 108th Congress, 1st Session Senate report 108-79, Jun. 2003 (27 pgs).

SoyBank Anywhere, "Consumer Internet Banking Service Agreement," Dec. 6, 2004 (6 pgs).

Teixeira, D., "Comment: Time to Overhaul Deposit Processing Systems," American Banker, Dec. 10, 1998, vol. 163, No. 235, p. 15 (3 pgs).

Thailandguru.com: How and where to Pay Bills @ www.thailandguru.com/paying-bills.html (2 pgs).

The Automated Clearinghouse, "Retail Payment Systems; Payment Instruments Clearing and Settlement: The Automated Clearinghouse (ACH)", www.ffiec.gov/ffiecinfobase/booklets/retail/retail_02d.html, Cited in patent No. 7,900,822, as dated Dec. 2005 (3 pgs).

The Green Sheet 2.0: Newswire, "Co-Op adds home deposit capabilities to suite of check imaging products", www.greensheet.com/newswire.php?newswire_id=8799, Mar. 5, 2008 (2 pgs).

Tygar, J.D., Atomicity in Electronic Commerce, In ACM Networker, 2:2, Apr./May 1998 (12 pgs).

Valentine, Lisa, "Remote Deposit Capture Hot Just Got Hotter," ABA Banking Journal, Mar. 2006, p. 1-9.

Wade, Will, "Early Notes: Updating Consumers on Check 21" American Banker Aug. 10, 2004 (3 pgs).

Wallison, Peter J., "Wal-Mart Case Exposes Flaws in Banking-Commerce Split", American Banker, vol. 167. No. 8, Jan. 11, 2002 (3 pgs).

Wells Fargo 2005 News Releases, "The New Wells Fargo Electronic Deposit Services Break Through Banking Boundaries in the Age of Check 21", San Francisco Mar. 28, 2005, www.wellsfargo.com/press/3282005 check21Year=2005 (1 pg).

Wells Fargo Commercial, "Remote Deposit".www.wellsfargo.com/com/treasury mgmtlreceivables/electronic/remote deposit, Copyright 2008 (1 pg).

White, J.M. et al., "Image Thresholding for Optical Character Recognition and Other Applications Requiring Character Image Extraction", IBM J. Res. Development, Jul. 1983, vol. 27, No. 4 (12 pgs).

Whitney et al., "Reserve Banks to Adopt DSTU X9.37/2003 Format for Check 21 Image Services", American Bankers Association, May 18, 2004, http://www.aba.com/NR/rdonlyres/CBDC1 A5C-43E3-43CC-B733-BE417C638618/35930/DSTUFormat.pdf (2 pages).

Wikipedia®, "Remote Deposit," http://en.wikipedia.org/wiki/Remote_deposit, 2007 (3 pgs).

Windowsfordevices.com, "Software lets camera phone users deposit checks, pay bills", www.windowsfordevices.com/news/NS3934956670.html, Jan. 29, 2008 (3 pgs).

Wolfe, Daniel, "Check Image Group Outlines Agenda," American Banker, New York, N.Y.: Feb. 13, 2009, vol. 174, Iss. 30, p. 12. (2 pgs).

Woody Baird Associated Press, "Pastor's Wife got Scammed—She Apparently Fell for Overseas Money Scheme," The Commercial Appeal, Jul. 1, 2006, p. A. 1.

Zhang, C.Y., "Robust Estimation and Image Combining" Astronomical Data Analysis Software and Systems IV, ASP Conference Series, 1995 (5 pgs).

Zions Bancorporation, "Moneytech, the technology of money in our world: Remote Deposit," http://www.bankjunior.com/pground/moneytech/remote_deposit.jsp, 2007 (2 pgs).

Application filed Apr. 3, 2008 for U.S. Appl. No. 12/062,143 (27 pgs).

Application filed Aug. 19, 2010 for U.S. Appl. No. 12/859,741 (235 pgs).

Application filed Aug. 21, 2008 for U.S. Appl. No. 12/195,723 (38 pgs).

Application filed Aug. 21, 2009 for U.S. Appl. No. 12/545,127 (45 pgs).

Application filed Aug. 28, 2009 for U.S. Appl. No. 12/549,443 (41 pgs).

Application filed Dec. 20, 2006 for U.S. Appl. No. 11/613,656 (21 pgs).

Application filed Dec. 30, 2010 for U.S. Appl. No. 12/982,494 (280 pgs).

Application filed Dec. 30, 2010 for U.S. Appl. No. 12/982,561 (275 pgs).

Application filed Dec. 30, 2010 for U.S. Appl. No. 12/982,578 (274 pgs).

Application filed Dec. 30, 2010 for U.S. Appl. No. 12/982,594 (275 pgs).

Application filed Feb. 15, 2012 for U.S. Appl. No. 13/397,405 (19 pgs).

Application filed Feb. 18, 2009 for U.S. Appl. No. 12/388,005 (37 pgs).

Application filed Jul. 13, 2006 for U.S. Appl. No. 11/487,537 (23 pgs).

Application filed Jul. 27, 2009 for U.S. Appl. No. 12/509,613 (48 pgs).

Application filed Jul. 27, 2009 for U.S. Appl. No. 12/509,680 (41 pgs).

Application filed Jul. 11, 2008 for U.S. Appl. No. 12/137,051 (29 pgs).

Application filed Jun. 8, 2011 for U.S. Appl. No. 13/155,976 (352 pgs).

Application filed Jun. 8, 2011 for U.S. Appl. No. 13/156,007 (356 pgs).

Application filed Jun. 8, 2011 for U.S. Appl. No. 13/156,018 (353 pgs).

Application filed Mar. 15, 2007 for U.S. Appl. No. 11/686,924 (34 pgs).

Application filed Mar. 15, 2007 for U.S. Appl. No. 11/686,928 (36 pgs).

Application filed Mar. 4, 2009 for U.S. Appl. No. 12/397,671 (40 pgs).

Application filed Mar. 4, 2009 for U.S. Appl. No. 12/397,930 (37 pgs).

Application filed May 10, 2007 for U.S. Appl. No. 11/747,222 (35 pgs).

Application filed Oct. 17, 2008 for U.S. Appl. No. 12/253,278 (42 pgs).

Application filed Oct. 23, 2007 for U.S. Appl. No. 11/876,925 (36 pgs).

Application filed Oct. 23, 2007 for U.S. Appl. No. 11/877,335 (29 pgs).

Application filed Oct. 25, 2007 for U.S. Appl. No. 11/923,839 (22 pgs).

Application filed Oct. 29, 2007 for U.S. Appl. No. 11/926,388 (23 pgs).

Application filed Oct. 30, 2007 for U.S. Appl. No. 11/928,297 (26 pgs).

Application filed Oct. 31, 2006 for U.S. Appl. No. 11/590,974 (31 pgs).

Application filed Oct. 31, 2006 for U.S. Appl. No. 11/591,008 (27 pgs).

Application filed Oct. 31, 2006 for U.S. Appl. No. 11/591,227 (58 pgs).

Application filed Oct. 31, 2006 for U.S. Appl. No. 11/591,273 (56 pgs).

Application filed Oct. 31, 2007 for U.S. Appl. No. 11/930,537 (27 pgs).

Application filed Oct. 31, 2007 for U.S. Appl. No. 11/931,670 (47 pgs).

Application filed Oct. 8, 2007 for U.S. Appl. No. 11/868,884 (30 pgs).

Application filed Sep. 28, 2007 for U.S. Appl. No. 11/864,569 (35 pgs).

Application filed Sep. 8, 2008 for U.S. Appl. No. 12/205,996 (30 pgs).

Claims as filed on Apr. 3, 2008 for U.S. Appl. No. 12/062,163 (3 pgs).

**US 8,699,779 B1**

Page 10

(56)            **References Cited**

OTHER PUBLICATIONS

Claims as filed on Apr. 3, 2008 for U.S. Appl. No. 12/062,175 (3 pgs.).
Claims as filed on Aug. 19, 2010 for U.S. Appl. No. 12/859,752 (5 pgs.).
Claims as filed on Dec. 15, 2011 for U.S. Appl. No. 13/327,478 (4 pgs.).
Claims as filed on Dec. 20, 2006 for U.S. Appl. No. 11/613,671 (3 pgs.).
Claims as filed on Dec. 29, 2005 for U.S. Appl. No. 11/320,998 (3 pgs.).
Claims as filed on Dec. 29, 2005 for U.S. Appl. No. 11/321,027 (3 pgs.).
Claims as filed on Dec. 8, 2010 for U.S. Appl. No. 12/963,513 (7 pgs.).
Claims as filed on Feb. 15, 2012 for U.S. Appl. No. 13/397,437 (6 pgs.).
Claims as filed on Feb. 16, 2011 for U.S. Appl. No. 13/028,477 (3 pgs.).
Claims as filed on Jan. 20, 2011 for U.S. Appl. No. 13/010,644 (9 pgs.).
Claims as filed on Jan. 31, 2011 for U.S. Appl. No. 13/017,865 (11 pgs.).
Claims as filed on Mar. 15, 2007 for U.S. Appl. No. 11/686,925 (5 pgs.).
Claims as filed on May 10, 2007 for U.S. Appl. No. 11/747,223 (4 pgs.).
Claims as filed on May 18, 2011 for U.S. Appl. No. 13/110,077 (9 pgs.).
Claims as filed on May 2, 2011 for U.S. Appl. No. 13/098,566 (10 pgs.).
Claims as filed on Oct. 23, 2007 for U.S. Appl. No. 11/877,382 (6 pgs.).
Claims as filed on Oct. 24, 2008 for U.S. Appl. No. 12/257,471 (4 pgs.).
Claims as filed on Oct. 31, 2006 for U.S. Appl. No. 11/590,963 (3 pgs.).
Claims as filed on Oct. 31, 2006 for U.S. Appl. No. 11/590,995 (3 pgs.).
Claims as filed on Oct. 31, 2006 for U.S. Appl. No. 11/590,998 (4 pgs.).
Claims as filed on Oct. 31, 2007 for U.S. Appl. No. 11/931,804 (4 pgs.).
Claims as filed on Oct. 8, 2007 for U.S. Appl. No. 11/868,878 (4 pgs.).
Claims as filed on Sep. 2, 2008 for U.S. Appl. No. 12/202,781 (4 pgs.).
Claims as filed on Sep. 8, 2008 for U.S. Appl. No. 12/206,001 (3 pgs.).
Claims as filed on Sep. 8, 2008 for U.S. Appl. No. 12/206,007 (3 pgs.).
Application as filed on Dec. 20, 2012 for U.S. Appl. No. 13/721,945 (55 pgs.).
Application as filed on Dec. 20, 2012 for U.S. Appl. No. 13/722,303 (32 pgs.).

Application as filed on Feb. 28, 2013 for U.S. Appl. No. 13/780,946 (55 pgs.).
Application as filed on Jan. 16, 2013 for U.S. Appl. No. 13/742,909 (31 pgs.).
Application as filed on Jan. 7, 2013 for U.S. Appl. No. 13/735,678 (30 pgs.).
Application as filed on Mar. 15, 2013 for U.S. Appl. No. 13/833,182 (74 pgs.).
Application as filed on Mar. 15, 2013 for U.S. Appl. No. 13/834,353 (37 pgs.).
Application as filed on Mar. 15, 2013 for U.S. Appl. No. 13/837,883 (28 pgs.).
Application as filed on Mar. 15, 2013 for U.S. Appl. No. 13/840,761 (56 pgs.).
Application as filed on Mar. 15, 2013 for U.S. Appl. No. 13/842,112 (62 pgs.).
Application as filed on Oct. 19, 2012 for U.S. Appl. No. 13/656,164 (32 pgs.).
Application as filed Sep. 14, 2012 for U.S. Appl. No. 13/619,405 (30 pgs.).
Claims as filed on Dec. 20, 2012 for U.S. Appl. No. 13/722,576 (4 pgs.).
Claims as filed on Dec. 20, 2012 for U.S. Appl. No. 13/722,602 (4 pgs.).
Claims as filed on Feb. 12, 2013 for U.S. Appl. No. 13/765,412 (1 pg.).
Claims as filed on Feb. 19, 2013 for U.S. Appl. No. 13/770,048 (4 pgs.).
Claims as filed on Nov. 20, 2012 for U.S. Appl. No. 13/682,268 (4 pgs.).
Claims as filed on Sep. 14, 2012 for U.S. Appl. No. 13/619,026 (3 pgs.).
Doermann, David et al., *"Progress in Camera-Based Document Image Analysis"*, Proceedings of the Seventh International Conference on Document Analysis and Recognition (ICDAR 2003) 2003 IEEE (11 pages).
Claims as filed on Jun. 20, 2013 for U.S. Appl. No. 13/922,686 (7 pgs.).
Office Action from corresponding U.S. Appl. No. 13/922,686 dated Oct. 16, 2013 (31 pgs.).
Response and Amended Claims as filed on Jan. 16, 2014 for U.S. Appl. No. 13/922,686 (19 pgs.).
Claims as filed on Aug. 21, 2009 for U.S. Appl. No. 12/545,127 (5 pgs.).
Office Action from corresponding U.S. Appl. No. 12/545,127 dated Nov. 8, 2011 (6 pgs.).
Final Office Action from corresponding U.S. Appl. No. 12/545,127 dated Apr. 4, 2012 (6 pgs.).
Office Action from corresponding U.S. Appl. No. 12/545,127 dated Oct. 9, 2013 (7 pgs.).
Appeal Brief from corresponding U.S. Appl. No. 12/454,127 dated Nov. 6, 2012 (21 pgs.).

* cited by examiner

Appx195



100

*FIG. 1*

Case 2:20-cv-00245-JRG   Document 1-3   Filed 06/07/18   Page 13 of 30 PageID #: 147



200

***FIG. 2***

Case 2:20-cv-00245-JRG   Document 1-3   Filed 06/07/18   Page 148 of 30 PageID #: 153



*FIG. 3*

*FIG. 4*

Case 2:20-cv-00245-JRG   Document 1-3   Filed 06/07/18   Page 150 of 30 PageID #: 169



300

**_FIG. 5_**

Case 2:20-cv-00245-JRG   Document 1-3   Filed 06/07/18   Page 16 of 20 PageID #: 120



Check
Image(s) 458

Processed
Image(s) 460

Client Apparatus 450

Communications
Module 452

Check Processing
Module 454

Image Capture
Module 456

*FIG. 6*

Case 2:20-cv-00245-JRG   Document 1-3   Filed 06/07/18   Page 176 of 29 PageID #: 181



*FIG. 7*

Case 2:20-cv-00245-JRG    Document 13    Filed 10/01/18    Page 19 of 39 PageID #: 132
Case 2:18-cv-00245-JRG    Document 1-3    Filed 06/07/18    Page 187 of 39 PageID #: 189



800

**_FIG. 8_**



FIG. 9

Case 2:20-cv-00245-JRG   Document 1-3   Filed 06/07/18   Page 29 of 30 PageID #: 124



1000

**_FIG. 10_**

Appx203

US 8,699,779 B1

**1**

# SYSTEMS AND METHODS FOR ALIGNMENT OF CHECK DURING MOBILE DEPOSIT

## BACKGROUND

Checks typically provide a safe and convenient method for an individual such as a payor to transfer funds to a payee. To use a check, the individual usually opens a checking account, or other similar account, at a financial institution and deposits funds, which are then available for later withdrawal. To transfer funds with a check, the payor usually designates a payee and an amount payable on the check. In addition, the payor often signs the check. Once the check has been signed, it is usually deemed negotiable, meaning the check may be validly transferred to the payee upon delivery. By signing and transferring the check to the payee, the payor authorizes funds to be withdrawn from the payor's account on behalf of the payee.

While a check may provide a payor with a convenient and secure form of payment, receiving a check may put certain burdens on the payee, such as the time and effort required to deposit the check. For example, depositing a check typically involves going to a local bank branch and physically presenting the check to a bank teller. To reduce such burdens for the payee, systems and methods have been developed to enable the remote deposit of checks.

For example, the payee may capture a digital image of a check using a mobile device. The financial institution may then receive from the payee the digital image of the check. The financial institution may then use the digital image to credit funds to the payee. However, such a technique requires the efficient and accurate detection and extraction of the information pertaining to a check in the digital image. Capturing a digital image at a mobile device that allows for detection and extraction of the information from the digital image is difficult.

## SUMMARY

An alignment guide may be provided in the field of view of a camera associated with a mobile device used to capture an image of a check. When the image of the check is within the alignment guide in the field of view, an image may be taken by the camera and provided from the mobile device to a financial institution. The check may be deposited in a user's bank account based on the image. Any technique for sending the image to the financial institution may be used.

In an implementation, the alignment guide may be adjustable at the mobile device. The adjustment may be made by the user, the financial institution, the camera, and/or the mobile device. In an implementation, an image may be captured when the image of the check is detected to be within the alignment guide. The image capture may be performed automatically by the camera or the mobile device as soon as the image of the check is determined to be within the alignment guide.

This summary is provided to introduce a selection of concepts in a simplified form that are further described below in the detailed description. This summary is not intended to identify key features or essential features of the claimed subject matter, nor is it intended to be used to limit the scope of the claimed subject matter.

## BRIEF DESCRIPTION OF THE DRAWINGS

The foregoing summary, as well as the following detailed description of illustrative embodiments, is better understood when read in conjunction with the appended drawings. For the purpose of illustrating the embodiments, there are shown in the drawings example constructions of the embodiments; however, the embodiments are not limited to the specific methods and instrumentalities disclosed. In the drawings:

FIG. 1 is a block diagram of an implementation of a system in which example embodiments and aspects may be implemented;

FIG. 2 shows a high-level block diagram of an implementation of a system that may be used for the deposit of a check;

FIG. 3 is a diagram of an example image comprising a check image, a background image, and an alignment guide;

FIG. 4 is a diagram of another example image comprising a check image, a background image, and an alignment guide;

FIG. 5 shows a data flow diagram of a system for the deposit of a check, in accordance with an example embodiment;

FIG. 6 shows a block diagram of a client apparatus for the deposit of a check, in accordance with an example embodiment;

FIG. 7 shows a block diagram of a server apparatus for the deposit of a check, in accordance with an example embodiment;

FIG. 8 is an operational flow of an implementation of a method that may be used for deposit of a check using alignment of the check;

FIG. 9 is an operational flow of another implementation of a method that may be used for deposit of a check using alignment of the check; and

FIG. 10 is a block diagram of an example computing environment in which example embodiments and aspects may be implemented.

## DETAILED DESCRIPTION

In the following detailed description of example embodiments, reference is made to the accompanying drawings, which form a part hereof and in which is shown, by way of illustration, specific embodiments in which the example methods, apparatuses, and systems may be practiced. It is to be understood that other embodiments may be used and structural changes may be made without departing from the scope of this description.

FIG. 1 is a block diagram of an implementation of a system 100 in which example embodiments and aspects may be implemented. System 100 may include an account owner, referred to herein as a user 102, and financial institutions 130, 140, and 150, which may be any type of entity capable of processing a transaction involving a negotiable instrument. For example, financial institutions 130, 140, and 150 may be a retail bank, an investment bank, an investment company, a regional branch of the Federal Reserve, a clearinghouse bank and/or a correspondent bank.

A negotiable instrument typically includes a type of contract that obligates one party to pay a specified sum of money to another party. Negotiable instrument as used herein is an unconditioned writing that promises or orders payment of a fixed amount of money. One example of a negotiable instrument is a check. The check may be taken by the receiving party and deposited into an account at a financial institution of the receiving party. The receiving party may endorse the check and then present it for deposit at a bank branch, via an automated teller machine (ATM), or by using remote deposit. Other examples of negotiable instruments include money orders, cashier's checks, drafts, bills of exchange, promissory notes, and the like. A money order is a trusted financial instrument that is a payment order for a pre-specified amount

Case 2:20-cv-00145-JRG   Document 1-3   Filed 06/04/18   Page 22 of 39 PageID #: 126

US 8,699,779 B1

3

of money. A cashier's check (also known as a bank check, official check, teller's check, bank draft or treasurer's check) is a check guaranteed by a bank and may be purchased from a bank.

The user 102 may be an individual or entity who owns account 160 that may be held at financial institution 130. Account 160 may be any type of deposit account for depositing funds, such as a savings account, a checking account, a brokerage account, and the like. The user 102 may deposit a check 108 or other negotiable instrument in the account 160 either electronically or physically. The financial institution 130 may process and/or clear the check 108 or other negotiable instrument. The user 102 may communicate with financial institution 130 by way of communications network 120 such as an intranet, the Internet, a local area network (LAN), a wide area network (WAN), a wireless fidelity (WiFi) network, a public switched telephone network (PSTN), a cellular network, a voice over Internet protocol (VoIP) network, and the like. The user 102 may communicate with financial institution 130 by phone, email, instant messaging, text messaging, web chat, facsimile, mail, and the like. Financial institutions 130, 140, and 150 also may communicate with each other by way of communications network 120.

In an implementation, the user 102 may receive payment from another individual such as a payor in the form of a check 108 or other negotiable instrument that is drawn from account 170 at financial institution 150. The user 102 may endorse the check 108 (e.g., sign the back of the check 108) and indicate an account number on the check 108 for depositing the funds. It is noted that although examples described herein may refer to a check, the techniques and systems described herein are contemplated for, and may be used for, deposit of any negotiable instrument. Similarly, the techniques and systems described herein are contemplated for and may be used with any form or document whose image may be captured with a camera or other imaging device of a mobile device for subsequent storage and/or processing.

As described further herein, a digital image of a check or other negotiable instrument may be provided from a user to a financial institution, and the digital image may be processed and funds associated with the check or negotiable instrument in the digital image may be deposited in a user's bank account. The user 102 may deposit the check 108 into account 160 by making a digital image of the check 108 and sending the image file containing the digital image to financial institution 130. For example, after endorsing the check 108, the user 102 may use a mobile device 106 that comprises a camera to convert the check 108 into a digital image by taking a picture of the front and/or back of the check 108. The mobile device 106 may be a mobile phone (also known as a wireless phone or a cellular phone), a personal digital assistant (PDA), or any handheld computing device, for example. Aspects of an example mobile device are described with respect to FIG. 10.

To increase the likelihood of capturing a digital image of the check 108 that may be readable and processed such that the check 108 can be cleared, an alignment guide may be provided in the field of view of the camera of the mobile device 106. The field of view is that part of the world that is visible through the camera at a particular position and orientation in space; objects outside the field of view when the image is captured are not recorded in the image. The user may move the camera or the check 108 until the check 108 is viewed within the alignment guide in the field of view of the camera. The digital image of the check 108 may then be captured. The alignment guide may provide a pre-image capture quality check that helps reduce the number of non-com-

4

forming images of checks during presentment of the images to a financial institution for processing and clearing.

In an implementation, the image capture may be performed automatically by the camera or the mobile device 106 as soon as the image of the check is determined to be within the alignment guide. Alternatively, the user 102 may manually instruct the camera to perform the image capture (e.g., by pressing a button the camera or the mobile device 106). Examples of alignment guides are described further with respect to FIGS. 3 and 4, for example.

In an implementation, the user 102 may send the digital image(s) to financial institution 130 using the mobile device 106. Any technique for sending a digital image to financial institution 130 may be used, such as providing a digital image to a website associated with financial institution 130 from storage, emailing a digital image to financial institution 130, or sending a digital image in a text message or instant message, for example.

Financial institution 130 may receive a digital image representing the check 108 and may use any known image processing software or other application(s) to obtain the relevant data of the check 108 from the digital image. Financial institution 130 may determine whether the financial information associated therewith may be valid. For example, financial institution 130 may include any combination of systems and subsystems such as electronic devices including, but not limited to, computers, servers, databases, or the like. The electronic devices may include any combination of hardware components such as processors, databases, storage drives, registers, cache, random access memory (RAM) chips, data buses, or the like and/or software components such as operating systems, database management applications, or the like. According to an embodiment, the electronic devices may include a network-based server that may process the financial information and may receive the digital image from the user 102.

The electronic devices may receive the digital image and may perform an initial analysis on the quality of the digital image, the readability of the data contained therein, or the like. For example, the electronic devices may determine whether the account number, amount payable, and the like may be readable such that it may be parsed or otherwise obtained and processed by the financial institution to credit an account 160 associated with the user 102 and debit an account associated with the payor. In an implementation, a representative 135 of financial institution 130 may provide assistance to the user 102 and may provide assistance in determining whether the financial information may be readable and/or of a good enough quality to be processed, as described further herein.

Upon receipt and approval of the digital image, financial institution 130 may credit the funds to account 160. Financial institution 130 may clear the check 108 by presenting a digital image of the check 108 captured from the digital image to an intermediary bank, such as a regional branch of the Federal Reserve, a correspondent bank, and/or a clearinghouse bank. For example, the check 108 may be cleared by presenting the digital image to financial institution 140, which may be a regional branch of the Federal Reserve, along with a request for payment. Financial institutions 130 and 150 may have accounts at the regional branch of the Federal Reserve. Financial institution 130 may create a substitute check using the image provided by the user 102 and present the substitute check to financial institution 140 for further processing. Upon receiving the substitute check, financial institution 140 may identify financial institution 150 as the paying bank (e.g., the bank from which the check 108 is drawn). This may be

US 8,699,779 B1

| 5 | 6 |
|---|---|

accomplished using a nine digit routing number located on the bottom left hand corner of the check. A unique routing number is typically assigned to every financial institution in the United States. Financial institution **140** may present the substitute check to financial institution **150** and request that the check be paid. If financial institution **150** verifies the check (i.e., agrees to honor the check), financial institution **140** may then settle the check by debiting funds from financial institution **150** and crediting funds to financial institution **130**. Financial institution **150** may then debit funds from account **170**.

It will be appreciated that the preceding examples are for purposes of illustration and explanation only, and that an embodiment is not limited to such examples. For example, financial institution **150** may be a correspondent bank (i.e., engaged in a partnership with financial institution **130**). Thus, financial institution **130** may bypass the regional branch of the Federal Reserve and clear the check directly with financial institution **150**. In addition, account **160** and account **170** may both be held at financial institution **130**, in which case the check **108** may be cleared internally.

FIG. **2** shows a high-level block diagram of an implementation of a system **200** that may be used for the deposit of a check, such as the check **108**. As described further herein, the user **102** may deposit the funds of the check **108** using the camera functionality in the mobile device **106**. In the example of one person giving a check to another person, this would enable the receiving party to deposit the funds at that time, without physically visiting an ATM or a bank branch.

In an implementation, the mobile device **106** may comprise a camera **207**, such as a digital camera. Such a mobile device may be called a camera phone. The mobile device **106**, through the camera **207**, has the ability to take or capture a picture or digital image of the check **108** or other negotiable instrument. The camera **207** may take an image of the front of the check **108**. Alternatively, the camera **207** may take an image of both the front and the back of the check **108**. The back of the check may provide endorsement verification, such as the signature of the person or party the check is made out to. In an implementation, an alignment guide may be provided within the field of view of the camera **207**, e.g., using a software application running on the mobile device **106**. The alignment guide may be provided during image capture to assist the user **102** in positioning the check **108** so that the image of the check **108** may be captured in such a manner that it may be more easily processed and cleared during subsequent operations, such as those involving one or more financial institutions.

A depository **204** may include a bank in which the user **102** has a deposit account; however, the present disclosure is not limited to just banks. Alternatively, a third party may act as the depository **204** providing functionality to a plurality of users without regard to the bank at which they have deposit accounts, or whether their individual bank allows for the methods and systems described herein. The depository **204**, in an implementation, after receiving the image(s) of the check **108** from the user **102**, may use a clearinghouse **210** to perform the check clearing operations. As described with respect to the system **100** of FIG. **1**, check clearing operations are used by banks to do the final settlement of the check **108**, such as removing funds from the account of the payor and transferring those funds to the user's bank. The user's bank may choose to make the funds available to the user **102** immediately and take on the risk that the check **108** does not clear. However, for various reasons, the bank may only make those funds available to the user **102** after the check **108** finally clears.

FIG. **3** is a diagram of an example image **230** comprising a check image **247**, a background image **250**, and an alignment guide **235**. The alignment guide **235** may be overlaid on the camera feed of the mobile device **106**, in an implementation. The alignment guide **235** is provided in FIG. **3** as a three sided bounding box (e.g., a rectangle in which one of the line segments or sides is removed), but any shape(s) or indicator(s) may be used, such as vertical bars, parallel lines, a circle, a square, a bounding rectangle, or a self-crop tool, for example. Any aspect ratio may be used for the alignment guide, and in an implementation, the aspect ratio may correspond to that of a personal check or a business check.

The image **230** may be provided in the field of view of the camera **207** during image capture of the check **108**. The user **102** may move the camera **207** or the check **108** so that the check image **247** appears within or lines up with the alignment guide **235**. Some of the background image **250** (e.g., the background on which the check **108** is placed during capture of the image of the check **108**) may also be within the alignment guide **235**.

When the check image **247** is within the alignment guide **235** (e.g., the edges **245** of the check image **247** are aligned with respect to the alignment guide **235**, such as parallel to the associated portion of the alignment guide **235**), the check image **247** and the background image **250** (if any) that are within the alignment guide may be captured either automatically (e.g., by the camera or the mobile device under direction of an application running on the camera **207** or the mobile device **106** or the financial institution) or manually (e.g., by the user **102** pressing a button or making a selection on the camera **207** or the mobile device **106**).

The digital capture thus captured may be provided from the mobile device **106** to a financial institution. The check **108** may be deposited in a user's bank account based on the digital image. Any technique for sending the digital image to the financial institution may be used.

In an implementation, an alignment guide may be provided that is adjustable at the mobile device **106**. The adjustment may be made by the user **102**, the mobile device **106** and/or the camera **207** (e.g., an application running on the mobile device **106** and/or the camera **207**), and/or the financial institution **130**. FIG. **4** is a diagram of an example image **260** comprising a check image **247**, a background image **250**, and an alignment guide **263**. The alignment guide **263** is shown as a bounding rectangle, though any shape(s) or indicator(s) may be used. With a bounding rectangle, for example, used as the alignment guide **263**, aligning the check means enclosing the check within the alignment guide.

The alignment guide **263** may be adjustable by the user **102** via one or more adjustment buttons, selectors, arrows, or other indicators (shown in FIG. **4** as an adjustment button **280** of the camera **207**). For example the user **102** may use the adjustment button **280** to change the shape, aspect ratio, and/or the location of the alignment guide **263** in the field of view of the camera **207**. In an implementation, the user may select the alignment guide **263** using any known selection techniques (e.g., moving a cursor to the alignment guide **263**, highlighting or clicking on the alignment guide **263**, selecting the alignment guide **263** from a pull down menu of the camera **207** or the mobile device **106**) and may use the adjustment button **280** to modify the alignment guide **263**. In an implementation, the user **102** may select which alignment guide from a plurality of alignment guides is to be displayed on the field of view. The camera **207** or the mobile device may store a plurality of alignment guides, and the user **102** may use any known selection technique(s) to select an alignment guide that is be displayed on the field of view of the camera **207**.

Case 2:20-cv-00145-JRG   Document 1-3   Filed 10/07/18   Page 24 of 30 PageID #: 183

US 8,699,779 B1

7

The adjustment button **280** may be provided as one or more physical buttons associated with the camera **207** or the mobile device **106** or may be provided as a selectable button, for example, on a touch screen associated with the camera **207** or the mobile device **106**. In an implementation, the display for the image **260** may comprise a touch screen and the adjustment button **280** may be provided on the touch screen, e.g., overlaying some of the check image **247** and/or the background image **250**.

In an implementation, instead of using the adjustment button **280**, the user **102** may use a finger, a stylus, or any other input device to change the shape, aspect ratio, and/or the location of the alignment guide **263** in the field of view of the camera **207**. Additionally or alternatively, the user **102** may perform cropping on the image **260** prior to the image being captured by the camera **207**. Using any type of selection tool provided with the camera **207** or the mobile device **106**, the user **102** may indicate the location of the edges **245** of the check image **247**, for example. Such an indication may be used in the subsequent capture and/or processing of the image **20** of the check **108**.

FIG. **5** shows a data flow diagram of a system for the deposit of a check, in accordance with an example embodiment. In the data flow diagram of FIG. **5**, a client **320** is one example of the mobile device **106** of the user **102** described with respect to the systems **100** and **200** of FIGS. **1** and **2**, respectively. In an implementation, a server **322** may be a software component operable by the depository **204** of FIG. **2**.

The client **320** may log in to a remote deposit system executed on the server **322**. The login **325** may serve to authenticate the user **102** as an authorized consumer of the depository **204**.

The server **322**, in one example, may send instructions **330** to the client **320** that execute an application on the client **320**. This may include instructions that cause a software object, which may have been previously downloaded and installed (e.g., pre-installed) on the client **320**, to be executed on the client **320**. The software object may generate and display an alignment guide, such as the alignment guide **235** or **263**, in the field of view of a digital camera, such as the camera **207** associated with the mobile device **106**.

In another example, the instructions **330** may include a wholly self-contained application that when delivered to the client **320** will execute and perform one or more operations described herein, such as those directed to generating and displaying an alignment guide in the field of view of the camera **207**. In either example, the software object may be configured to make one or more software calls **310** to the camera **207**. This may be through specific software instructions to the camera. In other words, the camera's functionality may not be abstracted through any software library. In such an example, software code may be written and delivered to every different camera-equipped mobile phone.

In an alternate example, the software object may operate through a software abstraction layer, such as an application programming interface (API). The software object developer may only insert code into the software object to call one or more APIs exposed by the software operating the mobile device. One example of such software is Windows Mobile by Microsoft Corporation. In the context of a Windows Mobile device, the Windows Mobile operating system (OS) has one or more APIs exposed to application developers that will translate instructions from applications into instructions operable by the camera **207** on the mobile device **106**. A mobile operating system, also known as a mobile platform or a handheld operating system, is the operating system that

8

controls a mobile device. Other mobiles OSs include Symbian OS, iPhone OS, Palm OS, BlackBerry OS, and Android.

The software object may cause the camera **207** to generate and display an alignment guide in the field of view and/or take a picture or capture one or more images of the check **108** being deposited. These images may be captured sequentially, e.g., pursuant to the user **102** flipping the check **108** over after an image of the front of the check **108** has been captured within the alignment guide. However, each side of the check **108** may be captured by the camera **207** using similar API calls. The images may be stored in an image file **315**.

Once the images of one or both sides of the check **108** are captured within the alignment guide by the camera **207**, the image file **315** may be operated on by the software object of the client **320**. These operations may include any of the following: deskewing, dewarping, magnetic ink character recognition (MICR), cropping (either automatically, or having the user **102** manually identify the corners and/or edges of the check **108** for example), reducing the resolution of the image, number detection, character recognition, and the like.

With respect to number and character recognition, commercial check scanners have used characteristics of the MICR encoding to detect information about the check, such as the bank's routing number and the account number. However, the characteristics that these scanners have used are the magnetic characteristic of the ink itself and these scanners have used methods similar to those of magnetic audio tape readers. In an implementation, a software object of the client **320** may optically recognize the characters on the MICR line, as a consumer mobile device such as the mobile device **106** will lack the magnetic reading ability of a commercial check scanner.

The image may be also down converted into a grayscale or black and white image, such as either in Joint Photographic Experts Group (JPEG) compliant format or in tabbed image file format (TIFF) for example. In an alternate example, the image may be formatted as a Scalable Vector Graphics (SVG) image. One of the benefits of an SVG file is a large size advantage over JPEG. In the former example, the image at some point before entry into the clearing system may be converted to TIFF format. This may be performed at the mobile device **106**, wherein the camera **207** captures the image in TIFF format. However, the camera **207** of the mobile device **106** may capture the image in JPEG format, which may then be converted into TIFF either at the mobile device **106** or at the server **322**. In the latter example, this may use the transmission of the TIFF image across a communications network which may be more advantageous as TIFF images are typically smaller in file size for the same size of picture as a JPEG formatted image.

The software object on the client **320** may operate by performing one or more of the operations described herein and then transmitting an image file **335** (e.g., based on image file **315** that has been processed) to the server **322** after the user **102** confirms that they do wish to deposit the check **108**. Alternately, the software object may capture the image of the check **108** and transmit that image to the server **322** that in turn may perform those operations, verifies that the image quality is within acceptable thresholds, and communicates that verification back to the client **320**, which can then instruct the user **102** to take a picture of the other side of the check **108**. In this example, the image transmitted to the server **322** may be in any format, such as JPEG or TIFF, insofar as the server software has the ability to convert that image into a Check 21 compliant format. Alternately, the bank may output an X9.37 file to the clearing system. The Check Clearing for the 21st Century Act (or Check 21 Act) is a United States federal law that allows the recipient of a paper check to create a digital

Appx207

US 8,699,779 B1

9

version, thereby eliminating the need for further handling of the physical document. The Check 21 standard for electronic exchange is defined in the standard DSTU X9.37-2003 ("X9.37"). It is a binary interchange format.

The server 322 may confirm (e.g., using a process confirmation 340) with the user 102 the transmission, reception, and processing of each side of the check 108 separately, or may confirm both sides at the same time. On the server side, more operations may be performed. such as signature verification. Where to perform these operations may be determined by the processing power of the mobile device 106 itself, which is typically limited in computational power. However, the present discussion is not limited in any way by discussion of where certain operations are described as operating. The operations of detecting and verifying information may be performed by the client 320 before the information is transmitted along with the image in the image file 335 to the server 322. Alternately, the software object(s) operating on the mobile device 106 may perform no operation other then capturing images of the front and back of the check 108 within the alignment guide, receiving confirmation that the user 102 wishes to proceed, and transmitting those images to the server 322, wherein the server 322 performs those operations.

In an implementation, after the image file 335 has been received by the server 322, the server 322 may send a process confirmation 340 to the client 320. The process confirmation 340 may request instructions from the client 320 to continue proceeding with the deposit now that the server 322 has received the image file 335. In response, the client 320 may send a deposit confirmation 345 to the server 322, instructing the server 322 to process the deposit of the check based on the image file 335 that had been received by the server 322.

FIG. 6 shows a block diagram of a client apparatus 450 for the deposit of a check, in accordance with an example embodiment. The client apparatus 450 may include one or more software objects operating on a mobile device 106, such as described above. The client apparatus 450 may include a communications module 452, a check processing module 454, and an image capture module 456. The client apparatus 450 may receive, in one example, one or more check images 458 captured within an alignment guide as an input and output one or more processed images 460.

In an implementation, the check images 458 may be received following a software call from the check processing module 454 to the image capture module 456. In such an implementation, the image capture module 456 may include the camera 207 contained within the mobile device 106. Alternately, the camera 207 may be detachably coupled to the mobile device 106 such as through a secure digital (SD) slot or over any suitable communications bus, such as USB (universal serial bus).

In an implementation, the image capture module 456 may retrieve previously captured and stored image files (e.g., in local, remote, or removable storage associated with the client apparatus 450) and send the image files to a financial institution (e.g., financial institution 130, the server 322, the server apparatus 570 of FIG. 7, etc.) for processing.

In an implementation, the client apparatus 450 may comprise a browser such as a web browser, for accessing a website on the Internet or other network associated with a financial institution. The user may access the website and select a "capture image" link or similar icon, button or link, for example, displayed on the browser. Such a selection may call the image capture module 456 on the client apparatus 450.

The communications module 452 may be configured, in one example, to receive and send data signals over a suitable communications network. This may include, without limita-

10

tion, GSM/GPR3, HSDPA, CDMA, TDMA, 802.11, 802.16 and the like. While the bandwidth available to the mobile device 106 may be an implementation concern such discussion is outside the scope of the present discussion and any suitable wireless communications network is considered to be within the scope of the present discussion. With respect to the present discussion, the communications module 452 may receive one or more processed check images 460 from the check processing module 454 and may transmit them over the suitable communications network to the depository 204, as described herein.

The check processing module 454 may be configured, in one example, to cause the image capture module 456 to capture a digital image of at least one side of a check within an alignment guide provided in a field of view of the camera 207. The alignment guide is intended to ensure that the image of the check is suitable for one or more processing tasks. For instance, if the check is rotated 45 degrees clockwise when captured, the check processing module 454 or a software object operated on the server 322 described above may be unable to optically detect information on the check.

The check processing module 454 may then perform one or more cleaning operations on the image of the check. For example, the check processing module 454 may deskew the image. Another aspect of an image that may be cleaned is a warping of the image. Warping, as used herein, is meant to denote that the check is tilted forward or back with respect to a plane that is perpendicular to a line drawn from the camera lens to the center of the check. Warping, or tilting, of the image may also lead to incorrect optical detection of the check. In an implementation, the check processing module 454 may dewarp the check image such that, in a three-dimensional space, the check would appear to be perpendicular to an imaginary line drawn from the center of the camera lens to the center of the check itself.

The check processing module 454, in further examples, may perform one or more other cleaning or processing operations. This may include down-converting the image received from the image capture module to a suitable size, such as 200 dots per inch (DPI) resolution or in a resolution range such as 200 DPI to 400 DPI. 300 DPI to 500 DPI, etc., and/or converting the image to grayscale or black and white. Such operation(s) may reduce the file size of the check image.

Alternatively, the check processing module 454 may send instructions to the image capture module 456 to cause the image capture module 456 to capture an image of the check at a suitable resolution within an alignment guide. The check processing module 454 may additionally perform any of the following operations, in further examples: convert from JPEG to TIFF, detect check information, perform signature detection on the image of the check, and the like. The check processing module 454 may, alternatively, send the captured check image to the server described herein for such processing, and receive confirmation that the operations were completed before further operations can proceed.

One of the issues with check processing is to detect the presence of a check against whatever background is present. While a user may be instructed to place the check on a dark or black background, such instructions may not provide a positive user experience. Alternatively or additionally, edge detection may be used to detect the check. Edge detection techniques are well known and any suitable method may be used herein. Alternative or additional methodology for check detection may use tile-cropping to detect and process the check.

The size of the file sent between the mobile device and the server may be small. This runs counter with respect to auto-

US 8,699,779 B1

**11**

matic check detection against a background. If captured in color, the contrast between check and background becomes easier. However, the processed image sent over the communications network may need to be smaller, and if the detection operation is performed by the server, it may be advantageous to convert the captured image to grayscale, or even black and white, before transmission to the server. Grayscale images are compliant with the Check 21 Act.

While "flat" is a fairly well known term to users, each user's appreciation of flat with respect to the camera lens of the camera 207 associated with the mobile device 106 may result in a problem with needing to align the check image programmatically or risk rejecting a large number of check images. As the image captured is a set of pixels, a tilted image will result in a jagged polygon rather than a perfect rectangle. Using convex hull algorithms, the check processing modules may create a smooth polygon around the boundary and remove the concavity of the check image. Alternatively, a rotating calipers algorithm may be used to determine the tightest fitting rectangle around the check boundary, which can then be used to determine the angle of it, with that angle being used to align the check properly.

The operator of the camera 207 may introduce distortions in the image due to a perspective problem, specifically an angling of the camera vertically over the check, and the top of the check is smaller than the bottom, or the reverse. A warping transformation algorithm (e.g., which may be exposed as a software call within Java advanced imaging) may be used to remove this distortion.

If user involvement is tolerated, the user may be queried to supply or identify three of the four corners of the check. In such an operation, the fourth corner may be derived, showing the perimeter of the check. This may allow a software object described herein to use less computational resources in processing the image of the check.

FIG. 7 shows a block diagram of a server apparatus 570 for the deposit of a check, in accordance with an example embodiment. Aspects of an example server apparatus are described with respect to FIG. 10. The server apparatus 570 may include one or more software objects operating on a server operated by the depository 204 described above with respect to FIG. 2. The server apparatus 570 may include a communications module 572, a check processing module 574, and a check clearance module 576. The server apparatus 570 may receive one or more processed images 460 from a mobile device 106 or a client apparatus 450 as an input and may output a file such as a Check 21 compliant file 578. The Check 21 compliant file 578 may be a file or entry in a record set that is compliant with the clearinghouse rules set forth in the Check 21 Act and may include outputting an X9.37 file, in one example.

The communications module 572 may be configured to receive a wireless communication from the mobile device 106 over any suitable communications network, such as those described above. The communications module 572 may additionally receive a communication over a different communications network than the mobile device 106 communicated on, such as receiving the communication over a TCP/IP (Transmission Control Protocol/Internet Protocol) connection from the user's communication provider.

The check processing module 574 may be configured, in one example, to perform one or more check processing operations on the processed image(s) 460 that are received. In an implementation, these operations may include any of the operations described herein with respect to the check processing module 454 of FIG. 6. The operation of signature verification may be performed by the check processing module 574

**12**

of the server apparatus 570 as the server apparatus 570 may interface with other systems of the depository 204 that may maintain previously verified signature samples of the user 102. Performing signature verification at the client apparatus 450 may be computationally unfeasible; additionally, there may be a security risk if the signature sample is stored on the user's own device.

A cropped grayscale image may be sent to the server apparatus 570. The server apparatus 570 may perform further processing to remove distortion such as warping. The server apparatus 570 may extract information via a TIFF conversion and determine the DPI and re-scale to the proper DPI (e.g., convert to TIFF and detect the DPI that was used in the grayscale image). In an implementation, DPI detection may run on the client apparatus 450.

The check clearance module 576 may be configured, in one example, to receive a file from the check processing module 574 and may communicate with a check clearinghouse such that a Check 21 compliant file may be delivered to the check clearinghouse and funds may be received by the depository 204. The availability of the funds to the user 102 may be delayed by this operation such that the user 102 only has access to those funds when the depository 204 receives confirmation that the check has cleared.

FIG. 8 is an operational flow of an implementation of a method 800 that may be used for deposit of a check using alignment of the check. At 810, a request for access may be received from a user (e.g., the user 102). The user may request access to a deposit system operated by a depository (e.g., the depository 204) by way of a mobile device (e.g., the mobile device 106) such as, such a cellular phone, a PDA, a handheld computing device, etc. operated by the user. The access may be through some sort of user login, in some examples. The deposit system may be configured to receive a deposit of a negotiable instrument, such as a check, money order, cashier's check, etc. from the user and clear the negotiable instrument in a suitable clearinghouse system.

At 820, the system may initialize a software object on the mobile device. This may include sending instructions to the mobile device intended to execute a previously installed (i.e., pre-installed) software object. Alternatively, the system may send a software object to the mobile device that may execute the software object, carry out operations described herein by use of the software object, and terminate the software object. In an implementation, the system may instruct a camera associated with the mobile device to capture an image of the negotiable instrument. The system may also instruct the camera or the mobile device to generate and display an alignment guide in the field of view of the camera.

At 830, an alignment guide, such as the alignment guide 235 or 263, may be provided in the field of view of the camera. The alignment guide may be generated and displayed pursuant to instructions received at the camera or mobile device from the deposit system operated by a depository, the server 322, or the server apparatus 570, for example.

At 840, an image of the check may be captured when the check is displayed within the alignment guide in the field of view. This may be accomplished through the software object accessing a camera associated with the mobile device (e.g., either comprised within the mobile device or separate from the mobile device). This may be done through an API exposed by the OS of the mobile device, or may be through software code customized for a specific phone and specific camera. With respect to the former, a developer of the software object may write code to the camera API(s), which may be specific to the OS and without regard to the camera on the device. In

US 8,699,779 B1

13

an implementation, the user may be directed to scale or move the captured image to ensure it is properly framed within the alignment guide.

At **850**, the image may be cleaned. Cleaning may include converting the image from JPEG format to TIFF format. Other cleaning operations are described herein. Cleaning operations may also be augmented by detecting operations. The operations at **850** may be carried out on the mobile device, in an implementation, though may include sending the image to the server apparatus, which may perform one or more cleaning operations and when complete may send a notification back to the mobile device of the completion. In either instance, the image may be deskewed, dewarped, and cropped for example, at **850**. Additionally, detection operations may be performed, e.g. after the cleaning operations are performed. The detection operations may include any of the following, for example: optically read the MICR line, courtesy amount recognition (CAR), legal amount recognition (LAR), signature block, and payee. As discussed above, the detecting operations may be performed by the client, the server, or some combination thereof.

In an implementation, an application on the mobile device may crop the image around where the alignment guide was during the image capture. Edge detection may be performed on the cropped image. In an implementation, the user may manually perform cropping on the image after the application crops the image around the alignment guide's position.

At **860**, the cleaned image may be transmitted to the depository. This may include transmitting the cleaned image alone to the depository, but may also include transmitting the detected information on the check to the depository. In an implementation, coordinate data of the alignment guide may be provided to the depository. Such coordinate data may correspond to the coordinates of the alignment guide in the field of view of the camera or in the image generated by the camera. Alternatively or additionally, the user can identify on the display of the captured image where each of the corners of the check is and the coordinate data (e.g., pertaining to the identified corners) and/or corner identification information may be provided to the depository along with the image of the check. The depository may use the coordinate data and/or corner identification information during subsequent processing such as cropping, edge detection, etc.

At **870**, the depository may receive the cleaned image of the check (along with financial information pertaining to the account for depositing funds, for example) and may process the image. Processing of the digital image file may include retrieving financial information regarding the check. The financial information may comprise the MICR number, the routing number, an amount, etc. Any known image processing technology may be used, such as edge detection, filtering to remove imagery except the check image or check data in the received digital image file, image sharpening, and technologies to distinguish between the front and the back sides of the check. The depository may identify and/or remove at least a portion of data that is extraneous to the check, such as background data.

After retrieving the financial information from the check in an electronic data representation form, the depository may determine whether the financial information such as the amount payable to the user, the account associated with the user to deposit funds, an account associated with a payor to debit funds, and an institution associated with the payor, etc., may be valid. For example, the depository may include electronic devices such as computers, servers, databases, or the like that may be in communication with each other. The electronic devices may receive an electronic data representa-

14

tion and may perform an analysis on the quality of the data representation, the readability of the data representation, or the like. For example, the electronic devices may determine whether the account number, amount payable, or the like may be readable such that they may be parsed and processed by the depository to credit an account associated with the user.

If the financial information is determined to be valid, the electronic data representation may be processed by the depository, thereby depositing the money in the user's account. If the financial information is determined to be invalid, then the user may be advised. For example, the depository may transmit an email, a web message, an instant message, or the like to the user indicating that the financial information associated with the electronic data representation may be invalid. The user may determine how to proceed by selecting an option on the web message, replying to the email, or the like.

Thus, in an implementation, instructions on how the user would like to proceed may be requested from the user, such as whether the user would like to try the deposit again (e.g., make another image of the check within the alignment guide and send it to the depository) or whether the user would like assistance from a representative, for example. The user may indicate how they would like to proceed.

If the user would like assistance, the financial information may be transferred to a representative for further review. The representative may review the financial information associated with the electronic data representation to determine whether to allow the electronic data representation to be processed by the depository. If so, the electronic data representation of the financial information may be processed by the depository, thereby depositing the check in the user's account. The depository may send a notice to the user via email, facsimile, instant message, or mail, for example, that the check has been deposited into the selected account.

FIG. **9** is an operational flow of another implementation of a method **900** that may be used for deposit of a check using alignment of the check. A user (e.g., the user **102**) may receive and endorse a check (e.g., the check **108**) at **910** and open a communication pathway with an institution (e.g., the financial institution **130**), at **920**. In an implementation, the user may open a communication pathway with the institution by logging into a website of the institution, for example. There may be several ways in which a communication pathway may be established, including, but not limited to, an Internet connection via a website of the institution. The user may access the website and log into the website using credentials, such as, but not limited to, a username and a password.

At **930**, the user may send a request to deposit the check and may select an account in which to deposit the check. In an implementation, the user may select a "deposit check" option provided on the website, and may enter details such as check amount, date, the account the check funds should be deposited in, comments, etc.

At **940**, an alignment guide may be provided in the field of view of the camera that is used to create a digital image of the check. The alignment guide, such as the alignment guide **263**, may be adjustable, e.g., using an adjustment button, such as the adjustment button **280**, or other selection and adjustment techniques.

The user may position the camera and the check such that the check is in the field of view of the camera, and at **950**, may manually adjust the alignment guide and/or the check so that the alignment guide is adjusted with respect to the image of the check that is displayed in the field of view. Alternatively, the camera, the mobile device, or the institution may adjust the alignment guide without user intervention so that the

US 8,699,779 B1

15

image of the check that is displayed in the field of view is positioned within the alignment guide. In an implementation, the camera, the mobile device, or the institution may provide feedback to the user regarding the alignment guide and the positioning of the check with respect to the alignment guide.

At **960**, when the image of the check is within the alignment guide, a digital image of the check may be created using the camera. In an implementation, the user may instruct the camera (e.g., by pressing a button on the camera or the mobile device) to create the digital image. In another implementation, the camera may automatically create the digital image as soon as the image of the check is within the alignment guide. In this manner, the user may point the camera at the check such that the image of the check appears in the field of view, and after the alignment guide has been adjusted (either by the user or automatically by the camera, the mobile device, or the financial institution via a communications network) and/or the check has been repositioned within the alignment guide by the user, a digital image of the check may be created without further user intervention. Depending on the implementation, one or more digital images of the check (e.g., corresponding to the front and back of the check) may be created using such techniques.

At **970**, the digital image(s) may be uploaded to the institution using any known image upload process. In an implementation, the upload may be augmented by secondary data which may be information relating to the deposit of the check, such as an account number and a deposit amount, for example. At **980**, when the institution has received the digital images (e.g., of the front and back sides of the check), the institution may process the digital images to obtain an image of the check and to deposit the funds of the check in the user's account, as described herein.

It is contemplated that processing such as grayscale conversion, image cropping, image compression, dewarping, edge and/or corner detection, etc. may be implemented in the method 900. Such operations may be performed on one or more digital images created by the camera and may be performed on the image(s) by the mobile device and/or by the institution, as described further above.

Although the examples described herein may refer to uploading of images of checks to an institution, it is contemplated that any negotiable instrument or image (e.g., vehicle accident pictures provided to an insurance company) may be processed and/or transmitted using the techniques described herein. Additionally, one or more of the techniques described herein may be performed by the institution instead of the mobile device of the user.

FIG. 10 is a block diagram of an example computing environment in which example embodiments and aspects may be implemented. The computing system environment is only one example of a suitable computing environment and is not intended to suggest any limitation as to the scope of use or functionality.

Numerous other general purpose or special purpose computing system environments or configurations may be used. Examples of well known computing systems, environments, and/or configurations that may be suitable for use include, but are not limited to, personal computers (PCs), server computers, handheld or laptop devices, multiprocessor systems, microprocessor-based systems, network PCs, minicomputers, mainframe computers, embedded systems, distributed computing environments that include any of the above systems or devices, and the like.

Computer-executable instructions, such as program modules, being executed by a computer may be used. Generally, program modules include routines, programs, objects, com-

16

ponents, data structures, etc. that perform particular tasks or implement particular abstract data types. Distributed computing environments may be used where tasks are performed by remote processing devices that are linked through a communications network or other data transmission medium. In a distributed computing environment, program modules and other data may be located in both local and remote computer storage media including memory storage devices.

With reference to FIG. 10, a system 1000 includes a computer 1010 connected to a network 1014. The computer 1010 includes a processor 1020, a storage device 1022, an output device 1024, an input device 1026, and a network interface device 1028, all connected via a bus 1030. The processor 1020 represents a central processing unit of any type of architecture, such as a CISC (Complex Instruction Set Computing), RISC (Reduced Instruction Set Computing), VLIW (Very Long Instruction Word), or a hybrid architecture, although any appropriate processor may be used. The processor 1020 executes instructions and includes that portion of the computer 1010 that controls the operation of the entire computer. Although not depicted in FIG. 10, the processor 1020 typically includes a control unit that organizes data and program storage in memory and transfers data and other information between the various parts of the computer 1010. The processor 1020 receives input data from the input device 1026 and the network 1014 reads and stores code and data in the storage device 1022 and presents data to the output device 1024.

Although the computer 1010 is shown to contain only a single processor 1020 and a single bus 1030, the disclosed embodiment applies equally to computers that may have multiple processors and to computers that may have multiple busses with some or all performing different functions in different ways.

The storage device 1022 represents one or more mechanisms for storing data. For example, the storage device 1022 may include read-only memory (ROM), RAM, magnetic disk storage media, optical storage media, flash memory devices, and/or other machine-readable media. In other embodiments, any appropriate type of storage device may be used. Although only one storage device 1022 is shown, multiple storage devices and multiple types of storage devices may be present. Further, although the computer 1010 is drawn to contain the storage device 1022, it may be distributed across other computers, for example on a server.

The storage device 1022 includes a controller (not shown in FIG. 10) and data items 1034. The controller includes instructions capable of being executed on the processor 1020 to carry out the functions as previously described herein with reference to FIGS. 1-9. In another embodiment, some or all of the functions are carried out via hardware in lieu of a processor-based system. In one embodiment, the controller is a web browser, but in other embodiments the controller may be a database system, a file system, an electronic mail system, a media manager, an image manager, or may include any other functions capable of accessing data items. The storage device 1022 may also contain additional software and data (not shown), which is not necessary to understand the invention. Although the controller and the data items 1034 are shown to be within the storage device 1022 in the computer 1010, some or all of them may be distributed across other systems, for example on a server and accessed via the network 1014.

The output device 1024 is that part of the computer 1010 that displays output to the user. The output device 1024 may be a liquid crystal display (LCD) well-known in the art of computer hardware. In other embodiments, the output device 1024 may be replaced with a gas or plasma-based flat-panel

US 8,699,779 B1

17

display or a traditional cathode-ray tube (CRT) display. In still other embodiments, any appropriate display device may be used. Although only one output device 1024 is shown, in other embodiments any number of output devices of different types, or of the same type, may be present. In an embodiment, the output device 1024 displays a user interface.

The input device 1026 may be a keyboard, mouse or other pointing device, trackball, touchpad, touch screen, keypad, microphone, voice recognition device, or any other appropriate mechanism for the user to input data to the computer 1010 and manipulate the user interface previously discussed. Although only one input device 1026 is shown, in another embodiment any number and type of input devices may be present.

The network interface device 1028 provides connectivity from the computer 1010 to the network 1014 through any suitable communications protocol. The network interface device 1028 sends and receives data items from the network 1014.

The bus 1030 may represent one or more busses, e.g., USB, PCI, ISA (Industry Standard Architecture), X-Bus, EISA (Extended Industry Standard Architecture), or any other appropriate bus and/or bridge (also called a bus controller).

The computer 1010 may be implemented using any suitable hardware and/or software, such as a personal computer or other electronic computing device. Portable computers, laptop or notebook computers, PDAs, pocket computers, appliances, telephones, and mainframe computers are examples of other possible configurations of the computer 1010. For example, other peripheral devices such as audio adapters or chip programming devices, such as EPROM (Erasable Programmable Read-Only Memory) programming devices may be used in addition to, or in place of, the hardware already depicted.

The network 1014 may be any suitable network and may support any appropriate protocol suitable for communication to the computer 1010. In an embodiment, the network 1014 may support wireless communications. In another embodiment, the network 1014 may support hard-wired communications, such as a telephone line or cable. In another embodiment, the network 1014 may support the Ethernet IEEE (Institute of Electrical and Electronics Engineers) 802.3x specification. In another embodiment, the network 1014 may be the Internet and may support IP (Internet Protocol). In another embodiment, the network 1014 may be a LAN or a WAN. In another embodiment, the network 1014 may be a hotspot service provider network. In another embodiment, the network 1014 may be an intranet. In another embodiment, the network 1014 may be a GPRS (General Packet Radio Service) network. In another embodiment, the network 1014 may be any appropriate cellular data network or cell-based radio network technology. In another embodiment, the network 1014 may be an IEEE 802.11 wireless network. In still another embodiment, the network 1014 may be any suitable network or combination of networks. Although one network 1014 is shown, in other embodiments any number of networks (of the same or different types) may be present.

It should be understood that the various techniques described herein may be implemented in connection with hardware or software or, where appropriate, with a combination of both. Thus, the methods and apparatus of the presently disclosed subject matter, or certain aspects or portions thereof, may take the form of program code (i.e., instructions) embodied in tangible media, such as floppy diskettes, CD-ROMs, hard drives, or any other machine-readable storage medium wherein, when the program code is loaded into and executed by a machine, such as a computer, the machine

18

becomes an apparatus for practicing the presently disclosed subject matter. In the case of program code execution on programmable computers, the computing device generally includes a processor, a storage medium readable by the processor (including volatile and non-volatile memory and/or storage elements), at least one input device, and at least one output device. One or more programs may implement or use the processes described in connection with the presently disclosed subject matter, e.g., through the use of an API, reusable controls, or the like. Such programs may be implemented in a high level procedural or object-oriented programming language to communicate with a computer system. However, the program(s) can be implemented in assembly or machine language, if desired. In any case, the language may be a compiled or interpreted language and it may be combined with hardware implementations.

Although exemplary embodiments may refer to using aspects of the presently disclosed subject matter in the context of one or more stand-alone computer systems, the subject matter is not so limited, but rather may be implemented in connection with any computing environment, such as a network or distributed computing environment. Still further, aspects of the presently disclosed subject matter may be implemented in or across a plurality of processing chips or devices, and storage may similarly be effected across a plurality of devices. Such devices might include personal computers, network servers, and handheld devices, for example.

Although the subject matter has been described in language specific to structural features and/or methodological acts, it is to be understood that the subject matter defined in the appended claims is not necessarily limited to the specific features or acts described above. Rather, the specific features and acts described above are disclosed as example forms of implementing the claims.

What is claimed:

1. A system for depositing a check, comprising:
a mobile device having a camera, a display and a processor, wherein the processor is configured to:
    project an alignment guide in the display of the mobile device, the display of the mobile device displaying a field of view of the camera;
    monitor an image of the check that is within the field of view;
    determine whether the image of the check aligns with the alignment guide;
    automatically capture the image of the check when the image of the check is determined to align with the alignment guide; and
    transmit the captured image of the check from the camera to a depository via a communication pathway between the mobile device and the depository.

2. The system of claim 1, wherein the processor is further configured to
    obtain financial information pertaining to the check from the captured image of the check.

3. The system of claim 1, wherein the processor is further configured to receive instructions inputted to the mobile device for adjusting the alignment guide, and adjust the alignment guide according to the received instructions.

4. The system of claim 1, wherein the processor is further configured to crop the image of the check around the alignment guide prior to transmitting the image to the depository.

5. The system of claim 1, wherein the processor is further configured to provide corner identification information pertaining to the image of the check, and control the mobile device to transmit the corner identification information to the depository.

US 8,699,779 B1

19

**6**. The system of claim **1**, wherein the alignment guide is comprised of a three sided opened box.

**7**. The system of claim **1**, wherein the processor is configured to determine the image of the check aligns with the alignment guide when at least one edge of the image of the check aligns with at least one line portion of the alignment guide.

**8**. The system of claim **1**, wherein the processor is configured to determine the image of the check aligns with the alignment guide when at least a first edge and second edge of the image of the check aligns parallel, respectively, to a first line portion and a second line portion of the alignment guide.

**9**. The system of claim **1**, wherein the processor is configured to determine the image of the check aligns with the alignment guide when at least a first edge, second edge and a third edge of the image of the check aligns parallel, respectively, to a first line portion, second line portion and a third line portion of the alignment guide.

**10**. A non-transitory computer-readable medium comprising instructions for depositing a check, said instructions being executed by a processor of a mobile device to:

project an alignment guide in a display of the mobile device, the display of the mobile device displaying a field of view of a camera of the mobile device;

monitor an image of the check that is within the field of view of the camera;

determine whether the image of the check aligns with the alignment guide;

automatically capture the image of the check when the image of the check is determined to align with the alignment guide; and

transmit the image of the check from the mobile device to a deposit system.

**11**. The non-transitory computer-readable medium of claim **10**, wherein the instructions are further executed by the processor to clean the image of the check prior to transmitting the image to the deposit system.

**12**. The non-transitory computer-readable medium of claim **11**, wherein cleaning the image comprises at least cropping the image of the check around the alignment guide and performing edge detection on the image of the check.

**13**. The non-transitory computer-readable medium of claim **10**, wherein the instructions are further executed by the processor to adjust the alignment guide according to received inputs corresponding to an adjustment button of the camera.

**14**. The non-transitory computer-readable medium of claim **10**, wherein the instructions are further executed by the processor to adjust the alignment guide so that the image of the check is displayed within the alignment guide.

**15**. The non-transitory computer-readable medium of claim **10**, wherein the instructions are further executed by the processor to determine the image of the check aligns with the alignment guide when at least one edge of the image of the check aligns with at least one line portion of the alignment guide.

**16**. The non-transitory computer-readable medium of claim **10**, wherein the instructions are further executed by the processor to determine the image of the check aligns with the

20

alignment guide when at least a first edge, second edge and a third edge of the image of the check aligns parallel, respectively, to a first line portion, second line portion and a third line portion of the alignment guide.

**17**. The non-transitory computer-readable medium of claim **10**, wherein the instructions are further executed by the processor to determine the image of the check aligns with the alignment guide when at least a first edge and second edge of the image of the check aligns parallel, respectively, to a first line portion and a second line portion of the alignment guide.

**18**. The non-transitory computer-readable medium of claim **10**, wherein the alignment guide is comprised of a three sided opened box.

**19**. A non-transitory computer-readable medium comprising computer-readable instructions for depositing a check, said computer-readable instructions being executed by a processor to:

receive at a server a request for access to a deposit system from a mobile device;

receive at the server an image of the check from the mobile device, wherein at least an edge of the image of the check has been aligned with an alignment guide;

clean the image of the check at a check processing module of the server using information corresponding to the alignment guide; and

deposit funds of the check into an account associated with the deposit system using the cleaned image of the check.

**20**. The non-transitory computer-readable medium of claim **19**, wherein the computer-readable instructions are further executed by the processor to clean the image of the check at the check processing module by using corner identification information pertaining to corners of the check in the image of the check, wherein the corner identification information is received from the mobile device.

**21**. The non-transitory computer-readable medium of claim **19**, wherein the computer-readable instructions are further executed by the processor to send a self-contained software object to the mobile device that when executed on the mobile device causes the mobile device to automatically capture the image of the check when the image of the check aligns with the alignment guide.

**22**. The non-transitory computer-readable medium of claim **19**, wherein the computer-readable instructions are further executed by the processor to send instructions to the mobile device that when executed on the mobile device causes the mobile device to initialize a pre-installed software object on the mobile device directed to providing the alignment guide in a display of the mobile device, wherein the display is configured to display a field of view of a camera of the mobile device and the camera is configured to automatically capture the image of the check when the image of the check aligns with the alignment guide.

**23**. The non-transitory computer-readable medium of claim **19**, wherein the computer-readable instructions are further executed by the processor to clean the image of the check by cropping the image of the check around the alignment guide.

\* \* \* \* \*



US009336517B1

(12) **United States Patent**   (10) **Patent No.:**    **US 9,336,517 B1**
Prasad et al.                    (45) **Date of Patent:**    ***May 10, 2016**

(54) **SYSTEMS AND METHODS FOR ALIGNMENT OF CHECK DURING MOBILE DEPOSIT**

(71) Applicant: **United Services Automobile Association (USAA)**, San Antonio, TX (US)

(72) Inventors: **Bharat Prasad**, San Antonio, TX (US); **Minya Liang**, San Antonio, TX (US); **Reynaldo Medina, III**, San Antonio, TX (US)

(73) Assignee: **United Services Automobile Association (USAA)**, San Antonio, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **14/516,350**

(22) Filed: **Oct. 16, 2014**

**Related U.S. Application Data**

(63) Continuation of application No. 14/224,944, filed on Mar. 25, 2014, which is a continuation of application No. 12/549,443, filed on Aug. 28, 2009, now Pat. No. 8,699,779.

(51) **Int. Cl.**
    *G06K 9/00*        (2006.01)
    *G06Q 20/04*       (2012.01)
    *G06K 9/32*        (2006.01)

(52) **U.S. Cl.**
    CPC ............ *G06Q 20/042* (2013.01); *G06K 9/3216* (2013.01)

(58) **Field of Classification Search**
    CPC ... G06K 9/00442; G06K 9/36; G06Q 20/042; G06Q 20/10; G06Q 20/108; H04N 1/00204;

H04N 1/00244; H04N 1/00307; H04N 1/00816; H04N 1/387; H04N 1/403; H04N 2101/00; H04N 2201/001; B28B 3/02; B28B 7/0064; H01L 21/4807

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,005,282 A   10/1961   Christiansen
3,341,820 A   9/1967   Grillmeier, Jr. et al.
(Continued)

FOREIGN PATENT DOCUMENTS

EP   0 984 410 A1   3/2000

OTHER PUBLICATIONS

"Accept "Customer Not Present" Checks," Accept Check Online, http://checksoftware.com, Cited in U.S. Pat. No. 7,900,822, as dated 2007 (1 pg).

(Continued)

*Primary Examiner* — Tom Y Lu
(74) *Attorney, Agent, or Firm* — Brinks Gilson & Lione

(57) **ABSTRACT**

An alignment guide may be provided in the field of view of a camera associated with a mobile device used to capture an image of a check. When the image of the check is within the alignment guide in the field of view, an image may be taken by the camera and provided from the mobile device to a financial institution. The alignment guide may be adjustable at the mobile device. The image capture may be performed automatically by the camera or the mobile device as soon as the image of the check is determined to be within the alignment guide. The check may be deposited in a user's bank account based on the image. Any technique for sending the image to the financial institution may be used.

**20 Claims, 9 Drawing Sheets**



Case: 23-1687    Document: 13    Page: 167    Filed: 06/13/2023

Case 2:20-cv-00145-JRG   Document 1-8   Filed 10/01/18   Page 3 of 30 PageID #: 187
Case 2:20-cv-00145-JRG   Document 1-8   Filed 10/01/18   Page 3 of 30 PageID #: 187

**US 9,336,517 B1**

Page 2

(56)           **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,576,972 A | 5/1971 | Wood | |
| 3,593,913 A | 7/1971 | Bremer | |
| 3,620,553 A | 11/1971 | Donovan | |
| 3,648,242 A | 3/1972 | Grosbard | |
| 3,800,124 A | 3/1974 | Walsh | |
| 3,816,943 A | 6/1974 | Henry | |
| 4,002,356 A | 1/1977 | Weidmann | |
| 4,060,711 A | 11/1977 | Buros | |
| 4,070,649 A | 1/1978 | Wright, Jr. et al. | |
| 4,128,202 A | 12/1978 | Buros | |
| 4,136,471 A | 1/1979 | Austin | |
| 4,205,780 A | 6/1980 | Burns | |
| 4,264,808 A | 4/1981 | Owens | |
| 4,305,216 A | 12/1981 | Skelton | |
| 4,321,672 A | 3/1982 | Braun | |
| 4,433,436 A | 2/1984 | Carnes | |
| 4,454,610 A | 6/1984 | Sziklai | |
| RE31,692 E | 10/1984 | Tyburski et al. | |
| 4,523,330 A | 6/1985 | Cain | |
| 4,636,099 A | 1/1987 | Goldstone | |
| 4,640,413 A | 2/1987 | Kaplan | |
| 4,644,144 A | 2/1987 | Chandek | |
| 4,722,444 A | 2/1988 | Murphy | |
| 4,722,544 A | 2/1988 | Weber | |
| 4,727,435 A | 2/1988 | Otani et al. | |
| 4,774,663 A | 9/1988 | Musmanno | |
| 4,790,475 A | 12/1988 | Griffin | |
| 4,806,780 A | 2/1989 | Yamamoto | |
| 4,837,693 A | 6/1989 | Schotz | |
| 4,890,228 A | 12/1989 | Longfield | |
| 4,927,071 A | 5/1990 | Wood | |
| 4,934,587 A | 6/1990 | McNabb | |
| 4,960,981 A | 10/1990 | Benton | |
| 4,975,735 A | 12/1990 | Bright | |
| 5,022,683 A | 6/1991 | Barbour | |
| 5,053,607 A | 10/1991 | Carlson | |
| 5,146,606 A | 9/1992 | Grondalski | |
| 5,157,620 A | 10/1992 | Shaar | |
| 5,159,548 A | 10/1992 | Caslavka | |
| 5,191,525 A | 3/1993 | LeBrun | |
| 5,193,121 A | 3/1993 | Elischer et al. | |
| 5,220,501 A | 6/1993 | Lawlor et al. | |
| 5,227,863 A | 7/1993 | Bilbrey et al. | |
| 5,229,589 A | 7/1993 | Schneider | |
| 5,237,159 A | 8/1993 | Stephens | |
| 5,257,320 A | 10/1993 | Etherington et al. | |
| 5,265,008 A | 11/1993 | Benton | |
| 5,321,816 A | 6/1994 | Rogan | |
| 5,347,302 A | 9/1994 | Simonoff | |
| 5,350,906 A | 9/1994 | Brody | |
| 5,373,550 A | 12/1994 | Campbell | |
| 5,419,588 A | 5/1995 | Wood | |
| 5,422,467 A | 6/1995 | Graef | |
| 5,444,794 A | 8/1995 | Uhland, Sr. | |
| 5,475,403 A | 12/1995 | Havlovick et al. | |
| 5,504,538 A | 4/1996 | Tsujihara | |
| 5,504,677 A | 4/1996 | Pollin | |
| 5,528,387 A | 6/1996 | Kelly et al. | |
| 5,577,179 A | 11/1996 | Blank | |
| 5,583,759 A | 12/1996 | Geer | |
| 5,590,196 A | 12/1996 | Moreau | |
| 5,594,225 A | 1/1997 | Botvin | |
| 5,598,969 A | 2/1997 | Ong | |
| 5,602,936 A | 2/1997 | Green | |
| 5,610,726 A | 3/1997 | Nonoshita | |
| 5,611,028 A | 3/1997 | Shibasaki | |
| 5,630,073 A | 5/1997 | Nolan | |
| 5,631,984 A | 5/1997 | Graf et al. | |
| 5,668,897 A | 9/1997 | Stolfo | |
| 5,673,320 A | 9/1997 | Ray | |
| 5,677,955 A | 10/1997 | Doggett | |
| 5,678,046 A | 10/1997 | Cahill et al. | |
| 5,679,938 A | 10/1997 | Templeton | |
| 5,680,611 A | 10/1997 | Rail | |
| 5,691,524 A | 11/1997 | Josephson | |
| 5,699,452 A | 12/1997 | Vaidyanathan | |
| 5,734,747 A | 3/1998 | Vaidyanathan | |
| 5,737,440 A | 4/1998 | Kunkler | |
| 5,748,780 A | 5/1998 | Stolfo | |
| 5,751,842 A | 5/1998 | Riach | |
| 5,784,503 A | 7/1998 | Bleecker, III et al. | |
| 5,830,609 A | 11/1998 | Warner | |
| 5,832,463 A | 11/1998 | Funk | |
| 5,838,814 A | 11/1998 | Moore | |
| 5,863,075 A | 1/1999 | Rich | |
| 5,870,456 A | 2/1999 | Rogers | |
| 5,870,724 A | 2/1999 | Lawlor | |
| 5,870,725 A | 2/1999 | Bellinger et al. | |
| 5,878,337 A | 3/1999 | Joao | |
| 5,893,101 A | 4/1999 | Balogh et al. | |
| 5,897,625 A | 4/1999 | Gustin | |
| 5,898,157 A | 4/1999 | Mangili et al. | |
| 5,901,253 A | 5/1999 | Tretter | |
| 5,903,878 A | 5/1999 | Talati | |
| 5,903,881 A | 5/1999 | Schrader | |
| 5,910,988 A | 6/1999 | Ballard | |
| 5,917,931 A | 6/1999 | Kunkler | |
| 5,924,737 A | 7/1999 | Schrupp | |
| 5,926,548 A | 7/1999 | Okamoto | |
| 5,930,778 A | 7/1999 | Geer | |
| 5,937,396 A | 8/1999 | Konya | |
| 5,940,844 A | 8/1999 | Cahill | |
| 5,982,918 A | 11/1999 | Mennie | |
| 5,987,439 A | 11/1999 | Gustin et al. | |
| 6,012,048 A | 1/2000 | Gustin et al. | |
| 6,014,454 A | 1/2000 | Kunkler | |
| 6,021,202 A | 2/2000 | Anderson | |
| 6,021,397 A | 2/2000 | Jones | |
| 6,029,887 A | 2/2000 | Furuhashi | |
| 6,030,000 A | 2/2000 | Diamond | |
| 6,032,137 A | 2/2000 | Ballard | |
| 6,038,553 A | 3/2000 | Hyde | |
| 6,053,405 A | 4/2000 | Irwin, Jr. et al. | |
| 6,073,119 A | 6/2000 | Bornemisza-Wahr | |
| 6,085,168 A | 7/2000 | Mori | |
| 6,097,834 A | 8/2000 | Krouse | |
| 6,097,845 A | 8/2000 | Ng et al. | |
| 6,097,885 A | 8/2000 | Rayner | |
| 6,105,865 A | 8/2000 | Hardesty | |
| 6,141,339 A | 10/2000 | Kaplan et al. | |
| 6,145,738 A | 11/2000 | Stinson et al. | |
| 6,151,426 A | 11/2000 | Lee | |
| 6,159,585 A | 12/2000 | Rittenhouse | |
| 6,170,744 B1 | 1/2001 | Lee | |
| 6,188,506 B1 | 2/2001 | Kaiserman | |
| 6,189,785 B1 | 2/2001 | Lowery | |
| 6,192,165 B1 | 2/2001 | Irons | |
| 6,195,694 B1 | 2/2001 | Chen et al. | |
| 6,199,055 B1 | 3/2001 | Kara | |
| 6,236,009 B1 | 5/2001 | Emigh et al. | |
| 6,243,689 B1 | 6/2001 | Norton | |
| 6,278,983 B1 | 8/2001 | Ball | |
| 6,282,826 B1 | 9/2001 | Richards | |
| 6,293,469 B1 | 9/2001 | Masson et al. | |
| 6,304,860 B1 | 10/2001 | Martin | |
| 6,314,452 B1 | 11/2001 | Dekel | |
| 6,317,727 B1 | 11/2001 | May | |
| 6,328,207 B1 | 12/2001 | Gregoire et al. | |
| 6,330,546 B1 | 12/2001 | Gopinathan et al. | |
| 6,339,658 B1 | 1/2002 | Moccagatta | |
| 6,363,164 B1 | 3/2002 | Jones et al. | |
| 6,390,362 B1 | 5/2002 | Martin | |
| 6,397,196 B1 | 5/2002 | Kravetz | |
| 6,408,084 B1 | 6/2002 | Foley | |
| 6,411,725 B1 | 6/2002 | Rhoads | |
| 6,411,737 B2 | 6/2002 | Wesolkowski et al. | |
| 6,411,938 B1 | 6/2002 | Gates et al. | |
| 6,413,305 B1 | 7/2002 | Mehta | |
| 6,417,869 B1 | 7/2002 | Do | |
| 6,425,017 B1 | 7/2002 | Dievendorff | |
| 6,429,952 B1 | 8/2002 | Olbricht | |
| 6,439,454 B1 | 8/2002 | Masson et al. | |
| 6,449,397 B1 | 9/2002 | Che-Chu | |
| 6,450,403 B1 | 9/2002 | Martens et al. | |

**US 9,336,517 B1**

Page 3

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,463,220 B1 | 10/2002 | Dance et al. |
| 6,464,134 B1 | 10/2002 | Page |
| 6,470,325 B1 | 10/2002 | Leemhuis |
| 6,505,178 B1 | 1/2003 | Flenley |
| 6,546,119 B2 | 4/2003 | Ciolli et al. |
| 6,574,609 B1 | 6/2003 | Downs |
| 6,578,760 B1 | 6/2003 | Otto |
| 6,587,837 B1 | 7/2003 | Spgna |
| 6,606,117 B1 | 8/2003 | Windle |
| 6,609,200 B2 | 8/2003 | Anderson |
| 6,611,598 B1 | 8/2003 | Hayosh |
| 6,614,930 B1 | 9/2003 | Agnihotri et al. |
| 6,643,416 B1 | 11/2003 | Daniels |
| 6,654,487 B1 | 11/2003 | Downs, Jr. |
| 6,661,910 B2 | 12/2003 | Jones et al. |
| 6,672,452 B1 | 1/2004 | Alves |
| 6,682,452 B2 | 1/2004 | Quintus |
| 6,695,204 B1 | 2/2004 | Stinson |
| 6,711,474 B1 | 3/2004 | Treyz et al. |
| 6,726,097 B2 | 4/2004 | Graef |
| 6,728,397 B2 | 4/2004 | Mcneal |
| 6,738,496 B1 | 5/2004 | Van Hall |
| 6,742,128 B1 | 5/2004 | Joiner |
| 6,745,186 B1 | 6/2004 | Testa et al. |
| 6,754,640 B2 | 6/2004 | Bozeman |
| 6,755,340 B1 | 6/2004 | Voss |
| 6,763,226 B1 | 7/2004 | McZeal |
| 6,781,962 B1 | 8/2004 | Williams |
| 6,786,398 B1 | 9/2004 | Stinson |
| 6,789,054 B1 | 9/2004 | Makhlouf |
| 6,796,491 B2 | 9/2004 | Nakajima |
| 6,806,903 B1 | 10/2004 | Okisu et al. |
| 6,813,733 B1 | 11/2004 | Li |
| 6,829,704 B2 | 12/2004 | Zhang |
| 6,844,885 B2 | 1/2005 | Anderson |
| 6,856,965 B1 | 2/2005 | Stinson |
| 6,863,214 B2 | 3/2005 | Garner et al. |
| 6,870,947 B2 | 3/2005 | Kelland |
| 6,883,140 B1 | 4/2005 | Acker |
| 6,898,314 B2 | 5/2005 | Kung et al. |
| 6,902,105 B2 | 6/2005 | Koakutsu |
| 6,913,188 B2 | 7/2005 | Wong |
| 6,931,591 B1 | 8/2005 | Brown |
| 6,934,719 B2 | 8/2005 | Nally |
| 6,957,770 B1 | 10/2005 | Robinson |
| 6,961,689 B1 | 11/2005 | Greenberg |
| 6,970,843 B1 | 11/2005 | Forte |
| 6,973,589 B2 | 12/2005 | Wright |
| 6,983,886 B2 | 1/2006 | Natsukari et al. |
| 6,993,507 B2 | 1/2006 | Meyer |
| 6,996,263 B2 | 2/2006 | Jones et al. |
| 6,999,943 B1 | 2/2006 | Johnson |
| 7,003,040 B2 | 2/2006 | Yi |
| 7,004,382 B2 | 2/2006 | Sandru |
| 7,010,155 B2 | 3/2006 | Koakutsu et al. |
| 7,010,507 B1 | 3/2006 | Anderson |
| 7,016,704 B2 | 3/2006 | Pallakoff |
| 7,039,048 B1 | 5/2006 | Monta |
| 7,058,036 B1 | 6/2006 | Yu |
| 7,062,099 B2 | 6/2006 | Li et al. |
| 7,062,456 B1 | 6/2006 | Riehl et al. |
| 7,062,768 B2 | 6/2006 | Kubo |
| 7,072,862 B1 | 7/2006 | Wilson |
| 7,076,458 B2 | 7/2006 | Lawlor et al. |
| 7,086,003 B2 | 8/2006 | Demsky |
| 7,092,561 B2 | 8/2006 | Downs, Jr. |
| 7,104,443 B1 | 9/2006 | Paul et al. |
| 7,113,925 B2 | 9/2006 | Waserstein |
| 7,114,649 B2 | 10/2006 | Nelson |
| 7,139,594 B2 | 11/2006 | Nagatomo |
| 7,140,539 B1 | 11/2006 | Crews |
| 7,163,347 B2 | 1/2007 | Lugg |
| 7,178,721 B2 | 2/2007 | Maloney |
| 7,181,430 B1 | 2/2007 | Buchanan et al. |
| 7,184,980 B2 | 2/2007 | Allen-Rouman et al. |
| 7,197,173 B2 | 3/2007 | Jones et al. |
| 7,200,255 B2 | 4/2007 | Jones |
| 7,204,412 B2 | 4/2007 | Foss, Jr. |
| 7,216,106 B1 | 5/2007 | Buchanan |
| 7,219,082 B2 | 5/2007 | Forte |
| 7,219,831 B2 | 5/2007 | Murata |
| 7,249,076 B1 | 7/2007 | Pendleton |
| 7,252,224 B2 | 8/2007 | Verma |
| 7,257,246 B1 | 8/2007 | Brodie et al. |
| 7,266,230 B2 | 9/2007 | Doran |
| 7,290,034 B2 | 10/2007 | Budd |
| 7,299,970 B1 | 11/2007 | Ching |
| 7,299,979 B2 | 11/2007 | Phillips |
| 7,313,543 B1 | 12/2007 | Crane |
| 7,314,163 B1 | 1/2008 | Crews et al. |
| 7,321,874 B2 | 1/2008 | Dilip |
| 7,321,875 B2 | 1/2008 | Dilip |
| 7,325,725 B2 | 2/2008 | Foss, Jr. |
| 7,328,190 B2 | 2/2008 | Smith et al. |
| 7,330,604 B2 | 2/2008 | Wu et al. |
| 7,336,813 B2 | 2/2008 | Prakash et al. |
| 7,343,320 B1 | 3/2008 | Treyz |
| 7,349,566 B2 | 3/2008 | Jones et al. |
| 7,356,505 B2 | 4/2008 | March |
| 7,377,425 B1 | 5/2008 | Ma |
| 7,379,978 B2 | 5/2008 | Anderson et al. |
| 7,385,631 B2 | 6/2008 | Maeno |
| 7,386,511 B2 | 6/2008 | Buchanan |
| 7,391,897 B2 | 6/2008 | Jones |
| 7,391,934 B2 | 6/2008 | Goodall et al. |
| 7,392,935 B2 | 7/2008 | Byrne |
| 7,401,048 B2 | 7/2008 | Rosedale |
| 7,403,917 B1 | 7/2008 | Larsen |
| 7,406,198 B2 | 7/2008 | Aoki et al. |
| 7,421,107 B2 | 9/2008 | Lugg |
| 7,421,410 B1 | 9/2008 | Schechtman et al. |
| 7,433,098 B2 | 10/2008 | Klein et al. |
| 7,437,327 B2 | 10/2008 | Lam |
| 7,440,924 B2 | 10/2008 | Buchanan |
| 7,447,347 B2 | 11/2008 | Weber |
| 7,455,220 B2 | 11/2008 | Phillips |
| 7,455,221 B1 | 11/2008 | Sheaffer |
| 7,460,108 B2 | 12/2008 | Tamura |
| 7,461,779 B2 | 12/2008 | Ramachandran |
| 7,461,780 B2 | 12/2008 | Potts |
| 7,471,818 B1 | 12/2008 | Price |
| 7,475,040 B2 | 1/2009 | Buchanan |
| 7,477,923 B2 | 1/2009 | Wallmark |
| 7,480,382 B2 | 1/2009 | Dunbar |
| 7,480,422 B2 | 1/2009 | Ackley et al. |
| 7,489,953 B2 | 2/2009 | Griffin |
| 7,490,242 B2 | 2/2009 | Torres |
| 7,497,429 B2 | 3/2009 | Reynders |
| 7,503,486 B2 | 3/2009 | Ahles |
| 7,505,759 B1 | 3/2009 | Rahman |
| 7,506,261 B2 | 3/2009 | Satou |
| 7,509,287 B2 | 3/2009 | Nutahara |
| 7,512,564 B1 | 3/2009 | Geer |
| 7,519,560 B2 | 4/2009 | Lam |
| 7,520,420 B2 | 4/2009 | Phillips |
| 7,520,422 B1 | 4/2009 | Robinson et al. |
| 7,536,354 B1 | 5/2009 | deGroeve |
| 7,536,440 B2 | 5/2009 | Budd |
| 7,539,646 B2 | 5/2009 | Gilder |
| 7,540,408 B2 | 6/2009 | Levine |
| 7,542,598 B2 | 6/2009 | Jones |
| 7,545,529 B2 | 6/2009 | Borrey et al. |
| 7,548,641 B2 | 6/2009 | Gilson et al. |
| 7,566,002 B2 | 7/2009 | Love et al. |
| 7,571,848 B2 | 8/2009 | Cohen |
| 7,587,066 B2 | 9/2009 | Cordery et al. |
| 7,587,363 B2 | 9/2009 | Cataline |
| 7,590,275 B2 | 9/2009 | Clarke et al. |
| 7,599,543 B2 | 10/2009 | Jones |
| 7,599,888 B2 | 10/2009 | Manfre |
| 7,602,956 B2 | 10/2009 | Jones |
| 7,606,762 B1 | 10/2009 | Heit |
| 7,609,873 B2 | 10/2009 | Foth et al. |
| 7,619,721 B2 | 11/2009 | Jones |

# US 9,336,517 B1

Page 4

(56)                 **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 7,620,231 | B2 | 11/2009 | Jones |
| 7,620,604 | B1 | 11/2009 | Bueche, Jr. |
| 7,630,518 | B2 | 12/2009 | Frew et al. |
| 7,644,037 | B1 | 1/2010 | Ostrovsky |
| 7,644,043 | B2 | 1/2010 | Minowa |
| 7,647,275 | B2 | 1/2010 | Jones |
| 7,668,363 | B2 | 2/2010 | Price |
| 7,672,940 | B2 | 3/2010 | Viola |
| 7,676,409 | B1 | 3/2010 | Ahmad |
| 7,680,735 | B1 | 3/2010 | Loy |
| 7,689,482 | B2 | 3/2010 | Lam |
| 7,697,776 | B2 | 4/2010 | Wu et al. |
| 7,698,222 | B1 | 4/2010 | Bueche, Jr. |
| 7,702,588 | B2 | 4/2010 | Gilder et al. |
| 7,734,545 | B1 | 6/2010 | Fogliano |
| 7,743,979 | B2 | 6/2010 | Fredman |
| 7,753,268 | B1 | 7/2010 | Robinson et al. |
| 7,761,358 | B2 | 7/2010 | Craig et al. |
| 7,766,244 | B1 | 8/2010 | Field |
| 7,769,650 | B2 | 8/2010 | Bleunven |
| 7,792,752 | B1 | 9/2010 | Kay |
| 7,792,753 | B1 | 9/2010 | Slater et al. |
| 7,810,714 | B2 | 10/2010 | Murata |
| 7,812,986 | B2 | 10/2010 | Graham et al. |
| 7,818,245 | B2 | 10/2010 | Prakash et al. |
| 7,856,402 | B1 | 12/2010 | Kay |
| 7,873,200 | B1 | 1/2011 | Oakes, III et al. |
| 7,876,949 | B1 | 1/2011 | Oakes, III et al. |
| 7,885,451 | B1 | 2/2011 | Walls et al. |
| 7,885,880 | B1 | 2/2011 | Prasad et al. |
| 7,894,094 | B2 | 2/2011 | Nacman et al. |
| 7,896,232 | B1 | 3/2011 | Prasad et al. |
| 7,900,822 | B1 | 3/2011 | Prasad et al. |
| 7,903,863 | B2 | 3/2011 | Jones et al. |
| 7,904,386 | B2 | 3/2011 | Kalra et al. |
| 7,912,785 | B1 | 3/2011 | Kay |
| 7,949,587 | B1 | 5/2011 | Morris et al. |
| 7,950,698 | B2 | 5/2011 | Popadic et al. |
| 7,953,441 | B2 | 5/2011 | Lors |
| 7,962,411 | B1 | 6/2011 | Prasad et al. |
| 7,970,677 | B1 | 6/2011 | Oakes, III et al. |
| 7,974,899 | B1 | 7/2011 | Prasad et al. |
| 7,978,900 | B2 | 7/2011 | Nepomniachtchi et al. |
| 7,996,314 | B1 | 8/2011 | Smith et al. |
| 7,996,315 | B1 | 8/2011 | Smith et al. |
| 7,996,316 | B1 | 8/2011 | Smith et al. |
| 8,001,051 | B1 | 8/2011 | Smith et al. |
| 8,045,784 | B2 | 10/2011 | Price et al. |
| 8,046,301 | B1 | 10/2011 | Smith et al. |
| 8,203,640 | B2 * | 6/2012 | Kim et al. ............... 348/333.12 |
| 8,204,293 | B2 | 6/2012 | Csulits et al. |
| 8,235,284 | B1 | 8/2012 | Prasad et al. |
| 8,320,657 | B1 | 11/2012 | Burks et al. |
| 8,358,826 | B1 | 1/2013 | Medina, III et al. |
| 8,422,758 | B1 | 4/2013 | Bueche, Jr. |
| 2001/0004235 | A1 | 6/2001 | Maloney |
| 2001/0014881 | A1 | 8/2001 | Drummond |
| 2001/0018739 | A1 | 8/2001 | Anderson |
| 2001/0027994 | A1 | 10/2001 | Hayashida |
| 2001/0037299 | A1 | 11/2001 | Nichols et al. |
| 2001/0042171 | A1 | 11/2001 | Vermeulen |
| 2001/0042785 | A1 | 11/2001 | Walker |
| 2001/0043748 | A1 | 11/2001 | Wesolkowski et al. |
| 2001/0047330 | A1 | 11/2001 | Gephart |
| 2001/0054020 | A1 | 12/2001 | Barth et al. |
| 2002/0001393 | A1 | 1/2002 | Jones |
| 2002/0016763 | A1 | 2/2002 | March |
| 2002/0016769 | A1 | 2/2002 | Barbara et al. |
| 2002/0032656 | A1 | 3/2002 | Chen |
| 2002/0038289 | A1 | 3/2002 | Lawlor et al. |
| 2002/0052841 | A1 | 5/2002 | Guthrie |
| 2002/0052853 | A1 | 5/2002 | Munoz |
| 2002/0065786 | A1 | 5/2002 | Martens et al. |
| 2002/0072974 | A1 | 6/2002 | Pugliese |
| 2002/0075524 | A1 | 6/2002 | Blair |

| | | | |
|---|---|---|---|
| 2002/0084321 | A1 | 7/2002 | Martens |
| 2002/0087467 | A1 | 7/2002 | Mascavage, III et al. |
| 2002/0107809 | A1 | 8/2002 | Biddle et al. |
| 2002/0116329 | A1 | 8/2002 | Serbetcioglu |
| 2002/0116335 | A1 | 8/2002 | Star |
| 2002/0118891 | A1 | 8/2002 | Rudd |
| 2002/0120562 | A1 | 8/2002 | Opiela |
| 2002/0129249 | A1 | 9/2002 | Maillard et al. |
| 2002/0133409 | A1 | 9/2002 | Sawano et al. |
| 2002/0138522 | A1 | 9/2002 | Muralidhar |
| 2002/0147798 | A1 | 10/2002 | Huang |
| 2002/0150279 | A1 | 10/2002 | Scott |
| 2002/0152160 | A1 | 10/2002 | Allen-Rouman et al. |
| 2002/0152161 | A1 | 10/2002 | Aoike |
| 2002/0152165 | A1 | 10/2002 | Dutta |
| 2002/0152169 | A1 | 10/2002 | Dutta et al. |
| 2002/0159648 | A1 | 10/2002 | Alderson et al. |
| 2002/0171820 | A1 | 11/2002 | Okamura |
| 2002/0178112 | A1 | 11/2002 | Goeller |
| 2002/0186881 | A1 | 12/2002 | Li |
| 2002/0188564 | A1 | 12/2002 | Star |
| 2002/0195485 | A1 | 12/2002 | Pomerleau et al. |
| 2003/0005326 | A1 | 1/2003 | Flemming |
| 2003/0023557 | A1 | 1/2003 | Moore |
| 2003/0038227 | A1 | 2/2003 | Sesek |
| 2003/0055776 | A1 | 3/2003 | Allan |
| 2003/0055776 | A1 | 3/2003 | Samuelson |
| 2003/0074315 | A1 | 4/2003 | Lam |
| 2003/0075596 | A1 | 4/2003 | Koakutsu |
| 2003/0075916 | A1 | 4/2003 | Gorski |
| 2003/0081824 | A1 | 5/2003 | Mennie |
| 2003/0093367 | A1 | 5/2003 | Allen-Rouman et al. |
| 2003/0093369 | A1 | 5/2003 | Ijichi et al. |
| 2003/0102714 | A1 | 6/2003 | Rhodes et al. |
| 2003/0105688 | A1 | 6/2003 | Brown |
| 2003/0105714 | A1 | 6/2003 | Alarcon-Luther et al. |
| 2003/0132384 | A1 | 7/2003 | Sugiyama et al. |
| 2003/0139999 | A1 | 7/2003 | Rowe |
| 2003/0159046 | A1 | 8/2003 | Choi et al. |
| 2003/0167225 | A1 | 9/2003 | Adams |
| 2003/0191615 | A1 | 10/2003 | Bailey |
| 2003/0191869 | A1 | 10/2003 | Williams |
| 2003/0200174 | A1 | 10/2003 | Star |
| 2003/0212904 | A1 | 11/2003 | Randle et al. |
| 2003/0217005 | A1 | 11/2003 | Drummond et al. |
| 2003/0225705 | A1 | 12/2003 | Park et al. |
| 2003/0233278 | A1 | 12/2003 | Marshall |
| 2003/0233318 | A1 | 12/2003 | King et al. |
| 2004/0010466 | A1 | 1/2004 | Anderson |
| 2004/0012496 | A1 | 1/2004 | De Souza |
| 2004/0013284 | A1 | 1/2004 | Yu |
| 2004/0024626 | A1 | 2/2004 | Bruijning |
| 2004/0024708 | A1 | 2/2004 | Masuda |
| 2004/0030741 | A1 | 2/2004 | Wolton et al. |
| 2004/0057697 | A1 | 3/2004 | Renzi |
| 2004/0058705 | A1 | 3/2004 | Morgan |
| 2004/0066031 | A1 | 4/2004 | Wong |
| 2004/0069841 | A1 | 4/2004 | Wong |
| 2004/0071333 | A1 | 4/2004 | Douglas et al. |
| 2004/0076320 | A1 | 4/2004 | Downs, Jr. |
| 2004/0078299 | A1 | 4/2004 | Down-Logan |
| 2004/0080795 | A1 | 4/2004 | Bean et al. |
| 2004/0089711 | A1 | 5/2004 | Sandru |
| 2004/0093303 | A1 | 5/2004 | Picciallo |
| 2004/0093305 | A1 | 5/2004 | Kight |
| 2004/0103057 | A1 | 5/2004 | Melbert et al. |
| 2004/0103296 | A1 | 5/2004 | Harp |
| 2004/0109596 | A1 | 6/2004 | Doran |
| 2004/0110975 | A1 | 6/2004 | Osinski et al. |
| 2004/0117302 | A1 | 6/2004 | Weichert |
| 2004/0122754 | A1 | 6/2004 | Stevens |
| 2004/0133511 | A1 | 7/2004 | Smith et al. |
| 2004/0138974 | A1 | 7/2004 | Shimamura |
| 2004/0148235 | A1 | 7/2004 | Craig |
| 2004/0158549 | A1 | 8/2004 | Matena |
| 2004/0165096 | A1 | 8/2004 | Maeno |
| 2004/0170259 | A1 | 9/2004 | Park |
| 2004/0210515 | A1 | 10/2004 | Hughes |

# US 9,336,517 B1

Page 5

(56)　　　　　　**References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 2004/0210523 A1 | 10/2004 | Gains et al. |
| 2004/0228277 A1 | 11/2004 | Williams |
| 2004/0236647 A1 | 11/2004 | Acharya |
| 2004/0236688 A1 | 11/2004 | Bozeman |
| 2004/0240722 A1 | 12/2004 | Tsuji et al. |
| 2004/0245324 A1 | 12/2004 | Chen |
| 2004/0247199 A1 | 12/2004 | Murai et al. |
| 2004/0248600 A1 | 12/2004 | Kim |
| 2004/0252679 A1 | 12/2004 | Williams |
| 2004/0260636 A1 | 12/2004 | Marceau |
| 2004/0267666 A1 | 12/2004 | Minami |
| 2005/0001421 A1 | 1/2005 | Luth et al. |
| 2005/0010108 A1 | 1/2005 | Rahn et al. |
| 2005/0021466 A1 | 1/2005 | Buchanan et al. |
| 2005/0033645 A1 | 2/2005 | Duphily |
| 2005/0033685 A1 | 2/2005 | Reyes |
| 2005/0033695 A1 | 2/2005 | Minowa |
| 2005/0035193 A1 | 2/2005 | Gustin et al. |
| 2005/0038746 A1 | 2/2005 | Latimer et al. |
| 2005/0038754 A1 | 2/2005 | Geist |
| 2005/0044042 A1 | 2/2005 | Mendiola |
| 2005/0044577 A1 | 2/2005 | Jerding |
| 2005/0049950 A1 | 3/2005 | Johnson |
| 2005/0071283 A1 | 3/2005 | Randle et al. |
| 2005/0075969 A1 | 4/2005 | Nielson |
| 2005/0075974 A1 | 4/2005 | Turgeon |
| 2005/0078336 A1 | 4/2005 | Ferlitsch |
| 2005/0080725 A1 | 4/2005 | Pick |
| 2005/0082364 A1 | 4/2005 | Alvarez et al. |
| 2005/0086140 A1 | 4/2005 | Ireland |
| 2005/0086168 A1 | 4/2005 | Alvarez |
| 2005/0091161 A1 | 4/2005 | Gustin |
| 2005/0096992 A1 | 5/2005 | Geisel |
| 2005/0097019 A1 | 5/2005 | Jacobs |
| 2005/0097046 A1 | 5/2005 | Singfield |
| 2005/0097050 A1 | 5/2005 | Orcutt |
| 2005/0108164 A1 | 5/2005 | Salafia |
| 2005/0108168 A1 | 5/2005 | Halpin |
| 2005/0115110 A1 | 6/2005 | Dinkins |
| 2005/0125338 A1 | 6/2005 | Tidwell et al. |
| 2005/0125360 A1 | 6/2005 | Tidwell et al. |
| 2005/0127160 A1 | 6/2005 | Fujikawa |
| 2005/0131820 A1 | 6/2005 | Rodriguez |
| 2005/0149436 A1 | 7/2005 | Elterich |
| 2005/0168566 A1 | 8/2005 | Tada et al. |
| 2005/0171899 A1 | 8/2005 | Dunn |
| 2005/0171907 A1 | 8/2005 | Lewis |
| 2005/0177499 A1 | 8/2005 | Thomas |
| 2005/0177518 A1 | 8/2005 | Brown |
| 2005/0182710 A1 | 8/2005 | Andersson |
| 2005/0188806 A1 | 8/2005 | Mackenzie |
| 2005/0205661 A1 | 9/2005 | Taylor |
| 2005/0209961 A1 | 9/2005 | Michelsen |
| 2005/0228733 A1 | 10/2005 | Bent et al. |
| 2005/0252955 A1 | 11/2005 | Sugai |
| 2005/0267843 A1 | 12/2005 | Acharya et al. |
| 2005/0268107 A1 | 12/2005 | Harris et al. |
| 2005/0269412 A1 | 12/2005 | Chiu et al. |
| 2005/0273368 A1 | 12/2005 | Hutten et al. |
| 2005/0278250 A1 | 12/2005 | Zair |
| 2005/0281448 A1 | 12/2005 | Lugg |
| 2005/0281471 A1 | 12/2005 | LeConte |
| 2005/0281474 A1 | 12/2005 | Huang |
| 2005/0289030 A1 | 12/2005 | Smith |
| 2005/0289182 A1 | 12/2005 | Pandian et al. |
| 2006/0002426 A1 | 1/2006 | Madour |
| 2006/0004660 A1 | 1/2006 | Pranger |
| 2006/0025697 A1 | 2/2006 | Kurzweil |
| 2006/0039628 A1 | 2/2006 | Li et al. |
| 2006/0039629 A1 | 2/2006 | Li |
| 2006/0041506 A1 | 2/2006 | Mason et al. |
| 2006/0045321 A1 | 3/2006 | Yu |
| 2006/0047593 A1 | 3/2006 | Naratil |
| 2006/0053056 A1 | 3/2006 | Alspach-Goss |
| 2006/0059085 A1 | 3/2006 | Tucker |
| 2006/0064368 A1 | 3/2006 | Forte |
| 2006/0080245 A1 | 4/2006 | Bahl |
| 2006/0085357 A1 | 4/2006 | Pizarro |
| 2006/0085516 A1 | 4/2006 | Farr et al. |
| 2006/0102704 A1 | 5/2006 | Reynders |
| 2006/0106691 A1 | 5/2006 | Sheaffer |
| 2006/0106717 A1 | 5/2006 | Randle |
| 2006/0110063 A1 | 5/2006 | Weiss |
| 2006/0112013 A1 | 5/2006 | Maloney |
| 2006/0115110 A1 | 6/2006 | Rodriguez et al. |
| 2006/0115141 A1 | 6/2006 | Koakutsu et al. |
| 2006/0118613 A1 | 6/2006 | McMann |
| 2006/0124730 A1 | 6/2006 | Maloney |
| 2006/0144924 A1 | 7/2006 | Stover |
| 2006/0144950 A1 | 7/2006 | Johnson |
| 2006/0161501 A1 | 7/2006 | Waserstein |
| 2006/0164682 A1 | 7/2006 | Lev |
| 2006/0167818 A1 | 7/2006 | Wentker et al. |
| 2006/0182331 A1 | 8/2006 | Gilson et al. |
| 2006/0182332 A1 | 8/2006 | Weber |
| 2006/0186194 A1 | 8/2006 | Richardson et al. |
| 2006/0206506 A1 | 9/2006 | Fitzpatrick |
| 2006/0208039 A1 | 9/2006 | Cable et al. |
| 2006/0210138 A1 | 9/2006 | Hilton et al. |
| 2006/0212391 A1 | 9/2006 | Norman et al. |
| 2006/0214940 A1 | 9/2006 | Kinoshita |
| 2006/0215204 A1 | 9/2006 | Miyamoto et al. |
| 2006/0215230 A1 | 9/2006 | Borrey et al. |
| 2006/0222260 A1 | 10/2006 | Sambongi et al. |
| 2006/0229976 A1 | 10/2006 | Jung |
| 2006/0229986 A1 | 10/2006 | Corder |
| 2006/0238503 A1 | 10/2006 | Smith |
| 2006/0242062 A1 | 10/2006 | Peterson |
| 2006/0242063 A1 | 10/2006 | Peterson |
| 2006/0249567 A1 | 11/2006 | Byrne |
| 2006/0274164 A1 | 12/2006 | Kimura et al. |
| 2006/0279628 A1 | 12/2006 | Fleming |
| 2006/0282383 A1 | 12/2006 | Doran |
| 2006/0291744 A1 | 12/2006 | Ikeda et al. |
| 2007/0016796 A1 | 1/2007 | Singhal |
| 2007/0019243 A1 | 1/2007 | Sato |
| 2007/0022053 A1 | 1/2007 | Waserstein et al. |
| 2007/0027802 A1 | 2/2007 | VanDeburg et al. |
| 2007/0031022 A1 | 2/2007 | Frew |
| 2007/0038561 A1 | 2/2007 | Vancini et al. |
| 2007/0041629 A1 | 2/2007 | Prakash et al. |
| 2007/0050292 A1 | 3/2007 | Yarbrough |
| 2007/0053574 A1 | 3/2007 | Verma et al. |
| 2007/0058851 A1 | 3/2007 | Quine |
| 2007/0063016 A1 | 3/2007 | Myatt |
| 2007/0064991 A1 | 3/2007 | Douglas et al. |
| 2007/0065143 A1 | 3/2007 | Didow et al. |
| 2007/0075772 A1 | 4/2007 | Kokubo |
| 2007/0076940 A1 | 4/2007 | Goodall et al. |
| 2007/0076941 A1 | 4/2007 | Carreon et al. |
| 2007/0077921 A1 | 4/2007 | Hayashi |
| 2007/0080207 A1 | 4/2007 | Williams |
| 2007/0082700 A1 | 4/2007 | Landschaft |
| 2007/0084911 A1 | 4/2007 | Crowell |
| 2007/0086642 A1 | 4/2007 | Foth |
| 2007/0086643 A1 | 4/2007 | Spier |
| 2007/0094088 A1 | 4/2007 | Mastie |
| 2007/0094140 A1 | 4/2007 | Riney et al. |
| 2007/0100748 A1 | 5/2007 | Dheer |
| 2007/0110277 A1 | 5/2007 | Hayduchok et al. |
| 2007/0118472 A1 | 5/2007 | Allen-Rouman et al. |
| 2007/0122024 A1 | 5/2007 | Haas et al. |
| 2007/0127805 A1 | 6/2007 | Foth et al. |
| 2007/0129955 A1 | 6/2007 | Dalmia |
| 2007/0136198 A1 | 6/2007 | Foth et al. |
| 2007/0140545 A1 | 6/2007 | Rossignoli |
| 2007/0140594 A1 | 6/2007 | Franklin |
| 2007/0143208 A1 | 6/2007 | Varga |
| 2007/0150337 A1 | 6/2007 | Hawkins et al. |
| 2007/0156438 A1 | 7/2007 | Popadic |
| 2007/0168265 A1 | 7/2007 | Rosenberger |
| 2007/0171288 A1 | 7/2007 | Inoue |
| 2007/0172107 A1 | 7/2007 | Jones et al. |
| 2007/0172148 A1 | 7/2007 | Hawley |

# US 9,336,517 B1

Page 6

(56)      **References Cited**

### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 2007/0179883 A1 | 8/2007 | Questembert |
| 2007/0183000 A1 | 8/2007 | Eisen et al. |
| 2007/0183741 A1 | 8/2007 | Lerman et al. |
| 2007/0194102 A1 | 8/2007 | Cohen |
| 2007/0198432 A1 | 8/2007 | Pitroda et al. |
| 2007/0203708 A1 | 8/2007 | Polcyn et al. |
| 2007/0208816 A1 | 9/2007 | Baldwin et al. |
| 2007/0217669 A1 | 9/2007 | Swift et al. |
| 2007/0233585 A1 | 10/2007 | Ben Simon et al. |
| 2007/0235518 A1 | 10/2007 | Mueller et al. |
| 2007/0235520 A1 | 10/2007 | Smith et al. |
| 2007/0241179 A1 | 10/2007 | Davis |
| 2007/0244782 A1 | 10/2007 | Chimento |
| 2007/0246525 A1 | 10/2007 | Smith et al. |
| 2007/0251992 A1 | 11/2007 | Sharma et al. |
| 2007/0255652 A1 | 11/2007 | Tumminaro |
| 2007/0255653 A1 | 11/2007 | Tumminaro |
| 2007/0255662 A1 | 11/2007 | Tumminaro |
| 2007/0258634 A1 | 11/2007 | Simonoff |
| 2007/0268540 A1 | 11/2007 | Gaspardo et al. |
| 2007/0271182 A1 | 11/2007 | Prakash et al. |
| 2007/0278286 A1 | 12/2007 | Crowell et al. |
| 2007/0288380 A1 | 12/2007 | Starrs |
| 2007/0288382 A1 | 12/2007 | Narayanan et al. |
| 2007/0295803 A1 | 12/2007 | Levine et al. |
| 2007/0299928 A1 | 12/2007 | Kohli et al. |
| 2008/0002911 A1 | 1/2008 | Eisen |
| 2008/0021802 A1 | 1/2008 | Pendleton |
| 2008/0040280 A1 | 2/2008 | Davis et al. |
| 2008/0052182 A1 | 2/2008 | Marshall |
| 2008/0059376 A1 | 3/2008 | Davis |
| 2008/0063253 A1 | 3/2008 | Wood |
| 2008/0068674 A1 | 3/2008 | McIntyre |
| 2008/0071721 A1 | 3/2008 | Wang |
| 2008/0080760 A1 | 4/2008 | Ronca |
| 2008/0086420 A1 | 4/2008 | Gilder et al. |
| 2008/0086421 A1 | 4/2008 | Gilder |
| 2008/0091599 A1 | 4/2008 | Foss, Jr. |
| 2008/0097899 A1 | 4/2008 | Jackson et al. |
| 2008/0103790 A1 | 5/2008 | Abernethy |
| 2008/0103967 A1 | 5/2008 | Ackert et al. |
| 2008/0113674 A1 | 5/2008 | Baig |
| 2008/0114739 A1 | 5/2008 | Hayes |
| 2008/0116257 A1 | 5/2008 | Fickling |
| 2008/0117991 A1 | 5/2008 | Peddireddy |
| 2008/0119178 A1 | 5/2008 | Peddireddy |
| 2008/0133411 A1 | 6/2008 | Jones et al. |
| 2008/0147549 A1 | 6/2008 | Rathbun |
| 2008/0156438 A1 | 7/2008 | Stumphauzer et al. |
| 2008/0162319 A1 | 7/2008 | Breeden et al. |
| 2008/0162350 A1 | 7/2008 | Allen-Rouman et al. |
| 2008/0162371 A1 | 7/2008 | Rampell et al. |
| 2008/0177659 A1 | 7/2008 | Lacey et al. |
| 2008/0180750 A1 | 7/2008 | Feldman |
| 2008/0208727 A1 | 8/2008 | McLaughlin et al. |
| 2008/0214180 A1 | 9/2008 | Cunningham et al. |
| 2008/0219543 A1 | 9/2008 | Csulits |
| 2008/0245869 A1 | 10/2008 | Berkun et al. |
| 2008/0247629 A1 | 10/2008 | Gilder |
| 2008/0247655 A1 | 10/2008 | Yano |
| 2008/0249941 A1 | 10/2008 | Gilder |
| 2008/0249951 A1 | 10/2008 | Gilder et al. |
| 2008/0262953 A1 | 10/2008 | Anderson |
| 2008/0275821 A1 | 11/2008 | Bishop et al. |
| 2008/0316542 A1 | 12/2008 | Mindrum et al. |
| 2009/0024520 A1 | 1/2009 | Drory et al. |
| 2009/0046938 A1 | 2/2009 | Yoder |
| 2009/0060396 A1 | 3/2009 | Blessan et al. |
| 2009/0066987 A1 | 3/2009 | Inokuchi |
| 2009/0108080 A1 | 4/2009 | Meyer |
| 2009/0110281 A1 | 4/2009 | Hirabayashi |
| 2009/0141962 A1 | 6/2009 | Borgia et al. |
| 2009/0166406 A1 | 7/2009 | Pigg et al. |
| 2009/0167870 A1 | 7/2009 | Caleca et al. |
| 2009/0171819 A1 | 7/2009 | Emde et al. |
| 2009/0171825 A1 | 7/2009 | Roman |
| 2009/0173781 A1 | 7/2009 | Ramachandran |
| 2009/0185738 A1 | 7/2009 | Nepomniachtchi |
| 2009/0190823 A1 | 7/2009 | Walters |
| 2009/0192938 A1 | 7/2009 | Amos |
| 2009/0236413 A1 | 9/2009 | Mueller et al. |
| 2009/0252437 A1 | 10/2009 | Li |
| 2009/0254447 A1 | 10/2009 | Blades |
| 2009/0281904 A1 | 11/2009 | Pharris |
| 2009/0313167 A1 | 12/2009 | Dujari |
| 2010/0007899 A1 | 1/2010 | Lay |
| 2010/0027679 A1 | 2/2010 | Sunahara et al. |
| 2010/0047000 A1 | 2/2010 | Park et al. |
| 2010/0057578 A1 | 3/2010 | Blair et al. |
| 2010/0061446 A1 | 3/2010 | Hands et al. |
| 2010/0082470 A1 | 4/2010 | Walach et al. |
| 2010/0165015 A1 | 7/2010 | Barkley et al. |
| 2010/0225773 A1* | 9/2010 | Lee .................... 348/222.1 |
| 2010/0226559 A1 | 9/2010 | Najari et al. |
| 2010/0260408 A1 | 10/2010 | Prakash et al. |
| 2010/0262522 A1 | 10/2010 | Anderson et al. |
| 2010/0312705 A1 | 12/2010 | Caruso et al. |
| 2011/0016084 A1 | 1/2011 | Mundy et al. |
| 2011/0112967 A1 | 5/2011 | Anderson et al. |
| 2011/0310442 A1 | 12/2011 | Popadic et al. |
| 2013/0021651 A9 | 1/2013 | Popadic et al. |

## OTHER PUBLICATIONS

"Adjusting Brightness and Contrast", www.eaglesoftware.com/adjustin.htm, retrieved on May 4, 2009 (4 pgs.).

"Best practices for producing quality digital image files." Digital Images Guidelines, http://deepblue.lib.umich.edu/bitstream/2027.42/40247/1/Images-Best_Practice.pdf, downloaded 2007 (2 pgs.).

"Chapter 7 Payroll Programs," Uniform Staff Payroll System, http://www2.oecn.k12.oh.us/www/ssdt/usps/usps_user_guide_005.html, Cited in U.S. Pat. No. 7,900,822, as dated 2007 (9 pgs.).

"Check 21—The check is not in the post", RedTitan Technology 2004 http://www.redtitan.com/check21/htm (3 pgs.).

"Check 21 Solutions," Columbia Financial International, Inc. http://www.columbiafinancial.us/check21/solutions.htm, Cited in U.S. Pat. No. 7,900,822, as dated 2007 (8 pgs.).

"Check Fraud: A Guide to Avoiding Losses", All Net, http://all.net/books/audit/checkfraud/security.htm, Cited in U.S. Pat. No. 7,900,822, as dated 2007 (1 pg.).

"Compliance with Regulation CC", http://www.federalreserve.gov/Pubs/regcc/regcc.htm, Jan. 24, 2006 (6 pgs.).

"Customer Personalized Bank Checks and Address Labels" Checks Your Way Inc., http://www.checksyourway.com/htm/web_pages/faq.htm, Cited in U.S. Pat. No. 7,900,822, as dated 2007 (6 pgs.).

"Direct Deposit Application for Payroll", Purdue University, Business Office Form 0003, http://purdue.edu/payroll/pdf/directdepositapplication.pdf, Jul. 2007 (2 pgs.).

"Direct Deposit Authorization Form", www.umass.edu/humres/library/DDForm.pdf, May 2003 (3 pgs.).

"Direct Deposit," University of Washington, http://www.washington.edu/admin/payroll/directdeposit.html, Cited in U.S. Pat. No. 7,900,822, as dated 2007 (3 pgs.).

"Electronic Billing Problem: The E-check is in the mail" American Banker—vol. 168, No. 95, May 19, 2003 (4 pgs.).

"Frequently Asked Questions" Bank of America, http://www.bankofamerica.com/deposits/checksave/index.cfm?template=lc_faq_bymail, Cited in U.S. Pat. No. 7,900,822, as dated 2007 (2 pgs.).

"Full Service Direct Deposit", www.nonprofitstaffing.com/images/upload/dirdepform.pdf. Cited in U.S. Pat. No. 7,900,822, as dated 2001, (2 pgs.).

"How to Digitally Deposit a Check Image", Smart Money Daily, Copyright 2008 (5 pgs.).

"ImageNet Mobile Deposit Provides Convenient Check Deposit and Bill Pay to Mobile Consumers," Miteksystems, 2008 (2 pgs.).

"It's the easiest way to Switch banks", LNB, http://www.inbky.com/pdf/LNBswitch-kit10-07.pdf Cited in U.S. Pat. No. 7,996,316, as dated 2007 (7 pgs.).

US 9,336,517 B1

Page 7

(56)        **References Cited**

OTHER PUBLICATIONS

"Lesson 38—More Bank Transactions", Turtle Soft, http://www.turtlesoft.com/goldenseal-software-manual.lesson38.htm, Cited in U.S. Pat. No. 7,900,822, as dated 2007 (8 pgs).

"Middleware", David E. Bakken, Encyclopedia of Distributed Computing, Kluwer Academic Press, 2001 (6 pgs).

"Mitek Systems Announces Mobile Deposit Application for Apple iPhone," http://prnewswire.com/cgi-bin/stories/pl?ACCT=104&STORY=/www/story/10-01- . . . , Nov. 25, 2008 (2 pgs).

"Personal Finance", PNC, http://www.pnc.com/webapp/unsec/productsandservice.do?sitearea=/PNC/home/personal/account+services/quick+switch/quick+switch+faqs, Cited in U.S. Pat. No. 7,900,822, as dated 2007 (12 pgs).

"Refractive index" Wikipedia, the free encyclopedia; http://en.wikipedia.org./wiki/refractiveindex.com Oct. 16, 2007 (4 pgs).

"Remote Deposit Capture". Plante & Moran, http://plantemoran.com/industries/fincial/institutions/bank/resources/community+bank+advistor/2007+summer+issue/remote+deposit+capture.htm, Cited in U.S. Pat. No. 7,900,822, as dated 2007 (3 pgs).

"Remote Deposit" National City, http://www.nationalcity.com/smallbusiness/cashmanagement/remotedeposit/default.asp; Cited in U.S. Pat. No. 7,900,822, as dated 2007 (1 pg).

"Save on ATM Fees", RedEye Edition, Chicago Tribune, Chicago, IL Jun. 30, 2007 (2 pgs).

"Switching Made Easy," Bank of North Georgia, http://www.banknorthgeorgia.com/cmsmaster/documents/286/documents616.pdf, 2007 (7 pgs).

"Two Words Every Business Should Know: Remote Deposit," Canon, http://www.rpsolutions.com/rpweb/pdfs/canon_rdc.pdf, 2005 (7 pgs).

"Virtual Bank Checks", Morebusiness.com, http://www.morebusiness.com/running_yourbusiness/businessbits/d908484987.brc, Cited in U.S. Pat. No. 7,900,822, as dated 2007 (3 pgs).

"WallStreetGrapevine.com" Stocks on the Rise: JADG, BKYI, MITK; Mar. 3, 2008 (4 pgs).

"What is check Fraud", National Check Fraud Center, http://www.ckfraud.org/ckfraud.html, Cited in U.S. Pat. No. 7,900,822, as dated 2007 (12 pgs).

Affinity Federal Credit Union, "Affinity Announces Online Deposit," Aug. 4, 2005 (1 pg).

Albrecht, W. Steve, "Check Kiting: Detection, Prosecution and Prevention," The FBI Law Enforcement Bulletin, Nov. 1, 1993 (6 pgs).

Alves, Vander and Borba, Paulo; "Distributed Adapters Pattern: A Design for Object-Oriented Distributed Applications"; First Latin American Conference on Pattern Languages of Programming; Oct. 2001; pp. 132-142; Rio de Janeiro, Brazil (11 pgs).

Amber Avalona-Butler / Paraglide, "At Your Service: Best iPhone Apps for Military Lifestyle," Jul. 9, 2010 (2 pgs).

Anderson, Milton M. "FSML and Echeck", Financial Services Technology Consortium, 1999 (17 pgs).

Archive Index Systems; Patent My Vision X-30 or VX30 or X30 © 1994-2008 Archive Systems, Inc. P/O. Box 40135 Bellevue, WA USA 98015 (2 pgs).

Associate of German Banks, SEPA 2008: Uniform Payment Instruments for Europe, Berlin, Cited in U.S. Pat. No. 7,900,822, as dated Jul. 2007, Bundesverbankd deutscher banker ev (42 pgs).

Automated Merchant Systems, Inc., "Electronic Check Conversion," http://www.automatedmerchant.com/electronic_check_conversion.cfm, 2006, downloaded Oct. 18, 2006 (3 pgs).

Bank Systems & Technology. Untitled Article, May 1, 2006, http://www.banktech.com/showarticle.jhtml? articleID=187003126, "Are you Winning in the Payment World?" (4 pgs).

BankServ, "DepositNow: What's the difference?" Cited in U.S. Pat. No. 7,970,677, as dated 2006, (14 pgs).

BankServ, Product Overview, http://www.bankserv.com/products/remotedeposit.htm, Cited in U.S. Pat. No. 7,970,677, as dated 2006, (3 pgs).

Blafore, Bonnie "Lower Commissions, Fewer Amenities", Better Investing, Madison Heights: Feb. 2003, vol. 52. Iss 6. (4 pgs).

BLM Technologies, "Case Study: Addressing Check 21 and RDC Error and Fraud Threats," Remote Deposit Capture News Articles from Jun. 11, 2007, Retrieved from http://www.remotedepositcapture.com/News/june_11_2007.htm on Feb. 19, 2008 (5 pgs).

Blue Mountain Consulting, from URL: www.bluemountainconsulting.com, Cited in U.S. Pat. No. 7,900,822, as dated Apr. 26, 2006 (3 pgs).

Board of Governors of the federal reserve system, "Report to the Congress on the Check Clearing for the 21st Century Act of 2003" Apr. 2007, Submitted to Congress pursuant to section 16 of the Check Clearing for the 21st Century Act of 2003, (59 pgs).

Bruene, Jim; "Check Free to Enable In-Home Remote Check Deposit for Consumers and Small Business", NetBanker. Com, Financial Insite, Inc., http://www.netbanker.com/2008/02/checkfree_to_enableinhome_rem.html, Feb. 5, 2008 (3 pgs).

Bruene, Jim; "Digital Federal Credit Union and Four Others Offer Consumer Remote Deposit Capture Through EasCorp", NetBanker—Tracking Online Finance, www.netbanker.com/2008/04/digital_federal_credit_union_a.html, Apr. 13, 2008 (3 pgs).

Bruno, M., "Instant Messaging, Bank Technology News," Dec. 2002 (3 pgs).

Burnett, J. "Depository Bank Endorsement Requirements," BankersOnline.com, http://www.bankersonline.com/cgi-bin/printview/printview.pl, Jan. 6, 2003 (3 pgs).

Canon, ImageFormula CR-25/CR-55, "Improve Your Bottom Line with Front-Line Efficiencies", 0117W117, 1207-55/25-1 OM-BSP, Cited in U.S. Pat. No. 7,949,587 as dated 2007. (4 pgs).

Carrubba, P. et al., "Remote Deposit Capture: A White Paper Addressing Regulatory, Operational and Risk Issues," NetDeposit Inc., 2006 (11 pgs).

Century Remote Deposit High-Speed Scanner User's Manual Release 2006, (Century Manual), Century Bank, 2006, (32 pgs).

Chiang. Chuck. The Bulletin, "Remote banking offered". http://bendbulletin.com/apps/pbcs.dll/article?AID=/20060201/BIZ0102/602010327&templ . . . , May 23, 2008 (2 pgs).

CNN.com/technology, "Scan, deposit checks from home", www.cnn.com/2008ITECH/biztech/02/07/check.scanning.ap/index.html, Feb. 7, 2008 (3 pgs).

Constanzo, Chris, "Remote Check Deposit: Wells Captures a New Checking Twist", Bank Technology News.Article—May 2005. www.americanbanker.com/btn_article.html?id=20050502YQ50FSYG (2 pgs).

Craig, Ben, "Resisting Electronic Payment Systems: Burning Down the House?", Federal Reserve Bank of Cleveland, Jul. 1999 (4 pgs).

Creativepaymentsolutions.com, "Creative Payment Solutions—Websolution," www.creativepaymentsolution.com/cps/financialservices/websolution/default.html, Copyright 2008, Creative Payment Solutions, Inc. (1 pg).

Credit Union Journal, "The Ramifications of Remote Deposit Capture Success", www.cuiournal.com/orinthis.html?id=20080411EODZT57G, Apr. 14, 2008 (1 pg).

Credit Union Journal, "AFCU Averaging 80 DepositHome Transactions Per Day", Credit Union Journal, Aug 15, 2005 (1 pg).

DCU Member's Monthly—Jan. 2008, "PC Deposit—Deposit Checks from Home!", http://www.mycreditunionnewsletter.com/dcu/01/08/page1. html, Copyright 2008 Digital Federal Credit Union (2 pgs).

De Jesus, A. et al., "Distributed Check Processing in a Check 21 Environment: An educational overview of the opportunities and challenges associated with implementing distributed check imaging and processing solutions," Panini, 2004, pp. 1-22.

De Queiroz, Ricardo et al., "Mixed Raster Content (MRC) Model for Compound Image Compression", 1998 (14 pgs).

DeYoung, Robert; "The Financial Performance of Pure Play Internet Banks"; Federal Reserve Bank of Chicago Economic Perspectives; 2001; pp. 60-75; vol. 25. No. 1 (16pgs).

Dias, Danilo et al., "A Model for the Electronic Representation of Bank Checks", Brasilia Univ. Oct. 2006 (5 pgs).

Digital Transactions News, "An ACH-Image Proposal for Check Roils Banks and Networks" May 26, 2006 (3 pgs).

Dinan, R.F. et al., "Image Plus High Performance Transaction System", IBM Systems Journal, 1990 vol. 29, No. 3 (14 pgs).

# US 9,336,517 B1

Page 8

(56)  **References Cited**

OTHER PUBLICATIONS

eCU Technologies, "Upost Remote Deposit Solution," Retrieved from the internet https://www.eutechnologies.com/products/upost. html, downloaded 2009 (1 pg).

EFT Network Unveils FAXTellerPlus, EFT Network, Inc., www. eftnetwork.com, Jan. 13, 2009 (2 pgs).

ElectronicPaymentProviders, Inc., "FAQs: ACH/ARC, CheckVerification/Conversion/Guarantee, RCK Check Re-Presentment," http://www.useapp.com/faq.htm, downloaded Oct. 18, 2006 (3 pgs).

Federal Check 21 Act, "New Check 21 Act effective Oct. 28, 2004: Bank No Longer Will Return Original Cancelled Checks," Consumer Union's FAQ's and Congressional Testimony on Check 21, www. consumerlaw.org.initiatives/content/check21_content.html, Cited in U.S. Pat. No. 7,873,200, as dated Dec. 2005 (20 pgs).

Federal Reserve Board, "Check Clearing for the 21st Century Act", FRB, http://www.federalreserve.gov/paymentsystems/truncation/, Mar. 1, 2006 (1 pg).

Federal Reserve System, "12 CFR, Part 229 [Regulation CC;]: Availability of Funds and Collection of Checks," Federal Registrar, Apr. 28, 1997, pp. 1-50.

Federal Reserve System, "Part IV, 12 CFR Part 229 [Regulation CC;]: Availability of Funds and Collection of Checks; Final Rule," Federal Registrar, vol. 69, No. 149, Aug. 4, 2004, pp. 47290-47328.

Fest, Glen., "Patently Unaware" Bank Technology News, Apr. 2006, Retrieved from the internet at URL:http://banktechnews.com/article. html?id=2006403T7612618 (5 pgs).

Fidelity Information Services, "Strategic Vision Embraces Major Changes in Financial Services Solutions: Fidelity's long-term product strategy ushers in new era of application design and processing," Insight, 2004, pp. 1-14.

Fisher, Dan M., "Home Banking in the 21st Century: Remote Capture Has Gone Retail," May 2008 (4 pgs).

Furst, Karen et al., "Internet Banking: Developments and Prospects", Economic and Policy Analysis Working Paper 2000-9, Sep. 2000 (60 pgs).

Garry, M., "Checking Options: Retailers face an evolving landscape for electronic check processing that will require them to choose among several scenarios," Supermarket News, vol. 53, No. 49, 2005 (3 pgs).

German Shegalov, Diplom-Informatiker, "Integrated Data, Message, and Process Recovery for Failure Masking in Web Services," Dissertation Jul. 2005 (146 pgs).

Gupta, Amar et al., "An Integrated Architecture for Recognition of Totally Unconstrained Handwritten Numerals", WP#3765, Jan. 1993, Productivity from Information Technology "Profit" Research Initiative Sloan School of Management (20 pgs).

Gupta, Maya R. et al., "OCR binarization and image pre-processing for searching historical documents," Pattern Recognition, vol. 40, No. 2, Feb. 2007, pp. 389-397.

Hale, J., "Picture this: Check 21 uses digital technology to speed check processing and shorten lag time," Columbus Business First, http://columbus.bizjournals.com/columbus/stories/2005/03/14focus1.html, downloaded 2007 (3 pgs).

Hartly, Thomas, "Banks Check Out New Image", Business First, Buffalo: Jul. 19, 2004, vol. 20, Issue 43, (3 pgs).

Heckenberg, D. "Using Mac OS X for Real-Time Image Processing" Oct. 8, 2003 (15 pgs).

Hildebrand, C. et al., "Electronic Money," Oracle, http://www.oracle. com/oramag/profit/05-feb/p15financial.html, 2005, downloaded Oct. 18, 2006 (5 pgs).

Hillebrand, G., "Questions and Answers About the Check Clearing for the 21st Century Act, 'Check 21," ConsumersUnion.org, http:// www.consumersunion.org/finance/ckclear1002.htm, Jul. 27, 2004, downloaded Oct. 18, 2006 (6 pgs).

Image Master, "Photo Restoration: We specialize in digital photo restoration and photograph repair of family pictures", http://www. imphotorepair.com, Cited in U.S. Pat. No. 7,900,822, as downloaded Apr. 2007 (1 pg).

Investment Systems Company, "Portfolio Accounting System," 2000, pp. 1-32.

JBC, "What is a MICR Line?," eHow.com, retrieved from http:// www.ehow.com/about_4684793_what-micr-line.html on May 4, 2009 (2 pgs).

Johnson, Jennifer J., Secretary of the Board; Federal Reserve System, 12 CFR Part 229. Regulation CC;, "Availability of Funds and Collection of Checks". Cited in U.S. Pat. No. 7,900,822, as dated 2009, (89 pgs).

Kendrick, Kevin B., "Check Kiting, Float for Purposes of Profit," Bank Security & Fraud Prevention, vol. 1, No. 2, 1994 (3 pgs).

Kiser, Elizabeth K.; "Modeling the Whole Firm: The Effect of Multiple Inputs and Financial Intermediation on Bank Deposit Rates;" FEDS Working Paper No. 2004-07; Jun. 3, 2003; pp. 1-46 (46 pgs).

Knestout, Brian P. et al., "Banking Made Easy" Kiplinger's Personal Finance Washington, Jul. 2003, vol. 57, Iss 7 (5 pgs).

Kornai Andras et al., "Recognition of Cursive Writing on Personal Checks", Proceedings of International Workshop on the Frontiers in Handwriting Recognition, Cited in U.S. Pat. No. 7,900,822, as dated Sep. 1996, (6 pgs).

Levitin, Adam J., Remote Deposit Capture: A Legal and Transactional Overview, Banking Law Journal, p. 115, 2009 (RDC).

Masonson, L., "Check Truncation and ACH Trends—Automated Clearing Houses", healthcare financial management associate, http:// www.findarticles.com/p/articles/mI.m3276/is_n7_v47/ai_ 14466034/print, 1993 (2 pgs).

Matthews, Deborah, "Advanced Technology Makes Remote Deposit Capture Less Risky," Indiana Bankers Association, Apr. 2008 (2 pgs).

Metro 1 Credit Union, "Remote Banking Services," http://www\i. metro1cu.org/metro1cu/remote.html, downloaded Apr. 17, 2007 (4 pgs).

Mitek Systems: Mitek Systems Launches First Mobile Check Deposit and Bill Pay Application, San Diego, CA, Jan. 22, 2008 (3 pgs).

Mohl, Bruce, "Banks Reimbursing ATM Fee to Compete With Larger Rivals", Boston Globe, Boston, MA, Sep. 19, 2004 (3 pgs).

Moreau, T., "Payment by Authenticated Facsimile Transmission: a Check Replacement Technology for Small and Medium Enterprises," CONNOTECH Experts-conseils, Inc., Apr. 1995 (31 pgs).

Nelson, B. et al., "Remote deposit capture changes the retail landscape." Northwestern Financial Review. http://findarticles.com/p/articles/mi qa3799/is200607/ai_n16537250, 2006 (3 pgs).

NetBank, Inc., "Branch Out: Annual Report 2004," 2004 (150 pgs).

NetBank, Inc., "Quick Post: Deposit and Payment Forwarding Service," 2005 (1 pg).

NetDeposit Awarded Two Patents for Electronic Check Process, NetDeposit. Jun. 18, 2007, (1 pg).

Online Deposit: Frequently Asked Questions, http://www. depositnow.com/faq.html, Copyright 2008 (1 pg).

Onlinecheck.com Merchant Advisors, "Real-Time Check Debit", Merchant Advisors: Retail Check Processing Check Conversion, http://www.onlinecheck/wach/rcareal.htm, Cited in U.S. Pat. No. 7,900,822, as dated 2006 (3 pgs).

Oxley, Michael G., from committee on Financial Services; "Check Clearing for the 21st Century Act", 108th Congress, 1st Session House of Representatives report 108-132, Jun. 2003 (20 pgs).

Oxley, Michael G., from the committee of conference; "Check Clearing for the 21st Century Act" 108th Congress, 1st Session Senate report 108-291, Oct. 1, 2003 (27 pgs).

Palacios, Rafael et al., "Automatic Processing of Brazilian Bank Checks". Cited in U.S. Pat. No. 7,900,822, as dated 2002 (28 pgs).

Patterson, Scott "USAA Deposit@Home—Another WOW moment for Net Banking", NextCU.com, Jan. 26, 2007 (5 pgs).

Public Law 108-100, 108 Congress; "An Act Check Clearing for the 21st Century Act", Oct. 28, 2003, 117 STAT. 1177 (18 pgs).

Rao, Bharat; "The Internet and the Revolution in Distribution: A Cross-Industry Examination"; Technology in Society; 1999; pp. 287-306; vol. 21, No. 3 (20 pgs).

Remotedepositcapture, URL:www.remotedepositcapture.com, Cited in U.S. Pat. No. 7,900,822, as dated 2006 (5 pgs).

RemoteDepositCapture.com, "PNC Bank to Offer Ease of Online Deposit Service Integrated with QuickBooks to Small Businesses", Remote Deposit Capture News Articles from Jul. 24, 2006, (2 pgs).

US 9,336,517 B1

Page 9

(56)        **References Cited**

OTHER PUBLICATIONS

RemoteDepositCapture.com, Remote Deposit Capture News Articles from Jul. 6, 2006, "BankServ Announces New Remote Deposit Product Integrated with QuickBooks" (3 pgs).

Remotedepositcapture.com. LLC, "Remote Deposit Capture Overview," ROC Overview, http://remotedepositcapture.com/overview/RDC_overview.htm, Cited in U.S. Pat. No. 7,900,822, as dated Mar. 12, 2007 (4 pgs).

Richey, J. C. et al., "EE 4530 Check Imaging," Nov. 18, 2008 (10 pgs).

Ritzer, J.R. "Hinky Dinky helped spearhead POS, remote banking movement", Bank Systems and Equipment, vol. 21, No. 12, Dec. 1984 (1 pg).

Rivlin, Alice M. et al., Chair, Vice Chair—Board of Governors, Committee on the Federal Reserve in the Payments Mechanism—Federal Reserve System, "The Federal Reserve in the Payments Mechanism", Jan. 1998 (41 pgs).

Rose, Sarah et al., "Best of the We: The Top 50 Financial Websites", Money, New York, Dec. 1999, vol. 28, Iss. 12 (8 pgs).

Shelby, Hon. Richard C. (Committee on Banking, Housing and Urban Affairs); "Check Truncation Act of 2003", calendar No. 168, 108th Congress, 1st Session Senate report 108-79, Jun. 2003 (27 pgs).

SoyBank Anywhere, "Consumer Internet Banking Service Agreement," Dec. 6, 2004 (6 pgs).

Teixeira, D., "Comment: Time to Overhaul Deposit Processing Systems," American Banker, Dec. 10, 1998, vol. 163, No. 235, p. 15 (3 pgs).

Thailandguru.com: How and where to Pay Bills @ www.thailandguru.com/paying-bills.html (2 pgs).

The Automated Clearinghouse, "Retail Payment Systems; Payment Instruments Clearing and Settlement: The Automated Clearinghouse (ACH)", www.ffiec.gov/ffiecinfobase/booklets/retailretail_02d.html, Cited in U.S. Pat. No. 7,900,822, as dated Dec. 2005 (3 pgs).

The Green Sheet 2.0: Newswire, "CO-OP adds home deposit capabilities to suite of check imaging products", www.greensheet.com/newswire.php?newswire_id=8799, Mar. 5, 2008 (2 pgs).

Tygar, J.D., Atomicity in Electronic Commerce, In ACM Networker, 2:2, Apr./May 1998 (12 pgs).

Valentine, Lisa, "Remote Deposit Capture Hot Just Got Hotter," ABA Banking Journal, Mar. 2006, p. 1-9.

Wade, Will, "Early Notes: Updating Consumers on Check 21" American Banker Aug. 10, 2004 (3 pgs).

Wallison, Peter J., "Wal-Mart Case Exposes Flaws in Banking-Commerce Split", American Banker, vol. 167. No. 8, Jan. 11, 2002 (3 pgs).

Wells Fargo 2005 News Releases, "The New Wells Fargo Electronic Deposit Services Break Through Banking Boundaries in the Age of Check 21", San Francisco Mar. 28, 2005, www.wellsfargo.com/press/3282005_check21Year=2005 (1 pg).

Wells Fargo Commercial, "Remote Deposit", www.wellsfargo.com/com/treasury mgmt/receivables/electronic/remote deposit, Copyright 2008 (1 pg).

White, J.M. et al., "Image Thresholding for Optical Character Recognition and Other Applications Requiring Character Image Extraction", IBM J. Res. Development, Jul. 1983, vol. 27, No. 4 (12 pgs).

Whitney et al., "Reserve Banks to Adopt DSTU X9.37-2003 Format for Check 21 Image Services", American Bankers Association, May 18, 2004, http://www.aba.com/NR/rdonlyres/CBDC1 A5C-43E3-43CC-B733-3E417C63B618/35930/DSTUFormat.pdf (2 pages).

Wikipedia®, "Remote Deposit", http://en.wikipedia.org/wiki/Remote_deposit, 2007 (3 pgs).

Windowsfordevices.com, "Software lets camera phone users deposit checks, pay bills", www.windowsfordevices.com/news/NS3934956670.html, Jan. 29, 2008 (3 pgs).

Wolfe, Daniel. "Check Image Group Outlines Agenda," American Banker, New York, N.Y.: Feb. 13, 2009, vol. 174, Iss. 30, p. 12. (2 pgs).

Woody Baird Associated Press, "Pastor's Wife got Scammed—She Apparently Fell for Overseas Money Scheme," The Commercial Appeal, Jul. 1, 2006, p. A. 1.

Zhang, C.Y., "Robust Estimation and Image Combining" Astronomical Data Analysis Software and Systems IV, ASP Conference Series, 1995 (5 pgs).

Zions Bancorporation, "Moneytech, the technology of money in our world: Remote Deposit," http://www.bankjunior.com/pground/moneytech/remote_deposit.jsp, 2007 (2 pgs).

Application as filed on Apr. 3, 2008 for U.S. Appl. No. 12/062,143 (27 pgs).

Application as filed on Aug. 19, 2010 for U.S. Appl. No. 12/859,741 (235 pgs).

Application as filed on Aug. 21, 2008 for U.S. Appl. No. 12/195,723 (38 pgs).

Application as filed on Aug. 21, 2009 for U.S. Appl. No. 12/545,127 (45 pgs).

Application as filed on Aug. 28, 2009 for U.S. Appl. No. 12/549,443 (41 pgs).

Application as filed on Dec. 20, 2006 for U.S. Appl. No. 11/613,656 (21 pgs).

Application as filed on Dec. 30, 2010 for U.S. Appl. No. 12/982,494 (280 pgs).

Application as filed on Dec. 30, 2010 for U.S. Appl. No. 12/982,561 (275 pgs).

Application as filed on Dec. 30, 2010 for U.S. Appl. No. 12/982,578 (274 pgs).

Application as filed on Dec. 30, 2010 for U.S. Appl. No. 12/982,594 (275 pgs).

Application as filed on Feb. 15, 2012 for U.S. Appl. No. 13/397,405 (19 pgs).

Application as filed on Feb. 18, 2009 for U.S. Appl. No. 12/388,005 (37 pgs).

Application as filed on Jul. 13, 2006 for U.S. Appl. No. 11/487,537 (23 pgs).

Application as filed on Jul. 27, 2009 for U.S. Appl. No. 12/509,613 (48 pgs).

Application as filed on Jul. 27, 2009 for U.S. Appl. No. 12/509,680 (41 pgs).

Application as filed on Jun. 11, 2008 for U.S. Appl. No. 12/137,051 (29 pgs).

Application as filed on Jun. 8, 2011 for U.S. Appl. No. 13/155,976 (352 pgs).

Application as filed on Jun. 8, 2011 for U.S. Appl. No. 13/156,007 (356 pgs).

Application as filed on Jun. 8, 2011 for U.S. Appl. No. 13/156,018 (353 pgs).

Application as filed on Mar. 15, 2007 for U.S. Appl. No. 11/686,924 (34 pgs).

Application as filed on Mar. 15, 2007 for U.S. Appl. No. 11/686,928 (36 pgs).

Application as filed on Mar. 4, 2009 for U.S. Appl. No. 12/397,671 (40 pgs).

Application as filed on Mar. 4, 2009 for U.S. Appl. No. 12/397,930 (37 pgs).

Application as filed on May 10, 2007 for U.S. Appl. No. 11/747,222 (35 pgs).

Application as filed on Oct. 17, 2008 for U.S. Appl. No. 12/253,278 (42 pgs).

Application as filed on Oct. 23, 2007 for U.S. Appl. No. 11/876,925 (36 pgs).

Application as filed on Oct. 23, 2007 for U.S. Appl. No. 11/877,335 (29 pgs).

Application as filed on Oct. 25, 2007 for U.S. Appl. No. 11/923,839 (22 pgs).

Application as filed on Oct. 29, 2007 for U.S. Appl. No. 11/926,388 (23 pgs).

Application as filed on Oct. 30, 2007 for U.S. Appl. No. 11/928,297 (26 pgs).

Application as filed on Oct. 31, 2006 for U.S. Appl. No. 11/590,974 (31 pgs).

Application as filed on Oct. 31, 2006 for U.S. Appl. No. 11/591,008 (22 pgs).

Application as filed on Oct. 31, 2006 for U.S. Appl. No. 11/591,227 (58 pgs).

# US 9,336,517 B1

Page 10

(56)         **References Cited**

OTHER PUBLICATIONS

Application as filed on Oct. 31, 2006 for U.S. Appl. No. 11/591,273 (56 pgs).
Application as filed on Oct. 31, 2007 for U.S. Appl. No. 11/930,537 (27 pgs).
Application as filed on Oct. 31, 2007 for U.S. Appl. No. 11/931,670 (47 pgs).
Application as filed on Oct. 8, 2007 for U.S. Appl. No. 11/868,884 (30 pgs).
Application as filed on Sep. 28, 2007 for U.S. Appl. No. 11/864,569 (35 pgs).
Application as filed on Sep. 8, 2008 for U.S. Appl. No. 12/205,996 (30 pgs).
Claims as filed on Apr. 3, 2008 for U.S. Appl. No. 12/062,163 (3 pgs).
Claims as filed on Apr. 3, 2008 for U.S. Appl. No. 12/062,175 (3 pgs).
Claims as filed on Aug. 19, 2010 for U.S. Appl. No. 12/859,752 (5 pgs).
Claims as filed on Dec. 15, 2011 for U.S. Appl. No. 13/327,478 (4 pgs).
Claims as filed on Dec. 20, 2005 for U.S. Appl. No. 11/613,671 (3 pgs).
Claims as filed on Dec. 29, 2005 for U.S. Appl. No. 11/320,998 (3 pgs).
Claims as filed on Dec. 29, 2005 for U.S. Appl. No. 11/321,027 (3 pgs).
Claims as filed on Dec. 8, 2010 for U.S. Appl. No. 12/963,513 (7 pgs).
Claims as filed on Feb. 15, 2012 for U.S. Appl. No. 13/397,437 (6 pgs).
Claims as filed on Feb. 16, 2011 for U.S. Appl. No. 13/028,477 (3 pgs).
Claims as filed on Jan. 20, 2011 for U.S. Appl. No. 13/010,644 (9 pgs).
Claims as filed on Jan. 31, 2011 for U.S. Appl. No. 13/017,865 (11 pgs).
Claims as filed on Mar. 15, 2007 for U.S. Appl. No. 11/686,925 (5 pgs).
Claims as filed on May 10, 2007 for U.S. Appl. No. 11/747,223 (4 pgs).
Claims as filed on May 18, 2011 for U.S. Appl. No. 13/110,077 (9 pgs).
Claims as filed on May 2, 2011 for U.S. Appl. No. 13/098,566 (10 pgs).
Claims as filed on Oct. 23, 2007 for U.S. Appl. No. 11/877,382 (6 pgs).
Claims as filed on Oct. 24, 2008 for U.S. Appl. No. 12/257,471 (4 pgs).
Claims as filed on Oct. 31, 2006 for U.S. Appl. No. 11/590,963 (3 pgs).
Claims as filed on Oct. 31, 2006 for U.S. Appl. No. 11/590,995 (4 pgs).
Claims as filed on Oct. 31, 2006 for U.S. Appl. No. 11/590,998 (4 pgs).
Claims as filed on Oct. 31, 2007 for U.S. Appl. No. 11/931,804 (4 pgs).
Claims as filed on Oct. 8, 2007 for U.S. Appl. No. 11/868,878 (4 pgs).
Claims as filed on Sep. 2, 2008 for U.S. Appl. No. 12/202,781 (4 pgs).
Claims as filed on Sep. 8, 2008 for U.S. Appl. No. 12/206,001 (3 pgs).
Claims as filed on Sep. 8, 2008 for U.S. Appl. No. 12/206,007 (3 pgs).
Application as filed on Dec. 20, 2012 for U.S. Appl. No. 13/721,945 (55 pgs).
Application as filed on Dec. 20, 2012 for U.S. Appl. No. 13/722,303 (32 pgs).
Application as filed on Feb. 28, 2013 for U.S. Appl. No. 13/780,946 (55 pgs).
Application as filed on Jan. 16, 2013 for U.S. Appl. No. 13/742,909 (31 pgs).
Application as filed on Jan. 7, 2013 for U.S. Appl. No. 13/735,678 (30 pgs).
Application as filed on Mar. 15, 2013 for U.S. Appl. No. 13/833,182 (74 pgs).
Application as filed on Mar. 15, 2013 for U.S. Appl. No. 13/834,353 (37 pgs).
Application as filed on Mar. 15, 2013 for U.S. Appl. No. 13/837,883 (28 pgs).
Application as filed on Mar. 15, 2013 for U.S. Appl. No. 13/840,761 (56 pgs).
Application as filed on Mar. 15, 2013 for U.S. Appl. No. 13/842,112 (62 pgs).
Application as filed on Oct. 19, 2012 for U.S. Appl. No. 13/656,164 (32 pgs).
Application as filed Sep. 14, 2012 for U.S. Appl. No. 13/619,405 (30 pgs).
Claims as filed on Dec. 20, 2012 for U.S. Appl. No. 13/722,576 (4 pgs).
Claims as filed on Dec. 20, 2012 for U.S. Appl. No. 13/722,602 (4 pgs).
Claims as filed on Feb. 12, 2013 for U.S. Appl. No. 13/765,412 (1 pg).
Claims as filed on Feb. 19, 2013 for U.S. Appl. No. 13/770,048 (4 pgs).
Claims as filed on Nov. 20, 2012 for U.S. Appl. No. 13/682,268 (4 pgs).
Claims as filed on Sep. 14, 2012 for U.S. Appl. No. 13/619,026 (3 pgs).
Doermann, David et al., "*Progress in Camera-Based Document Image Analysis*". Proceedings of the Seventh International Conference on Document Analysis and Recognition (ICDAR 2003) 0-7695-1960-1/03, 2003 IEEE (11 pages).
Claims as filed on Jun. 20, 2013 for U.S. Appl. No. 13/922,686 (7 pgs).
Office Action from corresponding U.S. Appl. No. 13/922,686 dated Oct. 16, 2013 (31 pgs).
Response and Amended Claims as filed on Jan. 16, 2014 for U.S. Appl. No. 13/922,686 (19 pgs).
Claims as filed on Aug. 21, 2009 for U.S. Appl. No. 12/545,127 (5 pgs).
Office Action from corresponding U.S. Appl. No. 12/545,127 dated Nov. 8, 2011 (6 pgs).
Final Office Action from corresponding U.S. Appl. No. 12/545,127 dated Apr. 4, 2012 (6 pgs).
Office Action from corresponding U.S. Appl. No. 12/545,127 dated Oct. 9, 2013 (7 pgs).
Appeal Brief from corresponding U.S. Appl. No. 12/545,127 dated Nov. 6, 2012 (21 pgs).
Mitek Systems, "ImageNet Mobile Deposit", San Diego, California, 2 pages.
Debello, James et al., "RDM and Mitek Systems to Provide Mobile Check Deposit", Mitek Systems, Inc. San Diego, California and Waterloo, Ontario, (Feb. 24, 2009), 2 pages.
Nixon, Julie et al., "Fiserv Research Finds Banks are Interested in Offering Mobile Deposit Capture as an", Fiserv, Inc. Brookfield, Wisconsin (Business Wire), (Feb. 20, 2009), 2 pages.

* cited by examiner

Case 2:20-cv-00245-JRG Document 1-4 Filed 06/07/19 Page 12 of 30 PageID #: 145

Case: 23-1687    Document: 13    Page: 176    Filed: 06/13/2023



FIG. 1

100

Case 2:20-cv-00245-JRG    Document 1-3    Filed 10/07/19    Page 13 of 39 PageID #: 147



200

**FIG. 2**

Case 2:20-cv-00245-JRG   Document 1-4   Filed 06/07/18   Page 13 of 39 PageID #: 146



**FIG. 3**

**FIG. 4**

Case 2:20-cv-00245-JRG   Document 1-4   Filed 06/07/18   Page 154 of 30 PageID #: 149



300

**FIG. 5**

Case 2:20-cv-00245-JRG    Document 1-8    Filed 06/07/18    Page 16 of 39 PageID #: 150



*FIG. 6*

Case 2:20-cv-00245-JRG    Document 1-43    Filed 06/07/18    Page 17 of 30 PageID #: 151



**FIG. 7**

Appx230

Case 2:20-cv-00245-JRG   Document 1-4   Filed 06/07/18   Page 187 of 39 PageID #: 152



800

**FIG. 8**

Case 2:20-cv-00245-JRG   Document 1-4   Filed 06/07/18   Page 18 of 39 PageID #: 153

U.S. Patent          May 10, 2016          Sheet 8 of 9          US 9,336,517 B1



FIG. 9

900

Appx232

Case 2:20-cv-00145-JRG    Document 1-3    Filed 06/07/18    Page 20 of 39 PageID #: 154



1000

**FIG. 10**

US 9,336,517 B1

**1**

### SYSTEMS AND METHODS FOR ALIGNMENT OF CHECK DURING MOBILE DEPOSIT

#### CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. application Ser. No. 14/224,944, filed Mar. 25, 2014, which is a continuation of U.S. application Ser. No. 12/549,443, filed Aug. 28, 2009, now U.S. Pat. No. 8,699,779, wherein the entirety of each of the aforementioned applications is hereby incorporated herein by reference.

#### BACKGROUND

Checks typically provide a safe and convenient method for an individual such as a payor to transfer funds to a payee. To use a check, the individual usually opens a checking account, or other similar account, at a financial institution and deposits funds, which are then available for later withdrawal. To transfer funds with a check, the payor usually designates a payee and an amount payable on the check. In addition, the payor often signs the check. Once the check has been signed, it is usually deemed negotiable, meaning the check may be validly transferred to the payee upon delivery. By signing and transferring the check to the payee, the payor authorizes funds to be withdrawn from the payor's account on behalf of the payee.

While a check may provide a payor with a convenient and secure form of payment, receiving a check may put certain burdens on the payee, such as the time and effort required to deposit the check. For example, depositing a check typically involves going to a local bank branch and physically presenting the check to a bank teller. To reduce such burdens for the payee, systems and methods have been developed to enable the remote deposit of checks.

For example, the payee may capture a digital image of a check using a mobile device. The financial institution may then receive from the payee the digital image of the check. The financial institution may then use the digital image to credit funds to the payee. However, such a technique requires the efficient and accurate detection and extraction of the information pertaining to a check in the digital image. Capturing a digital image at a mobile device that allows for detection and extraction of the information from the digital image is difficult.

#### SUMMARY

An alignment guide may be provided in the field of view of a camera associated with a mobile device used to capture an image of a check. When the image of the check is within the alignment guide in the field of view, an image may be taken by the camera and provided from the mobile device to a financial institution. The check may be deposited in a user's bank account based on the image. Any technique for sending the image to the financial institution may be used.

In an implementation, the alignment guide may be adjustable at the mobile device. The adjustment may be made by the user, the financial institution, the camera, and/or the mobile device. In an implementation, an image may be captured when the image of the check is detected to be within the alignment guide. The image capture may be performed automatically by the camera or the mobile device as soon as the image of the check is determined to be within the alignment guide.

**2**

This summary is provided to introduce a selection of concepts in a simplified form that are further described below in the detailed description. This summary is not intended to identify key features or essential features of the claimed subject matter, nor is it intended to be used to limit the scope of the claimed subject matter.

#### BRIEF DESCRIPTION OF THE DRAWINGS

The foregoing summary, as well as the following detailed description of illustrative embodiments, is better understood when read in conjunction with the appended drawings. For the purpose of illustrating the embodiments, there are shown in the drawings example constructions of the embodiments; however, the embodiments are not limited to the specific methods and instrumentalities disclosed. In the drawings:

FIG. 1 is a block diagram of an implementation of a system in which example embodiments and aspects may be implemented;

FIG. 2 shows a high-level block diagram of an implementation of a system that may be used for the deposit of a check;

FIG. 3 is a diagram of an example image comprising a check image, a background image, and an alignment guide;

FIG. 4 is a diagram of another example image comprising a check image, a background image, and an alignment guide;

FIG. 5 shows a data flow diagram of a system for the deposit of a check, in accordance with an example embodiment;

FIG. 6 shows a block diagram of a client apparatus for the deposit of a check, in accordance with an example embodiment;

FIG. 7 shows a block diagram of a server apparatus for the deposit of a check, in accordance with an example embodiment;

FIG. 8 is an operational flow of an implementation of a method that may be used for deposit of a check using alignment of the check;

FIG. 9 is an operational flow of another implementation of a method that may be used for deposit of a check using alignment of the check; and

FIG. 10 is a block diagram of an example computing environment in which example embodiments and aspects may be implemented.

#### DETAILED DESCRIPTION

In the following detailed description of example embodiments, reference is made to the accompanying drawings, which form a part hereof and in which is shown, by way of illustration, specific embodiments in which the example methods, apparatuses, and systems may be practiced. It is to be understood that other embodiments may be used and structural changes may be made without departing from the scope of this description.

FIG. 1 is a block diagram of an implementation of a system 100 in which example embodiments and aspects may be implemented. System 100 may include an account owner, referred to herein as a user 102, and financial institutions 130, 140, and 150, which may be any type of entity capable of processing a transaction involving a negotiable instrument. For example, financial institutions 130, 140, and 150 may be a retail bank, an investment bank, an investment company, a regional branch of the Federal Reserve, a clearinghouse bank and/or a correspondent bank.

A negotiable instrument typically includes a type of contract that obligates one party to pay a specified sum of money to another party. Negotiable instrument as used herein is an

US 9,336,517 B1

3

unconditioned writing that promises or orders payment of a fixed amount of money. One example of a negotiable instrument is a check. The check may be taken by the receiving party and deposited into an account at a financial institution of the receiving party. The receiving party may endorse the check and then present it for deposit at a bank branch, via an automated teller machine (ATM), or by using remote deposit. Other examples of negotiable instruments include money orders, cashier's checks, drafts, bills of exchange, promissory notes, and the like. A money order is a trusted financial instrument that is a payment order for a pre-specified amount of money. A cashier's check (also known as a bank check, official check, teller's check, bank draft or treasurer's check) is a check guaranteed by a bank and may be purchased from a bank.

The user 102 may be an individual or entity who owns account 160 that may be held at financial institution 130. Account 160 may be any type of deposit account for depositing funds, such as a savings account, a checking account, a brokerage account, and the like. The user 102 may deposit a check 108 or other negotiable instrument in the account 160 either electronically or physically. The financial institution 130 may process and/or clear the check 108 or other negotiable instrument. The user 102 may communicate with financial institution 130 by way of communications network 120 such as an intranet, the Internet, a local area network (LAN), a wide area network (WAN), a wireless fidelity (WiFi) network, a public switched telephone network (PSTN), a cellular network, a voice over Internet protocol (VoIP) network, and the like. The user 102 may communicate with financial institution 130 by phone, email, instant messaging, text messaging, web chat, facsimile, mail, and the like. Financial institutions 130, 140, and 150 also may communicate with each other by way of communications network 120.

In an implementation, the user 102 may receive payment from another individual such as a payor in the form of a check 108 or other negotiable instrument that is drawn from account 170 at financial institution 150. The user 102 may endorse the check 108 (e.g., sign the back of the check 108) and indicate an account number on the check 108 for depositing the funds. It is noted that although examples described herein may refer to a check, the techniques and systems described herein are contemplated for, and may be used for, deposit of any negotiable instrument. Similarly, the techniques and systems described herein are contemplated for and may be used with any form or document whose image may be captured with a camera or other imaging device of a mobile device for subsequent storage and/or processing.

As described further herein, a digital image of a check or other negotiable instrument may be provided from a user to a financial institution, and the digital image may be processed and funds associated with the check or negotiable instrument in the digital image may be deposited in a user's bank account. The user 102 may deposit the check 108 into account 160 by making a digital image of the check 108 and sending the image file containing the digital image to financial institution 130. For example, after endorsing the check 108, the user 102 may use a mobile device 106 that comprises a camera to convert the check 108 into a digital image by taking a picture of the front and/or back of the check 108. The mobile device 106 may be a mobile phone (also known as a wireless phone or a cellular phone), a personal digital assistant (PDA), or any handheld computing device, for example. Aspects of an example mobile device are described with respect to FIG. 10.

To increase the likelihood of capturing a digital image of the check 108 that may be readable and processed such that

4

the check 108 can be cleared, an alignment guide may be provided in the field of view of the camera of the mobile device 106. The field of view is that part of the world that is visible through the camera at a particular position and orientation in space; objects outside the field of view when the image is captured are not recorded in the image. The user may move the camera or the check 108 until the check 108 is viewed within the alignment guide in the field of view of the camera. The digital image of the check 108 may then be captured. The alignment guide may provide a pre-image capture quality check that helps reduce the number of non-conforming images of checks during presentment of the images to a financial institution for processing and clearing.

In an implementation, the image capture may be performed automatically by the camera or the mobile device 106 as soon as the image of the check is determined to be within the alignment guide. Alternatively, the user 102 may manually instruct the camera to perform the image capture (e.g., by pressing a button the camera or the mobile device 106). Examples of alignment guides are described further with respect to FIGS. 3 and 4, for example.

In an implementation, the user 102 may send the digital image(s) to financial institution 130 using the mobile device 106. Any technique for sending a digital image to financial institution 130 may be used, such as providing a digital image to a website associated with financial institution 130 from storage, emailing a digital image to financial institution 130, or sending a digital image in a text message or instant message, for example.

Financial institution 130 may receive a digital image representing the check 108 and may use any known image processing software or other application(s) to obtain the relevant data of the check 108 from the digital image. Financial institution 130 may determine whether the financial information associated therewith may be valid. For example, financial institution 130 may include any combination of systems and subsystems such as electronic devices including, but not limited to, computers, servers, databases, or the like. The electronic devices may include any combination of hardware components such as processors, databases, storage drives, registers, cache, random access memory (RAM) chips, data buses, or the like and/or software components such as operating systems, database management applications, or the like. According to an embodiment, the electronic devices may include a network-based server that may process the financial information and may receive the digital image from the user 102.

The electronic devices may receive the digital image and may perform an initial analysis on the quality of the digital image, the readability of the data contained therein, or the like. For example, the electronic devices may determine whether the account number, amount payable, and the like may be readable such that it may be parsed or otherwise obtained and processed by the financial institution to credit an account 160 associated with the user 102 and debit an account associated with the payor. In an implementation, a representative 135 of financial institution 130 may provide assistance to the user 102 and may provide assistance in determining whether the financial information may be readable and/or of a good enough quality to be processed, as described further herein.

Upon receipt and approval of the digital image, financial institution 130 may credit the funds to account 160. Financial institution 130 may clear the check 108 by presenting a digital image of the check 108 captured from the digital image to an intermediary bank, such as a regional branch of the Federal Reserve, a correspondent bank, and/or a clearinghouse bank.

US 9,336,517 B1

**5**

For example, the check 108 may be cleared by presenting the digital image to financial institution 140, which may be a regional branch of the Federal Reserve, along with a request for payment. Financial institutions 130 and 150 may have accounts at the regional branch of the Federal Reserve. Financial institution 130 may create a substitute check using the image provided by the user 102 and present the substitute check to financial institution 140 for further processing. Upon receiving the substitute check, financial institution 140 may identify financial institution 150 as the paying bank (e.g., the bank from which the check 108 is drawn). This may be accomplished using a nine digit routing number located on the bottom left hand corner of the check. A unique routing number is typically assigned to every financial institution in the United States. Financial institution 140 may present the substitute check to financial institution 150 and request that the check be paid. If financial institution 150 verifies the check (i.e., agrees to honor the check), financial institution 140 may then settle the check by debiting funds from financial institution 150 and crediting funds to financial institution 130. Financial institution 150 may then debit funds from account 170.

It will be appreciated that the preceding examples are for purposes of illustration and explanation only, and that an embodiment is not limited to such examples. For example, financial institution 150 may be a correspondent bank (i.e., engaged in a partnership with financial institution 130). Thus, financial institution 130 may bypass the regional branch of the Federal Reserve and clear the check directly with financial institution 150. In addition, account 160 and account 170 may both be held at financial institution 130, in which case the check 108 may be cleared internally.

FIG. 2 shows a high-level block diagram of an implementation of a system 200 that may be used for the deposit of a check, such as the check 108. As described further herein, the user 102 may deposit the funds of the check 108 using the camera functionality in the mobile device 106. In the example of one person giving a check to another person, this would enable the receiving party to deposit the funds at that time, without physically visiting an ATM or a bank branch.

In an implementation, the mobile device 106 may comprise a camera 207, such as a digital camera. Such a mobile device may be called a camera phone. The mobile device 106, through the camera 207, has the ability to take or capture a picture or digital image of the check 108 or other negotiable instrument. The camera 207 may take an image of the front of the check 108. Alternatively, the camera 207 may take an image of both the front and the back of the check 108. The back of the check may provide endorsement verification, such as the signature of the person or party the check is made out to. In an implementation, an alignment guide may be provided within the field of view of the camera 207, e.g., using a software application running on the mobile device 106. The alignment guide may be provided during image capture to assist the user 102 in positioning the check 108 so that the image of the check 108 may be captured in such a manner that it may be more easily processed and cleared during subsequent operations, such as those involving one or more financial institutions.

A depository 204 may include a bank in which the user 102 has a deposit account; however, the present disclosure is not limited to just banks. Alternatively, a third party may act as the depository 204 providing functionality to a plurality of users without regard to the bank at which they have deposit accounts, or whether their individual bank allows for the methods and systems described herein. The depository 204, in an implementation, after receiving the image(s) of the

**6**

check 108 from the user 102, may use a clearinghouse 210 to perform the check clearing operations. As described with respect to the system 100 of FIG. 1, check clearing operations are used by banks to do the final settlement of the check 108, such as removing funds from the account of the payor and transferring those funds to the user's bank. The user's bank may choose to make the funds available to the user 102 immediately and take on the risk that the check 108 does not clear. However, for various reasons, the bank may only make those funds available to the user 102 after the check 108 finally clears.

FIG. 3 is a diagram of an example image 230 comprising a check image 247, a background image 250, and an alignment guide 235. The alignment guide 235 may be overlaid on the camera feed of the mobile device 106, in an implementation. The alignment guide 235 is provided in FIG. 3 as a three sided bounding box (e.g., a rectangle in which one of the line segments or sides is removed), but any shape(s) or indicator(s) may be used, such as vertical bars, parallel lines, a circle, a square, a bounding rectangle, or a self-crop tool, for example. Any aspect ratio may be used for the alignment guide, and in an implementation, the aspect ratio may correspond to that of a personal check or a business check.

The image 230 may be provided in the field of view of camera 207 during image capture of the check 108. The user 102 may move the camera 207 or the check 108 so that the check image 247 appears within or lines up with the alignment guide 235. Some of the background image 250 (e.g., the background on which the check 108 is placed during capture of the image of the check 108) may also be within the alignment guide 235.

When the check image 247 is within the alignment guide 235 (e.g., the edges 245 of the check image 247 are aligned with respect to the alignment guide 235, such as parallel to the associated portion of the alignment guide 235), the check image 247 and the background image 250 (if any) that are within the alignment guide may be captured either automatically (e.g., by the camera or the mobile device under direction of an application running on the camera 207 or the mobile device 106 or the financial institution) or manually (e.g., by the user 102 pressing a button or making a selection on the camera 207 or the mobile device 106).

The digital image thus captured may be provided from the mobile device 106 to a financial institution. The check 108 may be deposited in a user's bank account based on the digital image. Any technique for sending the digital image to the financial institution may be used.

In an implementation, an alignment guide may be provided that is adjustable at the mobile device 106. The adjustment may be made by the user 102, the mobile device 106 and/or the camera 207 (e.g., an application running on the mobile device 106 and/or the camera 207), and/or the financial institution 130. FIG. 4 is a diagram of an example image 260 comprising a check image 247, a background image 250, and an alignment guide 263. The alignment guide 263 is shown as a bounding rectangle, though any shape(s) or indicator(s) may be used. With a bounding rectangle, for example, used as the alignment guide 263, aligning the check means enclosing the check within the alignment guide.

The alignment guide 263 may be adjustable by the user 102 via one or more adjustment buttons, selectors, arrows, or other indicators (shown in FIG. 4 as an adjustment button 280 of the camera 207). For example the user 102 may use the adjustment button 280 to change the shape, aspect ratio, and/or the location of the alignment guide 263 in the field of view of the camera 207. In an implementation, the user may select the alignment guide 263 using any known selection tech-

US 9,336,517 B1

7

niques (e.g., moving a cursor to the alignment guide 263, highlighting or clicking on the alignment guide 263, selecting the alignment guide 263 from a pull down menu of the camera 207 or the mobile device 106) and may use the adjustment button 280 to modify the alignment guide 263. In an implementation, the user 102 may select which alignment guide from a plurality of alignment guides is to be displayed on the field of view. The camera 207 or the mobile device may store a plurality of alignment guides, and the user 102 may use any known selection technique(s) to select an alignment guide that is be displayed on the field of view of the camera 207.

The adjustment button 280 may be provided as one or more physical buttons associated with the camera 207 or the mobile device 106 or may be provided as a selectable button, for example, on a touch screen associated with the camera 207 or the mobile device 106. In an implementation, the display for the image 260 may comprise a touch screen and the adjustment button 280 may be provided on the touch screen, e.g., overlaying some of the check image 247 and/or the background image 250.

In an implementation, instead of using the adjustment button 280, the user 102 may use a finger, a stylus, or any other input device to change the shape, aspect ratio, and/or the location of the alignment guide 263 in the field of view of the camera 207. Additionally or alternatively, the user 102 may perform cropping on the image 260 prior to the image being captured by the camera 207. Using any type of selection tool provided with the camera 207 or the mobile device 106, the user 102 may indicate the location of the edges 245 of the check image 247, for example. Such an indication may be used in the subsequent capture and/or processing of the image of the check 108.

FIG. 5 shows a data flow diagram of a system for the deposit of a check, in accordance with an example embodiment. In the data flow diagram of FIG. 5, a client 320 is one example of the mobile device 106 of the user 102 described with respect to the systems 100 and 200 of FIGS. 1 and 2, respectively. In an implementation, a server 322 may be a software component operable by the depository 204 of FIG. 2.

The client 320 may log in to a remote deposit system executed on the server 322. The login 325 may serve to authenticate the user 102 as an authorized consumer of the depository 204.

The server 322, in one example, may send instructions 330 to the client 320 that execute an application on the client 320. This may include instructions that cause a software object, which may have been previously downloaded and installed (e.g., pre-installed) on the client 320, to be executed on the client 320. The software object may generate and display an alignment guide, such as the alignment guide 235 or 263, in the field of view of a digital camera, such as the camera 207 associated with the mobile device 106.

In another example, the instructions 330 may include a wholly self-contained application that when delivered to the client 320 will execute and perform one or more operations described herein, such as those directed to generating and displaying an alignment guide in the field of view of the camera 207. In either example, the software object may be configured to make one or more software calls 310 to the camera 207. This may be through specific software instructions to the camera. In other words, the camera's functionality may not be abstracted through any software library. In such an example, software code may be written and delivered to every different camera-equipped mobile phone.

In an alternate example, the software object may operate through a software abstraction layer, such as an application

8

programming interface (API). The software object developer may only insert code into the software object to call one or more APIs exposed by the software operating the mobile device. One example of such software is Windows Mobile by Microsoft Corporation. In the context of a Windows Mobile device, the Windows Mobile operating system (OS) has one or more APIs exposed to application developers that will translate instructions from applications into instructions operable by the camera 207 on the mobile device 106. A mobile operating system, also known as a mobile platform or a handheld operating system, is the operating system that controls a mobile device. Other mobiles OSs include Symbian OS, iPhone OS, Palm OS, BlackBerry OS, and Android.

The software object may cause the camera 207 to generate and display an alignment guide in the field of view and/or take a picture or capture one or more images of the check 108 being deposited. These images may be captured sequentially, e.g., pursuant to the user 102 flipping the check 108 over after an image of the front of the check 108 has been captured within the alignment guide. However, each side of the check 108 may be captured by the camera 207 using similar API calls. The images may be stored in an image file 315.

Once the images of one or both sides of the check 108 are captured within the alignment guide by the camera 207, the image file 315 may be operated on by the software object of the client 320. These operations may include any of the following: deskewing, dewarping, magnetic ink character recognition (MICR), cropping (either automatically, or having the user 102 manually identify the corners and/or edges of the check 108 for example), reducing the resolution of the image, number detection, character recognition, and the like.

With respect to number and character recognition, commercial check scanners have used characteristics of the MICR encoding to detect information about the check, such as the bank's routing number and the account number. However, the characteristics that these scanners have used are the magnetic characteristic of the ink itself and these scanners have used methods similar to those of magnetic audio tape readers. In an implementation, a software object of the client 320 may optically recognize the characters on the MICR line, as a consumer mobile device such as the mobile device 106 will lack the magnetic reading ability of a commercial check scanner.

The image may be also down converted into a grayscale or black and white image, such as either in Joint Photographic Experts Group (JPEG) compliant format or in tabbed image file format (TIFF) for example. In an alternate example, the image may be formatted as a Scalable Vector Graphics (SVG) image. One of the benefits of an SVG file is a large size advantage over JPEG. In the former example, the image at some point before entry into the clearing system may be converted to TIFF format. This may be performed at the mobile device 106, wherein the camera 207 captures the image in TIFF format. However, the camera 207 of the mobile device 106 may capture the image in JPEG format, which may then be converted into TIFF either at the mobile device 106 or at the server 322. In the latter example, this may use the transmission of the TIFF image across a communications network which may be more advantageous as TIFF images are typically smaller in file size for the same size of picture as a JPEG formatted image.

The software object on the client 320 may operate by performing one or more of the operations described herein and then transmitting an image file 335 (e.g., based on image file 315 that has been processed) to the server 322 after the user 102 confirms that they do wish to deposit the check 108. Alternately, the software object may capture the image of the check 108 and transmit that image to the server 322 that in

US 9,336,517 B1

9

turn may perform those operations, verifies that the image quality is within acceptable thresholds, and communicates that verification back to the client 320, which can then instruct the user 102 to take a picture of the other side of the check 108. In this example, the image transmitted to the server 322 may be in any format, such as JPEG or TIFF, insofar as the server software has the ability to convert that image into a Check 21 compliant format. Alternately, the bank may output an X9.37 file to the clearing system. The Check Clearing for the 21st Century Act (or Check 21 Act) is a United States federal law that allows the recipient of a paper check to create a digital version, thereby eliminating the need for further handling of the physical document. The Check 21 standard for electronic exchange is defined in the standard DSTU X9.37-2003 ("X9.37"). It is a binary interchange format.

The server 322 may confirm (e.g., using a process confirmation 340) with the user 102 the transmission, reception, and processing of each side of the check 108 separately, or may confirm both sides at the same time. On the server side, more operations may be performed, such as signature verification. Where to perform these operations may be determined by the processing power of the mobile device 106 itself, which is typically limited in computational power. However, the present discussion is not limited in any way by discussion of where certain operations are described as operating. The operations of detecting and verifying information may be performed by the client 320 before the information is transmitted along with the image in the image file 335 to the server 322. Alternately, the software object(s) operating on the mobile device 106 may perform no operation other than capturing images of the front and back of the check 108 within the alignment guide, receiving confirmation that the user 102 wishes to proceed, and transmitting those images to the server 322, wherein the server 322 performs those operations.

In an implementation, after the image file 335 has been received by the server 322, the server 322 may send a process confirmation 340 to the client 320. The process confirmation 340 may request instructions from the client 320 to continue proceeding with the deposit now that the server 322 has received the image file 335. In response, the client 320 may send a deposit confirmation 345 to the server 322, instructing the server 322 to process the deposit of the check based on the image file 335 that had been received by the server 322.

FIG. 6 shows a block diagram of a client apparatus 450 for the deposit of a check, in accordance with an example embodiment. The client apparatus 450 may include one or more software objects operating on a mobile device 106, such as described above. The client apparatus 450 may include a communications module 452, a check processing module 454, and an image capture module 456. The client apparatus 450 may receive, in one example, one or more check images 458 captured within an alignment guide as an input and output one or more processed images 460.

In an implementation, the check images 458 may be received following a software call from the check processing module 454 to the image capture module 456. In such an implementation, the image capture module 456 may include the camera 207 contained within the mobile device 106. Alternately, the camera 207 may be detachably coupled to the mobile device 106 such as through a secure digital (SD) slot or over any suitable communications bus, such as USB (universal serial bus).

In an implementation, the image capture module 456 may retrieve previously captured and stored image files (e.g., in local, remote, or removable storage associated with the client apparatus 450) and send the image files to a financial institu-

10

tion (e.g., financial institution 130, the server 322, the server apparatus 570 of FIG. 7, etc.) for processing.

In an implementation, the client apparatus 450 may comprise a browser such as a web browser, for accessing a website on the Internet or other network associated with a financial institution. The user may access the website and select a "capture image" link or similar icon, button or link, for example, displayed on the browser. Such a selection may call the image capture module 456 on the client apparatus 450.

The communications module 452 may be configured, in one example, to receive and send data signals over a suitable communications network. This may include, without limitation, GSM/GPR3, HSDPA, CDMA, TDMA, 802.11, 802.16 and the like. While the bandwidth available to the mobile device 106 may be an implementation concern such discussion is outside the scope of the present discussion and any suitable wireless communications network is considered to be within the scope of the present discussion. With respect to the present discussion, the communications module 452 may receive one or more processed check images 460 from the check processing module 454 and may transmit them over the suitable communications network to the depository 204, as described herein.

The check processing module 454 may be configured, in one example, to cause the image capture module 456 to capture a digital image of at least one side of a check within an alignment guide provided in a field of view of the camera 207. The alignment guide is intended to ensure that the image of the check is suitable for one or more processing tasks. For instance, if the check is rotated 45 degrees clockwise when captured, the check processing module 454 or a software object operated on the server 322 described above may be unable to optically detect information on the check.

The check processing module 454 may then perform one or more cleaning operations on the image of the check. For example, the check processing module 454 may deskew the image. Another aspect of an image that may be cleaned is a warping of the image. Warping, as used herein, is meant to denote that the check is tilted forward or back with respect to a plane that is perpendicular to a line drawn from the camera lens to the center of the check. Warping, or tilting, of the image may also lead to incorrect optical detection of the check. In an implementation, the check processing module 454 may dewarp the check image such that, in a three-dimensional space, the check would appear to be perpendicular to an imaginary line drawn from the center of the camera lens to the center of the check itself.

The check processing module 454, in further examples, may perform one or more other cleaning or processing operations. This may include down-converting the image received from the image capture module to a suitable size, such as 200 dots per inch (DPI) resolution or in a resolution range such as 200 DPI to 400 DPI, 300 DPI to 500 DPI, etc., and/or converting the image to grayscale or black and white. Such operation(s) may reduce the file size of the check image.

Alternatively, the check processing module 454 may send instructions to the image capture module 456 to cause the image capture module 456 to capture an image of the check at a suitable resolution within an alignment guide. The check processing module 454 may additionally perform any of the following operations, in further examples: convert from JPEG to TIFF, detect check information, perform signature detection on the image of the check, and the like. The check processing module 454 may, alternatively, send the captured check image to the server described herein for such processing, and receive confirmation that the operations were completed before further operations can proceed.

US 9,336,517 B1

11

One of the issues with check processing is to detect the presence of a check against whatever background is present. While a user may be instructed to place the check on a dark or black background, such instructions may not provide a positive user experience. Alternatively or additionally, edge detection may be used to detect the check. Edge detection techniques are well known and any suitable method may be used herein. Alternative or additional methodology for check detection may use tile-cropping to detect and process the check.

The size of the file sent between the mobile device and the server may be small. This runs counter with respect to automatic check detection against a background. If captured in color, the contrast between check and background becomes easier. However, the processed image sent over the communications network may need to be smaller, and if the detection operation is performed by the server, it may be advantageous to convert the captured image to grayscale, or even black and white, before transmission to the server. Grayscale images are compliant with the Check 21 Act.

While "flat" is a fairly well known term to users, each user's appreciation of flat with respect to the camera lens of the camera 207 associated with the mobile device 106 may result in a problem with needing to align the check image programmatically or risk rejecting a large number of check images. As the image captured is a set of pixels, a tilted image will result in a jagged polygon rather than a perfect rectangle. Using convex hull algorithms, the check processing modules may create a smooth polygon around the boundary and remove the concavity of the check image. Alternatively, a rotating calipers algorithm may be used to determine the tightest fitting rectangle around the check boundary, which can then be used to determine the angle of it, with that angle being used to align the check properly.

The operator of the camera 207 may introduce distortions in the image due to a perspective problem, specifically an angling of the camera vertically over the check, and the top of the check is smaller than the bottom, or the reverse. A warping transformation algorithm (e.g., which may be exposed as a software call within Java advanced imaging) may be used to remove this distortion.

If user involvement is tolerated, the user may be queried to supply or identify three of the four corners of the check. In such an operation, the fourth corner may be derived, showing the perimeter of the check. This may allow a software object described herein to use less computational resources in processing the image of the check.

FIG. 7 shows a block diagram of a server apparatus 570 for the deposit of a check, in accordance with an example embodiment. Aspects of an example server apparatus are described with respect to FIG. 10. The server apparatus 570 may include one or more software objects operating on a server operated by the depository 204 described above with respect to FIG. 2. The server apparatus 570 may include a communications module 572, a check processing module 574, and a check clearance module 576. The server apparatus 570 may receive one or more processed images 460 from a mobile device 106 or a client apparatus 450 as an input and may output a file such as a Check 21 compliant file 578. The Check 21 compliant file 578 may be a file or entry in a record set that is compliant with the clearinghouse rules set forth in the Check 21 Act and may include outputting an X9.37 file, in one example.

The communications module 572 may be configured to receive a wireless communication from the mobile device 106 over any suitable communications network, such as those described above. The communications module 572 may addi-

12

tionally receive a communication over a different communications network than the mobile device 106 communicated on, such as receiving the communication over a TCP/IP (Transmission Control Protocol/Internet Protocol) connection from the user's communication provider.

The check processing module 574 may be configured, in one example, to perform one or more check processing operations on the processed image(s) 460 that are received. In an implementation, these operations may include any of the operations described herein with respect to the check processing module 454 of FIG. 6. The operation of signature verification may be performed by the check processing module 574 of the server apparatus 570 as the server apparatus 570 may interface with other systems of the depository 204 that may maintain previously verified signature samples of the user 102. Performing signature verification at the client apparatus 450 may be computationally unfeasible; additionally, there may be a security risk if the signature sample is stored on the user's own device.

A cropped grayscale image may be sent to the server apparatus 570. The server apparatus 570 may perform further processing to remove distortion such as warping. The server apparatus 570 may extract information via a TIFF conversion and determine the DPI and re-scale to the proper DPI (e.g., convert to TIFF and detect the DPI that was used in the grayscale image). In an implementation, DPI detection may run on the client apparatus 450.

The check clearance module 576 may be configured, in one example, to receive a file from the check processing module 574 and may communicate with a check clearinghouse such that a Check 21 compliant file may be delivered to the check clearinghouse and funds may be received by the depository 204. The availability of the funds to the user 102 may be delayed by this operation such that the user 102 only has access to those funds when the depository 204 receives confirmation that the check has cleared.

FIG. 8 is an operational flow of an implementation of a method 800 that may be used for deposit of a check using alignment of the check. At 810, a request for access may be received from a user (e.g., the user 102). The user may request access to a deposit system operated by a depository (e.g., the depository 204) by way of a mobile device (e.g., the mobile device 106) such as, such a cellular phone, a PDA, a handheld computing device, etc. operated by the user. The access may be through some sort of user login, in some examples. The deposit system may be configured to receive a deposit of a negotiable instrument, such as a check, money order, cashier's check, etc. from the user and clear the negotiable instrument in a suitable clearinghouse system.

At 820, the system may initialize a software object on the mobile device. This may include sending instructions to the mobile device intended to execute a previously installed (i.e., pre-installed) software object. Alternatively, the system may send a software object to the mobile device that may execute the software object, carry out operations described herein by use of the software object, and terminate the software object. In an implementation, the system may instruct a camera associated with the mobile device to capture an image of the negotiable instrument. The system may also instruct the camera or the mobile device to generate and display an alignment guide in the field of view of the camera.

At 830, an alignment guide, such as the alignment guide 235 or 263, may be provided in the field of view of the camera. The alignment guide may be generated and displayed pursuant to instructions received at the camera or mobile device from the deposit system operated by a depository, the server 322, or the server apparatus 570, for example.

Case 2:20-cv-00245-JRG   Document 1-3   Filed 10/07/19   Page 26 of 30 PageID #: 161

US 9,336,517 B1

13

At **840**, an image of the check may be captured when the check is displayed within the alignment guide in the field of view. This may be accomplished through the software object accessing a camera associated with the mobile device (e.g., either comprised within the mobile device or separate from the mobile device). This may be done through an API exposed by the OS of the mobile device, or may be through software code customized for a specific phone and specific camera. With respect to the former, a developer of the software object may write code to the camera API(s), which may be specific to the OS and without regard to the camera on the device. In an implementation, the user may be directed to scale or move the captured image to ensure it is properly framed within the alignment guide.

At **850**, the image may be cleaned. Cleaning may include converting the image from JPEG format to TIFF format. Other cleaning operations are described herein. Cleaning operations may also be augmented by detecting operations. The operations at **850** may be carried out on the mobile device, in an implementation, though may include sending the image to the server apparatus, which may perform one or more cleaning operations and when complete may send a notification back to the mobile device of the completion. In either instance, the image may be deskewed, dewarped, and cropped for example, at **850**. Additionally, detection operations may be performed, e.g. after the cleaning operations are performed. The detection operations may include any of the following, for example: optically read the MICR line, courtesy amount recognition (CAR), legal amount recognition (LAR), signature block, and payee. As discussed above, the detecting operations may be performed by the client, the server, or some combination thereof.

In an implementation, an application on the mobile device may crop the image around where the alignment guide was during the image capture. Edge detection may be performed on the cropped image. In an implementation, the user may manually perform cropping on the image after the application crops the image around the alignment guide's position.

At **860**, the cleaned image may be transmitted to the depository. This may include transmitting the cleaned image alone to the depository, but may also include transmitting the detected information on the check to the depository. In an implementation, coordinate data of the alignment guide may be provided to the depository. Such coordinate data may correspond to the coordinates of the alignment guide in the field of view of the camera or in the image generated by the camera. Alternatively or additionally, the user can identify on the display of the captured image where each of the corners of the check is and the coordinate data (e.g., pertaining to the identified corners) and/or corner identification information may be provided to the depository along with the image of the check. The depository may use the coordinate data and/or corner identification information during subsequent processing such as cropping, edge detection, etc.

At **870**, the depository may receive the cleaned image of the check (along with financial information pertaining to the account for depositing funds, for example) and may process the image. Processing of the digital image file may include retrieving financial information regarding the check. The financial information may comprise the MICR number, the routing number, an amount, etc. Any known image processing technology may be used, such as edge detection, filtering to remove imagery except the check image or check data in the received digital image file, image sharpening, and technologies to distinguish between the front and the back sides of

14

the check. The depository may identify and/or remove at least a portion of data that is extraneous to the check, such as background data.

After retrieving the financial information from the check in an electronic data representation form, the depository may determine whether the financial information such as the amount payable to the user, the account associated with the user to deposit funds, an account associated with a payor to debit funds, and an institution associated with the payor, etc., may be valid. For example, the depository may include electronic devices such as computers, servers, databases, or the like that may be in communication with each other. The electronic devices may receive an electronic data representation and may perform an analysis on the quality of the data representation, the readability of the data representation, or the like. For example, the electronic devices may determine whether the account number, amount payable, or the like may be readable such that they may be parsed and processed by the depository to credit an account associated with the user.

If the financial information is determined to be valid, the electronic data representation may be processed by the depository, thereby depositing the money in the user's account. If the financial information is determined to be invalid, then the user may be advised. For example, the depository may transmit an email, a web message, an instant message, or the like to the user indicating that the financial information associated with the electronic data representation may be invalid. The user may determine how to proceed by selecting an option on the web message, replying to the email, or the like.

Thus, in an implementation, instructions on how the user would like to proceed may be requested from the user, such as whether the user would like to try the deposit again (e.g., make another image of the check within the alignment guide and send it to the depository) or whether the user would like assistance from a representative, for example. The user may indicate how they would like to proceed.

If the user would like assistance, the financial information may be transferred to a representative for further review. The representative may review the financial information associated with the electronic data representation to determine whether to allow the electronic data representation to be processed by the depository. If so, the electronic data representation of the financial information may be processed by the depository, thereby depositing the check in the user's account. The depository may send a notice to the user via email, facsimile, instant message, or mail, for example, that the check has been deposited into the selected account.

FIG. **9** is an operational flow of another implementation of a method **900** that may be used for deposit of a check using alignment of the check. A user (e.g., the user **102**) may receive and endorse a check (e.g., the check **108**) at **910** and open a communication pathway with an institution (e.g., the financial institution **130**), at **920**. In an implementation, the user may open a communication pathway with the institution by logging into a website of the institution, for example. There may be several ways in which a communication pathway may be established, including, but not limited to, an Internet connection via a website of the institution. The user may access the website and log into the website using credentials, such as, but not limited to, a username and a password.

At **930**, the user may send a request to deposit the check and may select an account in which to deposit the check. In an implementation, the user may select a "deposit check" option provided on the website, and may enter details such as check amount, date, the account the check funds should be deposited in, comments, etc.

US 9,336,517 B1

15

At **940**, an alignment guide may be provided in the field of view of the camera that is used to create a digital image of the check. The alignment guide, such as the alignment guide **263**, may be adjustable, e.g., using an adjustment button, such as the adjustment button **280**, or other selection and adjustment techniques.

The user may position the camera and the check such that the check is in the field of view of the camera, and at **950**, may manually adjust the alignment guide and/or the check so that the alignment guide is adjusted with respect to the image of the check that is displayed in the field of view. Alternatively, the camera, the mobile device, or the institution may adjust the alignment guide without user intervention so that the image of the check that is displayed in the field of view is positioned within the alignment guide. In an implementation, the camera, the mobile device, or the institution may provide feedback to the user regarding the alignment guide and the positioning of the check with respect to the alignment guide.

At **960**, when the image of the check is within the alignment guide, a digital image of the check may be created using the camera. In an implementation, the user may instruct the camera (e.g., by pressing a button on the camera or the mobile device) to create the digital image. In another implementation, the camera may automatically create the digital image as soon as the image of the check is within the alignment guide. In this manner, the user may point the camera at the check such that the image of the check appears in the field of view, and after the alignment guide has been adjusted (either by the user or automatically by the camera, the mobile device, or the financial institution via a communications network) and/or the check has been repositioned within the alignment guide by the user, a digital image of the check may be created without further user intervention. Depending on the implementation, one or more digital images of the check (e.g., corresponding to the front and back of the check) may be created using such techniques.

At **970**, the digital image(s) may be uploaded to the institution using any known image upload process. In an implementation, the upload may be augmented by secondary data which may be information relating to the deposit of the check, such as an account number and a deposit amount, for example. At **980**, when the institution has received the digital images (e.g., of the front and back sides of the check), the institution may process the digital images to obtain an image of the check and to deposit the funds of the check in the user's account, as described herein.

It is contemplated that processing such as grayscale conversion, image cropping, image compression, dewarping, edge and/or corner detection, etc. may be implemented in the method **900**. Such operations may be performed on one or more digital images created by the camera and may be performed on the image(s) by the mobile device and/or by the institution, as described further above.

Although the examples described herein may refer to uploading of images of checks to an institution, it is contemplated that any negotiable instrument or image (e.g., vehicle accident pictures provided to an insurance company) may be processed and/or transmitted using the techniques described herein. Additionally, one or more of the techniques described herein may be performed by the institution instead of the mobile device of the user.

FIG. **10** is a block diagram of an example computing environment in which example embodiments and aspects may be implemented. The computing system environment is only one example of a suitable computing environment and is not intended to suggest any limitation as to the scope of use or functionality.

16

Numerous other general purpose or special purpose computing system environments or configurations may be used. Examples of well known computing systems, environments, and/or configurations that may be suitable for use include, but are not limited to, personal computers (PCs), server computers, handheld or laptop devices, multiprocessor systems, microprocessor-based systems, network PCs, minicomputers, mainframe computers, embedded systems, distributed computing environments that include any of the above systems or devices, and the like.

Computer-executable instructions, such as program modules, being executed by a computer may be used. Generally, program modules include routines, programs, objects, components, data structures, etc. that perform particular tasks or implement particular abstract data types. Distributed computing environments may be used where tasks are performed by remote processing devices that are linked through a communications network or other data transmission medium. In a distributed computing environment, program modules and other data may be located in both local and remote computer storage media including memory storage devices.

With reference to FIG. **10**, a system **1000** includes a computer **1010** connected to a network **1014**. The computer **1010** includes a processor **1020**, a storage device **1022**, an output device **1024**, an input device **1026**, and a network interface device **1028**, all connected to a bus **1030**. The processor **1020** represents a central processing unit of any type of architecture, such as a CISC (Complex Instruction Set Computing), RISC (Reduced Instruction Set Computing), VLIW (Very Long Instruction Word), or a hybrid architecture, although any appropriate processor may be used. The processor **1020** executes instructions and includes that portion of the computer **1010** that controls the operation of the entire computer. Although not depicted in FIG. **10**, the processor **1020** typically includes a control unit that organizes data and program storage in memory and transfers data and other information between the various parts of the computer **1010**. The processor **1020** receives input data from the input device **1026** and the network **1014** reads and stores code and data in the storage device **1022** and presents data to the output device **1024**.

Although the computer **1010** is shown to contain only a single processor **1020** and a single bus **1030**, the disclosed embodiment applies equally to computers that may have multiple processors and to computers that may have multiple busses with some or all performing different functions in different ways.

The storage device **1022** represents one or more mechanisms for storing data. For example, the storage device **1022** may include read-only memory (ROM), RAM, magnetic disk storage media, optical storage media, flash memory devices, and/or other machine-readable media. In other embodiments, any appropriate type of storage device may be used. Although only one storage device **1022** is shown, multiple storage devices and multiple types of storage devices may be present. Further, although the computer **1010** is drawn to contain the storage device **1022**, it may be distributed across other computers, for example on a server.

The storage device **1022** includes a controller (not shown in FIG. **10**) and data items **1034**. The controller includes instructions capable of being executed on the processor **1020** to carry out the functions as previously described herein with reference to FIGS. **1**-**9**. In another embodiment, some or all of the functions are carried out via hardware in lieu of a processor-based system. In one embodiment, the controller is a web browser, but in other embodiments the controller may be a database system, a file system, an electronic mail system, a

US 9,336,517 B1

17

media manager, an image manager, or may include any other functions capable of accessing data items. The storage device **1022** may also contain additional software and data (not shown), which is not necessary to understand the invention. Although the controller and the data items **1034** are shown to be within the storage device **1022** in the computer **1010**, some or all of them may be distributed across other systems, for example on a server and accessed via the network **1014**.

The output device **1024** is that part of the computer **1010** that displays output to the user. The output device **1024** may be a liquid crystal display (LCD) well-known in the art of computer hardware. In other embodiments, the output device **1024** may be replaced with a gas or plasma-based flat-panel display or a traditional cathode-ray tube (CRT) display. In still other embodiments, any appropriate display device may be used. Although only one output device **1024** is shown, in other embodiments any number of output devices of different types, or of the same type, may be present. In an embodiment, the output device **1024** displays a user interface.

The input device **1026** may be a keyboard, mouse or other pointing device, trackball, touchpad, touch screen, keypad, microphone, voice recognition device, or any other appropriate mechanism for the user to input data to the computer **1010** and manipulate the user interface previously discussed. Although only one input device **1026** is shown, in another embodiment any number and type of input devices may be present.

The network interface device **1028** provides connectivity from the computer **1010** to the network **1014** through any suitable communications protocol. The network interface device **1028** sends and receives data items from the network **1014**.

The bus **1030** may represent one or more busses, e.g., USB, PCI, ISA (Industry Standard Architecture), X-Bus, EISA (Extended Industry Standard Architecture), or any other appropriate bus and/or bridge (also called a bus controller).

The computer **1010** may be implemented using any suitable hardware and/or software, such as a personal computer or other electronic computing device. Portable computers, laptop or notebook computers, PDAs, pocket computers, appliances, telephones, and mainframe computers are examples of other possible configurations of the computer **1010**. For example, other peripheral devices such as audio adapters or chip programming devices, such as EPROM (Erasable Programmable Read-Only Memory) programming devices may be used in addition to, or in place of, the hardware already depicted.

The network **1014** may be any suitable network and may support any appropriate protocol suitable for communication to the computer **1010**. In an embodiment, the network **1014** may support wireless communications. In another embodiment, the network **1014** may support hard-wired communications, such as a telephone line or cable. In another embodiment, the network **1014** may support the Ethernet IEEE (Institute of Electrical and Electronics Engineers) 802.3x specification. In another embodiment, the network **1014** may be the Internet and may support IP (Internet Protocol). In another embodiment, the network **1014** may be a LAN or a WAN. In another embodiment, the network **1014** may be a hotspot service provider network. In another embodiment, the network **1014** may be an intranet. In another embodiment, the network **1014** may be a GPRS (General Packet Radio Service) network. In another embodiment, the network **1014** may be any appropriate cellular data network or cell-based radio network technology. In another embodiment, the network **1014** may be an IEEE 802.11 wireless network. In still another embodiment, the network **1014** may be any suitable

18

network or combination of networks. Although one network **1014** is shown, in other embodiments any number of networks (of the same or different types) may be present.

It should be understood that the various techniques described herein may be implemented in connection with hardware or software or, where appropriate, with a combination of both. Thus, the methods and apparatus of the presently disclosed subject matter, or certain aspects or portions thereof, may take the form of program code (i.e., instructions) embodied in tangible media, such as floppy diskettes, CD-ROMs, hard drives, or any other machine-readable storage medium wherein, when the program code is loaded into and executed by a machine, such as a computer, the machine becomes an apparatus for practicing the presently disclosed subject matter. In the case of program code execution on programmable computers, the computing device generally includes a processor, a storage medium readable by the processor (including volatile and non-volatile memory and/or storage elements), at least one input device, and at least one output device. One or more programs may implement or use the processes described in connection with the presently disclosed subject matter, e.g., through the use of an API, reusable controls, or the like. Such programs may be implemented in a high level procedural or object-oriented programming language to communicate with a computer system. However, the program(s) can be implemented in assembly or machine language, if desired. In any case, the language may be a compiled or interpreted language and it may be combined with hardware implementations.

Although exemplary embodiments may refer to using aspects of the presently disclosed subject matter in the context of one or more stand-alone computer systems, the subject matter is not so limited, but rather may be implemented in connection with any computing environment, such as a network or distributed computing environment. Still further, aspects of the presently disclosed subject matter may be implemented in or across a plurality of processing chips or devices, and storage may similarly be effected across a plurality of devices. Such devices might include personal computers, network servers, and handheld devices, for example.

Although the subject matter has been described in language specific to structural features and/or methodological acts, it is to be understood that the subject matter defined in the appended claims is not necessarily limited to the specific features or acts described above. Rather, the specific features and acts described above are disclosed as example forms of implementing the claims.

What is claimed:

1. A system, comprising:

a mobile device having a processor, wherein the processor is configured to:

generate an alignment guide adapted to align with an instrument, wherein the alignment guide is associated with an information capture component, wherein the information capture component is associated with the mobile device, and wherein the mobile device is adapted to capture information of the instrument;

monitor at least one feature of the instrument detected by the information capture component;

determine whether the at least one feature of the instrument aligns with the alignment guide;

automatically capture information of the instrument when the at least one feature aligns with the alignment guide; and

transmit the captured information from the mobile device to a server via a communication pathway between the mobile device and the server.

US 9,336,517 B1

19

**2**. The system of claim **1**, wherein the instrument further comprises at least a portion of a negotiable instrument, a credit instrument, a debit instrument, a financial document, a vehicle accident document, or an insurance document.

**3**. The system of claim **2**, wherein the processor is further configured to receive instructions inputted to the mobile device for adjusting the alignment guide, and adjust the alignment guide according to the received instructions.

**4**. The system of claim **3**, wherein the processor is further configured to crop at least one feature of the instrument around the alignment guide prior to transmitting the captured information.

**5**. The system of claim **1**, wherein the processor is further configured to transmit identification information pertaining to the instrument.

**6**. The system of claim **1**, wherein the information is captured by storing the information in a memory.

**7**. The system of claim **1**, wherein the processor is further configured to receive user-inputted instructions for adjusting an aspect ratio of the alignment guide, and adjust the aspect ratio of the alignment guide according to the received instructions.

**8**. The system of claim **1**, wherein the processor is further configured to receive user-inputted instructions for adjusting a location of the alignment guide, and adjust the location of the alignment guide according to the received instructions.

**9**. The system of claim **1**, wherein the instrument includes indicia.

**10**. A non-transitory computer-readable medium comprising instructions executed by a processor of a mobile device to:

monitor at least one feature of an instrument that is within a field of view of a camera associated with the mobile device, wherein the mobile device is adapted to capture information of the instrument;

determine whether the at least one feature aligns with an alignment guide adapted to align with an instrument;

automatically capture the information of the instrument when the at least one feature is determined to align with the alignment guide; and

transmit the captured information from the mobile device to a server.

**11**. The non-transitory computer-readable medium of claim **10**, wherein the instrument further comprises at least a portion of a negotiable instrument, a credit instrument, a debit

20

instrument, a financial document, a vehicle accident document, or an insurance document.

**12**. The non-transitory computer-readable medium of claim **10**, wherein the instructions are further executed by the processor to clean the instrument prior to transmitting the captured information to the server.

**13**. The non-transitory computer-readable medium of claim **12**, wherein the cleaning of the information comprises at least cropping a portion of the instrument around the alignment guide.

**14**. The non-transitory computer-readable medium of claim **10**, wherein the instructions are further executed by the processor to adjust the alignment guide according to received inputs corresponding to an adjustment button of the camera.

**15**. The non-transitory computer-readable medium of claim **11**, wherein the instructions are further executed by the processor to adjust the alignment guide automatically without user intervention so that the at least one feature is displayed within the alignment guide.

**16**. The non-transitory computer-readable medium of claim **11**, wherein the instructions are executed by the processor to capture the information by storing the information in a memory.

**17**. The non-transitory computer-readable medium of claim **10**, wherein the instructions are further executed by the processor to receive user-inputted instructions for selecting the alignment guide, and generate the alignment guide according to the received instructions.

**18**. The non-transitory computer-readable medium of claim **10**, wherein the instrument includes indicia.

**19**. The non-transitory computer-readable medium of claim **10**, wherein the determination of whether the at least one feature aligns with the alignment guide comprises a determination of whether an edge of the at least one feature is parallel to an edge of the alignment guide.

**20**. The non-transitory computer-readable medium of claim **10**, wherein the determination of whether the at least one feature aligns with the alignment guide comprises a determination of whether the at least one feature is enclosed within the alignment guide.

\* \* \* \* \*

US008977571B1

(12) **United States Patent**
Bueche, Jr. et al.

(10) Patent No.:     **US 8,977,571 B1**
(45) Date of Patent:     **\*Mar. 10, 2015**

(54) **SYSTEMS AND METHODS FOR IMAGE MONITORING OF CHECK DURING MOBILE DEPOSIT**

(75) Inventors: **Michael Patrick Bueche, Jr.**, San Antonio, TX (US); **Bharat Prasad**, San Antonio, TX (US); **Minya Liang**, San Antonio, TX (US); **Reynaldo Medina**, San Antonio, TX (US); **Charles Lee Oakes, III**, Boerne, TX (US)

(73) Assignee: **United Services Automobile Association (USAA)**, San Antonio, TX (US)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 581 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **12/545,127**

(22) Filed: **Aug. 21, 2009**

(51) **Int. Cl.**
*G06Q 40/00*     (2012.01)
(52) **U.S. Cl.**
USPC ............................................. **705/45**; 705/44
(58) **Field of Classification Search**
USPC ............................................. 705/3–45
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,005,282 A | 10/1961 | Christiansen |
| 3,341,820 A | 9/1967 | Grillmeier, Jr. et al. |
| 3,576,972 A | 5/1971 | Wood |
| 3,593,913 A | 7/1971 | Bremer |
| 3,620,553 A | 11/1971 | Donovan |
| 3,648,242 A | 3/1972 | Grosbard |
| 3,800,124 A | 3/1974 | Walsh |
| 3,816,943 A | 6/1974 | Henry |
| 4,002,356 A | 1/1977 | Weidmann |
| 4,060,711 A | 11/1977 | Buros |
| 4,070,649 A | 1/1978 | Wright, Jr. et al. |
| 4,128,202 A | 12/1978 | Buros |
| 4,136,471 A | 1/1979 | Austin |
| 4,205,780 A | 6/1980 | Burns |
| 4,264,808 A | 4/1981 | Owens |
| 4,305,216 A | 12/1981 | Skelton |
| 4,321,672 A | 3/1982 | Braun |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 984 410 | 3/2000 |
| KR | 2004076131 A | 8/2004 |

(Continued)

OTHER PUBLICATIONS

Mitek Systems: "ImageNet Mobile Deposit", 2 pages, San Diego, California.

(Continued)

*Primary Examiner* — Frantzy Poinvil
(74) *Attorney, Agent, or Firm* — Brinks Gilson & Lione

(57)     **ABSTRACT**

An image of a check that is in the field of view of a camera is monitored prior to the image of the check being captured. The camera is associated with a mobile device. When the image of the check in the field of view passes monitoring criteria, an image may be taken by the camera and provided from the mobile device to a financial institution. The image capture may be performed automatically as soon as the image of the check is determined to pass the monitoring criteria. The check may be deposited in a user's bank account based on the image. Any technique for sending the image to the financial institution may be used. Feedback may be provided to the user of the camera regarding the image of the check in the field of view.

**20 Claims, 8 Drawing Sheets**



**US 8,977,571 B1**

Page 2

(56)                **References Cited**

                U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,433,436 A | 2/1984 | Carnes | |
| 4,454,610 A | 6/1984 | Sziklai | |
| RE31,692 E | 10/1984 | Tyburski et al. | |
| 4,523,330 A | 6/1985 | Cain | |
| 4,636,099 A | 1/1987 | Goldston | |
| 4,640,413 A | 2/1987 | Kaplan | |
| 4,644,144 A | 2/1987 | Chandek | |
| 4,722,444 A | 2/1988 | Murphy | |
| 4,722,544 A | 2/1988 | Weber | |
| 4,727,435 A | 2/1988 | Otani et al. | |
| 4,774,663 A | 9/1988 | Musmanno | |
| 4,790,475 A | 12/1988 | Griffin | |
| 4,806,740 A | 2/1989 | Yamamoto | |
| 4,837,693 A | 6/1989 | Schotz | |
| 4,890,228 A | 12/1989 | Longfield | |
| 4,927,071 A | 5/1990 | Wood | |
| 4,934,587 A | 6/1990 | McNabb | |
| 4,960,981 A | 10/1990 | Benton | |
| 4,975,735 A | 12/1990 | Bright | |
| 5,022,683 A | 6/1991 | Barbour | |
| 5,053,607 A | 10/1991 | Carlson | |
| 5,146,606 A | 9/1992 | Grondalski | |
| 5,157,620 A | 10/1992 | Shaar | |
| 5,159,548 A | 10/1992 | Caslavka | |
| 5,191,525 A | 3/1993 | LeBrun | |
| 5,193,121 A | 3/1993 | Elischer et al. | |
| 5,220,501 A | 6/1993 | Lawlor | |
| 5,227,863 A | 7/1993 | Bilbrey et al. | |
| 5,229,589 A | 7/1993 | Schneider | |
| 5,237,159 A | 8/1993 | Stephens | |
| 5,257,320 A | 10/1993 | Etherington et al. | |
| 5,265,008 A | 11/1993 | Benton | |
| 5,321,816 A | 6/1994 | Rogan | |
| 5,347,302 A | 9/1994 | Simonoff | |
| 5,350,906 A | 9/1994 | Brody | |
| 5,373,550 A | 12/1994 | Campbell | |
| 5,419,588 A | 5/1995 | Wood | |
| 5,422,467 A | 6/1995 | Graef | |
| 5,444,794 A | 8/1995 | Uhland, Sr. | |
| 5,475,403 A | 12/1995 | Havlovick et al. | |
| 5,504,538 A | 4/1996 | Tsujihara | |
| 5,504,677 A | 4/1996 | Pollin | |
| 5,528,387 A | 6/1996 | Kelly et al. | |
| 5,577,179 A | 11/1996 | Blank | |
| 5,583,759 A | 12/1996 | Geer | |
| 5,590,196 A | 12/1996 | Moreau | |
| 5,594,225 A | 1/1997 | Botvin | |
| 5,598,969 A | 2/1997 | Ong | |
| 5,602,936 A | 2/1997 | Green | |
| 5,610,726 A | 3/1997 | Nonoshita | |
| 5,611,028 A | 3/1997 | Shibasaki | |
| 5,630,073 A | 5/1997 | Nolan | |
| 5,631,984 A | 5/1997 | Graf et al. | |
| 5,668,897 A | 9/1997 | Stolfo | |
| 5,673,320 A | 9/1997 | Ray | |
| 5,677,955 A | 10/1997 | Doggett | |
| 5,678,046 A | 10/1997 | Cahill et al. | |
| 5,679,938 A | 10/1997 | Templeton | |
| 5,680,611 A | 10/1997 | Rail | |
| 5,691,524 A | 11/1997 | Josephson | |
| 5,699,452 A | 12/1997 | Vaidyanathan | |
| 5,734,747 A | 3/1998 | Vaidyanathan | |
| 5,737,440 A | 4/1998 | Kunkler | |
| 5,748,780 A | 5/1998 | Stolfo | |
| 5,751,842 A | 5/1998 | Riach | |
| 5,784,503 A | 7/1998 | Bleecker, III et al. | |
| 5,830,609 A | 11/1998 | Warner | |
| 5,832,463 A | 11/1998 | Funk | |
| 5,838,814 A | 11/1998 | Moore | |
| 5,863,075 A | 1/1999 | Rich | |
| 5,870,456 A | 2/1999 | Rogers | |
| 5,870,724 A | 2/1999 | Lawlor | |
| 5,870,725 A | 2/1999 | Bellinger et al. | |
| 5,878,337 A | 3/1999 | Joao | |
| 5,893,101 A | 4/1999 | Balogh et al. | |

| | | | |
|---|---|---|---|
| 5,897,625 A | 4/1999 | Gustin | |
| 5,898,157 A | 4/1999 | Mangili et al. | |
| 5,901,253 A | 5/1999 | Tretter | |
| 5,903,878 A | 5/1999 | Talati | |
| 5,903,881 A | 5/1999 | Schrader | |
| 5,910,988 A | 6/1999 | Ballard | |
| 5,917,931 A | 6/1999 | Kunkler | |
| 5,924,737 A | 7/1999 | Schrupp | |
| 5,926,548 A | 7/1999 | Okamoto | |
| 5,930,778 A | 7/1999 | Geer | |
| 5,937,396 A | 8/1999 | Konya | |
| 5,940,844 A | 8/1999 | Cahill | |
| 5,982,918 A | 11/1999 | Mennie | |
| 5,987,439 A | 11/1999 | Gustin | |
| 6,012,048 A | 1/2000 | Gustin | |
| 6,014,454 A | 1/2000 | Kunkler | |
| 6,021,202 A | 2/2000 | Anderson | |
| 6,021,397 A | 2/2000 | Jones | |
| 6,029,887 A | 2/2000 | Furuhashi | |
| 6,030,000 A | 2/2000 | Diamond | |
| 6,032,137 A | 2/2000 | Ballard | |
| 6,038,553 A | 3/2000 | Hyde | |
| 6,053,405 A | 4/2000 | Irwin, Jr. et al. | |
| 6,073,119 A | 6/2000 | Bornemisza-wahr | |
| 6,085,168 A | 7/2000 | Mori | |
| 6,097,834 A | 8/2000 | Krouse | |
| 6,097,845 A | 8/2000 | Ng et al. | |
| 6,097,885 A | 8/2000 | Rayner | |
| 6,105,865 A | 8/2000 | Hardesty | |
| 6,141,339 A | 10/2000 | Kaplan et al. | |
| 6,145,738 A | 11/2000 | Stinson | |
| 6,151,423 A | 11/2000 | Melen | |
| 6,151,426 A | 11/2000 | Lee | |
| 6,159,585 A | 12/2000 | Rittenhouse | |
| 6,170,744 B1 | 1/2001 | Lee | |
| 6,188,506 B1 | 2/2001 | Kaiserman | |
| 6,189,785 B1 | 2/2001 | Lowery | |
| 6,192,165 B1 | 2/2001 | Irons | |
| 6,195,694 B1 | 2/2001 | Chen | |
| 6,199,055 B1 | 3/2001 | Kara | |
| 6,236,009 B1 | 5/2001 | Emigh et al. | |
| 6,243,689 B1 | 6/2001 | Norton | |
| 6,278,983 B1 | 8/2001 | Ball | |
| 6,282,826 B1 | 9/2001 | Richards | |
| 6,293,469 B1 | 9/2001 | Masson et al. | |
| 6,304,860 B1 | 10/2001 | Martin | |
| 6,314,452 B1 | 11/2001 | Dekel | |
| 6,317,727 B1 | 11/2001 | May | |
| 6,328,207 B1 | 12/2001 | Gregoire et al. | |
| 6,330,546 B1 | 12/2001 | Gopinathan et al. | |
| 6,339,658 B1 | 1/2002 | Moccagatta | |
| 6,363,164 B1 | 3/2002 | Jones | |
| 6,390,362 B1 | 5/2002 | Martin | |
| 6,397,196 B1 | 5/2002 | Kravetz | |
| 6,408,084 B1 | 6/2002 | Foley | |
| 6,411,725 B1 | 6/2002 | Rhoads | |
| 6,411,737 B2 | 6/2002 | Wesolkowski et al. | |
| 6,411,938 B1 | 6/2002 | Gates et al. | |
| 6,413,305 B1 | 7/2002 | Mehta | |
| 6,417,869 B1 | 7/2002 | Do | |
| 6,425,017 B1 | 7/2002 | Dievendorff | |
| 6,429,952 B1 | 8/2002 | Olbricht | |
| 6,439,454 B1 | 8/2002 | Masson et al. | |
| 6,449,397 B1 | 9/2002 | Che-chu | |
| 6,450,403 B1 | 9/2002 | Martens | |
| 6,463,220 B1 | 10/2002 | Dance et al. | |
| 6,464,134 B1 | 10/2002 | Page | |
| 6,469,745 B1 | 10/2002 | Yamada et al. | |
| 6,470,325 B1 | 10/2002 | Leemhuis | |
| 6,505,178 B1 | 1/2003 | Flenley | |
| 6,546,119 B2 | 4/2003 | Ciolli et al. | |
| 6,574,609 B1 | 6/2003 | Downs | |
| 6,578,760 B1 | 6/2003 | Otto | |
| 6,587,837 B1 | 7/2003 | Spagna | |
| 6,606,117 B1 | 8/2003 | Windle | |
| 6,609,200 B2 | 8/2003 | Anderson | |
| 6,611,598 B1 | 8/2003 | Hayosh | |
| 6,614,930 B1 | 9/2003 | Agnihotri et al. | |
| 6,643,416 B1 | 11/2003 | Daniels | |

**US 8,977,571 B1**

Page 3

(56)         **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 6,654,487 B1 | 11/2003 | Downs, Jr. |
| 6,661,910 B2 | 12/2003 | Jones et al. |
| 6,672,452 B1 | 1/2004 | Alves |
| 6,682,452 B2 | 1/2004 | Quintus |
| 6,695,204 B1 | 2/2004 | Stinson |
| 6,711,474 B1 | 3/2004 | Treyz et al. |
| 6,726,097 B1 | 4/2004 | Graef |
| 6,728,397 B2 | 4/2004 | Mcneal |
| 6,738,496 B1 | 5/2004 | Van Hall |
| 6,742,128 B1 | 5/2004 | Joiner |
| 6,745,186 B1 | 6/2004 | Testa et al. |
| 6,754,640 B2 | 6/2004 | Bozeman |
| 6,755,340 B1 | 6/2004 | Voss |
| 6,763,226 B1 | 7/2004 | McZeal |
| 6,781,962 B1 | 8/2004 | Williams |
| 6,786,398 B1 | 9/2004 | Stinson |
| 6,789,054 B1 | 9/2004 | Makhlouf |
| 6,796,491 B2 | 9/2004 | Nakajima |
| 6,806,903 B1 | 10/2004 | Okisu et al. |
| 6,813,733 B1 | 11/2004 | Li |
| 6,829,704 B2 | 12/2004 | Zhang |
| 6,844,885 B2 | 1/2005 | Anderson |
| 6,856,965 B1 | 2/2005 | Stinson |
| 6,863,214 B2 | 3/2005 | Garner et al. |
| 6,870,947 B2 | 3/2005 | Kelland |
| 6,883,140 B1 | 4/2005 | Acker |
| 6,898,314 B2 | 5/2005 | Kung et al. |
| 6,902,105 B2 | 6/2005 | Koakutsu |
| 6,913,188 B2 | 7/2005 | Wong |
| 6,931,591 B1 | 8/2005 | Brown |
| 6,934,719 B2 | 8/2005 | Nally |
| 6,957,770 B1 | 10/2005 | Robinson |
| 6,961,689 B2 | 11/2005 | Greenberg |
| 6,970,843 B1 | 11/2005 | Forte |
| 6,973,589 B2 | 12/2005 | Wright |
| 6,983,886 B2 | 1/2006 | Natsukari et al. |
| 6,993,507 B2 | 1/2006 | Meyer |
| 6,996,263 B2 | 2/2006 | Jones et al. |
| 6,999,943 B1 | 2/2006 | Johnson |
| 7,003,040 B2 | 2/2006 | Yi |
| 7,004,382 B2 | 2/2006 | Sandru |
| 7,010,155 B2 | 3/2006 | Koakutsu et al. |
| 7,010,507 B1 | 3/2006 | Anderson |
| 7,016,704 B2 | 3/2006 | Pallakoff |
| 7,039,048 B1 | 5/2006 | Monta |
| 7,058,036 B1 | 6/2006 | Yu |
| 7,062,099 B2 | 6/2006 | Li et al. |
| 7,062,456 B1 | 6/2006 | Riehl et al. |
| 7,062,768 B2 | 6/2006 | Kubo |
| 7,072,862 B1 | 7/2006 | Wilson |
| 7,076,458 B2 | 7/2006 | Lawlor et al. |
| 7,086,003 B2 | 8/2006 | Demsky |
| 7,092,561 B2 | 8/2006 | Downs, Jr. |
| 7,104,443 B1 | 9/2006 | Paul et al. |
| 7,113,925 B2 | 9/2006 | Waserstein |
| 7,114,649 B2 | 10/2006 | Nelson |
| 7,139,594 B2 | 11/2006 | Nagatomo |
| 7,140,539 B1 | 11/2006 | Crews |
| 7,163,347 B2 | 1/2007 | Lugg |
| 7,178,721 B2 | 2/2007 | Maloney |
| 7,181,430 B1 | 2/2007 | Buchanan |
| 7,184,980 B2 | 2/2007 | Allen-Rouman et al. |
| 7,197,173 B2 | 3/2007 | Jones et al. |
| 7,200,255 B2 | 4/2007 | Jones |
| 7,204,412 B2 | 4/2007 | Foss, Jr. |
| 7,216,106 B1 | 5/2007 | Buchanan |
| 7,219,082 B2 | 5/2007 | Forte |
| 7,219,831 B2 | 5/2007 | Murata |
| 7,249,076 B1 | 7/2007 | Pendleton |
| 7,252,224 B2 | 8/2007 | Verma |
| 7,257,246 B1 | 8/2007 | Brodie et al. |
| 7,266,230 B2 | 9/2007 | Doran |
| 7,290,034 B2 | 10/2007 | Budd |
| 7,299,970 B1 | 11/2007 | Ching |
| 7,299,979 B2 | 11/2007 | Phillips |
| 7,313,543 B1 | 12/2007 | Crane |
| 7,314,163 B1 | 1/2008 | Crews et al. |
| 7,321,874 B2 | 1/2008 | Dilip |
| 7,321,875 B2 | 1/2008 | Dilip |
| 7,325,725 B2 | 2/2008 | Foss, Jr. |
| 7,328,190 B2 | 2/2008 | Smith et al. |
| 7,330,604 B2 | 2/2008 | Wu et al. |
| 7,331,523 B2 | 2/2008 | Meier et al. |
| 7,336,813 B2 | 2/2008 | Prakash et al. |
| 7,343,320 B1 | 3/2008 | Treyz |
| 7,349,566 B2 | 3/2008 | Jones et al. |
| 7,356,505 B2 | 4/2008 | March |
| 7,377,425 B1 | 5/2008 | Ma |
| 7,379,978 B2 | 5/2008 | Anderson |
| 7,385,631 B2 | 6/2008 | Maeno |
| 7,386,511 B2 | 6/2008 | Buchanan |
| 7,391,897 B2 | 6/2008 | Jones |
| 7,391,934 B2 | 6/2008 | Goodall et al. |
| 7,392,935 B2 | 7/2008 | Byrne |
| 7,401,048 B2 | 7/2008 | Rosedale |
| 7,403,917 B1 | 7/2008 | Larsen |
| 7,406,198 B2 | 7/2008 | Aoki et al. |
| 7,421,107 B2 | 9/2008 | Lugg |
| 7,421,410 B1 | 9/2008 | Schechtman et al. |
| 7,427,016 B2 | 9/2008 | Chimento |
| 7,433,098 B2 | 10/2008 | Klein et al. |
| 7,437,327 B2 | 10/2008 | Lam |
| 7,440,924 B2 | 10/2008 | Buchanan |
| 7,447,347 B2 | 11/2008 | Weber |
| 7,455,220 B2 | 11/2008 | Phillips |
| 7,455,221 B2 | 11/2008 | Sheaffer |
| 7,460,108 B2 | 12/2008 | Tamura |
| 7,461,779 B2 | 12/2008 | Ramachandran |
| 7,461,780 B2 | 12/2008 | Potts |
| 7,471,818 B1 | 12/2008 | Price |
| 7,475,040 B2 | 1/2009 | Buchanan |
| 7,477,923 B2 | 1/2009 | Wallmark |
| 7,480,382 B2 | 1/2009 | Dunbar |
| 7,480,422 B2 | 1/2009 | Ackley et al. |
| 7,489,953 B2 | 2/2009 | Griffin |
| 7,490,242 B2 | 2/2009 | Torres |
| 7,497,429 B2 | 3/2009 | Reynders |
| 7,503,486 B2 | 3/2009 | Ahles |
| 7,505,759 B1 | 3/2009 | Rahman |
| 7,506,261 B2 | 3/2009 | Satou |
| 7,509,287 B2 | 3/2009 | Nutahara |
| 7,512,564 B1 | 3/2009 | Geer |
| 7,519,560 B2 | 4/2009 | Lam |
| 7,520,420 B2 | 4/2009 | Phillips |
| 7,520,422 B1 | 4/2009 | Robinson et al. |
| 7,536,354 B1 | 5/2009 | deGroeve et al. |
| 7,536,440 B2 | 5/2009 | Budd |
| 7,539,646 B2 | 5/2009 | Gilder |
| 7,540,408 B2 | 6/2009 | Levine |
| 7,542,598 B2 | 6/2009 | Jones |
| 7,545,529 B2 | 6/2009 | Borrey et al. |
| 7,548,641 B2 | 6/2009 | Gilson et al. |
| 7,566,002 B2 | 7/2009 | Love et al. |
| 7,571,848 B2 | 8/2009 | Cohen |
| 7,587,066 B2 | 9/2009 | Cordery et al. |
| 7,587,363 B2 | 9/2009 | Cataline |
| 7,590,275 B2 | 9/2009 | Clarke et al. |
| 7,599,543 B2 | 10/2009 | Jones |
| 7,599,888 B2 | 10/2009 | Manfre |
| 7,602,956 B2 | 10/2009 | Jones |
| 7,606,762 B1 | 10/2009 | Heit |
| 7,609,873 B2 | 10/2009 | Foth et al. |
| 7,619,721 B2 | 11/2009 | Jones |
| 7,620,231 B2 | 11/2009 | Jones |
| 7,620,604 B1 | 11/2009 | Bueche, Jr. |
| 7,630,518 B2 | 12/2009 | Frew et al. |
| 7,644,037 B1 | 1/2010 | Ostrovsky |
| 7,644,043 B2 | 1/2010 | Minowa |
| 7,647,275 B2 | 1/2010 | Jones |
| 7,668,363 B2 | 2/2010 | Price |
| 7,672,940 B2 | 3/2010 | Viola |
| 7,676,409 B1 | 3/2010 | Ahmad |
| 7,680,735 B1 | 3/2010 | Loy |
| 7,689,482 B2 | 3/2010 | Lam |

**US 8,977,571 B1**

Page 4

(56)          **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 7,697,776 B2 | 4/2010 | Wu et al. |
| 7,698,222 B1 | 4/2010 | Bueche, Jr. |
| 7,702,588 B2 | 4/2010 | Gilder |
| 7,734,545 B1 | 6/2010 | Fogliano |
| 7,743,979 B2 | 6/2010 | Fredman |
| 7,753,268 B1 | 7/2010 | Robinson et al. |
| 7,761,358 B2 | 7/2010 | Craig et al. |
| 7,766,244 B1 | 8/2010 | Field |
| 7,769,650 B2 | 8/2010 | Bleuven |
| 7,792,752 B1 | 9/2010 | Kay |
| 7,792,753 B1 | 9/2010 | Slater et al. |
| 7,810,714 B2 | 10/2010 | Murata |
| 7,818,245 B2 | 10/2010 | Prakash et al. |
| 7,856,402 B1 | 12/2010 | Kay |
| 7,873,200 B1 | 1/2011 | Oakes, III et al. |
| 7,876,949 B1 | 1/2011 | Oakes, III et al. |
| 7,885,451 B1 | 2/2011 | Walls et al. |
| 7,885,880 B1 | 2/2011 | Prasad et al. |
| 7,894,094 B2 | 2/2011 | Nacman et al. |
| 7,896,232 B1 | 3/2011 | Prasad et al. |
| 7,900,822 B1 | 3/2011 | Prasad et al. |
| 7,903,863 B2 | 3/2011 | Jones et al. |
| 7,904,386 B2 | 3/2011 | Kalra et al. |
| 7,912,785 B1 | 3/2011 | Kay |
| 7,949,587 B1 | 5/2011 | Morris et al. |
| 7,950,698 B2 | 5/2011 | Popadic et al. |
| 7,962,411 B1 | 6/2011 | Prasad et al. |
| 7,970,677 B1 | 6/2011 | Oakes, III et al. |
| 7,974,899 B1 | 7/2011 | Prasad et al. |
| 7,978,900 B2 | 7/2011 | Nepomniachtchi et al. |
| 7,996,314 B1 | 8/2011 | Smith et al. |
| 7,996,315 B1 | 8/2011 | Smith et al. |
| 7,996,316 B1 | 8/2011 | Smith et al. |
| 8,001,051 B1 | 8/2011 | Smith et al. |
| 8,045,784 B2 | 10/2011 | Price et al. |
| 8,046,301 B1 | 10/2011 | Smith et al. |
| 8,060,442 B1 | 11/2011 | Hecht et al. |
| 8,116,513 B2 * | 2/2012 | Kiplinger et al. .......... 382/112 |
| 8,204,293 B2 | 6/2012 | Csulits et al. |
| 8,235,284 B1 | 8/2012 | Prasad et al. |
| 8,320,657 B1 | 11/2012 | Burks et al. |
| 8,358,826 B1 | 1/2013 | Medina, III et al. |
| 8,422,758 B1 | 4/2013 | Bueche, Jr. |
| 2001/0004235 A1 | 6/2001 | Maloney |
| 2001/0014881 A1 | 8/2001 | Drummond |
| 2001/0016084 A1 | 8/2001 | Pollard et al. |
| 2001/0018739 A1 | 8/2001 | Anderson |
| 2001/0027994 A1 | 10/2001 | Hayashida |
| 2001/0037299 A1 | 11/2001 | Nichols et al. |
| 2001/0042171 A1 | 11/2001 | Vermeulen |
| 2001/0042785 A1 | 11/2001 | Walker |
| 2001/0043748 A1 | 11/2001 | Wesolkowski et al. |
| 2001/0047330 A1 | 11/2001 | Gephart |
| 2001/0054020 A1 | 12/2001 | Barth et al. |
| 2002/0001393 A1 | 1/2002 | Jones |
| 2002/0016763 A1 | 2/2002 | March |
| 2002/0016769 A1 | 2/2002 | Barbara et al. |
| 2002/0032656 A1 | 3/2002 | Chen |
| 2002/0038289 A1 | 3/2002 | Lawlor et al. |
| 2002/0052841 A1 | 5/2002 | Guthrie |
| 2002/0052853 A1 | 5/2002 | Munoz |
| 2002/0065786 A1 | 5/2002 | Martens et al. |
| 2002/0072974 A1 | 6/2002 | Pugliese |
| 2002/0075524 A1 | 6/2002 | Blair |
| 2002/0084321 A1 | 7/2002 | Martens |
| 2002/0087467 A1 | 7/2002 | Mascavage, III et al. |
| 2002/0107809 A1 | 8/2002 | Biddle et al. |
| 2002/0116329 A1 | 8/2002 | Serbetcioglu |
| 2002/0116335 A1 | 8/2002 | Star |
| 2002/0118891 A1 | 8/2002 | Rudd |
| 2002/0120562 A1 | 8/2002 | Opiela |
| 2002/0129249 A1 | 9/2002 | Maillard et al. |
| 2002/0133409 A1 | 9/2002 | Sawano et al. |
| 2002/0138522 A1 | 9/2002 | Muralidhar |
| 2002/0147798 A1 | 10/2002 | Huang |
| 2002/0150279 A1 | 10/2002 | Scott |
| 2002/0152160 A1 | 10/2002 | Allen-Rouman et al. |
| 2002/0152161 A1 | 10/2002 | Aoike |
| 2002/0152164 A1 | 10/2002 | Dutta |
| 2002/0152165 A1 | 10/2002 | Dutta et al. |
| 2002/0152169 A1 | 10/2002 | Dutta |
| 2002/0159648 A1 | 10/2002 | Alderson et al. |
| 2002/0171820 A1 | 11/2002 | Okamura |
| 2002/0178112 A1 | 11/2002 | Goeller |
| 2002/0186881 A1 | 12/2002 | Li |
| 2002/0188564 A1 | 12/2002 | Star |
| 2002/0195485 A1 | 12/2002 | Pomerleau et al. |
| 2003/0005326 A1 | 1/2003 | Flemming |
| 2003/0023557 A1 | 1/2003 | Moore |
| 2003/0026609 A1 * | 2/2003 | Parulski .......... 396/281 |
| 2003/0038227 A1 | 2/2003 | Sesek |
| 2003/0055756 A1 | 3/2003 | Allan |
| 2003/0055776 A1 | 3/2003 | Samuelson |
| 2003/0074315 A1 | 4/2003 | Lam |
| 2003/0075596 A1 | 4/2003 | Koakutsu |
| 2003/0075916 A1 | 4/2003 | Gorski |
| 2003/0081824 A1 | 5/2003 | Mennie |
| 2003/0093367 A1 | 5/2003 | Allen-Rouman et al. |
| 2003/0093369 A1 | 5/2003 | Ijichi et al. |
| 2003/0102714 A1 | 6/2003 | Rhodes et al. |
| 2003/0105688 A1 | 6/2003 | Brown et al. |
| 2003/0120053 A1 | 6/2003 | Alarcon-Luther et al. |
| 2003/0132384 A1 * | 7/2003 | Sugiyama et al. .......... 250/330 |
| 2003/0130999 A1 | 7/2003 | Rowe |
| 2003/0159046 A1 | 8/2003 | Choi et al. |
| 2003/0167225 A1 | 9/2003 | Adams |
| 2003/0191615 A1 | 10/2003 | Bailey |
| 2003/0191869 A1 | 10/2003 | Williams |
| 2003/0200174 A1 | 10/2003 | Star |
| 2003/0212904 A1 | 11/2003 | Randle et al. |
| 2003/0217005 A1 | 11/2003 | Drummond et al. |
| 2003/0225705 A1 | 12/2003 | Park et al. |
| 2003/0233278 A1 | 12/2003 | Marshall |
| 2003/0233318 A1 | 12/2003 | King et al. |
| 2004/0010466 A1 | 1/2004 | Anderson |
| 2004/0012496 A1 | 1/2004 | De Souza |
| 2004/0013284 A1 | 1/2004 | Yu |
| 2004/0024626 A1 | 2/2004 | Bruijning |
| 2004/0024708 A1 | 2/2004 | Masuda |
| 2004/0030741 A1 | 2/2004 | Wolton et al. |
| 2004/0057697 A1 | 3/2004 | Renzi |
| 2004/0058705 A1 | 3/2004 | Morgan |
| 2004/0066031 A1 | 4/2004 | Wong |
| 2004/0069841 A1 | 4/2004 | Wong |
| 2004/0071333 A1 | 4/2004 | Douglas et al. |
| 2004/0076320 A1 | 4/2004 | Downs, Jr. |
| 2004/0078299 A1 | 4/2004 | Down-Logan |
| 2004/0080795 A1 | 4/2004 | Bean et al. |
| 2004/0089711 A1 | 5/2004 | Sandru |
| 2004/0093303 A1 | 5/2004 | Picciallo |
| 2004/0093305 A1 | 5/2004 | Kight |
| 2004/0103057 A1 | 5/2004 | Melbert et al. |
| 2004/0103296 A1 | 5/2004 | Harp |
| 2004/0109596 A1 | 6/2004 | Doran |
| 2004/0110975 A1 | 6/2004 | Osinski et al. |
| 2004/0117302 A1 | 6/2004 | Weichert |
| 2004/0122754 A1 | 6/2004 | Stevens |
| 2004/0133511 A1 | 7/2004 | Smith et al. |
| 2004/0138974 A1 | 7/2004 | Shimamura |
| 2004/0148235 A1 | 7/2004 | Craig |
| 2004/0158549 A1 | 8/2004 | Matena |
| 2004/0165096 A1 | 8/2004 | Maeno |
| 2004/0170259 A1 | 9/2004 | Park |
| 2004/0210515 A1 | 10/2004 | Hughes |
| 2004/0210523 A1 | 10/2004 | Gains et al. |
| 2004/0228277 A1 | 11/2004 | Williams |
| 2004/0236647 A1 | 11/2004 | Acharya |
| 2004/0236688 A1 | 11/2004 | Bozeman |
| 2004/0240722 A1 | 12/2004 | Tsuji et al. |
| 2004/0245324 A1 | 12/2004 | Chen |
| 2004/0247199 A1 | 12/2004 | Murai et al. |
| 2004/0248600 A1 | 12/2004 | Kim |
| 2004/0252679 A1 | 12/2004 | Williams |
| 2004/0260636 A1 | 12/2004 | Marceau |

**US 8,977,571 B1**

Page 5

(56)         **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2004/0267666 A1 | 12/2004 | Minami | |
| 2005/0001421 A1 | 1/2005 | Luth et al. | |
| 2005/0010108 A1 | 1/2005 | Rahn et al. | |
| 2005/0021466 A1 | 1/2005 | Buchanan et al. | |
| 2005/0030388 A1 * | 2/2005 | Stavely et al. | 348/222.1 |
| 2005/0033645 A1 | 2/2005 | Duphily | |
| 2005/0033685 A1 | 2/2005 | Reyes | |
| 2005/0033695 A1 | 2/2005 | Minowa | |
| 2005/0035193 A1 | 2/2005 | Gustin et al. | |
| 2005/0038746 A1 | 2/2005 | Latimer et al. | |
| 2005/0038754 A1 | 2/2005 | Geist | |
| 2005/0044042 A1 | 2/2005 | Mendiola | |
| 2005/0044577 A1 | 2/2005 | Jerding | |
| 2005/0049950 A1 | 3/2005 | Johnson | |
| 2005/0071283 A1 | 3/2005 | Randle et al. | |
| 2005/0075969 A1 | 4/2005 | Nielson et al. | |
| 2005/0075974 A1 | 4/2005 | Turgeon | |
| 2005/0078336 A1 | 4/2005 | Ferlitsch | |
| 2005/0080725 A1 | 4/2005 | Pick | |
| 2005/0082364 A1 | 4/2005 | Alvarez et al. | |
| 2005/0086140 A1 | 4/2005 | Ireland | |
| 2005/0086168 A1 | 4/2005 | Alvarez | |
| 2005/0091161 A1 | 4/2005 | Gustin | |
| 2005/0096992 A1 | 5/2005 | Geisel | |
| 2005/0097019 A1 | 5/2005 | Jacobs | |
| 2005/0097046 A1 | 5/2005 | Singfield | |
| 2005/0097050 A1 | 5/2005 | Orcutt | |
| 2005/0108164 A1 | 5/2005 | Salafia | |
| 2005/0108168 A1 | 5/2005 | Halpin | |
| 2005/0115110 A1 | 6/2005 | Dinkins | |
| 2005/0125338 A1 | 6/2005 | Tidwell et al. | |
| 2005/0125360 A1 | 6/2005 | Tidwell et al. | |
| 2005/0127160 A1 | 6/2005 | Fujikawa | |
| 2005/0131820 A1 | 6/2005 | Rodriguez | |
| 2005/0143136 A1 | 6/2005 | Lev et al. | |
| 2005/0149436 A1 | 7/2005 | Elterich | |
| 2005/0168566 A1 | 8/2005 | Tada | |
| 2005/0171809 A1 | 8/2005 | Dunn | |
| 2005/0171907 A1 | 8/2005 | Lewis | |
| 2005/0177499 A1 | 8/2005 | Thomas | |
| 2005/0177518 A1 | 8/2005 | Brown | |
| 2005/0182710 A1 | 8/2005 | Anderson | |
| 2005/0188306 A1 | 8/2005 | Mackenzie | |
| 2005/0205661 A1 | 9/2005 | Taylor | |
| 2005/0209961 A1 | 9/2005 | Michelsen | |
| 2005/0220324 A1 * | 10/2005 | Klein et al. | 382/112 |
| 2005/0228733 A1 | 10/2005 | Bent | |
| 2005/0252955 A1 | 11/2005 | Sugai | |
| 2005/0267843 A1 | 12/2005 | Acharya et al. | |
| 2005/0268107 A1 | 12/2005 | Harris et al. | |
| 2005/0269412 A1 | 12/2005 | Chiu | |
| 2005/0273368 A1 | 12/2005 | Hutten et al. | |
| 2005/0278250 A1 | 12/2005 | Zair | |
| 2005/0281448 A1 | 12/2005 | Lugg | |
| 2005/0281471 A1 | 12/2005 | LeConte | |
| 2005/0281474 A1 | 12/2005 | Huang | |
| 2005/0289030 A1 | 12/2005 | Smith | |
| 2005/0289182 A1 | 12/2005 | Pandian et al. | |
| 2006/0002426 A1 | 1/2006 | Madour | |
| 2006/0004660 A1 | 1/2006 | Pranger | |
| 2006/0017752 A1 | 1/2006 | Kurzweil et al. | |
| 2006/0025697 A1 | 2/2006 | Kurzweil | |
| 2006/0039628 A1 | 2/2006 | Li et al. | |
| 2006/0039629 A1 | 2/2006 | Li | |
| 2006/0041506 A1 | 2/2006 | Mason et al. | |
| 2006/0045321 A1 | 3/2006 | Yu | |
| 2006/0047593 A1 | 3/2006 | Naratil | |
| 2006/0053056 A1 | 3/2006 | Alspach-Goss | |
| 2006/0059085 A1 | 3/2006 | Tucker | |
| 2006/0064368 A1 | 3/2006 | Forte | |
| 2006/0080245 A1 | 4/2006 | Bahl | |
| 2006/0085357 A1 | 4/2006 | Pizarro | |
| 2006/0085516 A1 | 4/2006 | Farr et al. | |
| 2006/0102704 A1 | 5/2006 | Reynders | |
| 2006/0106691 A1 | 5/2006 | Sheaffer | |

| | | | |
|---|---|---|---|
| 2006/0106717 A1 | 5/2006 | Randle | |
| 2006/0110063 A1 | 5/2006 | Weiss | |
| 2006/0112013 A1 | 5/2006 | Maloney | |
| 2006/0115110 A1 | 6/2006 | Rodriguez | |
| 2006/0115141 A1 | 6/2006 | Koakutsu | |
| 2006/0118613 A1 | 6/2006 | McMann | |
| 2006/0124730 A1 | 6/2006 | Maloney | |
| 2006/0144924 A1 | 7/2006 | Stover | |
| 2006/0144950 A1 | 7/2006 | Johnson | |
| 2006/0161501 A1 | 7/2006 | Waserstein | |
| 2006/0164682 A1 | 7/2006 | Lev | |
| 2006/0166178 A1 * | 7/2006 | Driedijk | 434/307 R |
| 2006/0167818 A1 | 7/2006 | Wentker et al. | |
| 2006/0182331 A1 | 8/2006 | Gilson et al. | |
| 2006/0182332 A1 | 8/2006 | Weber | |
| 2006/0186194 A1 | 8/2006 | Richardson et al. | |
| 2006/0206506 A1 | 9/2006 | Fitzpatrick | |
| 2006/0208059 A1 | 9/2006 | Cable et al. | |
| 2006/0210138 A1 | 9/2006 | Hilton et al. | |
| 2006/0212391 A1 | 9/2006 | Norman et al. | |
| 2006/0214940 A1 | 9/2006 | Kinoshita | |
| 2006/0215204 A1 | 9/2006 | Miyamoto et al. | |
| 2006/0215230 A1 | 9/2006 | Borrey et al. | |
| 2006/0222260 A1 | 10/2006 | Sambongi et al. | |
| 2006/0229976 A1 | 10/2006 | Jung | |
| 2006/0229986 A1 | 10/2006 | Corder | |
| 2006/0238503 A1 | 10/2006 | Smith | |
| 2006/0242062 A1 | 10/2006 | Peterson | |
| 2006/0242063 A1 | 10/2006 | Peterson | |
| 2006/0249567 A1 | 11/2006 | Byrne | |
| 2006/0274164 A1 | 12/2006 | Kimura et al. | |
| 2006/0279628 A1 | 12/2006 | Fleming | |
| 2006/0282383 A1 | 12/2006 | Doran | |
| 2006/0291744 A1 | 12/2006 | Ikeda et al. | |
| 2007/0016796 A1 | 1/2007 | Singhal | |
| 2007/0019243 A1 | 1/2007 | Sato | |
| 2007/0022053 A1 | 1/2007 | Waserstein | |
| 2007/0027802 A1 | 2/2007 | VanDeburg et al. | |
| 2007/0030357 A1 | 2/2007 | Levien et al. | |
| 2007/0031022 A1 | 2/2007 | Frew | |
| 2007/0038561 A1 | 2/2007 | Vancini et al. | |
| 2007/0041629 A1 | 2/2007 | Prakash et al. | |
| 2007/0050292 A1 | 3/2007 | Yarbrough | |
| 2007/0053574 A1 | 3/2007 | Verma et al. | |
| 2007/0058851 A1 | 3/2007 | Quine | |
| 2007/0063016 A1 | 3/2007 | Myatt | |
| 2007/0064991 A1 | 3/2007 | Douglas et al. | |
| 2007/0065143 A1 | 3/2007 | Didow et al. | |
| 2007/0075772 A1 | 4/2007 | Kokubo | |
| 2007/0076940 A1 | 4/2007 | Goodall et al. | |
| 2007/0076941 A1 | 4/2007 | Carreon et al. | |
| 2007/0077921 A1 | 4/2007 | Hayashi | |
| 2007/0080207 A1 | 4/2007 | Williams | |
| 2007/0082700 A1 | 4/2007 | Landschaft et al. | |
| 2007/0084911 A1 | 4/2007 | Crowell | |
| 2007/0086642 A1 | 4/2007 | Foth | |
| 2007/0086643 A1 | 4/2007 | Spier | |
| 2007/0094088 A1 | 4/2007 | Mastie | |
| 2007/0094140 A1 | 4/2007 | Riney et al. | |
| 2007/0100748 A1 | 5/2007 | Dheer | |
| 2007/0110277 A1 | 5/2007 | Hayduchok et al. | |
| 2007/0118472 A1 | 5/2007 | Allen-Rouman et al. | |
| 2007/0122024 A1 | 5/2007 | Haas et al. | |
| 2007/0127805 A1 | 6/2007 | Foth et al. | |
| 2007/0112955 A1 | 6/2007 | Dalmia | |
| 2007/0136198 A1 | 6/2007 | Foth et al. | |
| 2007/0140545 A1 | 6/2007 | Rossignoli | |
| 2007/0140594 A1 | 6/2007 | Franklin | |
| 2007/0143208 A1 | 6/2007 | Varga | |
| 2007/0150337 A1 | 6/2007 | Hawkins et al. | |
| 2007/0156438 A1 | 7/2007 | Popadic | |
| 2007/0168265 A1 | 7/2007 | Rosenberger | |
| 2007/0171288 A1 | 7/2007 | Inoue et al. | |
| 2007/0172107 A1 | 7/2007 | Jones et al. | |
| 2007/0172148 A1 | 7/2007 | Hawley | |
| 2007/0179883 A1 | 8/2007 | Questembert | |
| 2007/0183000 A1 | 8/2007 | Eisen et al. | |
| 2007/0183741 A1 | 8/2007 | Lerman et al. | |
| 2007/0194102 A1 | 8/2007 | Cohen | |

## US 8,977,571 B1
Page 6

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 2007/0198432 A1 | 8/2007 | Pitroda et al. |
| 2007/0203708 A1 | 8/2007 | Polcyn et al. |
| 2007/0208816 A1 | 9/2007 | Baldwin et al. |
| 2007/0217669 A1 | 9/2007 | Swift et al. |
| 2007/0233585 A1 | 10/2007 | Ben Simon et al. |
| 2007/0235518 A1 | 10/2007 | Mueller et al. |
| 2007/0235520 A1 | 10/2007 | Smith et al. |
| 2007/0241179 A1 | 10/2007 | Davis |
| 2007/0244782 A1 | 10/2007 | Chimento |
| 2007/0246525 A1 | 10/2007 | Smith et al. |
| 2007/0251992 A1 | 11/2007 | Sharma et al. |
| 2007/0255652 A1 | 11/2007 | Tumminaro |
| 2007/0255653 A1 | 11/2007 | Tumminaro |
| 2007/0255662 A1 | 11/2007 | Tumminaro |
| 2007/0258634 A1 | 11/2007 | Simonoff |
| 2007/0268540 A1 | 11/2007 | Gaspardo et al. |
| 2007/0271182 A1 | 11/2007 | Prakash et al. |
| 2007/0288286 A1 | 12/2007 | Crowell et al. |
| 2007/0288380 A1 | 12/2007 | Starrs |
| 2007/0288382 A1 | 12/2007 | Narayanan et al. |
| 2007/0295803 A1 | 12/2007 | Levine et al. |
| 2007/0299928 A1 | 12/2007 | Kohli et al. |
| 2008/0002911 A1 | 1/2008 | Eisen |
| 2008/0021802 A1 | 1/2008 | Pendelton |
| 2008/0040280 A1 | 2/2008 | Davis et al. |
| 2008/0052182 A1 | 2/2008 | Marshall |
| 2008/0059376 A1 | 3/2008 | Davis |
| 2008/0063253 A1 | 3/2008 | Wood |
| 2008/0068674 A1 | 3/2008 | McIntyre |
| 2008/0071721 A1 | 3/2008 | Wang |
| 2008/0080760 A1 | 4/2008 | Ronca |
| 2008/0086420 A1 | 4/2008 | Gilder et al. |
| 2008/0086421 A1 | 4/2008 | Gilder |
| 2008/0091599 A1 | 4/2008 | Foss, Jr. |
| 2008/0097899 A1 | 4/2008 | Jackson et al. |
| 2008/0103790 A1 | 5/2008 | Abernethy |
| 2008/0103967 A1 | 5/2008 | Ackert et al. |
| 2008/0113674 A1 | 5/2008 | Baig |
| 2008/0114739 A1 | 5/2008 | Hayes |
| 2008/0116257 A1 | 5/2008 | Fickling |
| 2008/0117991 A1 | 5/2008 | Peddireddy |
| 2008/0119178 A1 | 5/2008 | Peddireddy |
| 2008/0133411 A1 | 6/2008 | Jones et al. |
| 2008/0147549 A1 | 6/2008 | Rathbun |
| 2008/0156438 A1 | 7/2008 | Stumphauzer et al. |
| 2008/0162319 A1 | 7/2008 | Breeden et al. |
| 2008/0162350 A1 | 7/2008 | Allen-Rouman et al. |
| 2008/0162371 A1 | 7/2008 | Rampell et al. |
| 2008/0177659 A1 | 7/2008 | Lacey et al. |
| 2008/0180750 A1 | 7/2008 | Feldman |
| 2008/0208727 A1 | 8/2008 | McLaughlin et al. |
| 2008/0214180 A1 | 9/2008 | Cunningham et al. |
| 2008/0219543 A1 | 9/2008 | Csulits |
| 2008/0245869 A1 | 10/2008 | Berkun et al. |
| 2008/0247629 A1 | 10/2008 | Gilder |
| 2008/0247655 A1 | 10/2008 | Yano |
| 2008/0249931 A1 | 10/2008 | Gilder |
| 2008/0249951 A1 | 10/2008 | Gilder et al. |
| 2008/0262953 A1 | 10/2008 | Anderson |
| 2008/0275821 A1 | 11/2008 | Bishop et al. |
| 2008/0316542 A1 | 12/2008 | Mindrum et al. |
| 2009/0024520 A1 | 1/2009 | Drory et al. |
| 2009/0046938 A1 | 2/2009 | Yoder |
| 2009/0060396 A1 | 3/2009 | Blessan et al. |
| 2009/0066987 A1 | 3/2009 | Inokuchi |
| 2009/0108080 A1 | 4/2009 | Meyer |
| 2009/0110281 A1 | 4/2009 | Hirabayashi |
| 2009/0141962 A1 | 6/2009 | Borgia et al. |
| 2009/0166406 A1 | 7/2009 | Pigg et al. |
| 2009/0167870 A1 | 7/2009 | Caleca et al. |
| 2009/0171819 A1 | 7/2009 | Emde et al. |
| 2009/0171825 A1 | 7/2009 | Roman |
| 2009/0173781 A1 | 7/2009 | Ramachadran |
| 2009/0185738 A1 | 7/2009 | Nepomniachtchi |
| 2009/0190823 A1 | 7/2009 | Walters |

| | | | |
|---|---|---|---|
| 2009/0192938 A1 | 7/2009 | Amos | |
| 2009/0236413 A1 | 9/2009 | Mueller et al. | |
| 2009/0252437 A1 | 10/2009 | Li | |
| 2009/0254447 A1 | 10/2009 | Blades | |
| 2009/0281904 A1 | 11/2009 | Pharris | |
| 2009/0284637 A1 * | 11/2009 | Parulski et al. | 348/333.12 |
| 2009/0313167 A1 | 12/2009 | Dujari | |
| 2010/0007899 A1 | 1/2010 | Lay | |
| 2010/0027679 A1 | 2/2010 | Sunahara et al. | |
| 2010/0047000 A1 | 2/2010 | Park et al. | |
| 2010/0057578 A1 | 3/2010 | Blair et al. | |
| 2010/0061446 A1 | 3/2010 | Hands et al. | |
| 2010/0082470 A1 | 4/2010 | Walach | |
| 2010/0165015 A1 | 7/2010 | Barkley et al. | |
| 2010/0226559 A1 | 9/2010 | Najari et al. | |
| 2010/0260408 A1 | 10/2010 | Prakash et al. | |
| 2010/0262522 A1 | 10/2010 | Anderson et al. | |
| 2010/0312705 A1 | 12/2010 | Caruso | |
| 2011/0112967 A1 | 5/2011 | Anderson et al. | |
| 2011/0310442 A1 | 12/2011 | Popadic et al. | |
| 2012/0229872 A1 * | 9/2012 | Dolev | 358/448 |
| 2013/0021651 A9 | 1/2013 | Popadic et al. | |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | 2006/075967 A1 | 7/2006 |
| WO | 2006/136958 A2 | 12/2006 |

OTHER PUBLICATIONS

Mitek Systems: "Mitek Systems Launches First Mobile Check Deposit and Bill Pay Application", Jan. 22, 2008. 3 pages, San Diego, California.

Fisher, Dan M.: "Home Banking in the 21st Century: Remote Capture Has Gone Retail!", 4 pages.

White, J.M. et al., "Image Thresholding for Optical Character Recognition and Other Applications Requiring Character Image Extraction", IBM J. Res. Development, Jul. 1983, vol. 27, No. 4 (12 pgs).

Ritzer, J.R. "Hinky Dinky helped spearhead POS, remote banking movement", Bank Systems and Equipment, vol. 21, No. 12, Dec. 1984 (1 pg).

Dinan, R.F. et al., "Image Plus High Performance Transaction System", IBM Systems Journal, 1990 vol. 29, No. 3 (14 pgs).

Gupta, Amar et al., "An Integrated Architecture for Recognition of Totally Unconstrained Handwritten Numerals", WP#3765, Jan. 1993, Productivity from Information Technology "Profit" Research Initiative Sloan School of Management (20 pgs).

Masonson, L., "Check Truncation and ACH Trends—Automated Clearing Houses", healthcare financial management associate, http://www.findarticles.com/p/articles/mLm3276/is_n7_v47/ai_14466034/print, 1993 (2 pgs).

Zhang, C.Y., "Robust Estimation and Image Combining" Astronomical Data Analysis Software and Systems IV, ASP Conference Series, 1995 (5 pgs).

Kornai Andras et al., "Recognition of Cursive Writing on Personal Checks", Proceedings of International Workshop on the Frontiers in Handwriting Recognition, Cited in patent No. 7,900,822, as dated Sep. 1996, (6 pgs).

De Queiroz, Ricardo et al., "Mixed Raster Content (MRC) Model for Compound Image Compression", 1998 (14 pgs).

Rivlin, Alice M. et al., Chair, Vice Chair—Board of Governors, Committee on the Federal Reserve in the Payments Mechanism—Federal Reserve System, "The Federal Reserve in the Payments Mechanism", Jan. 1998 (41 pgs).

Tygar, J.D., Atomicity in Electronic Commerce, In ACM Networker, 2:2, Apr./May 1998 (12 pgs).

Anderson, Milton M. "FSML and Echeck", Financial Services Technology Consortium, 1999 (17 pgs).

"Full Service Direct Deposit", www.nonprofitstaffing.com/images/upload/dirdepform.pdf, Cited in patent No. 7,900,822, as dated 2001, (2 pgs).

Craig, Ben, "Resisting Electronic Payment Systems: Burning Down the House?", Federal Reserve Bank of Cleveland, Jul. 1999 (2 pgs).

Rose, Sarah et al., "Best of the We: Top 50 Financial Websites", Money, New York, Dec. 1999, vol. 28, Iss. 12 (8 pgs).

**US 8,977,571 B1**

Page 7

(56)        **References Cited**

OTHER PUBLICATIONS

Furst, Karen et al., "Internet Banking: Developments and Prospects", Economic and Policy Analysis Working Paper 2000-9, Sep. 2000 (60 pgs).

"Middleware", David E. Bakken, Encyclopedia of Distributed Computing, Kluwer Academic Press, 2001 (6 pgs).

Palacios, Rafael et al., "Automatic Processing of Brazilian Bank Checks". Cited in patent No. 7,900,822, as dated 2002 (28 pgs).

Wallison, Peter J., "Wal-Mart Case Exposes Flaws in Banking-Commerce Split", American Banker, vol. 167, No. 8, Jan. 11, 2002 (3 pgs).

Heckenberg, D. "Using Mac OS X for Real-Time Image Processing" Oct. 8, 2003 (15 pgs).

Burnett, J. "Depository Bank Endorsement Requirements," BankersOnline.com, http://www.bankersonline.com/cgi-bin/printview/printview.pl, Jan. 6, 2003 (3 pgs).

Blafore, Bonnie "Lower Commissions, Fewer Amenities", Better Investing, Madison Heights: Feb. 2003, vol. 52, Iss 6, (4 pgs).

"Direct Deposit Authorization Form", www.umass.edu/humres/library/DDForm.pdf, May 2003 (3 pgs).

"Electronic Billing Problem: The E-check is in the mail" American Banker—vol. 168, No. 95, May 19, 2003 (4 pgs).

Oxley, Michael G., From committee on Financial Services; "Check Clearing for the 21st Century Act", 108th Congress, 1st Session House of Representatives report 108-132, Jun. 2003 (20 pgs).

Shelby, Hon. Richard C. (Committee on Banking, Housing and Urban Affairs); "Check Truncation Act of 2003", calendar No. 168, 108th Congress, 1st Session Senate report 108-79, Jun. 2003 (27 pgs).

Knestout, Brian P et al., "Banking Made Easy" Kiplinger's Personal Finance Washington, Jul. 2003, vol. 57, Iss 7 (5 pgs).

Oxley, Michael G., From the committee of conference; "Check Clearing for the 21st Century Act" 108th Congress, 1st Session Senate report 108-291, Oct. 1, 2003 (27 pgs).

Public Law 108-100, 108 Congress; "An Act Check Clearing for the 21st Century Act", Oct. 28, 2003, 117 STAT. 1177 (18 pgs).

Johnson, Jennifer J., Secretary of the Board; Federal Reserve System, 12 CFR Part 229, Regulation CC; Docket No. R 1176, "Availability of Funds and Collection of Checks". Cited in patent No. 7,900,822, as dated 2009, (89 pgs).

Mohl, Bruce, "Banks Reimbursing ATM Fee to Compete With Larger Rivals", Boston Globe, Boston, MA, Sep. 19, 2004 (3 pgs).

The Automated Clearinghouse, "Retail Payment Systems; Payment Instruments Clearing and Settlement: The Automated Clearinghouse (ACH)", www.ffiec.gov/ffiecinfobase/booklets/retailretail_02d.html. Cited in patent No. 7,900,822, as dated Dec. 2005 (3 pgs).

"Two Words Every Business Should Know: Remote Deposit," Canon, http://www.rpsolutions.com/rpweb/pdfs/canon_rdc.pdf, 2005 (7 pgs).

Wells Fargo 2005 News Releases, "The New Wells Fargo Electronic Deposit Services Break Through Banking Boundaries In The Age of Check 21", San Francisco Mar. 28, 2005. www.wellsfargo.com/press/3282005_check21Year=2005 (1 pg).

Constanzo, Chris, "Remote Check Deposit: Wells Captures A New Checking Twist", Bank Technology News Article—May 2005, www.americanbanker.com/btn_article.html?id=20050502YQ5OFSYG (2 pgs).

German Shegalov, Diplom-Informatiker, "Integrated Data, Message, and Process Recovery for Failure Masking in Web Services", Dissertation Jul. 2005 (146 pgs).

Credit Union Journal, "AFCU Averaging 80 DepositHome Transactions Per Day", Credit Union Journal, Aug. 15, 2005 (1 pg).

Federal Check 21 Act, "New Check 21 Act effective Oct. 28, 2004: Bank No Longer Will Return Original Cancelled Checks," Consumer Union's FAQ's and Congressional Testimony on Check 21, www.consumerlaw.org.initiatives/content/check21_content.html, Cited in patent No. 7,873,200, as dated Dec. 2005 (20 pgs).

BankServ, "DepositNow: What's the difference?" Cited in patent No. 7,970,677, as dated 2006, (4 pgs).

BankServ, Product Overview, http://www.bankserv.com/products/remotedeposit.htm, Cited in patent No. 7,970,677, as dated 2006 (3 pgs).

Blue Mountain Consulting. from URL: www.bluemountainconsulting.com, Cited in patent No. 7,900,822 as dated Apr. 26, 2006 (3 pgs).

Remotedepositcapture, URL:www.remotedepositcapture.com, Cited in patent No. 7,900,822, as dated 2006 (5 pgs).

Onlinecheck/Merchant Advisors, "Real-Time Check Debit", Merchant Advisors: Retail Check Processing Check Conversion, http://www.onlinecheck/wach/rcareal.htm, Cited in patent No. 7,900,822, as dated 2006 (2 pgs).

"Compliance with Regulation CC", http./www/federalreserve.org/Pubs/regcc/regcc.htm, Jan. 24, 2006 (6 pgs).

Chiang, Chuck, The Bulletin, "Remote banking offered", http://bendbulletin.com/apps/pbcs.dll/article?AID=/20060201/BIZ0102/602010327&templ . . . Feb. 1, 2006 (2 pgs).

Federal Reserve Board, "Check Clearing for the 21st Century Act", FRB, http://www.federalreserve.gov/paymentsystems/truncation/, Mar. 1, 2006 (1 pg).

Fest, Glen., "Patently Unaware" Bank Technology News, Apr. 2006, Retrieved from the internet at URL:http://banktechnews.com/article.html?id=2006403T7612618 (5 pgs).

Bank Systems & Technology, Untitled Article, May 1. 2006, http://www.banktech.com/showarticle.jhtml?_articleID=187003126, (3 pgs).

"Are you Winning in the Payment World?" (4 pgs).

Digital Transactions News, "An ACH-Image Proposal for Check Roils Banks and Networks" May 26, 2006 (3 pgs).

RemoteDepositCapture.com, Remote Deposit Capture News Articles from Jul. 6, 2006, "BankServ Announces New Remote Deposit Product Integrated with QuickBooks" (3 pgs).

RemoteDepositCapture.com, "PNC Bank to Offer Ease of Online Deposit Service Integrated with QuickBooks to Small Businesses", Remote Deposit Capture News Articles from Jul. 24, 2006, (2 pgs).

Dias, Danilo et al., "A Model for the Electronic Representation of Bank Checks", Brasilia Univ. Oct. 2006 (5 pgs).

"Check Fraud: A Guide to Avoiding Losses", All Net, http://all.net/books/audit/checkfraud/security.htm, Cited in patent No. 7,900,822, as dated 2007 (1 pg).

"What is check Fraud", National Check Fraud Center, http://www.ckfraud.org/ckfraud.html , Cited in patent No. 7,900,822, as dated 2007 (12 pgs).

"Remote Deposit" National City, http://www.nationalcity.com/smallbusiness/cashmanagement/remotedeposit/default.asp, Cited in patent No. 7,900,822, as dated 2007 (1 pg).

"Remote Deposit Capture", Plante & Moran, http://plantemoran.com/industries/fincial/institutions/bank/resources/community+bank+advisor/2007+summer+issue/remote+deposit+capture.htm, Cited in patent No. 7,900,822, as dated 2007 (3 pgs).

"Virtual Bank Checks", Morebusiness.com, http://www.morebusiness.com/running_yourbusiness/businessbits/d908484987.brc, Cited in patent No. 7,900,822, as dated 2007 (3 pgs).

Canon. ImageFormula CR-25/CR-55, "Improve Your Bottom Line with Front-Line Efficiencies", 0117W117, 1207-55/25-1 OM-BSP, Cited in U.S. Pat. No. 7,949,587 as dated 2007. (4 pgs).

"It's the easiest way to Switch banks", LNB, http://www.inbky.com/pdf/LNBswitch-kit10-07.pdf Cited in patent No. 7,996,316, as dated 2007 (7 pgs).

"Lesson 38—More Bank Transactions", Turtle Soft, http://www.turtlesoft.com/goldenseal-software-manual.lesson38.htm, Cited in patent No. 7,900,822, as dated 2007 (8 pgs).

"Personal Finance", PNC, http://www.pnc.com/webapp/unsec/productsandservice.do?siteareas=PNC/home/personal/account+services/quick+switch/quick+switch+faqs, Cited in patent No. 7,900,822, as dated 2007 (12 pgs).

"Switching Made Easy," Bank of North Georgia, http://www.banknorthgeorgia.com/cmsmaster/documents/286/documents616.pdf, 2007 (7 pgs).

"Chapter 7 Payroll Programs," Uniform Staff Payroll System, http://www2.occn.k12.oh.us/www/ssdt/usps/usps_user_guide_005.html, Cited in patent No. 7,900,822, as dated 2007 (9 pgs).

"Check 21 Solutions," Columbia Financial International, Inc. http://www.columbiafinancial.us/check21/solutions.htm, Cite in patent No. 7,900,822, as dated 2007 (8 pgs).

**US 8,977,571 B1**

Page 8

(56)        **References Cited**

OTHER PUBLICATIONS

"Direct Deposit," University of Washington, http://www. washington.edu/admin/payroll/directdeposit.html, Cite in patent No. 7,900,822, as dated 2007 (3 pgs).

"Accept "Customer Not Present" Checks," Accept Check Online, http://checksoftware.com, Cited in patent No. 7,900,822, as dated 2007 (1 pg).

"Customer Personalized Bank Checks and Address Labels" Checks Your Way Inc., http://www.checksyourway.com/htm/web_pages/faq.htm, Cited in patent No. 7,900,822, as dated 2007 (6 pgs).

"Direct Deposit Application for Payroll", Purdue University, Business Office Form 0003, http://purdue.edu/payroll/pdf/directdepositapplication.pdf, Jul. 2007 (2 pgs).

"Frequently Asked Questions" Bank of America, http://www/bankofamerica.com/deposits/checksave/index.cfm?template-lc_faq_bymail, Cited in patent No. 7,900,822, as dated 2007 (2 pgs).

"Refractive index" Wikipedia, the free encyclopedia, http://en.wikipedia.org/wiki/refractiveindex.bem Oct. 16, 2007 (4 pgs).

Patterson, Scott "USAA Deposit@Home—Another WOW moment for Net Banking", NextCU.com, Jan. 26, 2007 (5 pgs).

Remotedepsitcapture.com, LLC, "Remote Deposit Capture Overview," ROC Overview, http://remotedepositcapture.com/overview/RDC_overview.htm, Cited in patent No. 7,900,822, as dated Mar. 12, 2007 (4 pgs).

Board of Governors of the federal reserve system, "Report to the Congress on the Check Clearing for the 21st Century Act of 2003" Apr. 2007, Submitted to Congress pursuant to section 16 of the Check Clearing for the 21st Century Act of 2003, (59 pgs).

Image Master, "Photo Restoration: We specialize in digital photo restoration and photograph repair of family pictures", http://www.imphotorepair.com, Cited in patent No. 7,900,822, as downloaded Apr. 2007 (1 pg).

"Save on ATM Fees", RedEye Edition, Chicago Tribune, Chicago, IL Jun. 30, 2007 (2 pgs).

Associate of German Banks, SEPA 2008: Uniform Payment Instruments for Europe, Berlin, Cited in patent No. 7,900,822, as dated Jul. 2007, Bundesverbankd deutscher banker ev (42 pgs).

Affinity Federal Credit Union, "Affinity Announces Online Deposit," Aug. 4, 2005 (1 pg).

"Check 21—The check is not in the post", RedTitan Technology 2004 http://www.redtitan.com/check21/htm (3 pgs).

Hartly, Thomas, "Banks Check Out New Image", Business First, Buffalo: Jul. 19, 2004, vol. 20, Issue 43, (3 pgs).

Wade, Will, "Early Notes: Updating Consumers on Check 21" American Banker Aug. 10, 2004 (3 pgs).

Rao, Bharat; "The Internet and The Revolution in Distribution: A Cross-Industry Examination"; Technology in Society; 1999; pp. 287-306; vol. 21, No. 3 (20 pgs).

Alves, Vander and Borba, Paulo; "Distributed Adapters Pattern: A Design for Object-Oriented Distributed Applications"; First Latin American Conference on Pattern Languages of Programming; Oct. 2001; pp. 132-142; Rio de Janeiro, Brazil (11 pgs).

Kiser, Elizabeth K.; "Modeling the Whole Firm: The Effect of Multiple Inputs and Financial Intermediation on Bank Deposit Rates;" FEDS Working Paper No. 2004-07; Jun. 3, 2003; pp. 1-46 (46 pgs).

DeYoung, Robert; "The Financial Performance of Pure Play Internet Banks"; Federal Reserve Bank of Chicago Economic Perspectives; 2001; pp. 60-75; vol. 25, No. 1 (16pgs).

Archive Index Systems; Panini My Vision X-30 or VX30 or X30 © 1994-2008 Archive Systems, Inc. P./O. Box 40135 Bellevue, WA USA 98015 (2 pgs).

Aradhye, Hrishikesh B., A generic method for determining up/down orientation of text in roman and non-roman scripts, Pattern Recognition Society, Dec. 13, 2004 (18 pages).

Liang, Jian et al., Camera-based analysis of text and documents: a survey, International Journal on Document Analysis and Recognitio, Jun. 21, 2005 (21 pages).

Luo, Xi-Ping et al., Design and implementation of a card reader based on build-in camera, Proceedings of the 17th International Conference on Pattern Recognition, 2004 (4 pages).

Zandifar, A., A video-based framework for the analysis of presentations/posters, International Journal on Document Analysis and Recognition, Feb. 2, 2005 (10 pages).

Doermann, David, et al., Progress in Camera-Based Document Image Analysis, Proceedings of the Seventh Int'l Conf. on Document Analysis and Recognition, 2003, 11 pages.

U.S. Appl. No. 12/549,443, Office Action dated May 8, 2012, 9 pages.

U.S. Appl. No. 12/549,443, Applicant's Office Action Response dated Aug. 28, 2012, 11 pages.

U.S. Appl. No. 13/922,686, Office Action mailed Oct. 16, 2013, 30 pages.

U.S. Appl. No. 13/922,686, Office Action dated Apr. 25, 2014, 50 pages.

"Adjusting Brightness and Contrast", www.eaglesoftware.com/adjustin.htm, retrieved on May 4, 2009 (4 pgs).

"Best practices for producing quality digital image files", Digital Images Guidelines, http://deepblue.lib.umich.edu/bitstream/2027.42/40247/1/Images-Best_Practice.pdf, downloaded 2007 (2 pgs).

"How to Digitally Deposit a Check Image", Smart Money Daily, Copyright 2008 (5 pgs).

"ImageNet Mobile Deposit Provides Convenient Check Deposit and Bill Pay to Mobile Consumers", Miteksystems, 2008 (2 pgs).

"Mitek Systems Announces Mobile Deposit Application for Apple iPhone," http://prnewswire.com/cgi-bin/stories/pl?ACCT=104&STORY=/www/story/10-01- . . . , Nov. 25, 2008 (2 pgs).

"WallStreetGrapevine.com" Stocks on the Rise: JADG, BKYI, MITK; Mar. 3, 2008 (4 pgs).

Albrecht, W. Steve, "Check Kiting: Detection, Prosecution and Prevention," The FBI Law Enforcement Bulletin, Nov. 1, 1993 (6 pgs).

Amber Avalona-Butler / Paraglide, "At Your Service: Best iPhone Apps for Military Lifestyle," Jul. 9, 2010 (2 pgs).

Automated Merchant Systems, Inc., "Electronic Check Conversion," http://www.automatedmerchant.com/electronic_check_conversion.cfm, 2006, downloaded Oct. 18, 2006 (3 pgs).

BLM Technologies, "Case Study: Addressing Check 21 and RDC Error and Fraud Threats," Remote Deposit Capture News Articles from Jun. 11, 2007, Retrieved from http://www.remotedepositcapture.com/News/june_11_2007.htm on Feb. 19, 2008 (5 pgs).

Bruene, Jim; "Check Free to Enable In-Home Remote Check Deposit for Consumers and Small Business," NetBanker. Com, Financial Insite, Inc., http://www.netbanker.com/2008/02/checkfree_to_enableinhome_rem.html, Feb. 5, 2008 (3 pgs).

Bruene, Jim; "Digital Federal Credit Union and Four Others Offer Consumer Remote Deposit Capture Through EasCorp", NetBanker—Tracking Online Finance, www.netbanker.com/2008/04/digital_federal_credit_union_a.html, Apr. 13, 2008 (3 pgs).

Bruno, M., "Instant Messaging," Bank Technology News, Dec. 2002 (3 pgs).

Carrubba, P. et al., "Remote Deposit Capture: A White Paper Addressing Regulatory, Operational and Risk Issues," NetDeposit Inc., 2006 (11 pgs).

Century Remote Deposit High-Speed Scanner Users Manual Release 2006, (Century Manual), Century Bank, 2006, (32 pgs).

CNN.com/technology, "Scan, deposit checks from home", www.cnn.com/2008ITECH/biztech/02/07/check.scanning.ap/index.html, Feb. 7, 2008 (3 pgs).

Creativepaymentsolutions.com, "Creative Payment Solutions—Websolution," www.creativepaymentsolution.com/cps/financialservices/websolution/default.html, Copyright 2008, Creative Payment Solutions, Inc. (1 pg).

Credit Union Journal, "The Ramifications of Remote Deposit Capture Success", www.cuiournal.com/orinthis.html?id=20080411 EODZT57G, Apr. 14, 2008 (1 pg).

DCU Member's Monthly—Jan. 2008, "PC Deposit—Deposit Checks from Home!", http://www.mycreditunionnewsletter.com/dcu/01 08/page1. html, Copyright 2008 Digital Federal Credit Union (2 pgs).

De Jesus, A. et al., "Distributed Check Processing in a Check 21 Environment: An educational overview of the opportunities and challenges associated with implementing distributed check imaging and processing solutions," Panini, 2004, pp. 1-22.

<div align="center">

**US 8,977,571 B1**

Page 9

</div>

| (56) | **References Cited** |
| --- | --- |

OTHER PUBLICATIONS

Debello, James et al., "RDM and Mitek Systems to Provide Mobile Check Deposit," Mitek Systems, Inc., San Diego, California and Waterloo, Ontario, (Feb. 24, 2009). 2 pgs.

eCU Technologies, "Upost Remote Deposit Solution," Retrieved from the internet https://www.eutechnologies.com/products/upost.html, downloaded 2009 (1 pg).

EFT Network Unveils FAXTellerPlus, EFT Network, Inc., www.eftnetwork.com, Jan. 13, 2009 (2 pgs).

ElectronicPaymentProviders, Inc., "FAQs: ACH/ARC, CheckVerification/Conversion/Guarantee, RCK Check Re-Presentment," http://www.useapp.com/faq.htm, downloaded Oct. 18, 2006 (3 pgs).

Federal Reserve System, "12 CFR, Part 229 [Regulation CC; Docket No. R-0926]: Availability of Funds and Collection of Checks," Federal Registrar, Apr. 28. 1997, pp. 1-50.

Federal Reserve System, "Part IV, 12 CFR Part 229 [Regulation CC; Docket No. R-1176]: Availability of Funds and Collection of Checks; Final Rule," Federal Registrar, vol. 69, No. 149, Aug. 4, 2004, pp. 47290-47328.

Fidelity Information Services, "Strategic Vision Embraces Major Changes in Financial Services Solutions: Fidelity's long-term product strategy ushers in new era of application design and processing," Insight, 2004, pp. 1-14.

Garry, M., "Checking Options: Retailers face an evolving landscape for electronic check processing that will require them to choose among several scenarios," Supermarket News, vol. 53, No. 49, 2005 (3 pgs).

Gupta, Maya R. et al., "OCR binarization and image pre-processing for searching historical documents," Pattern Recognition, vol. 40, No. 2, Feb. 2007, pp. 389-397.

Hale, J., "Picture this: Check 21 uses digital technology to speed check processing and shorten lag time," Columbus Business First, http://columbus.bizjournals/columbus/stories/2005/03/14focus1.html, downloaded 2007 (3 pgs).

Hildebrand, C. et al., "Electronic Money," Oracle. http://www.oracle.com/oramag/profit/05-feb/p15financial.html, 2005, downloaded Oct. 18, 2006 (5 pgs).

Hillebrand, G., "Questions and Answers About the Check Clearing for the 21st Century Act, 'Check 21," ConsumersUnion.org, http://www.consumersunion.org/finance/ckclear1002.htm, Jul. 27, 2004, downloaded Oct. 18, 2006 (6 pgs).

Investment Systems Company, "Portfolio Accounting System," 2000, pp. 1-32.

JBC, "What is a MICR Line?," eHow.com, retrieved from http://www.ehow.com/about_4684793_what-micr-line.html on May 4, 2009 (2 pgs).

Kendrick, Kevin B., "Check Kiting, Float for Purposes of Profit," Bank Security & Fraud Prevention, vol. 1, No. 2, 1994 (3 pgs).

Levitin, Adam J., Remote Deposit Capture: A Legal and Transactional Overview, Banking Law Journal, p. 115, 2009 (RDC).

Matthews, Deborah, "Advanced Technology Makes Remote Deposit Capture Less Risky," Indiana Bankers Association, Apr. 2008 (2 pgs).

Metro 1 Credit Union, "Remote Banking Services," http://ww\i.metro1cu.org/metro1cu/remote.html, downloaded Apr. 17, 2007 (4 pgs).

Moreau, T., "Payment by Authenticated Facsimile Transmission: a Check Replacement Technology for Small and Medium Enterprises," CONNOTECH Experts-conseils, Inc., Apr. 1995 (31 pgs).

Nelson, B. et al., "Remote deposit capture changes the retail landscape," Northwestern Financial Review, http://findarticles.com/p/articles/mi_qa3799/is200607/ai_n16537250, 2006 (3 pgs).

NetBank, Inc., "Branch Out: Annual Report 2004." 2004 (150 pgs).

NetBank, Inc., "Quick Post: Deposit and Payment Forwarding Service," 2005 (1 pg).

NetDeposit Awarded Two Patents for Electronic Check Process, NetDeposit, Jun. 18, 2007, (1 pg).

Nixon, Julie et al., "Fiserv Research Finds Banks are Interested in Offering Mobile Deposit Capture as an," Fiserv, Inc. Brookfield, Wis., (Business Wire), (Feb. 20. 2009), 2 pgs.

Online Deposit: Frequently Asked Questions, http://www.depositnow.com/faq.html, Copyright 2008 (1 pg).

Richey, J. C. et al., "EE 4530 Check Imaging," Nov. 18, 2008 (10 pgs).

SoyBank Anywhere, "Consumer Internet Banking Service Agreement," Dec. 6, 2004 (6 pgs).

Teixeira, D., "Comment: Time to Overhaul Deposit Processing Systems." American Banker, Dec. 10, 1998, vol. 163, No. 235, p. 15 (3 pgs).

The Green Sheet 2.0: Newswire, "CO-OP adds home deposit capabilities to suite of check imaging products", www.greensheet.com/newswire.php?newswire__id=8799, Mar. 5, 2008 (2 pgs).

Valentine, Lisa, "Remote Deposit Capture Hot Just Got Hotter," ABA Banking Journal, Mar. 2006, p. 1-9.

Wells Fargo Commercial, "Remote Deposit", www.wellsfargo.com/com/treasury mgmt\receivables/electronic/remote_deposit, Copyright 2008 (1 pg).

Whitney et al., "Reserve Banks to Adopt DSTU X9.37-2003 Format for Check 21 Image Services", American Bankers Association. May 18, 2004, http://www.aba/com/NR/rdonlyres/CBDC1 A5C-43E3-43CC-B733-BE417C63861B/35930/DSTUFormat.pdf (2 pages).

Wikipedia ®, "Remote Deposit," http://en.wikipedia.org/wiki/Remote_deposit, 2007 (3 pgs).

Windowsfordevices.com, "Software lets camera phone users deposit checks, pay bills", www.windowsfordevices.com/news/NS3934956670.html, Jan. 29, 2008 (3 pgs).

Wolfe, Daniel, "Check Image Group Outlines Agenda," American Banker, New York, N.Y.: Feb. 13, 2009, vol. 174, Iss. 30, p. 12. (2 pgs).

Woody Baird Associated Press, "Pastor's Wife got Scammed—She Apparently Fell for Overseas Money Scheme," The Commercial Appeal. Jul. 1, 2006, p. A. 1.

Zions Bancorporation, "Moneytech, the technology of money in our world: Remote Deposit," http://www.bankjunior.com/pground/moneytech/remote_deposit.jsp, 2007 (2 pgs).

U.S. Appl. No. 12/062,143, filed Apr. 3, 2008 (27 pgs).

U.S. Appl. No. 12/859,741, filed Aug. 19, 2010 (235 pgs).

U.S. Appl. No. 12/195,723, filed Aug. 21, 2008 (38 pgs).

U.S. Appl. No. 12/545,127, filed Aug. 21, 2009 (45 pgs).

U.S. Appl. No. 12/549,443, filed Aug. 28, 2009 (41 pgs).

U.S. Appl. No. 11/613,656, filed Dec. 20, 2006 (21 pgs).

U.S. Appl. No. 12/982,494, filed Dec. 30, 2010 (280 pgs).

U.S. Appl. No. 12/982,561, filed Dec. 30, 2010 (275 pgs).

U.S. Appl. No. 12/982,578, filed Dec. 30, 2010 (274 pgs).

U.S. Appl. No. 12/982,594, filed Dec. 30, 2010 (275 pgs).

U.S. Appl. No. 13/397,405, filed Feb. 15, 2012 (19 pgs).

U.S. Appl. No. 12/388,005, filed Feb. 18, 2009 (37 pgs).

U.S. Appl. No. 13/735,678, filed Jan. 7, 2013 (30 pgs).

U.S. Appl. No. 11/487,537, filed Jul. 13, 2006 (24 pgs).

U.S. Appl. No. 12/509,613, filed Jul. 27, 2009 (48 pgs).

U.S. Appl. No. 12/509,680, filed Jul. 27, 2009 (41 pgs).

U.S. Appl. No. 12/137,051, filed Jun. 11, 2008 (29 pgs).

U.S. Appl. No. 13/155,976, filed Jun. 8, 2011 (352 pgs).

U.S. Appl. No. 13/156,007, filed Jun. 8, 2011 (356 pgs).

U.S. Appl. No. 13/156,018, filed Jun. 8, 2011 (353 pgs).

U.S. Appl. No. 11/686,924, filed Mar. 15, 2007 (34 pgs).

U.S. Appl. No. 11/686,928, filed Mar. 15, 2007 (36 pgs).

U.S. Appl. No. 13/842,112, filed Mar. 15, 2013 (62 pgs).

U.S. Appl. No. 12/397,671, filed Mar. 4, 2009 (40 pgs).

U.S. Appl. No. 12/397,930, filed Mar. 4, 2009 (37 pgs).

U.S. Appl. No. 11/747,222, filed May 10, 2007 (35 pgs).

U.S. Appl. No. 12/253,278, filed Oct. 17, 2008 (42 pgs).

U.S. Appl. No. 11/876,925, filed Oct. 23, 2007 (36 pgs).

U.S. Appl. No. 11/877,335, filed Oct. 23, 2007 (39 pgs).

U.S. Appl. No. 11/923,839, filed Oct. 25, 2007 (22 pgs).

U.S. Appl. No. 11/926,388, filed Oct. 29, 2007 (23 pgs).

U.S. Appl. No. 11/928,297, filed Oct. 30, 2007 (26 pgs).

U.S. Appl. No. 11/590,974, filed Oct. 31, 2006 (31 pgs).

U.S. Appl. No. 11/591,008, filed Oct. 31, 2006 (27 pgs).

U.S. Appl. No. 11/591,227, filed Oct. 31, 2006 (58 pgs).

U.S. Appl. No. 11/591,273, filed Oct. 31, 2006 (56 pgs).

U.S. Appl. No. 11/930,537, filed Oct. 31, 2007 (46 pgs).

U.S. Appl. No. 11/931,670, filed Oct. 31, 2007 (47 pgs).

# US 8,977,571 B1

Page 10

(56)         **References Cited**

OTHER PUBLICATIONS

U.S. Appl. No. 11/868,884, filed Oct. 8, 2007 (30 pgs).
U.S. Appl. No. 11/864,569, filed Sep. 28, 2007 (35 pgs).
U.S. Appl. No. 12/205,996, filed Sep. 8, 2008 (30 pgs).
Claims as filed on Apr. 3, 2008 for U.S. Appl. No. 12/062,163 (3 pgs).
Claims as filed on Apr. 3, 2008 for U.S. Appl. No. 12/062,175 (3 pgs).
Claims as filed on Aug. 19, 2010 for U.S. Appl. No. 12/859,752 (5 pgs).
Claims as filed on Dec. 15, 2011 for U.S. Appl. No. 13/327,478 (4 pgs).
Claims as filed on Dec. 20, 2006 for U.S. Appl. No. 11/613,671, (3 pgs).
Claims as filed on Dec. 20, 2012 for U.S. Appl. No. 13/722,576 (4 pgs).
Claims as filed on Dec. 29, 2005 for U.S. Appl. No. 11/320,998 (3 pgs).
Claims as filed on Dec. 29, 2005 for U.S. Appl. No. 11/321,027 (3 pgs).
Claims as filed on Dec. 8, 2010 for U.S. Appl. No. 12/963,513 (7 pgs).
Claims as filed on Feb. 12, 2013 for U.S. Appl. No. 13/765,412 (1 pg).
Claims as filed on Feb. 15, 2012 for U.S. Appl. No. 13/397,437 (6 pgs).
Claims as filed on Feb. 16, 2011 for U.S. Appl. No. 13/028,477 (3 pgs).
Claims as filed on Feb. 19, 2013 for U.S. Appl. No. 13/770,048 (4 pgs).
Claims as filed on Jan. 20, 2011 for U.S. Appl. No. 13/010,644 (9 pgs).
Claims as filed on Jan. 31, 2011 for U.S. Appl. No. 13/017,865 (11 pgs).
Claims as filed on Mar. 15, 2007 for U.S. Appl. No. 11/686,925 (5 pgs).
Claims as filed on May 10, 2007 for U.S. Appl. No. 11/747,223 (4 pgs).
Claims as filed on May 18, 2011 for U.S. Appl. No. 13/110,077 (9 pgs).
Claims as filed on May 2, 2011 for U.S. Appl. No. 13/098,566 (10 pgs).
Claims as filed on Nov. 20, 2012 for U.S. Appl. No. 13/682,268 (4 pgs).
Claims as filed on Oct. 23, 2007 for U.S. Appl. No. 11/877,382 (6 pgs).
Claims as filed on Oct. 24, 2008 for U.S. Appl. No. 12/257,471 (4 pgs).
Claims as filed on Oct. 31, 2006 for U.S. Appl. No. 11/590,963 (3 pgs).
Claims as filed on Oct. 31, 2006 for U.S. Appl. No. 11/590,995 (3 pgs).
Claims as filed on Oct. 31, 2006 for U.S. Appl. No. 11/590,998 (4 pgs).
Claims as filed on Oct. 31, 2007 for U.S. Appl. No. 11/931,804 (4 pgs).
Claims as filed on Oct. 8, 2007 for U.S. Appl. No. 11/868,878 (4 pgs).
Claims as filed on Sep. 14, 2012 for U.S. Appl. No. 13/619,026 (3 pgs).
Claims as filed on Sep. 2, 2008 for U.S. Appl. No. 12/202,781 (4 pgs).
Claims as filed on Sep. 8, 2008 for U.S. Appl. No. 12/206,001 (3 pgs).
Claims as filed on Sep. 8, 2008 for U.S. Appl. No. 12/206,007 (3 pgs).

* cited by examiner

Case 2:18-cv-00245-JRG   Document 1-5   Filed 06/07/18   Page 12 of 39 PageID #: 146



FIG. 1

Case 2:20-cv-00245-JRG    Document 1-5    Filed 06/07/19    Page 13 of 39 PageID #: 123



200

**_FIG. 2_**

Case 2:18-cv-00245-JRG     Document 1-5     Filed 06/07/18     Page 14 of 39 PageID #:  178



*FIG. 3*

*FIG. 4*

Case 2:18-cv-00245-JRG   Document 1-5   Filed 06/01/18   Page 15 of 29 PageID #: 178



Background of image 286

Check data 289

Amount of image at grayscale level

0          Grayscale level          255

280

**FIG. 5**



Login 325

Instructions 330

Software Call(s) 310

Image File 335

Camera 207

Image File 315

Client 320

Process Confirmation 340

Server 322

Deposit Confirmation 345

300

**FIG. 6**

Appx258

Case 2:20-cv-00245-JRG   Document 1-5   Filed 06/07/19   Page 16 of 20 PageID #:  180



*FIG. 7*

Case 2:20-cv-00245-JRG   Document 1-5   Filed 06/07/19   Page 17 of 39 PageID #:  187



810    Receive request for access

820    Initialize software object on camera

830    Monitor image in field of view of camera with respect to monitoring criteria (e.g., light contrast, light brightness, positioning, dimensions, tolerances, character spacing, skewing, warping, corner detection, MICR line detection, etc.)

840    Provide feedback to user regarding image

850    Capture image when image passes monitoring criteria

860    Transmit image

870    Receive image; process image; process check; deposit funds into account

800

**FIG. 8**

Appx260

User receives and endorses check
910
Open communication pathway between user and institution
920
User requests to deposit check
930
Receive, at institution system from camera, image in field of view of camera
940
Analyze image in field of view of camera with respect to monitoring criteria; provide feedback to user
950
Create digital image of check when image passes monitoring criteria
960
Upload digital image to institution; provide secondary data, if any, to institution
970
Institution receives digital image and processes digital image; processes check; deposits funds into account
980

900

*FIG. 9*

**U.S. Patent**    Mar. 10, 2015    Sheet 8 of 8    US 8,977,571 B1



1000

*FIG. 10*

US 8,977,571 B1

**1**

## SYSTEMS AND METHODS FOR IMAGE MONITORING OF CHECK DURING MOBILE DEPOSIT

### BACKGROUND

Checks typically provide a safe and convenient method for an individual such as a payor to transfer funds to a payee. To use a check, the individual usually opens a checking account, or other similar account, at a financial institution and deposits funds, which are then available for later withdrawal. To transfer funds with a check, the payor usually designates a payee and an amount payable on the check. In addition, the payor often signs the check. Once the check has been signed, it is usually deemed negotiable, meaning the check may be validly transferred to the payee upon delivery. By signing and transferring the check to the payee, the payor authorizes funds to be withdrawn from the payor's account on behalf of the payee.

While a check may provide a payor with a convenient and secure form of payment, receiving a check may put certain burdens on the payee, such as the time and effort required to deposit the check. For example, depositing a check typically involves going to a local bank branch and physically presenting the check to a bank teller. To reduce such burdens for the payee, systems and methods have been developed to enable the remote deposit of checks. For example, the payee may capture a digital image of a check using a mobile device. The financial institution may then receive from the payee the digital image of the check. The financial institution may then use the digital image to credit funds to the payee. However, such a technique requires the efficient and accurate detection and extraction of the information pertaining to a check in the digital image. Capturing a digital image at a mobile device that allows for subsequent detection and extraction of the information from the digital image is difficult.

### SUMMARY

An image of a check that is in the field of view of a camera is monitored prior to the image of the check being captured. The camera is associated with a mobile device. The monitoring may be performed by the camera, the mobile device, and/or a financial institution that is in communication with the mobile device. When the image of the check in the field of view passes monitoring criteria, an image may be taken by the camera and provided from the mobile device to a financial institution. The check may be deposited in a user's bank account based on the image. Any technique for sending the image to the financial institution may be used.

In an implementation, the image capture may be performed automatically by the camera, the mobile device, and/or the financial institution as soon as the image of the check is determined to pass the monitoring criteria. In an implementation, feedback may be provided to the user of the camera regarding the image of the check in the field of view. The user may reposition the check and/or the camera, for example, responsive to the feedback. Alternatively, the user may capture an image of the check responsive to the feedback.

This summary is provided to introduce a selection of concepts in a simplified form that are further described below in the detailed description. This summary is not intended to identify key features or essential features of the claimed subject matter, nor is it intended to be used to limit the scope of the claimed subject matter.

### BRIEF DESCRIPTION OF THE DRAWINGS

The foregoing summary, as well as the following detailed description of illustrative embodiments, is better understood

**2**

when read in conjunction with the appended drawings. For the purpose of illustrating the embodiments, there are shown in the drawings example constructions of the embodiments; however, the embodiments are not limited to the specific methods and instrumentalities disclosed. In the drawings:

FIG. 1 is a block diagram of an implementation of a system in which example embodiments and aspects may be implemented;

FIG. 2 shows a high-level block diagram of an implementation of a system that may be used for the deposit of a check;

FIG. 3 is a diagram of an example image comprising a check image, a background image, and feedback;

FIG. 4 is a diagram of an example image divided into segments that may be used for monitoring the image;

FIG. 5 is a diagram of an example histogram for a segment of an image comprising check data and background data;

FIG. 6 shows a data flow diagram of a system for the deposit of a check, in accordance with an example embodiment;

FIG. 7 shows a block diagram of a client apparatus and a server apparatus for the deposit of a check, in accordance with an example embodiment;

FIG. 8 is an operational flow of an implementation of a method that may be used for deposit of a check using image monitoring of the check;

FIG. 9 is an operational flow of another implementation of a method that may be used for deposit of a check using image monitoring of the check; and

FIG. 10 is a block diagram of an example computing environment in which example embodiments and aspects may be implemented.

### DETAILED DESCRIPTION

In the following detailed description of example embodiments, reference is made to the accompanying drawings, which form a part hereof and in which is shown, by way of illustration, specific embodiments in which the example methods, apparatuses, and systems may be practiced. It is to be understood that other embodiments may be used and structural changes may be made without departing from the scope of this description.

FIG. 1 is a block diagram of an implementation of a system 100 in which example embodiments and aspects may be implemented. System 100 may include an account owner, referred to herein as a user 102, and financial institutions 130, 140, and 150, which may be any type of entity capable of processing a transaction involving a negotiable instrument. For example, financial institutions 130, 140, and 150 may be a retail bank, an investment bank, an investment company, a regional branch of the Federal Reserve, a clearinghouse bank, and/or a correspondent bank.

A negotiable instrument typically includes a type of contract that obligates one party to pay a specified sum of money to another party. Negotiable instrument as used herein is an unconditional writing that promises or orders payment of a fixed amount of money. One example of a negotiable instrument is a check. The check may be taken by the receiving party and deposited into an account at a financial institution of the receiving party. The receiving party may endorse the check and then present it for deposit at a bank branch, via an automated teller machine (ATM), or by using remote deposit. Other examples of negotiable instruments include money orders, cashier's checks, drafts, bills of exchange, promissory notes, and the like. A money order is a trusted financial instrument that is a payment order for a pre-specified amount of money. A cashier's check (also known as a bank check,

US 8,977,571 B1

3

official check, teller's check, bank draft or treasurer's check) is a check guaranteed by a bank and may be purchased from a bank.

The user 102 may be an individual or entity who owns account 160 that may be held at financial institution 130. Account 160 may be any type of deposit account for depositing funds, such as a savings account, a checking account, a brokerage account, and the like. The user 102 may deposit a check 108 or other negotiable instrument in the account 160 either electronically or physically. The financial institution 130 may process and/or clear the check 108 or other negotiable instrument. The user 102 may communicate with financial institution 130 by way of communications network 120 such as an intranet, the Internet, a local area network (LAN), a wide area network (WAN), a wireless fidelity (WiFi) network, a public switched telephone network (PSTN), a cellular network, a voice over Internet protocol (VoIP) network, and the like. The user 102 may communicate with financial institution 130 by phone, email, instant messaging, text messaging, web chat, facsimile, mail, and the like. Financial institutions 130, 140, and 150 also may communicate with each other by way of communications network 120.

In an implementation, the user 102 may receive payment from another individual such as a payor in the form of a check 108 or other negotiable instrument that is drawn from account 170 at financial institution 150. The user 102 may endorse the check 108 (e.g., sign the back of the check 108) and indicate an account number on the check 108 for depositing the funds. It is noted that although examples described herein may refer to a check, the techniques and systems described herein are contemplated for, and may be used for, deposit of any negotiable instrument. Similarly, the techniques and systems described herein are contemplated for and may be used with any form or document whose image may be captured with a camera or other imaging device of a mobile device for subsequent storage and/or processing.

As described further herein, a digital image of a check or other negotiable instrument may be provided from a user to a financial institution, and the digital image may be processed and funds associated with the check or negotiable instrument in the digital image may be deposited in a user's bank account. The user 102 may deposit the check 108 into account 160 by making a digital image of the check 108 and sending the image file containing the digital image to financial institution 130. For example, after endorsing the check 108, the user 102 may use a mobile device 106 that comprises a camera to convert the check 108 into a digital image by taking a picture of the front and/or back of the check 108. The mobile device 106 may be a mobile phone (also known as a wireless phone or a cellular phone), a personal digital assistant (PDA), or any handheld computing device, for example. Aspects of an example mobile device are described with respect to FIG. 10.

To increase the likelihood of capturing a digital image of the check 108 that may be readable and processed such that the check 108 can be cleared, the image is monitored for compliance with one or more monitoring criteria, prior to the image of the check 108 being captured. The monitoring criteria may be directed to proper lighting and/or framing of the check 108 in an image of the check 108 that will be captured and presented for clearing of the check 108. An application may monitor whether the check 108 is sufficiently within the frame of the camera and has a high enough quality for subsequent processing. The monitoring is performed with respect to the image as it appears in the field of view of the camera of the mobile device 106. The field of view is that part of the world that is visible through the camera at a particular

4

position and orientation in space; objects outside the field of view when the image is captured are not recorded in the image. The monitoring criteria may be based on one or more of light contrast on the image, light brightness of the image, positioning of the image, dimensions, tolerances, character spacing, skewing, warping, corner detection, and MICR (magnetic ink character recognition) line detection, as described further herein. In an implementation, one or more histograms may be determined using the image being monitored. The histograms may be used in conjunction with monitoring criteria, as described further herein.

The monitoring may be performed by the camera, the mobile device 106, and/or a financial institution that is in communication with the mobile device 106. When the image of the check 108 in the field of view passes the monitoring criteria, an image may be taken by the camera and provided from the mobile device 106 to a financial institution. By ensuring that the image of the check passes monitoring criteria during pre-image capture monitoring, the number of nonconforming images of checks is reduced during presentment of the images to a financial institution for processing and clearing. In an implementation, feedback may be provided to the user 102 regarding the image of the check in the field of view. Based on the feedback, the user 102 may reposition the check 108 and/or the camera, for example, or may capture an image of the check 108.

In an implementation, the image capture may be performed automatically by the camera, the mobile device 106, and/or the financial institution as soon as the image of the check 108 is determined to pass the monitoring criteria. Alternatively, the user 102 may manually instruct the camera to perform the image capture (e.g., by pressing a button the camera or the mobile device 106) after the user 102 receives an indication or other feedback that the image passes the monitoring criteria.

In an implementation, the user 102 may send the digital image(s) to financial institution 130 using the mobile device 106. Any technique for sending a digital image to financial institution 130 may be used, such as providing a digital image to a website associated with financial institution 130 from storage, emailing a digital image to financial institution 130, or sending a digital image in a text message or instant message, for example.

Financial institution 130 may receive a digital image representing the check 108 and may use any known image processing software or other application(s) to obtain the relevant data of the check 108 from the digital image. Financial institution 130 may determine whether the financial information associated therewith may be valid. For example, financial institution 130 may include any combination of systems and subsystems such as electronic devices including, but not limited to, computers, servers, databases, or the like. The electronic devices may include any combination of hardware components such as processors, databases, storage drives, registers, cache, random access memory (RAM) chips, data buses, or the like and/or software components such as operating systems, database management applications, or the like. According to an embodiment, the electronic devices may include a network-based server that may process the financial information and may receive the digital image from the user 102.

The electronic devices may receive the digital image and may perform an analysis on the quality of the digital image, the readability of the data contained therein, or the like. For example, the electronic devices may determine whether the account number, amount payable, and the like may be readable such that it may be parsed or otherwise obtained and processed by the financial institution to credit an account 160

US 8,977,571 B1

**5**

associated with the user 102 and debit an account associated with the payor. In an implementation, a representative 135 of financial institution 130 may provide assistance to the user 102 and may provide assistance in determining whether the financial information may be readable and/or of a good enough quality to be processed.

Upon receipt and approval of the digital image, financial institution 130 may credit the funds to account 160. Financial institution 130 may clear the check 108 by presenting a digital image of the check 108 captured from the digital image to an intermediary bank, such as a regional branch of the Federal Reserve, a correspondent bank, and/or a clearinghouse bank. For example, the check 108 may be cleared by presenting the digital image to financial institution 140, which may be a regional branch of the Federal Reserve, along with a request for payment. Financial institutions 130 and 150 may have accounts at the regional branch of the Federal Reserve. Financial institution 130 may create a substitute check using the image provided by the user 102 and present the substitute check to financial institution 140 for further processing. Upon receiving the substitute check, financial institution 140 may identify financial institution 150 as the paying bank (e.g., the bank from which the check 108 is drawn). This may be accomplished using a nine digit routing number located on the bottom left hand corner of the check. A unique routing number is typically assigned to every financial institution in the United States. Financial institution 140 may present the substitute check to financial institution 150 and request that the check be paid. If financial institution 150 verifies the check (i.e., agrees to honor the check), financial institution 140 may then settle the check by debiting funds from financial institution 150 and crediting funds to financial institution 130. Financial institution 150 may then debit funds from account 170.

It will be appreciated that the preceding examples are for purposes of illustration and explanation only, and that an embodiment is not limited to such examples. For example, financial institution 150 may be a correspondent bank (i.e., engaged in a partnership with financial institution 130). Thus, financial institution 130 may bypass the regional branch of the Federal Reserve and clear the check directly with financial institution 150. In addition, account 160 and account 170 may both be held at financial institution 130, in which case the check 108 may be cleared internally.

In an implementation, the mobile device 106 may comprise a video source such as a video camera, a web camera, or a video-enabled phone, for example, to obtain a video of the check 108. A frame of the video may be obtained and monitored with respect to monitoring criteria, as described further herein. The mobile device 106 and/or the institution may obtain the frame and monitor the frame, depending on an implementation. Generation of a live video of a check 108 is not limited to a video camera, a web camera, and a video-enabled phone, and it is contemplated that any device that is capable of generating a live video may be used to make a video of the check 108 which may be monitored in real-time with respect to monitoring criteria. Additional devices that may be used in the generation and/or transmission of a live video include a web-enabled video computing device, a mobile phone, a camcorder, and a computer camera, for example.

FIG. 2 shows a high-level block diagram of an implementation of a system 200 that may be used for the deposit of a check, such as the check 108. As described further herein, the user 102 may deposit the funds of the check 108 using the camera functionality in the mobile device 106. In the example of one person giving a check to another person, this would

**6**

enable the receiving party to deposit the funds at that time, without physically visiting an ATM or a bank branch.

In an implementation, the mobile device 106 may comprise a camera 207, such as a digital camera. Such a mobile device may be called a camera phone. The mobile device 106, through the camera 207, has the ability to take or capture a picture or digital image of the check 108 or other negotiable instrument. The camera 207 may take an image of the front of the check 108. Alternatively, the camera 207 may take an image of both the front and the back of the check 108. The back of the check may provide endorsement verification, such as the signature of the person or party the check is made out to.

In an implementation, prior to an image in the field of view of the camera 207 being captured by the camera 207, the image may be monitored with respect to monitoring criteria, e.g., using a software application running on the mobile device 106. Feedback based on the monitoring of the image may be provided to the user 102 to assist the user 102 in positioning the check 108 so that the image of the check 108 may be captured in such a manner that it may be more easily processed and cleared during subsequent operations, such as those involving one or more financial institutions.

A depository 204 may include a bank in which the user 102 has a deposit account; however, the present disclosure is not limited to just banks. Alternatively, a third party may act as the depository 204 providing functionality to a plurality of users without regard to the bank at which they have deposit accounts, or whether their individual bank allows for the methods and systems described herein. The depository 204, in an implementation, after receiving the image(s) of the check 108 from the user 102, may use a clearinghouse 210 to perform the check clearing operations. As described with respect to the system 100 of FIG. 1, check clearing operations are used by banks to do the final settlement of the check 108, such as removing funds from the account of the payor and transferring those funds to the user's bank. The user's bank may choose to make the funds available to the user 102 immediately and take on the risk that the check 108 does not clear. However, for various reasons, the bank may only make those funds available to the user 102 after the check 108 finally clears.

In an implementation, the user 102 may place the check 108 on a background and generate a digital image comprising an image of the check (e.g., a check image) and a portion of the background (e.g., a background image) using the camera 207. Any background may be used, although a dark background or a consistently colored background may provide more optimal results. It is noted that although examples and implementations described herein may refer to a check image and check data, the term "check image" may refer to any foreground image in a digital image (as opposed to the background image) and the term "check data" may refer to any foreground data in a digital image (as opposed to background data). Thus, the "check image" and the "check data" may refer to the foreground image and foreground data in implementations involving any negotiable instrument, form, or document.

In an implementation, the image being monitored in the field of view of the camera 207 comprises check data and background data. The check data pertains to the check image and the background data pertains to the background image (e.g., the background on which the check image is disposed).

FIG. 3 is a diagram of an example image 230 comprising a check image 247, a background image 250, and a feedback indicator 235 providing feedback to the user 102. The image 230 may be generated by an imaging device associated with the mobile device 106, such as the camera 207. An edge 245

US 8,977,571 B1

7

separates the check image 247 from the background image 250. The edge 257 may be detected using any known technique(s). The image 230 may be provided in the field of view of the camera 207 prior to and during image capture of the check 108. The user 102 may adjust the camera 207, the check 108, and/or any light source so that the image 230 passes one or more monitoring criteria. For example, a light source from a specific angle can lead to poor light contrast. Light contrast may be a monitoring criterion, and poor light contrast may be corrected easily by moving the lens of the camera 207 to a different perspective, thereby allowing the image to pass the monitoring criterion.

Feedback regarding the image 230 in the field of view with respect to the monitoring criteria may be generated and provided to the user 102. In an implementation, the feedback may be provided visually, such as by text (e.g., "go closer", "go farther", "move the check to the right", "put the check on a darker background", "tilt the camera down", "take the picture now", etc.), arrows, or other visual indicators or cues (e.g., green lights, red lights, etc.) overlaid on the image 230, shown as feedback indicator 235. Alternatively or additionally, feedback may be provided to the user 102 aurally, such as through a speaker associated with the mobile device 106. The feedback may advise the user 102 to move the camera 207 or the check 108 or adjust the lighting or the background, for example. The feedback may also advise the user 102 when the image 230 passes the one or more monitoring criteria and to capture the image of the check 108.

One of the monitoring criteria may be based on the positioning of the check 180 in the image 230. The positioning of the check 108 may be determined from the image 230 and compared with predetermined dimensions (e.g., of a typical personal check, of a typical business check) and tolerances. If the dimensions are within a certain acceptable tolerance, then it may be determined that the check 108 is properly positioned. Such feedback may be generated and provided to the user 102.

In an implementation, the positioning of the check 108 in the image 230 may be compared with an alignment guide (which may or may not be visible to the user 102 in the field of view of the camera 207). For example, measurements may be made by a processor in the camera 207, the mobile device 106, or a computing device at the financial institution to determine the check's position with respect to the alignment guide. The measurements may be compared to predetermined measurements or values to determine whether the check's positioning in the image 230 is proper or sufficient for further processing of the image 230. Edge detection and/or corner detection may be used in such measurements (e.g., in measuring the distance from the check 108 in the image 230 to the alignment guide). Any known technique(s) for edge detection and/or corner detection may be used. In an implementation, corner detection itself may be a monitoring criterion, such that if corner detection of the check 108 in the image 230 is achieved, then it may be concluded that the image 230 may be properly processed and cleared by a depository (i.e., the image 230 passes the monitoring criterion).

The alignment guide may be overlaid on the camera feed of the mobile device 106, in an implementation. The alignment guide may take any shape such as a bounding rectangle or other bounding box or shape, horizontal and/or vertical bars, parallel lines, etc., for example. With a bounding rectangle, for example, used as the alignment guide, aligning the check 108, thereby passing this monitoring criterion, means enclosing the check 108 within the bounding rectangle. If the check 108 is outside of the alignment guide in the image 230, feedback may be generated and provided to the user 102

8

regarding this monitoring criterion with instructions for moving the check 108 or the camera 207 in order to properly align the check 108 in the field of view.

The operator of the camera 207 may introduce distortions in the image due to a perspective problem, specifically an angling of the camera vertically over the check, and the top of the check is smaller than the bottom, or the reverse. Monitoring criteria may be directed to determining whether the image is skewed or warped. Skewing occurs when the check 208 is rotated from the horizontal in the image 230. By measuring the distance from the edge(s) of the check 208 in the image to an alignment guide or the edge of the field of view, it may be determined whether the check 208 is skewed (e.g., by comparing the distances to one another, by comparing the distances to predetermined values, etc.). If skewing is present in the image 230, feedback may be generated and provided to the user 102 with instructions for moving the check 108 or the camera 207 in order to properly align the check 108 in the field of view with respect to the horizontal.

Warping, as used herein, is meant to denote that the check 108 is tilted forward or back with respect to a plane that is perpendicular to a line drawn from the camera lens to the center of the check 108. Warping, or tilting, of the image may lead to incorrect optical detection of the check 108. In an implementation, a processor in the camera 207, the mobile device 106, or a computing device at the financial institution may determine whether warping is present in the image, and if so, may generate and provide feedback to the user 102. Such feedback may comprise instructions to the user 102 for moving the check 108 or the camera 207 such that the check 108 would appear to be perpendicular to an imaginary line drawn from the center of the camera lens to the center of the check 108 itself (e.g., dewarping instructions).

If user involvement is tolerated, the user may be queried to supply or identify one or more corners of the check 108 in the image 230. The perimeter of the check 108 may be determined using this information. Additionally, this information may be used for monitoring the image 230 for distortions.

In an implementation, a monitoring criterion may be whether the MICR line can be detected and/or read. Any known MICR line detection technique(s) may be used by the camera 207, the mobile device 106, and/or the financial institution (e.g., using an image processor, for example) to detect the MICR line on the check 108 in the image 230. If the MICR line can be detected, it may be determined that the image 230 may be captured and sent to the financial institution for processing and clearing of the check 108 (i.e., the image passes the monitoring criterion directed to MICR line detection). If the MICR line cannot be detected, feedback may be provided to the user 102, such as to reposition the check 108 and/or the camera 207 (i.e., the image fails to pass the monitoring criterion, perhaps because the image is out focus or the lighting is inadequate, for example).

In an implementation, spacing between certain characters, points, or features (e.g., MICR number, "S" sign, signature line, courtesy amount line, legal amount line, etc.) may be determined and used as a monitoring criterion. For example, if the MICR line can be detected, then the spacing between the numbers in the MICR line may be determined using any known measuring and/or image processing technique(s). If the spacing is outside of a certain range corresponding to valid spacing between number in a MICR line, then it may be determined that the image 230 may be not properly processed if captured by the camera 207. In such a case, feedback may be generated and provided to the user 102, such as to reposition the check 108 and/or the camera 207.

US 8,977,571 B1

9

Another monitoring criterion may be based on the light in the image 230, such as the light contrast and/or light brightness found on the image 230, such as in various regions of the image 230. For example, if the light contrast between the check image 247 and the background image 250 is less than a predetermined amount, then it may be determined that the image 230 may be not properly processed if captured by the camera 207. In such a case, instead of capturing the image 230, feedback may be generated and provided to the user 102 to adjust the camera 207, the check 108, and/or the lighting in order to bring the image 230 into compliance with the monitoring criteria.

As another example, the light brightness on various regions of the image may be determined and compared to each other and/or may be compared to a predetermined threshold. If the difference between the light brightness of the various regions is less than a predetermined amount (e.g., the light brightness does not vary significantly among the regions) or if the light brightness is less than a predetermined threshold, then it may be determined that the image 230 may be properly processed if captured by the camera 207. Otherwise, feedback may be generated and provided to the user 102 to adjust the camera 207, the check 108, and/or the lighting in order to change the light brightness on the image 230.

In an implementation, one or more histograms may be generated based on the image 230 and used in the determination of light contrast and/or light brightness monitoring criteria. A histogram is a well known graph and may be used to display where all of the brightness levels contained in an image are found, from the darkest to the brightest. These values may be provided across the bottom of the graph from left (darkest) to right (brightest). The vertical axis (the height of points on the graph) shows how much of the image is found at any particular brightness level.

Histograms may be used to monitor whether the light on the image 230 is uniform, not too bright, etc. For example, the mobile device 106 can monitor the histogram of the image 230 to ensure that there is a large contrast between the background image 250 and the check image 247. Feedback may be provided to the user 102 as to how to move or adjust the camera, lighting, etc. in order to get a good image for subsequent processing (i.e., how to get an image that passes the monitoring criteria).

In an implementation, the image 230 may be divided into segments, such as those shown in FIG. 4. FIG. 4 is a diagram of the example image 230 of FIG. 3 divided into segments 260, 265, 270, 275 that may be used for monitoring the image 230. Although four segments are shown in FIG. 4, any number of segments may be used with techniques described herein. Although the segments 260, 265, 270, 275 are formed by dividing the image 250 into quadrants, the segments may be formed by any techniques, take any shape, and have any area, subject to a constraint that each segment comprises a portion of the check data 247 and a portion of the background data 250 separated by a portion of the edge 245. In this manner, distinct areas of density corresponding to the background of the image and the check data of the image may be provided in a histogram.

FIG. 5 is a diagram of an example histogram 280 for a segment of an image comprising check data and background data. The horizontal axis of the histogram 280 represents the grayscale level between 0 and 255, where 0 represents true black and 255 represents true white. The vertical axis represents the amount of the image at a particular grayscale level of the horizontal axis. Any known technique for generating a histogram for an image (such as a grayscale image of the image 230) may be used. The histogram 280 shows two

10

distinct areas of density (i.e., two distinct density distributions). The density area 286 closer to the grayscale level of zero corresponds to the background of the image, and the density area 289 closer to the grayscale level of 255 corresponds to the check data.

The density distribution for each segment (or for the entire image 230) may be analyzed to determine whether the light contrast and/or light brightness is appropriate for processing and clearing of the check 108 in the image 230 (and thus passes that monitoring criterion) or whether the light contrast and/or light brightness does not pass the monitoring criterion and the camera 207, the check 108, and/or the light source should be adjusted or repositioned. For example, the density distributions for the segments may be compared with each other and/or may be compared to predetermined values or levels. If the differences are less than a predetermined difference amount, such as less than 1 percent different, less than 5 percent different, etc., then the image 230 may be captured and sent to the financial institution for processing. Otherwise, feedback may be generated and provided to the user 102 to reposition the camera 207, the check 108, and/or the light source.

When the image 230 passes the monitoring criteria (e.g., is positioned properly with respect to an alignment guide, is not warped, is not skewed, has adequate light brightness and/or light contrast, etc.), the image 230 may be captured either automatically (e.g., by the camera or the mobile device under direction of an application running on the camera 207 or the mobile device 106 or the financial institution) or manually (e.g., by the user 102 pressing a button or making a selection on the camera 207 or the mobile device 106). The digital image thus captured may be provided from the mobile device 106 to a financial institution. The check 108 may be deposited in a user's bank account based on the digital image. Any technique for sending the digital image to the financial institution may be used.

FIG. 6 shows a data flow diagram 300 of a system for the deposit of a check, in accordance with an example embodiment. In the data flow diagram 300, a client 320 is one example of the mobile device 106 of the user 102 described with respect to the systems 100 and 200 of FIGS. 1 and 2, respectively. In an implementation, a server 322 may be a software component operable by the depository 204 of FIG. 2. The client 320 may log in to a remote deposit system executed on the server 322. The login 325 may serve to authenticate the user 102 as an authorized consumer of the depository 204.

The server 322, in one example, may send instructions 330 to the client 320 that execute an application on the client 320. This may include instructions that cause a software object, which may have been previously downloaded and installed (e.g., pre-installed) on the client 320, to be executed on the client 320. The software object may analyze the image in the field of view of a digital camera (e.g., the image 230 shown in the field of view of the camera 207 associated with the mobile device 106) with respect to one or more monitoring criteria and may generate and provide feedback to the user regarding the monitoring criteria and/or instructions for capturing an image of the check 108.

In another example, the instructions 330 may include a wholly self-contained application that when delivered to the client 320 will execute and perform one or more operations described herein, such as those directed to analyzing the image in the field of view of the camera 207 with respect to monitoring criteria and providing feedback to the user 102. In either example, the software object may be configured to make one or more software calls 310 to the camera 207. This

US 8,977,571 B1

11

may be through specific software instructions to the camera 207. In other words, the camera's functionality may not be abstracted through any software library. In such an example, software code may be written and delivered to every different camera-equipped mobile phone.

In an alternate example, the software object may operate through a software abstraction layer, such as an application programming interface (API). The software object developer may only insert code into the software object to call one or more APIs exposed by the software operating the mobile device 106. One example of such software is Windows Mobile by Microsoft Corporation. In the context of a Windows Mobile device, the Windows Mobile operating system (OS) has one or more APIs exposed to application developers that will translate instructions from applications into instructions operable by the camera 207 on the mobile device 106. A mobile operating system, also known as a mobile platform or a handheld operating system, is the operating system that controls a mobile device. Other mobiles OSs include Symbian OS, iPhone OS, Palm OS, BlackBerry OS, and Android.

The software object may cause the camera 207 to analyze an image in the field of view with respect to monitoring criteria, provide feedback, and/or take a picture or capture one or more images of the check 108 being deposited. These images may be captured sequentially, e.g., pursuant to the user 102 flipping the check 108 over after an image of the front of the check 108 has been captured after passing the monitoring criteria. However, each side of the check 108 may be captured by the camera 207 using similar API calls. The images may be stored in an image file 315.

Once the images of one or both sides of the check 108 pass the monitoring criteria and are captured by the camera 207, the image file 315 may be operated on by the software object of the client 320. These operations may include any of the following: deskewing, dewarping, magnetic ink character recognition, cropping (either automatically, or having the user 102 manually identify the corners and/or edges of the check 108 for example), reducing the resolution of the image, number detection, character recognition, and the like.

With respect to number and character recognition, commercial check scanners have used characteristics of the MICR encoding to detect information about the check, such as the bank's routing number and the account number. However, the characteristics that these scanners have used are the magnetic characteristic of the ink itself and these scanners have used methods similar to those of magnetic audio tape readers. In an implementation, a software object of the client 320 may optically recognize the characters on the MICR line, as a consumer mobile device such as the mobile device 106 will lack the magnetic reading ability of a commercial check scanner.

The image may be also down converted into a grayscale or black and white image, such as either in Joint Photographic Experts Group (JPEG) compliant format or in tabbed image file format (TIFF) for example. In an alternate example, the image may be formatted as a Scalable Vector Graphics (SVG) image. One of the benefits of an SVG file is a large size advantage over JPEG. In the former example, the image at some point before entry into the clearing system may be converted to TIFF format. This may be performed at the mobile device 106, wherein the camera 207 captures the image in TIFF format. However, the camera 207 of the mobile device 106 may capture the image in JPEG format, which may then be converted into TIFF either at the mobile device 106 or at the server 322. In the latter example, this may use the transmission of the TIFF image across a communications

12

network which may be more advantageous as TIFF images are typically smaller in file size for the same size of picture as a JPEG formatted image.

The software object on the client 320 may operate by performing one or more of the operations described herein and then transmitting an image file 335 (e.g., based on image file 315 that has been processed) to the server 322 after the user 102 confirms that they do wish to deposit the check 108. Alternately, the software object may capture the image of the check 108 and transmit that image to the server 322 that in turn may perform those operations, verifies that the image quality is within acceptable thresholds, and communicates that verification back to the client 320, which can then instruct the user 102 to take a picture of the other side of the check 108. In this example, the image transmitted to the server 322 may be in any format, such as JPEG or TIFF, insofar as the server software has the ability to convert that image into a Check 21 compliant format. Alternately, the bank may output an X9.37 file to the clearing system. The Check Clearing for the 21st Century Act (or Check 21 Act) is a United States federal law that allows the recipient of a paper check to create a digital version, thereby eliminating the need for further handling of the physical document. The Check 21 standard for electronic exchange is defined in the standard DSTU X9.37-2003 ("X9.37"). It is a binary interchange format.

The server 322 may confirm (e.g., using a process confirmation 340) with the user 102 the transmission, reception, and processing of each side of the check 108 separately, or may confirm both sides at the same time. On the server side, more operations may be performed, such as signature verification. Where to perform these operations may be determined by the processing power of the mobile device 106 itself, which is typically limited in computational power. However, the present discussion is not limited in any way by discussion of where certain operations are described as operating. The operations of detecting and verifying information may be performed by the client 320 before the information is transmitted along with the image in the image file 335 to the server 322. Alternately, the software object(s) operating on the mobile device 106 may perform no operation other then capturing images of the front and back of the check 108 after passing the monitoring criteria, receiving confirmation that the user 102 wishes to proceed, and transmitting those images to the server 322, wherein the server 322 performs those operations.

In an implementation, after the image file 335 has been received by the server 322, the server 322 may send a process confirmation 340 to the client 320. The process confirmation 340 may request instructions from the client 320 to continue proceeding with the deposit now that the server 322 has received the image file 335. In response, the client 320 may send a deposit confirmation 345 to the server 322, instructing the server 322 to process the deposit of the check based on the image file 335 that had been received by the server 322.

FIG. 7 shows a block diagram of a client apparatus 450 and a server apparatus 570 for the deposit of a check, in accordance with an example embodiment. The client apparatus 450 may include one or more software objects operating on a mobile device 106, such as described above. The client apparatus 450 may include a communications module 452, a check processing module 454, and an image monitoring and capture module 456. The client apparatus 450 may receive, in one example, one or more check images 458 as an input and output one or more processed images 460.

In an implementation, the check images 458 may be received following a software call from the check processing module 454 to the image monitoring and capture module 456.

US 8,977,571 B1

13

In such an implementation, the image monitoring and capture module **456** may include the camera **207** contained within the mobile device **106**. Alternately, the camera **207** may be detachably coupled to the mobile device **106** such as through a secure digital (SD) slot or over any suitable communications bus, such as USB (universal serial bus).

In an implementation, the image monitoring and capture module **456** may obtain an image and send the image to a financial institution (e.g., financial institution **130**, the server **322**, the server apparatus **570**, etc.) for processing. In an implementation, the client apparatus **450** may comprise a browser such as a web browser, for accessing a website on the Internet or other network associated with a financial institution. The user may access the website and select a "monitor and capture image" link or similar icon, button or link, for example, displayed on the browser. Such a selection may call the image monitoring and capture module **456** on the client apparatus **450**.

The communications module **452** may be configured, in one example, to receive and send data signals over a suitable communications network. This may include, without limitation, GSM/GPR3, HSDPA, CDMA, TDMA, 802.11, 802.16 and the like. While the bandwidth available to the mobile device **106** may be an implementation concern such discussion is outside the scope of the present discussion and any suitable wireless communications network is considered to be within the scope of the present discussion. With respect to the present discussion, the communications module **452** may receive one or more processed check images **460** from the check processing module **454** and may transmit them over the suitable communications network to the depository **204**, as described herein.

The check processing module **454** may be configured, in one example, to cause the image monitoring and capture module **456** to monitor an image of at least one side of a check provided in a field of view of the camera **207** and then capture the image after it passes monitoring criteria. Compliance with the monitoring criteria is intended to ensure that the image of the check is suitable for one or more processing tasks. For instance, if the check is rotated 45 degrees clockwise when captured, the check processing module **454** or a software object operated on the server **322** described above may be unable to optically detect information on the check.

The check processing module **454** may perform one or more cleaning or processing operations on the captured image of the check. Such cleaning or processing may include dewarping and/or deskewing (if not part of the monitoring criteria, in an implementation), for example. Cleaning or processing may include down-converting the image received from the image capture module to a suitable size, such as 200 dots per inch (DPI) resolution or in a resolution range such as 200 DPI to 400 DPI, 300 DPI to 500 DPI, etc., and/or converting the image to grayscale or black and white. Such operation(s) may reduce the file size of the check image. Alternatively, the check processing module **454** may send instructions to the image monitoring and capture module **456** to cause the image monitoring and capture module **456** to capture an image of the check at a suitable resolution. The check processing module **454** may additionally perform any of the following operations, in further examples: convert from JPEG to TIFF, detect check information, perform signature detection on the image of the check, and the like. The check processing module **454** may, alternatively, send the captured check image to the server described herein for such processing, and receive confirmation that the operations were completed before further operations can proceed.

14

The size of the file sent between the mobile device and the server may be small. This runs counter with respect to automatic check detection against a background. If captured in color, the contrast between check and background becomes easier. However, the processed image sent over the communications network may need to be smaller, and if the detection operation is performed by the server, it may be advantageous to convert the captured image to grayscale, or even black and white, before transmission to the server. Grayscale images are compliant with the Check 21 Act.

While "flat" is a fairly well known term to users, each user's appreciation of flat with respect to the camera lens of the camera **207** associated with the mobile device **106** may result in a problem with needing to align the check image programmatically or risk rejecting a large number of check images. As the image captured is a set of pixels, a tilted image will result in a jagged polygon rather than a perfect rectangle. Using convex hull algorithms, the check processing modules may create a smooth polygon around the boundary and remove the concavity of the check image. Alternatively, a rotating calipers algorithm may be used to determine the tightest fitting rectangle around the check boundary, which can then be used to determine the angle of it, with that angle being used to align the check properly.

The server apparatus **570** may include one or more software objects operating on a server operated by the depository **204**. Aspects of an example server apparatus are described with respect to FIG. **10**. The server apparatus **570** may include a communications module **572**, a check processing module **574**, and a check clearance module **576**. The server apparatus **570** may receive one or more processed images **460** from a mobile device **106** or a client apparatus **450** as an input and may output a file such as a Check 21 compliant file **578**. The Check 21 compliant file **578** may be a file or entry in a record set that is compliant with the clearinghouse rules set forth in the Check 21 Act and may include outputting an X9.37 file, in one example.

The communications module **572** may be configured to receive a wireless communication from the mobile device **106** over any suitable communications network, such as those described above. The communications module **572** may additionally receive a communication over a different communications network than the mobile device **106** communicated on, such as receiving the communication over a TCP/IP (Transmission Control Protocol/Internet Protocol) connection from the user's communication provider.

The check processing module **574** may be configured, in one example, to perform one or more check processing operations on the processed image(s) **460** that are received. In an implementation, these operations may include any of the operations described herein with respect to the check processing module **454**. The operation of signature verification may be performed by the check processing module **574** of the server apparatus **570** as the server apparatus **570** may interface with other systems of the depository **204** that may maintain previously verified signature samples of the user **102**. Performing signature verification at the client apparatus **450** may be computationally unfeasible; additionally, there may be a security risk if the signature sample is stored on the user's own device.

A cropped grayscale image may be sent to the server apparatus **570**. The server apparatus **570** may extract information via a TIFF conversion and determine the DPI and re-scale to the proper DPI (e.g., convert to TIFF and detect the DPI that was used in the grayscale image). In an implementation, DPI detection may run on the client apparatus **450**.

US 8,977,571 B1

15

The check clearance module **576** may be configured, in one example, to receive a file from the check processing module **574** and may communicate with a check clearinghouse such that a Check 21 compliant file may be delivered to the check clearinghouse and funds may be received by the depository **204**. The availability of the funds to the user **102** may be delayed by this operation such that the user **102** only has access to those funds when the depository **204** receives confirmation that the check has cleared.

FIG. **8** is an operational flow of an implementation of a method **800** that may be used for deposit of a check using image monitoring of the check. At **810**, a request for access may be received from a user (e.g., the user **102**). The user may request access to a deposit system operated by a depository (e.g., the depository **204**) by way of a mobile device (e.g., the mobile device **106**) such as a cellular phone, a PDA, a handheld computing device, etc. operated by the user. The access may be through some sort of user login, in some examples. The deposit system may be configured to receive a deposit of a negotiable instrument, such as a check, money order, cashier's check, etc. from the user and clear the negotiable instrument in a suitable clearinghouse system.

At **820**, the system may initialize a software object on the mobile device. This may include sending instructions to the mobile device intended to execute a previously installed (i.e., pre-installed) software object. Alternatively, the system may send a software object to the mobile device that may execute the software object, carry out operations described herein by use of the software object, and terminate the software object. In an implementation, the system may instruct a camera associated with the mobile device to monitor and capture an image of the negotiable instrument in conjunction with monitoring criteria.

The user may use the camera to obtain an image in the field of view of the camera, and at **830**, the image in the field of view of the camera may be monitored with respect to one or more monitoring criteria, such as those described above. The monitoring may be performed by the camera, the mobile device, and/or a computing device associated with the depository, for example. The monitoring may be performed pursuant to instructions received at the camera or mobile device from the deposit system operated by a depository, the server **322**, or the server apparatus **570**, for example. In an implementation, the results of the monitoring may indicate that the camera and/or the check should be repositioned and/or the light source should be adjusted prior to an image capture in order to capture an image of the check that may be processed properly, e.g., to have the data from the check obtained without error from the image, so that that check can be cleared.

At **840**, feedback based on the results may be generated and provided visually and/or aurally to the user via the camera and/or the mobile device. In an implementation, the feedback may be provided if the image fails to pass the monitoring criteria. The feedback may comprise instructions or guidance for the user to follow to obtain an image of the check in the field of view of the camera that will pass the monitoring criteria. Processing may continue at **830** with the image that is currently in the field of view of the camera (after the user has received and acted on the feedback) being monitored with respect to the monitoring criteria.

When the image in the field of view passes the monitoring criteria as determined at **830**, the image in the field of view may be captured by the camera at **850**. This may be accomplished through the software object accessing a camera associated with the mobile device (e.g., either comprised within the mobile device or separate from the mobile device). This may be done through an API exposed by the OS of the mobile

16

device, or may be through software code customized for a specific phone and specific camera. With respect to the former, a developer of the software object may write code to the camera API(s), which may be specific to the OS and without regard to the camera on the device. The user may initiate the capture of the image (e.g., by pressing a button on the camera or the mobile device) or the image may be captured automatically, without user intervention, as soon as the image in the field of view is determined to have passed the monitoring criteria. In this manner, the occurrence of non-conforming images downstream (e.g., at a depository or financial institution) is reduced, and there is a high confidence that the image will be properly processed downstream.

In an implementation, when the image in the field of view is determined to pass the monitoring criteria, feedback may be generated and provided to the user indicating so. The feedback may instruct the user to capture the image now (e.g., by pressing a button on the camera or mobile device) or may advise the user that the image has been captured, for example.

At **860**, the captured image may be transmitted to the depository, e.g. as a digital image file. At **870**, the depository may receive the image of the check (along with financial information pertaining to the account for depositing funds, for example) and may process the image. Processing of the digital image file may include retrieving financial information regarding the check. The financial information may comprise the MICR number, the routing number, an amount, etc. Any known image processing technology may be used, such as edge detection, filtering to remove imagery except the check image or check data in the received digital image file, image sharpening, and technologies to distinguish between the front and the back sides of check. The depository may identify and/or remove at least a portion of data that is extraneous to the check, such as background data.

After retrieving the financial information from the check in an electronic data representation form, the depository may determine whether the financial information such as the amount payable to the user, the account associated with the user to deposit funds, an account associated with a payor to debit funds, and an institution associated with the payor, etc., may be valid. For example, the depository may include electronic devices such as computers, servers, databases, or the like that may be in communication with each other. The electronic devices may receive an electronic data representation and may perform an analysis on the quality of the data representation, the readability of the data representation, or the like. For example, the electronic devices may determine whether the account number, amount payable, or the like may be readable such that they may be parsed and processed by the depository to credit an account associated with the user.

If the financial information is determined to be valid, the electronic data representation may be processed by the depository, thereby depositing the money in the user's account. If the financial information is determined to be invalid, then the user may be advised. For example, the depository may transmit an email, a web message, an instant message, or the like to the user indicating that the financial information associated with the electronic data representation may be invalid. The user may determine how to proceed by selecting an option on the web message, replying to the email, or the like.

Thus, in an implementation, instructions on how the user would like to proceed may be requested from the user, such as whether the user would like to try the deposit again (e.g., make another image of the check that pass the monitoring criteria and send it to the depository) or whether the user would like assistance from a representative, for example. The

Case 2:18-cv-00245-JRG   Document 1-5   Filed 06/07/18   Page 27 of 39 PageID #: 198

US 8,977,571 B1

17

user may indicate how they would like to proceed. If the user would like assistance, the financial information may be transferred to a representative for further review. The representative may review the financial information associated with the electronic data representation to determine whether to allow the electronic data representation to be processed by the depository. If so, the electronic data representation of the financial information may be processed by the depository, thereby depositing the check in the user's account. The depository may send a notice to the user via email, facsimile, instant message, or mail, for example, that the check has been deposited into the selected account.

FIG. 9 is an operational flow of another implementation of a method 900 that may be used for deposit of a check using image monitoring of the check. A user (e.g., the user 102) may receive and endorse a check (e.g., the check 108) at 910, and open a communication pathway with an institution (e.g., the financial institution 130) at 920. In an implementation, the user may open a communication pathway with the institution by logging into a website of the institution, for example. There may be several ways in which a communication pathway may be established, including, but not limited to, an Internet connection via a website of the institution. The user may access the website and log into the website using credentials, such as, but not limited to, a username and a password.

At 930, the user may send a request to deposit the check and may select an account in which to deposit the check. In an implementation, the user may select a "deposit check" option provided on the website, and may enter details such as check amount, date, the account the check funds should be deposited in, comments, etc.

At 940, an image in the field of view of the camera may be obtained and provided, via the communication pathway, to the institution. A still image may be provided or a video may be provided, such as a video stream generated by the camera.

At 950, the institution may receive the image or video stream and may analyze the image or a frame of the video stream with respect to one or more monitoring criteria, such as those described above. Feedback pertaining to the image with respect to the monitoring criteria may be generated and provided to the user over the communication pathway. Based on the feedback, the user may adjust the position the camera and/or the check and/or may adjust the light source until the image in the field of view of the camera is determined by the institution to pass the monitoring criteria.

When the image in the field of view passes the monitoring criteria, the image in the field of view may be captured (e.g., automatically without user intervention or pursuant to the user pressing a button) by the camera at 960, thereby creating a digital image of the check. In an implementation, the user may instruct the camera (e.g., by pressing a button on the camera or the mobile device) to create the digital image. In another implementation, the camera may automatically create the digital image as soon as the image of the check passes the monitoring criteria. In this manner, the user may point the camera at the check such that the image of the check appears in the field of view, and after image has been determined to pass the monitoring criteria, a digital image of the check may be created without further user intervention. Depending on the implementation, one or more digital images of the check (e.g., corresponding to the front and back of the check) may be created using such techniques.

At 970, the digital image(s) may be uploaded to the institution using any known image upload process. In an implementation, the upload may be augmented by secondary data which may be information relating to the deposit of the check,

18

such as an account number and a deposit amount, for example. At 980, when the institution has received the digital images (e.g., of the front and back sides of the check), the institution may process the digital images to obtain an image of the check and to deposit the funds of the check in the user's account, as described herein. It is contemplated that processing such as grayscale conversion, image cropping, image compression, edge and/or corner detection, etc. may be implemented in the method 900. Such operations may be performed on one or more digital images created by the camera and may be performed on the image(s) by the mobile device and/or by the institution, as described further above.

Although the examples described herein may refer to uploading of images of checks to an institution, it is contemplated that any negotiable instrument or image (e.g., vehicle accident pictures provided to an insurance company) may be processed and/or transmitted using the techniques described herein. Additionally, one or more of the techniques described herein may be performed by the institution instead of a mobile device of the user.

FIG. 10 is a block diagram of an example computing environment in which example embodiments and aspects may be implemented. The computing system environment is only one example of a suitable computing environment and is not intended to suggest any limitation as to the scope of use or functionality. Numerous other general purpose or special purpose computing system environments or configurations may be used. Examples of well known computing systems, environments, and/or configurations that may be suitable for use include, but are not limited to, personal computers (PCs), server computers, handheld or laptop devices, multiprocessor systems, microprocessor-based systems, network PCs, minicomputers, mainframe computers, embedded systems, distributed computing environments that include any of the above systems or devices, and the like.

Computer-executable instructions, such as program modules, being executed by a computer may be used. Generally, program modules include routines, programs, objects, components, data structures, etc. that perform particular tasks or implement particular abstract data types. Distributed computing environments may be used where tasks are performed by remote processing devices that are linked through a communications network or other data transmission medium. In a distributed computing environment, program modules and other data may be located in both local and remote computer storage media including memory storage devices.

With reference to FIG. 10, a system 1000 includes a computer 1010 connected to a network 1014. The computer 1010 includes a processor 1020, a storage device 1022, an output device 1024, an input device 1026, and a network interface device 1028, all connected via a bus 1030. The processor 1020 represents a central processing unit of any type of architecture, such as a CISC (Complex Instruction Set Computing), RISC (Reduced Instruction Set Computing), VLIW (Very Long Instruction Word), or a hybrid architecture, although any appropriate processor may be used. The processor 1020 executes instructions and includes that portion of the computer 1010 that controls the operation of the entire computer. Although not depicted in FIG. 10, the processor 1020 typically includes a control unit that organizes data and program storage in memory and transfers data and other information between the various parts of the computer 1010. The processor 1020 receives input data from the input device 1026 and the network 1014 reads and stores code and data in the storage device 1022 and presents data to the output device 1024. Although the computer 1010 is shown to contain only a single processor 1020 and a single bus 1030, the disclosed

US 8,977,571 B1

19

embodiment applies equally to computers that may have multiple processors and to computers that may have multiple busses with some or all performing different functions in different ways.

The storage device **1022** represents one or more mechanisms for storing data. For example, the storage device **1022** may include read-only memory (ROM), RAM, magnetic disk storage media, optical storage media, flash memory devices, and/or other machine-readable media. In other embodiments, any appropriate type of storage device may be used. Although only one storage device **1022** is shown, multiple storage devices and multiple types of storage devices may be present. Further, although the computer **1010** is drawn to contain the storage device **1022**, it may be distributed across other computers, for example on a server.

The storage device **1022** includes a controller (not shown in FIG. **10**) and data items **1034**. The controller includes instructions capable of being executed on the processor **1020** to carry out functions previously described herein with reference to FIGS. **1-9**. In another embodiment, some or all of the functions are carried out via hardware in lieu of a processor-based system. In one embodiment, the controller is a web browser, but in other embodiments the controller may be a database system, a file system, an electronic mail system, a media manager, an image manager, or may include any other functions capable of accessing data items. The storage device **1022** may also contain additional software and data (not shown), which is not necessary to understand the invention. Although the controller and the data items **1034** are shown to be within the storage device **1022** in the computer **1010**, some or all of them may be distributed across other systems, for example on a server and accessed via the network **1014**.

The output device **1024** is that part of the computer **1010** that displays output to the user. The output device **1024** may be a liquid crystal display (LCD) well-known in the art of computer hardware. In other embodiments, the output device **1024** may be replaced with a gas or plasma-based flat-panel display or a traditional cathode-ray tube (CRT) display. In still other embodiments, any appropriate display device may be used. Although only one output device **1024** is shown, in other embodiments any number of output devices of different types, or of the same type, may be present. In an embodiment, the output device **1024** displays a user interface. The input device **1026** may be a keyboard, mouse or other pointing device, trackball, touchpad, touch screen, keypad, microphone, voice recognition device, or any other appropriate mechanism for the user to input data to the computer **1010** and manipulate the user interface previously discussed. Although only one input device **1026** is shown, in another embodiment any number and type of input devices may be present.

The network interface device **1028** provides connectivity from the computer **1010** to the network **1014** through any suitable communications protocol. The network interface device **1028** sends and receives data items from the network **1014**. The bus **1030** may represent one or more busses, e.g., USB, PCI, ISA (Industry Standard Architecture), X-Bus, EISA (Extended Industry Standard Architecture), or any other appropriate bus and/or bridge (also called a bus controller).

The computer **1010** may be implemented using any suitable hardware and/or software, such as a personal computer or other electronic computing device. Portable computers, laptop or notebook computers, PDAs, pocket computers, appliances, telephones, and mainframe computers are examples of other possible configurations of the computer **1010**. For example, other peripheral devices such as audio adapters or chip programming devices, such as EPROM

20

(Erasable Programmable Read-Only Memory) programming devices may be used in addition to, or in place of, the hardware already depicted.

The network **1014** may be any suitable network and may support any appropriate protocol suitable for communication to the computer **1010**. In an embodiment, the network **1014** may support wireless communications. In another embodiment, the network **1014** may support hard-wired communications, such as a telephone line or cable. In another embodiment, the network **1014** may support the Ethernet IEEE (Institute of Electrical and Electronics Engineers) 802.3x specification. In another embodiment, the network **1014** may be the Internet and may support IP (Internet Protocol). In another embodiment, the network **1014** may be a LAN or a WAN. In another embodiment, the network **1014** may be a hotspot service provider network. In another embodiment, the network **1014** may be an intranet. In another embodiment, the network **1014** may be a GPRS (General Packet Radio Service) network. In another embodiment, the network **1014** may be any appropriate cellular data network or cell-based radio network technology. In another embodiment, the network **1014** may be an IEEE 802.11 wireless network. In still another embodiment, the network **1014** may be any suitable network or combination of networks. Although one network **1014** is shown, in other embodiments any number of networks (of the same or different types) may be present.

It should be understood that the various techniques described herein may be implemented in connection with hardware or software or, where appropriate, with a combination of both. Thus, the methods and apparatus of the presently disclosed subject matter, or certain aspects or portions thereof, may take the form of program code (i.e., instructions) embodied in tangible media, such as floppy diskettes, CD-ROMs, hard drives, or any other machine-readable storage medium wherein, when the program code is loaded into and executed by a machine, such as a computer, the machine becomes an apparatus for practicing the presently disclosed subject matter. In the case of program code execution on programmable computers, the computing device generally includes a processor, a storage medium readable by the processor (including volatile and non-volatile memory and/or storage elements), at least one input device, and at least one output device. One or more programs may implement or use the processes described in connection with the presently disclosed subject matter, e.g., through the use of an API, reusable controls, or the like. Such programs may be implemented in a high level procedural or object-oriented programming language to communicate with a computer system. However, the program(s) can be implemented in assembly or machine language, if desired. In any case, the language may be a compiled or interpreted language and it may be combined with hardware implementations.

Although exemplary embodiments may refer to using aspects of the presently disclosed subject matter in the context of one or more stand-alone computer systems, the subject matter is not so limited, but rather may be implemented in connection with any computing environment, such as a network or distributed computing environment. Still further, aspects of the presently disclosed subject matter may be implemented in or across a plurality of processing chips or devices, and storage may similarly be effected across a plurality of devices. Such devices might include personal computers, network servers, and handheld devices, for example. Although the subject matter has been described in language specific to structural features and/or methodological acts, it is to be understood that the subject matter defined in the appended claims is not necessarily limited to the specific

US 8,977,571 B1

21

features or acts described above. Rather, the specific features and acts described above are disclosed as example forms of implementing the claims.

What is claimed:

1. A non-transitory computer-readable medium comprising computer-readable instructions for depositing a check that, when executed by a processor, cause the processor to:

monitor an image of the check in a field of view of a camera of a mobile device with respect to a monitoring criterion using an image monitoring and capture module of the mobile device;

capture the image of the check with the camera when the image of the check passes the monitoring criterion; and

provide the image of the check from the camera to a depository via a communication pathway between the mobile device and the depository.

2. The non-transitory computer-readable medium of claim 1, further comprising instructions that provide feedback, via the mobile device to a user of the mobile device, regarding the image of the check with respect to the monitoring criterion prior to capturing the image of the check.

3. The non-transitory computer-readable medium of claim 2, wherein the feedback is provided if the image fails to pass the monitoring criterion.

4. The non-transitory computer-readable medium of claim 3, wherein the feedback comprises instructions for the user to follow to obtain a second image of the check in the field of view of the camera that passes the monitoring criterion.

5. The non-transitory computer-readable medium of claim 4, wherein the feedback is provided visually in the field of view of the camera.

6. The non-transitory computer-readable medium of claim 1, wherein capturing the image of the check is performed automatically without user intervention when the image of the check passes the monitoring criterion.

7. The non-transitory computer-readable medium of claim 1, where the computer-readable instructions cause the processor to monitor the image of the check in the field of view of the camera with respect to a monitoring criterion without providing feedback, via the mobile device, regarding the monitoring of the image of the check in the field of view of the camera.

8. The non-transitory computer-readable medium of claim 1, where the computer-readable instructions cause the processor to monitor the image of the check in the field of view of the camera with respect to a monitoring criterion without providing feedback, via the mobile device, regarding the monitoring of the image of the check in the field of view of the camera.

9. A non-transitory computer-readable medium comprising computer-readable instructions for depositing a check that, when executed by a processor, cause the processor to:

initialize a software object on a mobile device operated by a user, the software object configured to communicate with a camera;

monitor an image of the check in a field of view of the camera with respect to a monitoring criterion using an image monitoring and capture module associated with the camera;

22

capture the image of the check using the camera when the image of the check in the field of view passes the monitoring criterion; and

transmit the image of the check from the mobile device to a deposit system configured to clear the check and deposit funds of the check into a deposit account of the user.

10. The non-transitory computer-readable medium of claim 9, further comprising instructions that provide feedback, via the mobile device to the user, when the image of the check in the field of view passes the monitoring criterion, prior to capturing the image of the check.

11. The non-transitory computer-readable medium of claim 10, wherein the feedback comprises instructions to the user to capture the image of the check.

12. The non-transitory computer-readable medium of claim 9, wherein the monitoring criterion comprises light contrast or light brightness of the image.

13. The non-transitory computer-readable medium of claim 9, wherein the monitoring criterion comprises skewing of the image or warping of the image.

14. A system for depositing a check, comprising:

a subsystem that receives at a server a request for access to a deposit system from a mobile device;

a subsystem that receives, at the server from the mobile device, an image of the check in a field of view of a camera associated with the mobile device;

a subsystem that monitors, at a computing device of the server, the image with respect to a monitoring criterion;

a subsystem that provides instructions from the server to the mobile device to create a digital image of the check when the image passes the monitoring criterion;

a subsystem that receives the digital image at the server from the mobile device;

a subsystem that processes the digital image at a check processing module of the server; and

a subsystem that deposits funds of the check into an account associated with the deposit system using the processed digital image and a check clearance module of the server.

15. The system of claim 14, wherein the monitoring criterion is based on light in the image.

16. The system of claim 15, wherein the subsystem that monitors the image with respect to the monitoring criterion comprises a subsystem that generates a histogram using the image and uses the histogram in determining when the image passes the monitoring criterion.

17. The system of claim 14, further comprising a subsystem that provides feedback from the server to the mobile device regarding the image with respect to the monitoring criterion prior to the image passing the monitoring criterion.

18. The system of claim 14, wherein creating the digital image of the check when the image passes the monitoring criterion is performed without user intervention.

19. The system of claim 14, wherein the mobile device comprises a video source and the image of the check is provided in a video received from the mobile device.

20. The system of claim 14, wherein the image of the check is a frame of a live video of the check.

* * * * *

US009818090B1

(12) **United States Patent**      (10) **Patent No.:**    **US 9,818,090 B1**
Bueche, Jr. et al.                  (45) **Date of Patent:**      **\*Nov. 14, 2017**

(54) **SYSTEMS AND METHODS FOR IMAGE AND CRITERION MONITORING DURING MOBILE DEPOSIT**

(71) Applicant: **United Services Automobile Association (USAA)**, San Antonio, TX (US)

(72) Inventors: **Michael Patrick Bueche, Jr.**, San Antonio, TX (US); **Bharat Prasad**, San Antonio, TX (US); **Minya Liang**, San Antonio, TX (US); **Reynaldo Medina**, San Antonio, TX (US); **Charles Lee Oakes, III**, Boerne, TX (US)

(73) Assignee: **United Services Automobile Association (USAA)**, San Antonio, TX (US)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/392,950**

(22) Filed: **Dec. 28, 2016**

**Related U.S. Application Data**

(63) Continuation of application No. 13/922,686, filed on Jun. 20, 2013, now Pat. No. 9,569,756, which is a (Continued)

(51) **Int. Cl.**
*G06K 9/00* (2006.01)
*G06Q 20/04* (2012.01)
(Continued)

(52) **U.S. Cl.**
CPC ............ *G06Q 20/042* (2013.01); *G06K 9/186* (2013.01); *G06Q 20/108* (2013.01); *G06Q 20/3223* (2013.01); *H04N 7/183* (2013.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,005,282 A    10/1961  Christiansen
3,341,820 A    9/1967  Grillmeier, Jr. et al.
(Continued)

FOREIGN PATENT DOCUMENTS

EP    0 984 410 A1    3/2000
KR    20040076131 A    8/2004
(Continued)

OTHER PUBLICATIONS

"Accept "Customer Not Present" Checks," Accept Check Online, http://checksoftware.com, Cited in U.S. Pat. No. 7,900,822, as dated 2007 (1 pg).

(Continued)

*Primary Examiner* — Tahmina Ansari
(74) *Attorney, Agent, or Firm* — Brinks Gilson & Lione

(57) **ABSTRACT**

An image of a check that is in the field of view of a camera is monitored prior to the image of the check being captured. The camera is associated with a mobile device. When the image of the check in the field of view passes monitoring criteria, an image may be taken by the camera and provided from the mobile device to a financial institution. The image capture may be performed automatically as soon as the image of the check is determined to pass the monitoring criteria. The check may be deposited in a user's bank account based on the image. Any technique for sending the image to the financial institution may be used. Feedback may be provided to the user of the camera regarding the image of the check in the field of view.

**20 Claims, 8 Drawing Sheets**



## US 9,818,090 B1

Page 2

### Related U.S. Application Data

continuation of application No. 12/545,127, filed on Aug. 21, 2009, now Pat. No. 8,977,571.

(51) **Int. Cl.**

| | |
|---|---|
| *H04N 7/18* | (2006.01) |
| *G06K 9/18* | (2006.01) |
| *G06Q 20/10* | (2012.01) |
| *G06Q 20/32* | (2012.01) |

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,576,972 A | 5/1971 | Wood |
| 3,593,913 A | 7/1971 | Bremer |
| 3,620,553 A | 11/1971 | Donovan |
| 3,648,242 A | 3/1972 | Grosbard |
| 3,800,124 A | 3/1974 | Walsh |
| 3,816,943 A | 6/1974 | Henry |
| 4,002,356 A | 1/1977 | Weidmann |
| 4,060,711 A | 11/1977 | Buros |
| 4,070,649 A | 1/1978 | Wright, Jr. et al. |
| 4,128,202 A | 12/1978 | Buros |
| 4,136,471 A | 1/1979 | Austin |
| 4,205,780 A | 6/1980 | Burns |
| 4,264,808 A | 4/1981 | Owens |
| 4,305,216 A | 12/1981 | Skelton |
| 4,321,672 A | 3/1982 | Braun |
| 4,433,436 A | 2/1984 | Carnes |
| 4,454,610 A | 6/1984 | Sziklai |
| RE31,692 E | 10/1984 | Tyburski et al. |
| 4,523,330 A | 6/1985 | Cain |
| 4,636,099 A | 1/1987 | Goldston |
| 4,640,413 A | 2/1987 | Kaplan |
| 4,644,144 A | 2/1987 | Chandek |
| 4,722,444 A | 2/1988 | Murphy et al. |
| 4,722,544 A | 2/1988 | Weber |
| 4,727,435 A | 2/1988 | Otani et al. |
| 4,774,663 A | 9/1988 | Musmanno |
| 4,790,475 A | 12/1988 | Griffin |
| 4,806,780 A | 2/1989 | Yamamoto |
| 4,837,693 A | 6/1989 | Schotz |
| 4,890,228 A | 12/1989 | Longfield |
| 4,927,071 A | 5/1990 | Wood |
| 4,934,587 A | 6/1990 | McNabb |
| 4,960,981 A | 10/1990 | Benton |
| 4,975,735 A | 12/1990 | Bright |
| 5,022,683 A | 6/1991 | Barbour |
| 5,053,607 A | 10/1991 | Carlson |
| 5,146,606 A | 9/1992 | Grondalski |
| 5,157,620 A | 10/1992 | Shaar |
| 5,159,548 A | 10/1992 | Caslavka |
| 5,191,525 A | 3/1993 | LeBrun |
| 5,193,121 A | 3/1993 | Elischer et al. |
| 5,220,501 A | 6/1993 | Lawlor |
| 5,227,863 A | 7/1993 | Bilbrey et al. |
| 5,229,589 A | 7/1993 | Schneider |
| 5,237,159 A | 8/1993 | Stephens |
| 5,257,320 A | 10/1993 | Etherington et al. |
| 5,265,008 A | 11/1993 | Benton |
| 5,321,816 A | 6/1994 | Rogan |
| 5,347,302 A | 9/1994 | Simonoff |
| 5,350,906 A | 9/1994 | Brody |
| 5,373,550 A | 12/1994 | Campbell |
| 5,419,588 A | 5/1995 | Wood |
| 5,422,467 A | 6/1995 | Graef |
| 5,444,794 A | 8/1995 | Uhland, Sr. |
| 5,475,403 A | 12/1995 | Havlovick et al. |
| 5,504,538 A | 4/1996 | Tsujihara |
| 5,504,677 A | 4/1996 | Pollin |
| 5,528,387 A | 6/1996 | Kelly et al. |
| 5,577,179 A | 11/1996 | Blank |
| 5,583,759 A | 12/1996 | Geer |
| 5,590,196 A | 12/1996 | Moreau |
| 5,594,225 A | 1/1997 | Botvin |
| 5,598,969 A | 2/1997 | Ong |
| 5,602,936 A | 2/1997 | Green |
| 5,610,726 A | 3/1997 | Nonoshita |
| 5,611,028 A | 3/1997 | Shibasaki |
| 5,630,073 A | 5/1997 | Nolan |
| 5,631,984 A | 5/1997 | Graf et al. |
| 5,668,897 A | 9/1997 | Stolfo |
| 5,673,320 A | 9/1997 | Ray et al. |
| 5,677,955 A | 10/1997 | Doggett |
| 5,678,046 A | 10/1997 | Cahill et al. |
| 5,679,938 A | 10/1997 | Templeton |
| 5,680,611 A | 10/1997 | Rail |
| 5,691,524 A | 11/1997 | Josephson |
| 5,699,452 A | 12/1997 | Vaidyanathan |
| 5,734,747 A | 3/1998 | Vaidyanathan |
| 5,737,440 A | 4/1998 | Kunkler |
| 5,748,780 A | 5/1998 | Stolfo |
| 5,751,842 A | 5/1998 | Riach |
| 5,784,503 A | 7/1998 | Bleecker, III et al. |
| 5,830,609 A | 11/1998 | Warner |
| 5,832,463 A | 11/1998 | Funk |
| 5,838,814 A | 11/1998 | Moore |
| 5,863,075 A | 1/1999 | Rich |
| 5,870,456 A | 2/1999 | Rogers |
| 5,870,724 A | 2/1999 | Lawlor |
| 5,870,725 A | 2/1999 | Bellinger et al. |
| 5,878,337 A | 3/1999 | Joao |
| 5,893,101 A | 4/1999 | Balogh et al. |
| 5,897,625 A | 4/1999 | Gustin |
| 5,898,157 A | 4/1999 | Mangili et al. |
| 5,901,253 A | 5/1999 | Tretter |
| 5,903,878 A | 5/1999 | Talati |
| 5,903,881 A | 5/1999 | Schrader |
| 5,910,988 A | 6/1999 | Ballard |
| 5,917,931 A | 6/1999 | Kunkler |
| 5,924,737 A | 7/1999 | Schrupp |
| 5,926,548 A | 7/1999 | Okamoto |
| 5,930,778 A | 7/1999 | Geer |
| 5,937,396 A | 8/1999 | Konya |
| 5,940,844 A | 8/1999 | Cahill |
| 5,982,918 A | 11/1999 | Mennie |
| 5,987,439 A | 11/1999 | Gustin |
| 6,012,048 A | 1/2000 | Gustin |
| 6,014,454 A | 1/2000 | Kunkler |
| 6,021,202 A | 2/2000 | Anderson |
| 6,021,397 A | 2/2000 | Jones |
| 6,029,887 A | 2/2000 | Furuhashi |
| 6,030,000 A | 2/2000 | Diamond |
| 6,032,137 A | 2/2000 | Ballard |
| 6,038,553 A | 3/2000 | Hyde |
| 6,053,405 A | 4/2000 | Irwin, Jr. et al. |
| 6,073,119 A | 6/2000 | Borenmisza-wahr |
| 6,085,168 A | 7/2000 | Mori |
| 6,097,834 A | 8/2000 | Krouse |
| 6,097,845 A | 8/2000 | Ng et al. |
| 6,097,885 A | 8/2000 | Rayner |
| 6,105,865 A | 8/2000 | Hardesty |
| 6,141,339 A | 10/2000 | Kaplan et al. |
| 6,145,738 A | 11/2000 | Stinson et al. |
| 6,151,423 A | 11/2000 | Melen |
| 6,151,426 A | 11/2000 | Lee |
| 6,159,585 A | 12/2000 | Rittenhouse |
| 6,170,744 B1 | 1/2001 | Lee |
| 6,188,506 B1 | 2/2001 | Kaiserman |
| 6,189,785 B1 | 2/2001 | Lowery |
| 6,192,165 B1 | 2/2001 | Irons |
| 6,195,694 B1 | 2/2001 | Chen et al. |
| 6,199,055 B1 | 3/2001 | Kara |
| 6,236,009 B1 | 5/2001 | Emigh et al. |
| 6,243,689 B1 | 6/2001 | Norton |
| 6,278,983 B1 | 8/2001 | Ball |
| 6,282,826 B1 | 9/2001 | Richards |
| 6,293,469 B1 | 9/2001 | Masson et al. |
| 6,304,860 B1 | 10/2001 | Martin |
| 6,314,452 B1 | 11/2001 | Dekel |
| 6,317,727 B1 | 11/2001 | May |
| 6,328,207 B1 | 12/2001 | Gregoire et al. |
| 6,330,546 B1 | 12/2001 | Gopinathan et al. |
| 6,339,658 B1 | 1/2002 | Moccagatta |
| 6,363,164 B1 | 3/2002 | Jones et al. |

**US 9,818,090 B1**

Page 3

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,390,362 B1 | 5/2002 | Martin | |
| 6,397,196 B1 | 5/2002 | Kravetz | |
| 6,408,084 B1 | 6/2002 | Foley | |
| 6,411,725 B1 | 6/2002 | Rhoads | |
| 6,411,737 B2 | 6/2002 | Wesolkowski et al. | |
| 6,411,938 B1 | 6/2002 | Gates et al. | |
| 6,413,305 B1 | 7/2002 | Mehta | |
| 6,417,869 B1 | 7/2002 | Do | |
| 6,425,017 B1 | 7/2002 | Dievendorff | |
| 6,429,952 B1 | 8/2002 | Olbricht | |
| 6,439,454 B1 | 8/2002 | Masson et al. | |
| 6,449,397 B1 | 9/2002 | Che-chu | |
| 6,450,403 B1 | 9/2002 | Martens et al. | |
| 6,463,220 B1 * | 10/2002 | Dance | G03B 17/06 |
| | | | 396/431 |
| 6,464,134 B1 | 10/2002 | Page | |
| 6,469,745 B1 | 10/2002 | Yamada et al. | |
| 6,470,325 B1 | 10/2002 | Leemhuis | |
| 6,505,178 B1 | 1/2003 | Flenley | |
| 6,546,119 B2 | 4/2003 | Ciolli et al. | |
| 6,574,609 B1 | 6/2003 | Downs | |
| 6,578,760 B1 | 6/2003 | Otto | |
| 6,587,837 B1 | 7/2003 | Spagna | |
| 6,606,117 B1 | 8/2003 | Windle | |
| 6,609,200 B2 | 8/2003 | Anderson | |
| 6,611,598 B1 | 8/2003 | Hayosh | |
| 6,614,930 B1 | 9/2003 | Agnihotri et al. | |
| 6,643,416 B1 | 11/2003 | Daniels et al. | |
| 6,654,487 B1 | 11/2003 | Downs, Jr. | |
| 6,661,910 B2 | 12/2003 | Jones et al. | |
| 6,672,452 B1 | 1/2004 | Alves | |
| 6,682,452 B2 | 1/2004 | Quintus | |
| 6,695,204 B1 | 2/2004 | Stinson | |
| 6,711,474 B1 | 3/2004 | Treyz et al. | |
| 6,726,097 B2 | 4/2004 | Graef | |
| 6,728,397 B2 | 4/2004 | Mcneal | |
| 6,738,496 B1 | 5/2004 | Van Hall | |
| 6,742,128 B1 | 5/2004 | Joiner | |
| 6,745,186 B1 | 6/2004 | Testa et al. | |
| 6,754,640 B2 | 6/2004 | Bozeman | |
| 6,755,340 B1 | 6/2004 | Voss | |
| 6,763,226 B1 | 7/2004 | McZeal | |
| 6,781,962 B1 | 8/2004 | Williams | |
| 6,786,398 B1 | 9/2004 | Stinson et al. | |
| 6,789,054 B1 | 9/2004 | Makhlouf | |
| 6,796,491 B2 | 9/2004 | Nakajima | |
| 6,806,903 B1 | 10/2004 | Okisu et al. | |
| 6,813,733 B1 | 11/2004 | Li | |
| 6,829,704 B2 | 12/2004 | Zhang | |
| 6,844,885 B2 | 1/2005 | Anderson | |
| 6,856,965 B1 | 2/2005 | Stinson | |
| 6,863,214 B2 | 3/2005 | Garner et al. | |
| 6,870,947 B2 | 3/2005 | Kelland | |
| 6,883,140 B1 | 4/2005 | Acker | |
| 6,898,314 B2 | 5/2005 | Kung et al. | |
| 6,902,105 B2 | 6/2005 | Koakutsu | |
| 6,913,188 B2 | 7/2005 | Wong | |
| 6,931,591 B1 | 8/2005 | Brown | |
| 6,934,719 B2 | 8/2005 | Nally | |
| 6,957,770 B1 | 10/2005 | Robinson | |
| 6,961,689 B1 | 11/2005 | Greenberg | |
| 6,970,843 B1 | 11/2005 | Forte | |
| 6,973,589 B2 | 12/2005 | Wright | |
| 6,983,886 B2 | 1/2006 | Natsukari et al. | |
| 6,993,507 B2 | 1/2006 | Meyer | |
| 6,996,263 B2 | 2/2006 | Jones et al. | |
| 6,999,943 B1 | 2/2006 | Johnson | |
| 7,003,040 B2 | 2/2006 | Yi | |
| 7,004,382 B2 | 2/2006 | Sandru | |
| 7,010,155 B2 | 3/2006 | Koakutsu et al. | |
| 7,010,507 B1 | 3/2006 | Anderson | |
| 7,016,704 B2 | 3/2006 | Pallakoff | |
| 7,039,048 B1 | 5/2006 | Monta | |
| 7,058,036 B1 | 6/2006 | Yu | |
| 7,062,099 B2 | 6/2006 | Li et al. | |
| 7,062,456 B1 | 6/2006 | Riehl et al. | |
| 7,062,768 B2 | 6/2006 | Kubo | |
| 7,072,862 B1 | 7/2006 | Wilson | |
| 7,076,458 B2 | 7/2006 | Lawlor et al. | |
| 7,086,003 B2 | 8/2006 | Demsky | |
| 7,092,561 B2 | 8/2006 | Downs, Jr. | |
| 7,104,443 B1 | 9/2006 | Paul et al. | |
| 7,113,925 B2 | 9/2006 | Waserstein | |
| 7,114,649 B2 | 10/2006 | Nelson | |
| 7,139,594 B2 | 11/2006 | Nagatomo | |
| 7,140,539 B1 | 11/2006 | Crews | |
| 7,163,347 B1 | 1/2007 | Lugg | |
| 7,178,721 B2 | 2/2007 | Maloney | |
| 7,181,430 B1 | 2/2007 | Buchanan et al. | |
| 7,184,980 B2 | 2/2007 | Allen-Rouman et al. | |
| 7,197,173 B2 | 3/2007 | Verma | |
| 7,200,255 B2 | 4/2007 | Jones | |
| 7,204,412 B2 | 4/2007 | Foss, Jr. | |
| 7,216,106 B1 | 5/2007 | Buchanan | |
| 7,219,082 B2 | 5/2007 | Forte | |
| 7,219,831 B2 | 5/2007 | Murata | |
| 7,249,076 B1 | 7/2007 | Pendleton | |
| 7,252,224 B2 | 8/2007 | Verma | |
| 7,257,246 B1 | 8/2007 | Brodie et al. | |
| 7,266,230 B2 | 9/2007 | Doran | |
| 7,290,034 B2 | 10/2007 | Budd | |
| 7,299,970 B1 | 11/2007 | Ching | |
| 7,299,979 B2 | 11/2007 | Phillips | |
| 7,313,543 B1 | 12/2007 | Crane | |
| 7,314,163 B1 | 1/2008 | Crews et al. | |
| 7,321,874 B2 | 1/2008 | Dilip | |
| 7,321,875 B2 | 1/2008 | Dilip | |
| 7,325,725 B2 | 2/2008 | Foss, Jr. | |
| 7,328,190 B2 | 2/2008 | Smith et al. | |
| 7,330,604 B2 | 2/2008 | Wu et al. | |
| 7,331,523 B2 | 2/2008 | Meier et al. | |
| 7,336,813 B2 | 2/2008 | Prakash et al. | |
| 7,343,320 B1 | 3/2008 | Treyz | |
| 7,349,566 B2 | 3/2008 | Jones et al. | |
| 7,356,505 B2 | 4/2008 | March | |
| 7,377,425 B1 | 5/2008 | Ma | |
| 7,379,978 B2 | 5/2008 | Anderson | |
| 7,385,631 B2 | 6/2008 | Maeno | |
| 7,386,511 B2 | 6/2008 | Buchanan | |
| 7,391,897 B2 | 6/2008 | Jones | |
| 7,391,934 B2 | 6/2008 | Goodall et al. | |
| 7,392,935 B2 | 7/2008 | Byrne | |
| 7,401,048 B2 | 7/2008 | Rosedale | |
| 7,403,917 B1 | 7/2008 | Larsen | |
| 7,406,198 B2 | 7/2008 | Aoki et al. | |
| 7,421,107 B2 | 9/2008 | Lugg | |
| 7,421,410 B1 | 9/2008 | Schechtman et al. | |
| 7,427,016 B2 | 9/2008 | Chimento | |
| 7,433,098 B2 | 10/2008 | Klein et al. | |
| 7,437,327 B2 | 10/2008 | Lam | |
| 7,440,924 B2 | 10/2008 | Buchanan | |
| 7,447,347 B2 | 11/2008 | Weber | |
| 7,455,220 B2 | 11/2008 | Phillips | |
| 7,455,221 B2 | 11/2008 | Sheaffer | |
| 7,460,108 B2 | 12/2008 | Tamura | |
| 7,461,779 B2 | 12/2008 | Ramachandran | |
| 7,461,780 B2 | 12/2008 | Potts | |
| 7,471,818 B1 | 12/2008 | Price | |
| 7,475,040 B2 | 1/2009 | Buchanan | |
| 7,477,923 B2 | 1/2009 | Wallmark | |
| 7,480,382 B2 | 1/2009 | Dunbar | |
| 7,480,422 B2 | 1/2009 | Ackley et al. | |
| 7,489,953 B2 | 2/2009 | Griffin | |
| 7,490,242 B2 | 2/2009 | Torres | |
| 7,497,429 B2 | 3/2009 | Reynders | |
| 7,503,486 B2 | 3/2009 | Ahles | |
| 7,505,759 B1 | 3/2009 | Rahman | |
| 7,506,261 B2 | 3/2009 | Satou | |
| 7,509,287 B2 | 3/2009 | Nutahara | |
| 7,512,564 B1 | 3/2009 | Geer | |
| 7,519,560 B2 | 4/2009 | Lam | |
| 7,520,420 B2 | 4/2009 | Phillips | |
| 7,520,422 B1 | 4/2009 | Robinson et al. | |
| 7,536,354 B1 | 5/2009 | deGroeve et al. | |

# US 9,818,090 B1
## Page 4

| (56) | References Cited | | 8,422,758 B1 * | 4/2013 | Bueche, Jr. .......... G06Q 20/042 |
|---|---|---|---|---|---|
| | | | | | 382/137 |
| | U.S. PATENT DOCUMENTS | | 8,977,571 B1 * | 3/2015 | Bueche, Jr. .......... G06Q 40/02 |
| | | | | | 705/44 |
| 7,536,440 B2 | 5/2009 | Budd | 2001/0004235 A1 | 6/2001 | Maloney |
| 7,539,646 B1 | 5/2009 | Gilder | 2001/0014881 A1 | 8/2001 | Drummond |
| 7,540,408 B2 | 6/2009 | Levine | 2001/0016084 A1 | 8/2001 | Pollard et al. |
| 7,542,598 B2 | 6/2009 | Jones | 2001/0018739 A1 | 8/2001 | Anderson |
| 7,545,529 B2 | 6/2009 | Borrey et al. | 2001/0027994 A1 | 10/2001 | Hayashida |
| 7,548,641 B2 | 6/2009 | Gilson et al. | 2001/0037299 A1 | 11/2001 | Nichols et al. |
| 7,566,002 B2 | 7/2009 | Love et al. | 2001/0042171 A1 | 11/2001 | Vermeulen |
| 7,571,848 B2 | 8/2009 | Cohen | 2001/0042785 A1 | 11/2001 | Walker |
| 7,587,066 B2 | 9/2009 | Cordery et al. | 2001/0043748 A1 | 11/2001 | Wesolkowski et al. |
| 7,587,363 B2 | 9/2009 | Cataline | 2001/0047330 A1 | 11/2001 | Gephart |
| 7,590,275 B2 | 9/2009 | Clarke et al. | 2001/0054020 A1 | 12/2001 | Barth et al. |
| 7,599,543 B2 | 10/2009 | Jones | 2002/0001393 A1 | 1/2002 | Jones |
| 7,599,888 B2 | 10/2009 | Manfre | 2002/0016763 A1 | 2/2002 | March |
| 7,602,956 B2 | 10/2009 | Jones | 2002/0016769 A1 | 2/2002 | Barbara et al. |
| 7,606,762 B1 | 10/2009 | Heit | 2002/0032656 A1 | 3/2002 | Chen |
| 7,609,873 B2 | 10/2009 | Foth et al. | 2002/0038289 A1 | 3/2002 | Lawlor et al. |
| 7,619,721 B2 | 11/2009 | Jones | 2002/0052841 A1 | 5/2002 | Guthrie |
| 7,620,231 B2 | 11/2009 | Jones | 2002/0052853 A1 | 5/2002 | Munoz |
| 7,620,604 B1 | 11/2009 | Bueche, Jr. | 2002/0065786 A1 | 5/2002 | Martens et al. |
| 7,630,518 B2 | 12/2009 | Frew et al. | 2002/0072974 A1 | 6/2002 | Pugliese |
| 7,644,037 B1 | 1/2010 | Ostrovsky | 2002/0075524 A1 | 6/2002 | Blair |
| 7,644,043 B2 | 1/2010 | Minowa | 2002/0084321 A1 | 7/2002 | Martens |
| 7,647,275 B2 | 1/2010 | Jones | 2002/0087467 A1 | 7/2002 | Mascavage, III et al. |
| 7,668,363 B2 | 2/2010 | Price | 2002/0107809 A1 | 8/2002 | Biddle et al. |
| 7,672,940 B2 | 3/2010 | Viola | 2002/0116329 A1 | 8/2002 | Serbetcioglu |
| 7,676,409 B1 | 3/2010 | Ahmad | 2002/0116335 A1 | 8/2002 | Star |
| 7,680,735 B1 | 3/2010 | Loy | 2002/0118891 A1 | 8/2002 | Rudd |
| 7,689,482 B2 | 3/2010 | Lam | 2002/0120562 A1 | 8/2002 | Opiela |
| 7,697,776 B2 | 4/2010 | Wu et al. | 2002/0129249 A1 | 9/2002 | Maillard et al. |
| 7,698,222 B1 | 4/2010 | Bueche, Jr. | 2002/0133409 A1 | 9/2002 | Sawano et al. |
| 7,702,588 B2 | 4/2010 | Gilder et al. | 2002/0138522 A1 | 9/2002 | Muralidhar |
| 7,734,545 B1 | 6/2010 | Fogliano | 2002/0147798 A1 | 10/2002 | Huang |
| 7,743,979 B2 | 6/2010 | Fredman | 2002/0150279 A1 | 10/2002 | Scott |
| 7,753,268 B1 | 7/2010 | Robinson et al. | 2002/0152160 A1 | 10/2002 | Allen-Rouman et al. |
| 7,761,358 B2 | 7/2010 | Craig et al. | 2002/0152161 A1 | 10/2002 | Aoike |
| 7,766,244 B1 | 8/2010 | Field | 2002/0152164 A1 | 10/2002 | Dutta |
| 7,769,650 B2 | 8/2010 | Bleunven | 2002/0152165 A1 | 10/2002 | Dutta et al. |
| 7,792,752 B1 | 9/2010 | Kay | 2002/0152169 A1 | 10/2002 | Dutta et al. |
| 7,792,753 B1 | 9/2010 | Slater et al. | 2002/0159648 A1 | 10/2002 | Alderson et al. |
| 7,810,714 B2 | 10/2010 | Murata | 2002/0171820 A1 | 11/2002 | Okamura |
| 7,812,986 B2 | 10/2010 | Graham et al. | 2002/0178112 A1 | 11/2002 | Goeller |
| 7,818,245 B2 | 10/2010 | Prakash et al. | 2002/0186881 A1 | 12/2002 | Li |
| 7,856,402 B1 | 12/2010 | Kay | 2002/0188564 A1 | 12/2002 | Star |
| 7,873,200 B1 | 1/2011 | Oakes, III et al. | 2002/0195485 A1 | 12/2002 | Pomerleau et al. |
| 7,876,949 B1 | 1/2011 | Oakes, III et al. | 2003/0005326 A1 | 1/2003 | Flemming |
| 7,885,451 B1 | 2/2011 | Walls et al. | 2003/0023557 A1 | 1/2003 | Moore |
| 7,885,880 B1 | 2/2011 | Prasad et al. | 2003/0026609 A1 | 2/2003 | Parulski |
| 7,894,094 B2 | 2/2011 | Nacman et al. | 2003/0038227 A1 | 2/2003 | Sesek |
| 7,896,232 B1 | 3/2011 | Prasad et al. | 2003/0055776 A1 | 3/2003 | Allan |
| 7,900,822 B1 | 3/2011 | Prasad et al. | 2003/0055787 A1 | 3/2003 | Samuelson |
| 7,903,863 B2 | 3/2011 | Jones et al. | 2003/0074315 A1 | 4/2003 | Lam |
| 7,904,386 B2 | 3/2011 | Kalra et al. | 2003/0075596 A1 | 4/2003 | Koakutsu |
| 7,912,785 B1 | 3/2011 | Kay | 2003/0075916 A1 | 4/2003 | Gorski |
| 7,949,587 B1 | 5/2011 | Morris et al. | 2003/0081824 A1 | 5/2003 | Mennie |
| 7,950,698 B2 | 5/2011 | Popadic et al. | 2003/0093367 A1 | 5/2003 | Allen-Rouman et al. |
| 7,953,441 B2 | 5/2011 | Lors | 2003/0093369 A1 | 5/2003 | Ijichi et al. |
| 7,962,411 B1 | 6/2011 | Prasad et al. | 2003/0102714 A1 | 6/2003 | Rhodes et al. |
| 7,970,677 B1 | 6/2011 | Oakes, III et al. | 2003/0105688 A1 | 6/2003 | Brown |
| 7,974,899 B1 | 7/2011 | Prasad et al. | 2003/0105714 A1 | 6/2003 | Alarcon-Luther et al. |
| 7,978,900 B2 | 7/2011 | Nepomniachtchi et al. | 2003/0132384 A1 | 7/2003 | Sugiyama et al. |
| 7,996,314 B1 | 8/2011 | Smith et al. | 2003/0139999 A1 | 7/2003 | Rowe |
| 7,996,315 B1 | 8/2011 | Smith et al. | 2003/0159046 A1 | 8/2003 | Choi et al. |
| 7,996,316 B1 | 8/2011 | Smith et al. | 2003/0167225 A1 | 9/2003 | Adams |
| 8,001,051 B1 | 8/2011 | Smith et al. | 2003/0191615 A1 | 10/2003 | Bailey |
| 8,045,784 B2 | 10/2011 | Price et al. | 2003/0191869 A1 | 10/2003 | Williams |
| 8,046,301 B1 | 10/2011 | Smith et al. | 2003/0200174 A1 | 10/2003 | Star |
| 8,060,442 B1 | 11/2011 | Hecht et al. | 2003/0212904 A1 | 11/2003 | Randle et al. |
| 8,116,533 B2 | 2/2012 | Kiplinger et al. | 2003/0217005 A1 | 11/2003 | Drummond et al. |
| 8,203,640 B2 | 6/2012 | Kim et al. | 2003/0225713 A1 | 12/2003 | Park et al. |
| 8,204,293 B2 | 6/2012 | Csulits et al. | 2003/0233278 A1 | 12/2003 | Marshall |
| 8,235,284 B1 | 8/2012 | Prasad et al. | 2003/0233318 A1 | 12/2003 | King et al. |
| 8,320,657 B1 | 11/2012 | Burks et al. | 2004/0010466 A1 | 1/2004 | Anderson |
| 8,358,826 B1 * | 1/2013 | Medina, III .......... G06Q 20/042 | 2004/0012496 A1 | 1/2004 | De Souza |
| | | 382/137 | 2004/0013284 A1 | 1/2004 | Yu |
| | | | 2004/0024626 A1 | 2/2004 | Bruijning |

**US 9,818,090 B1**

Page 5

(56)        **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 2004/0024708 A1 | 2/2004 | Masuda |
| 2004/0030741 A1 | 2/2004 | Wolton et al. |
| 2004/0057697 A1 | 3/2004 | Renzi |
| 2004/0058705 A1 | 3/2004 | Morgan |
| 2004/0066031 A1 | 4/2004 | Wong |
| 2004/0069841 A1 | 4/2004 | Wong |
| 2004/0071333 A1 | 4/2004 | Douglas et al. |
| 2004/0076320 A1 | 4/2004 | Downs, Jr. |
| 2004/0078299 A1 | 4/2004 | Down-Logan |
| 2004/0080795 A1 | 4/2004 | Bean et al. |
| 2004/0089711 A1 | 5/2004 | Sandru |
| 2004/0093303 A1 | 5/2004 | Picciallo |
| 2004/0093305 A1 | 5/2004 | Right |
| 2004/0103057 A1 | 5/2004 | Melbert et al. |
| 2004/0103296 A1 | 5/2004 | Harp |
| 2004/0109596 A1 | 6/2004 | Doran |
| 2004/0110975 A1 | 6/2004 | Osinski et al. |
| 2004/0117302 A1 | 6/2004 | Weichert |
| 2004/0122754 A1 | 6/2004 | Stevens |
| 2004/0133511 A1 | 7/2004 | Smith et al. |
| 2004/0138974 A1 | 7/2004 | Shimamura |
| 2004/0148235 A1 | 7/2004 | Craig et al. |
| 2004/0158549 A1 | 8/2004 | Matena |
| 2004/0165096 A1 | 8/2004 | Maeno |
| 2004/0170259 A1 | 9/2004 | Park |
| 2004/0210515 A1 | 10/2004 | Hughes |
| 2004/0210523 A1 | 10/2004 | Gains et al. |
| 2004/0228277 A1 | 11/2004 | Williams |
| 2004/0236647 A1 | 11/2004 | Acharya |
| 2004/0236688 A1 | 11/2004 | Bozeman |
| 2004/0240722 A1 | 12/2004 | Tsuji et al. |
| 2004/0245324 A1 | 12/2004 | Chen |
| 2004/0247199 A1 | 12/2004 | Murai et al. |
| 2004/0248600 A1 | 12/2004 | Kim |
| 2004/0252679 A1 | 12/2004 | Williams |
| 2004/0260636 A1 | 12/2004 | Marceau |
| 2004/0267666 A1 | 12/2004 | Minami |
| 2005/0001421 A1 | 1/2005 | Luth et al. |
| 2005/0010108 A1 | 1/2005 | Rahn et al. |
| 2005/0021466 A1 | 1/2005 | Buchanan et al. |
| 2005/0030388 A1 | 2/2005 | Stavely et al. |
| 2005/0033645 A1 | 2/2005 | Duphily |
| 2005/0033685 A1 | 2/2005 | Reyes |
| 2005/0033695 A1 | 2/2005 | Minowa |
| 2005/0035193 A1 | 2/2005 | Gustin et al. |
| 2005/0038746 A1 | 2/2005 | Latimer et al. |
| 2005/0038754 A1 | 2/2005 | Geist |
| 2005/0044042 A1 | 2/2005 | Mendiola |
| 2005/0044577 A1 | 2/2005 | Jerding |
| 2005/0049950 A1 | 3/2005 | Johnson |
| 2005/0071283 A1 | 3/2005 | Randle et al. |
| 2005/0075969 A1 | 4/2005 | Nielson et al. |
| 2005/0075974 A1 | 4/2005 | Turgeon |
| 2005/0078336 A1 | 4/2005 | Ferlitsch |
| 2005/0080725 A1 | 4/2005 | Pick |
| 2005/0082364 A1 | 4/2005 | Alvarez et al. |
| 2005/0086140 A1 | 4/2005 | Ireland |
| 2005/0086168 A1 | 4/2005 | Alvarez |
| 2005/0091161 A1 | 4/2005 | Gustin |
| 2005/0096992 A1 | 5/2005 | Geisel |
| 2005/0097019 A1 | 5/2005 | Jacobs |
| 2005/0097046 A1 | 5/2005 | Singfield |
| 2005/0097050 A1 | 5/2005 | Orcutt |
| 2005/0108164 A1 | 5/2005 | Salafia |
| 2005/0108168 A1 | 5/2005 | Halpia |
| 2005/0115110 A1 | 6/2005 | Dinkins |
| 2005/0125338 A1 | 6/2005 | Tidwell et al. |
| 2005/0125360 A1 | 6/2005 | Tidwell et al. |
| 2005/0127160 A1 | 6/2005 | Fujikawa |
| 2005/0131820 A1 | 6/2005 | Rodriguez |
| 2005/0143136 A1 | 6/2005 | Lev et al. |
| 2005/0149436 A1 | 7/2005 | Elterich |
| 2005/0168566 A1 | 8/2005 | Tada |
| 2005/0171899 A1 | 8/2005 | Dunn |
| 2005/0171907 A1 | 8/2005 | Lewis |

| | | |
|---|---|---|
| 2005/0177499 A1 | 8/2005 | Thomas |
| 2005/0177518 A1 | 8/2005 | Brown |
| 2005/0182710 A1 | 8/2005 | Anderson |
| 2005/0188306 A1 | 8/2005 | Mackenzie |
| 2005/0205661 A1 | 9/2005 | Taylor |
| 2005/0209961 A1 | 9/2005 | Michelsen |
| 2005/0220324 A1 | 10/2005 | Klein et al. |
| 2005/0228733 A1 | 10/2005 | Bent |
| 2005/0252955 A1 | 11/2005 | Sugai |
| 2005/0267843 A1 | 12/2005 | Acharya et al. |
| 2005/0268107 A1 | 12/2005 | Harris et al. |
| 2005/0269412 A1 | 12/2005 | Chiu |
| 2005/0273368 A1 | 12/2005 | Hutten et al. |
| 2005/0278250 A1 | 12/2005 | Zair |
| 2005/0281448 A1 | 12/2005 | Lugg |
| 2005/0281471 A1 | 12/2005 | LeConte |
| 2005/0281474 A1 | 12/2005 | Huang |
| 2005/0289030 A1 | 12/2005 | Smith |
| 2005/0289182 A1 | 12/2005 | Pandian et al. |
| 2006/0002426 A1 | 1/2006 | Madour |
| 2006/0004660 A1 | 1/2006 | Pranger |
| 2006/0017752 A1 | 1/2006 | Kurzweil et al. |
| 2006/0025697 A1 | 2/2006 | Kurzweil |
| 2006/0039628 A1 | 2/2006 | Li et al. |
| 2006/0039629 A1 | 2/2006 | Li |
| 2006/0041506 A1 | 2/2006 | Mason et al. |
| 2006/0045321 A1* | 3/2006 | Yu ..................... G06K 9/3216 |
| | | 382/137 |
| 2006/0047593 A1 | 3/2006 | Naratil |
| 2006/0053056 A1 | 3/2006 | Alspach-Goss |
| 2006/0059085 A1 | 3/2006 | Tucker |
| 2006/0064368 A1 | 3/2006 | Forte |
| 2006/0080245 A1 | 4/2006 | Bahl |
| 2006/0085357 A1 | 4/2006 | Pizarro |
| 2006/0085516 A1 | 4/2006 | Farr et al. |
| 2006/0102704 A1 | 5/2006 | Reynders |
| 2006/0106691 A1 | 5/2006 | Sheaffer |
| 2006/0106717 A1 | 5/2006 | Randle |
| 2006/0110063 A1 | 5/2006 | Weiss |
| 2006/0112013 A1 | 5/2006 | Maloney |
| 2006/0115110 A1 | 6/2006 | Rodriguez |
| 2006/0115141 A1 | 6/2006 | Koakutsu et al. |
| 2006/0118613 A1 | 6/2006 | McMann |
| 2006/0124730 A1 | 6/2006 | Maloney |
| 2006/0144924 A1 | 7/2006 | Stover |
| 2006/0144950 A1 | 7/2006 | Johnson |
| 2006/0161501 A1 | 7/2006 | Waserstein |
| 2006/0164682 A1 | 7/2006 | Lev |
| 2006/0166178 A1 | 7/2006 | Driedijk |
| 2006/0167818 A1 | 7/2006 | Wentker et al. |
| 2006/0182331 A1 | 8/2006 | Gilson et al. |
| 2006/0182332 A1 | 8/2006 | Weber |
| 2006/0186194 A1 | 8/2006 | Richardson et al. |
| 2006/0206506 A1 | 9/2006 | Fitzpatrick |
| 2006/0208059 A1 | 9/2006 | Cable et al. |
| 2006/0210138 A1 | 9/2006 | Hilton et al. |
| 2006/0212391 A1 | 9/2006 | Norman et al. |
| 2006/0214940 A1 | 9/2006 | Kinoshita |
| 2006/0215204 A1 | 9/2006 | Miyamoto et al. |
| 2006/0215230 A1 | 9/2006 | Borrey et al. |
| 2006/0222202 A1 | 10/2006 | Sambongi et al. |
| 2006/0229976 A1 | 10/2006 | Jung |
| 2006/0229986 A1 | 10/2006 | Corder |
| 2006/0238503 A1 | 10/2006 | Smith |
| 2006/0242062 A1 | 10/2006 | Peterson |
| 2006/0242063 A1 | 10/2006 | Peterson |
| 2006/0249567 A1 | 11/2006 | Byrne |
| 2006/0274164 A1 | 12/2006 | Kimura et al. |
| 2006/0279628 A1 | 12/2006 | Fleming |
| 2006/0282383 A1 | 12/2006 | Doran |
| 2006/0291744 A1 | 12/2006 | Ikeda et al. |
| 2007/0016796 A1 | 1/2007 | Singhal |
| 2007/0019243 A1 | 1/2007 | Sato |
| 2007/0022053 A1 | 1/2007 | Waserstein |
| 2007/0027802 A1 | 2/2007 | VanDeburg et al. |
| 2007/0030357 A1 | 2/2007 | Levien et al. |
| 2007/0031022 A1 | 2/2007 | Frew |
| 2007/0038561 A1 | 2/2007 | Vancini et al. |
| 2007/0041629 A1 | 2/2007 | Prakash et al. |

**US 9,818,090 B1**

Page 6

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 2007/0050292 A1 | 3/2007 | Yarbrough |
| 2007/0053574 A1 | 3/2007 | Verma et al. |
| 2007/0058851 A1 | 3/2007 | Quine |
| 2007/0063016 A1 | 3/2007 | Myatt |
| 2007/0064991 A1 | 3/2007 | Douglas et al. |
| 2007/0065143 A1 | 3/2007 | Didow et al. |
| 2007/0075772 A1 | 4/2007 | Kokubo |
| 2007/0076940 A1 | 4/2007 | Goodall et al. |
| 2007/0076941 A1 | 4/2007 | Carreon et al. |
| 2007/0077921 A1 | 4/2007 | Hayashi |
| 2007/0080207 A1 | 4/2007 | Williams |
| 2007/0082700 A1 | 4/2007 | Landschaft |
| 2007/0084911 A1 | 4/2007 | Crowell |
| 2007/0086642 A1 | 4/2007 | Foth |
| 2007/0086643 A1 | 4/2007 | Spier |
| 2007/0094088 A1 | 4/2007 | Mastie |
| 2007/0094140 A1 | 4/2007 | Riney et al. |
| 2007/0100748 A1 | 5/2007 | Dheer |
| 2007/0110277 A1 | 5/2007 | Hayduchok et al. |
| 2007/0118472 A1 | 5/2007 | Allen-Rouman et al. |
| 2007/0122024 A1 | 5/2007 | Haas et al. |
| 2007/0127805 A1 | 6/2007 | Foth et al. |
| 2007/0129955 A1 | 6/2007 | Dalmia |
| 2007/0136198 A1 | 6/2007 | Foth et al. |
| 2007/0140545 A1 | 6/2007 | Rossignoli |
| 2007/0140594 A1 | 6/2007 | Franklin |
| 2007/0143208 A1 | 6/2007 | Varga |
| 2007/0150337 A1 | 6/2007 | Hawkins et al. |
| 2007/0156438 A1 | 7/2007 | Popadic |
| 2007/0168265 A1 | 7/2007 | Rosenberger |
| 2007/0171288 A1 | 7/2007 | Inoue |
| 2007/0172107 A1* | 7/2007 | Jones ................. G06K 9/033 |
| | | 382/137 |
| 2007/0172148 A1 | 7/2007 | Hawley |
| 2007/0179883 A1 | 8/2007 | Questembert |
| 2007/0183000 A1 | 8/2007 | Eisen et al. |
| 2007/0183741 A1 | 8/2007 | Lerman et al. |
| 2007/0194102 A1 | 8/2007 | Cohen |
| 2007/0198432 A1 | 8/2007 | Pitroda et al. |
| 2007/0203708 A1 | 8/2007 | Polcyn et al. |
| 2007/0208816 A1 | 9/2007 | Baldwin et al. |
| 2007/0217669 A1 | 9/2007 | Swift et al. |
| 2007/0233585 A1 | 10/2007 | Ben Simon et al. |
| 2007/0235518 A1 | 10/2007 | Mueller et al. |
| 2007/0235520 A1 | 10/2007 | Smith et al. |
| 2007/0241179 A1 | 10/2007 | Davis |
| 2007/0244782 A1 | 10/2007 | Chimento |
| 2007/0246525 A1 | 10/2007 | Smith et al. |
| 2007/0251992 A1 | 11/2007 | Sharma et al. |
| 2007/0255652 A1 | 11/2007 | Tumminaro |
| 2007/0255653 A1 | 11/2007 | Tumminaro |
| 2007/0255662 A1 | 11/2007 | Tumminaro |
| 2007/0258634 A1 | 11/2007 | Simonoff |
| 2007/0268540 A1 | 11/2007 | Gaspardo et al. |
| 2007/0271182 A1 | 11/2007 | Prakash et al. |
| 2007/0278286 A1 | 12/2007 | Crowell et al. |
| 2007/0288380 A1 | 12/2007 | Starrs |
| 2007/0288382 A1 | 12/2007 | Narayanan et al. |
| 2007/0295803 A1 | 12/2007 | Levine et al. |
| 2007/0299928 A1 | 12/2007 | Kohli et al. |
| 2008/0002911 A1 | 1/2008 | Eisen |
| 2008/0021802 A1 | 1/2008 | Pendleton |
| 2008/0040280 A1 | 2/2008 | Davis et al. |
| 2008/0052182 A1 | 2/2008 | Marshall |
| 2008/0059376 A1 | 3/2008 | Davis |
| 2008/0063253 A1 | 3/2008 | Wood |
| 2008/0068674 A1 | 3/2008 | McIntyre |
| 2008/0071721 A1 | 3/2008 | Wang |
| 2008/0080760 A1 | 4/2008 | Ronca |
| 2008/0086420 A1 | 4/2008 | Gilder et al. |
| 2008/0086421 A1 | 4/2008 | Gilder |
| 2008/0091599 A1 | 4/2008 | Foss, Jr. |
| 2008/0097909 A1 | 4/2008 | Jackson et al. |
| 2008/0103790 A1 | 5/2008 | Abernethy |
| 2008/0103967 A1 | 5/2008 | Ackert et al. |

| | | |
|---|---|---|
| 2008/0113674 A1 | 5/2008 | Baig |
| 2008/0114739 A1 | 5/2008 | Hayes |
| 2008/0116257 A1 | 5/2008 | Fickling |
| 2008/0117991 A1 | 5/2008 | Peddireddy |
| 2008/0119178 A1 | 5/2008 | Peddireddy |
| 2008/0133411 A1 | 6/2008 | Jones et al. |
| 2008/0147549 A1 | 6/2008 | Ruthbun |
| 2008/0156438 A1 | 7/2008 | Stumphauzer et al. |
| 2008/0162319 A1 | 7/2008 | Breeden et al. |
| 2008/0162350 A1 | 7/2008 | Allen-Rouman et al. |
| 2008/0162371 A1 | 7/2008 | Rampell et al. |
| 2008/0177659 A1 | 7/2008 | Lacey et al. |
| 2008/0180750 A1 | 7/2008 | Feldman |
| 2008/0208727 A1 | 8/2008 | McLaughlin et al. |
| 2008/0214180 A1 | 9/2008 | Cunningham et al. |
| 2008/0219543 A1 | 9/2008 | Csulits |
| 2008/0245869 A1 | 10/2008 | Berkun et al. |
| 2008/0247629 A1 | 10/2008 | Gilder |
| 2008/0247655 A1 | 10/2008 | Yano |
| 2008/0249931 A1 | 10/2008 | Gilder |
| 2008/0249951 A1 | 10/2008 | Gilder et al. |
| 2008/0262953 A1 | 10/2008 | Anderson |
| 2008/0275821 A1 | 11/2008 | Bishop et al. |
| 2008/0316542 A1 | 12/2008 | Mindrum et al. |
| 2009/0024520 A1 | 1/2009 | Drory et al. |
| 2009/0046938 A1 | 2/2009 | Yoder |
| 2009/0060396 A1 | 3/2009 | Blessan et al. |
| 2009/0066987 A1 | 3/2009 | Inokuchi |
| 2009/0108080 A1 | 4/2009 | Meyer |
| 2009/0110281 A1 | 4/2009 | Hirabayashi |
| 2009/0141962 A1 | 6/2009 | Borgia et al. |
| 2009/0166406 A1 | 7/2009 | Pigg et al. |
| 2009/0167870 A1 | 7/2009 | Caleca et al. |
| 2009/0171819 A1 | 7/2009 | Von der Emde et al. |
| 2009/0171825 A1 | 7/2009 | Roman |
| 2009/0173781 A1 | 7/2009 | Ramachandran |
| 2009/0185738 A1 | 7/2009 | Nepomniachtchi |
| 2009/0190823 A1 | 7/2009 | Walters |
| 2009/0192938 A1 | 7/2009 | Amos |
| 2009/0236413 A1 | 9/2009 | Mueller et al. |
| 2009/0252437 A1 | 10/2009 | Li |
| 2009/0254447 A1 | 10/2009 | Blades |
| 2009/0281904 A1 | 11/2009 | Pharris |
| 2009/0284637 A1* | 11/2009 | Parulski ............ H04N 1/00183 |
| | | 348/333.12 |
| 2009/0313167 A1 | 12/2009 | Dujari et al. |
| 2010/0007899 A1 | 1/2010 | Lay |
| 2010/0027679 A1 | 2/2010 | Sunahara et al. |
| 2010/0047000 A1 | 2/2010 | Park et al. |
| 2010/0057578 A1 | 3/2010 | Blair et al. |
| 2010/0061446 A1 | 3/2010 | Hands et al. |
| 2010/0082470 A1 | 4/2010 | Walach |
| 2010/0165015 A1 | 7/2010 | Barkley et al. |
| 2010/0225773 A1* | 9/2010 | Lee .................... H04N 5/232 |
| | | 348/222.1 |
| 2010/0226559 A1 | 9/2010 | Najari et al. |
| 2010/0260408 A1 | 10/2010 | Prakash et al. |
| 2010/0262522 A1 | 10/2010 | Anderson et al. |
| 2010/0312705 A1 | 12/2010 | Caruso et al. |
| 2011/0016084 A1 | 1/2011 | Mundy et al. |
| 2011/0112967 A1 | 5/2011 | Anderson et al. |
| 2011/0310442 A1 | 12/2011 | Popadic et al. |
| 2012/0229872 A1 | 9/2012 | Dolev |
| 2013/0021651 A9 | 1/2013 | Popadic et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | WO 2006/075967 A1 | 7/2006 |
| WO | WO 2006/136958 A2 | 12/2006 |

OTHER PUBLICATIONS

"Adjusting Brightness and Contrast", www.eaglesoftware.com/adjustin.htm, retrieved on May 4, 2009 (4 pgs).

"Best practices for producing quality digital image files," Digital Images Guidelines, http://deepblue.lib.umich.edu/bitstream/2027.42/40247/1/Images-Best_Practice.pdf, downloaded 2007 (2 pgs).

## US 9,818,090 B1

Page 7

(56)          **References Cited**

OTHER PUBLICATIONS

"Chapter 7 Payroll Programs," Uniform Staff Payroll System. http://www2.oecn.k12.oh.us/www/ssdt/usps/usps_user_guide_005.html, Cited in U.S. Pat. No. 7,900,822, as dated 2007 (9 pgs).

"Check 21—The check is not in the post", RedTitan Technology 2004 http://www.redtitan.com/check21/htm (3 pgs).

"Check 21 Solutions," Columbia Financial International, Inc. http:// www.columbiafinancial.us/check21/solutions.htm, Cited in U.S. Pat. No. 7,900,822, as dated 2007 (8 pgs).

"Check Fraud: A Guide to Avoiding Losses", All Net, http://all.net/ books/audit/checkfraud/security.htm, Cited in U.S. Pat. No. 7,900,822, as dated 2007 (1 pg).

"Compliance with Regulation CC", http://www.federalreserve.gov/ Pubs/regcc/regcc.htm, Jan. 24, 2006 (6 pgs).

"Customer Personalized Bank Checks and Address Labels" Checks Your Way Inc., http://www.checksyourway.com/htm/web_pages/ faq.htm, Cited in U.S. Pat. No. 7,900,822. as dated 2007 (6 pgs).

"Direct Deposit Application for Payroll", Purdue University, Business Office Form 0003, http://purdue.edu/payroll/pdf/ directdepositapplication.pdf, Jul. 2007 (2 pgs).

"Direct Deposit Authorization Form", www.umass.edu/humres/library/DDForm.pdf, May 2003 (3 pgs).

"Direct Deposit," University of Washington, http://www.washington.edu/admin/payroll/directdeposit.html, Cited in U.S. Pat. No. 7,900,822, as dated 2007 (3 pgs).

"Electronic Billing Problem: The E-check is in the mail" American Banker—vol. 168, No. 95, May 19, 2003 (4 pgs).

"Frequently Asked Questions" Bank of America, http://www/ bankofamerica.com/deposits/checksave/index.cfm?template-lc_faq_bymail, Cited in U.S. Pat. No. 7,900,822, as dated 2007 (2 pgs).

"Full Service Direct Deposit", www.nonprofitstaffing.com/images/ upload/dirdepform.pdf. Cited in U.S. Pat. No. 7,900,822, as dated 2001, (2 pgs).

"How to Digitally Deposit a Check Image", Smart Money Daily, Copyright 2008 (5 pgs).

"ImageNet Mobile Deposit Provides Convenient Check Deposit and Bill Pay to Mobile Consumers," Miteksystems, 2008 (2 pgs).

"It's the easiest way to Switch banks", LNB, http://www.inbky. com/pdf/LNBswitch-kit10-07.pdf Cited in U.S. Pat. No. 7,996,316, as dated 2007 (7 pgs).

"Lesson 38—More Bank Transactions", Turtle Soft, http://www. turtlesoft.com/goldenseal-software-manual.lesson38.htm, Cited in U.S. Pat. No. 7,900,822, as dated 2007 (8 pgs).

"Middleware", David E. Bakken, Encyclopedia of Distributed Computing, Kluwer Academic Press, 2001 (6 pgs).

"Mitek Systems Announces Mobile Deposit Application for Apple iPhone," http://prnewswire.com/cgi-bin/stories/pl?ACCT–104 &STORY–/www/story/10-01-. . ., Nov. 25, 2008 (2 pgs).

"Personal Finance", PNC, http://www.pnc.com/webapp/unsec/ productsandservice.do?siteara–/PNC/home/personal/ account+services/quick+switch/quick+switch+faqs, Cited in U.S. Pat. No. 7,900,822, as dated 2007 (12 pgs).

"Refractive index" Wikipedia, the free encyclopedia; http://en. wikipedia.org./wiki/refractiveindex.com Oct. 16, 2007 (4 pgs).

"Remote Deposit Capture", Plante & Moran, http://plantemoran. com/industries/fincial/institutions/bank/resources/ community+bank+advisor/2007+summer+issue/ remote+deposit+capture.htm, Cited in U.S. Pat. No. 7,900,822, as dated 2007 (3 pgs).

"Remote Deposit" National City, http://www.nationalcity.com/ smallbusiness/cashmanagement/remotedeposit/default.asp; Cited in U.S. Pat. No. 7,900,822, as dated 2007 (3 pgs).

"Save on ATM Fees", RedEye Edition, Chicago Tribune, Chicago, IL Jun. 30, 2007 (2 pgs).

"Switching Made Easy," Bank of North Georgia, http://www. banknorthgeorgia.com/cmsmaster/documents/286/documents616. pdf, 2007 (7 pgs).

"Two Words Every Business Should Know: Remote Deposit," Canon, http://www.rpsolutions.com/rpweb/pdfs/canon_rdc.pdf, 2005 (7 pgs).

"Virtual Bank Checks", Morebusiness.com, http://www.morebusiness.com/running_your_business/businessbits/d908484987.brc, Cited in U.S. Pat. No. 7,900,822, as dated 2007 (3 pgs).

"WallStreetGrapevine.com" Stocks on the Rise: JADG, BKYI, MITK; Mar. 3, 2008 (4 pgs).

"What is check Fraud", National Check Fraud Center, http://www. ckfraud.org/ckfraud.html , Cited in U.S. Pat. No. 7,900,822, as dated 2007 (12 pgs).

Affinity Federal Credit Union, "Affinity Announces Online Deposit," Aug. 4, 2005 (1 pg).

Albrecht, W. Steve, "Check Kiting: Detection, Prosecution and Prevention," The FBI Law Enforcement Bulletin, Nov. 1, 1993 (6 pgs).

Alves, Vander and Borba, Paulo; "Distributed Adapters Pattern: A Design for Object-Oriented Distributed Applications"; First Latin American Conference on Pattern Languages of Programming; Oct. 2001; pp. 132-142; Rio de Janeiro, Brazil (11 pgs).

Amber Avalona-Butler / Paraglide, "At Your Service: Best iPhone Apps for Military Lifestyle," Jul. 9, 2010 (2 pgs).

Anderson, Milton M. "FSML and Echeck", Financial Services Technology Consortium, 1999 (17 pgs).

Archive Index Systems; Panini My Vision X-30 or VX30 or X30 © 1994-2008 Archive Systems, Inc. P./O. Box 40135 Bellevue, WA USA 98015 (2 pgs).

Associate of German Banks, SEPA 2008: Uniform Payment Instruments for Europe, Berlin, Cited in U.S. Pat. No. 7,900,822, as dated Jul. 2007, Bundesverbankd deutscher banker ev (42 pgs).

Automated Merchant Systems, Inc., "Electronic Check Conversion," http://www.automatedmerchant.com/electronic_check_conversion.cfm, 2006, downloaded Oct. 18, 2006 (3 pgs).

Bank Systems & Technology, Untitled Article, May 1, 2006, http:// www.banktech.com/showarticle.jhtml?articleID–187003126, "Are you Winning in the Payment World?" (4 pgs).

BankServ, "DepositNow: What's the difference?" Cited in U.S. Pat. No. 7,970,677, as dated 2006, (4 pgs).

BankServ, Product Overview, http://www.bankserv.com/products/ remotedeposit.htm, Cited in U.S. Pat. No. 7,970,677, as dated 2006, (3 pgs).

Blafore, Bonnie "Lower Commissions, Fewer Amenities", Better Investing, Madison Heights: Feb. 2003, vol. 52, Iss 6, (4 pgs).

BLM Technologies, "Case Study: Addressing Check 21 and RDC Error and Fraud Threats," Remote Deposit Capture News Articles from Jun. 11, 2007, Retrieved from http://www. remotedepositcapture.com/News/june_11_2007.htm on Feb. 19, 2008 (5 pgs).

Blue Mountain Consulting, from URL: www.bluemountainconsulting.com, Cited in U.S. Pat. No. 7,900,822, as dated Apr. 26, 2006 (3 pgs).

Board of Governors of the federal reserve system, "Report to the Congress on the Check Clearing for the 21st Century Act of 2003" Apr. 2007, Submitted to Congress pursuant to section 16 of the Check Clearing for the 21st Century Act of 2003, (59 pgs).

Bruene, Jim; "Check Free to Enable In-Home Remote Check Deposit for Consumers and Small Business", NetBanker. Com, Financial Insite, Inc., http://www. netbanker.com/2008/02/ checkfree_to_enableinhome_rem.html, Feb. 5, 2008 (3 pgs).

Bruene, Jim; "Digital Federal Credit Union and Four Others Offer Consumer Remote Deposit Capture Through EasCorp", NetBanker—Tracking Online Finance, www.netbanker.com/2008/ 04/digital_federal_credit_union_a.html, Apr. 13, 2008 (3 pgs).

Bruno, M., "Instant Messaging," Bank Technology News, Dec. 2002 (3 pgs).

Burnett, J. "Depository Bank Endorsement Requirements," BankersOnline.com, http://www.bankersonline.com/cgi-bin/ printview/printview.pl, Jan. 6. 2003 (3 pgs).

Canon, ImageFormula CR-25/CR-55, "Improve Your Bottom Line with Front-Line Efficiencies", 0117W117, 1207-55/25-1 OM-BSP, Cited in U.S. Pat. No. 7,949,587 as dated 2007. (4 pgs).

(56)           **References Cited**

OTHER PUBLICATIONS

Carrubba, P. et al., "Remote Deposit Capture: A White Paper Addressing Regulatory, Operational and Risk Issues," NetDeposit Inc., 2006 (11 pgs).

Century Remote Deposit High-Speed Scanner User's Manual Release 2006, (Century Manual), Century Bank, 2006, (32 pgs).

Chiang, Chuck, The Bulletin. "Remote banking offered", http://bendbulletin.com/apps/pbcs.dll/article?AID=/20060201/BIZ0102/602010327&templ . . . , May 23, 2008 (2 pgs).

CNN.com/technology, "Scan, deposit checks from home", www.cnn.com/2008ITECH/biztech/02/07/check.scanning.ap/index.html, Feb. 7, 2008 (3 pgs).

Constanzo, Chris, "Remote Check Deposit: Wells Captures a New Checking Twist", Bank Technology News Article—May 2005, www.americanbanker.com/btn_article.html?id=20050502YQ50FSYG (2 pgs).

Craig, Ben, "Resisting Electronic Payment Systems: Burning Down the House?", Federal Reserve Bank of Cleveland, Jul. 1999 (4 pgs).

Creativepaymentsolutions.com, "Creative Payment Solutions—Websolution," www.creativepaymentsolution.com/cps/financialservices/websolution/default.html, Copyright 2008, Creative Payment Solutions, Inc. (1 pg).

Credit Union Journal, "The Ramifications of Remote Deposit Capture Success", www.cuiournal.com/orinthis.html?id=20080411EODZT57G, Apr. 14, 2008 (1 pg).

Credit Union Journal, "AFCU Averaging 80 DepositHome Transactions Per Day", Credit Union Journal, Aug. 15, 2005 (1 pg).

DCU Member's Monthly—Jan. 2008, "PC Deposit—Deposit Checks from Home!", http://www.mycreditunionnewsletter.com/dcu/01 08/page1. html, Copyright 2008 Digital Federal Credit Union (2 pgs).

De Jesus, A. et al., "Distributed Check Processing in a Check 21 Environment: An educational overview of the opportunities and challenges associated with implementing distributed check imaging and processing solutions," Panini, 2004, pp. 1-22.

De Queiroz, Ricardo et al., "Mixed Raster Content (MRC) Model for Compound Image Compression", 1998 (14 pgs).

Debello, James et al., "RDM and Mitek Systems to Provide Mobile Check Deposit," Mitek Systems, Inc., San Diego, California and Waterloo, Ontario, (Feb. 24, 2009), 2 pgs.

DeYoung, Robert; "The Financial Performance of Pure Play Internet Banks"; Federal Reserve Bank of Chicago Economic Perspectives; 2001; pp. 60-75; vol. 25, No. 1 (16pgs).

Dias, Danilo et al., "A Model for the Electronic Representation of Bank Checks", Brasilia Univ. Oct. 2006 (5 pgs).

Digital Transactions News, "An ACH-Image Proposal for Check Roils Banks and Networks" May 26, 2006 (3 pgs).

Dinan, R.F. et al., "Image Plus High Performance Transaction System", IBM Systems Journal, 1990 vol. 29, No. 3 (14 pgs).

eCU Technologies, "Upost Remote Deposit Solution," Retrieved from the internet https://www.eutechnologies.com/products/upost.html, downloaded 2009 (1 pg).

EFT Network Unveils FAXTellerPlus, EFT Network, Inc., www.eftnetwork.com, Jan. 13, 2009 (2 pgs).

ElectronicPaymentProviders, Inc., "FAQs: ACII/ARC, CheckVerification/Conversion/Guarantee, RCK Check Re-Presentment," http://www.useapp.com/faq.htm, downloaded Oct. 18, 2006 (3 pgs).

Federal Check 21 Act, "New Check 21 Act effective Oct. 28, 2004: Bank No Longer Will Return Original Cancelled Checks," Consumer Union's FAQ's and Congressional Testimony on Check 21, www.consumerlaw.org.initiatives/content/check21_content.html, Cited in U.S. Pat. No. 7,873,200. as dated Dec. 2005 (20 pgs).

Federal Reserve Board, "Check Clearing for the 21st Century Act", FRB, http://www.federalreserve.gov/paymentsystems/truncation/, Mar. 1, 2006 (1 pg).

Federal Reserve System, "12 CFR, Part 229 [Regulation CC; Docket No. R-0926]: Availability of Funds and Collection of Checks," Federal Registrar, Apr. 28, 1997, pp. 1-50.

Federal Reserve System, "Part IV, 12 CFR Part 229 [Regulation CC; Docket No. R-1176]: Availability of Funds and Collection of Checks; Final Rule," Federal Registrar, vol. 69, No. 149, Aug. 4, 2004, pp. 47290-47328.

Fest. Glen., "Patently Unaware" Bank Technology News, Apr. 2006, Retrieved from the internet at URL:http://banktechnews.com/article.html?id=200640317612618 (5 pgs).

Fidelity Information Services, "Strategic Vision Embraces Major Changes in Financial Services Solutions: Fidelity's long-term product strategy ushers in new era of application design and processing," Insight, 2004, pp. 1-14.

Fisher, Dan M., "Home Banking in the 21st Century: Remote Capture Has Gone Retail", May 2008 (4 pgs).

Furst, Karen et al., "Internet Banking: Developments and Prospects", Economic and Policy Analysis Working Paper 2000-9, Sep. 2000 (60 pgs).

Garry, M., "Checking Options: Retailers face an evolving landscape for electronic check processing that will require them to choose among several scenarios," Supermarket News, vol. 53, No. 49, 2005 (3 pgs).

German Shegalov, Diplom-Informatiker, "Integrated Data. Message, and Process Recovery for Failure Masking in Web Services", Dissertation Jul. 2005 (146 pgs).

Gupta, Amar et al., "An Integrated Architecture for Recognition of Totally Unconstrained Handwritten Numerals", WP#3765. Jan. 1993, Productivity from Information Technology "Profit" Research Initiative Sloan School of Management (20 pgs).

Gupta, Maya R. et al., "OCR binarization and image pre-processing for searching historical documents", Pattern Recognition, vol. 40, No. 2, Feb. 2007, pp. 389-397.

Hale, J., "Picture this: Check 21 uses digital technology to speed check processing and shorten lag time," Columbus Business First, http://columbus.bizjournals.com/columbus/stories/2005/03/14focus1.html, downloaded 2007 (3 pgs).

Hartly, Thomas. "Banks Check Out New Image", Business First, Buffalo: Jul. 19, 2004, vol. 20, Issue 43, (3 pgs).

Heckenberg, D. "Using Mac OS X for Real-Time Image Processing" Oct. 8, 2003 (15 pgs).

Hildebrand, C. et al., "Electronic Money," Oracle, http://www.oracle.com/oramag/profit/05-feb/p15financial.html, 2005, downloaded Oct. 18, 2006 (5 pgs).

Hillebrand, G., "Questions and Answers About the Check Clearing for the 21st Century Act, Check 21," ConsumersUnion.org, http://www.consumersunion.org/finance/ckclear1002.htm, Jul. 27, 2004, downloaded Oct. 18, 2006 (6 pgs).

Image Master, "Photo Restoration: We specialize in digital photo restoration and photograph repair of family pictures", http://www.imphotorepair.com, Cited in U.S. Pat. No. 7,900,822, as downloaded Apr. 2007 (1 pg).

Investment Systems Company, "Portfolio Accounting System," 2000, pp. 1-32.

JBC, "What is a MICR Line?," eHow.com, retrieved from http://www.ehow.com/about_4684793_what-micr-line.html on May 4, 2009 (2 pgs).

Johnson, Jennifer J., Secretary of the Board; Federal Reserve System, 12 CFR Part 229, Regulation CC; Docket No. R 1176, "Availability of Funds and Collection of Checks". Cited in U.S. Pat. No. 7,900,822, as dated 2009, (89 pgs).

Kendrick, Kevin B., "Check Kiting, Float for Purposes of Profit," Bank Security & Fraud Prevention, vol. 1, No. 2, 1994 (3 pgs).

Kiser, Elizabeth K.; "Modeling the Whole Firm: The Effect of Multiple Inputs and Financial Intermediation on Bank Deposit Rates;" FEDS Working Paper No. 2004-07; Jun. 3, 2003; pp. 1-46 (46 pgs).

Knestout, Brian P. et al., "Banking Made Easy" Kiplinger's Personal Finance Washington, Jul. 2003, vol. 57, Iss 7 (5 pgs).

Kornai Andras et al., "Recognition of Cursive Writing on Personal Checks", Proceedings of International Workshop on the Frontiers in Handwriting Recognition, Cited in U.S. Pat. No. 7,900,822, as dated Sep. 1996, (6 pgs).

Levitin, Adam J., Remote Deposit Capture: A Legal and Transactional Overview, Banking Law Journal, p. 115, 2009 (RDC).

US 9,818,090 B1

Page 9

(56)                References Cited

OTHER PUBLICATIONS

Masonson, L., "Check Truncation and ACH Trends—Automated Clearing Houses", healthcare financial management associate, http://www.findarticles.com/p/articles/mI_m3276/is_n7_v47/ai_14466034/print, 1993 (2 pgs).

Matthews, Deborah, "Advanced Technology Makes Remote Deposit Capture Less Risky," Indiana Bankers Association, Apr. 2008 (2 pgs).

Metro 1 Credit Union, "Remote Banking Services," http://www.i.metro1cu.org/metro1cu/remote.html, downloaded Apr. 17, 2007 (4 pgs).

Mitek systems, "Imagenet Mobile Deposit", San Diego, CA, downloaded 2009 (2 pgs).

Mitek Systems: Mitek Systems Launches First Mobile Check Deposit and Bill Pay Application, San Diego, CA, Jan. 22, 2008 (3 pgs).

Mohl, Bruce, "Banks Reimbursing ATM Fee to Compete With Larger Rivals", Boston Globe, Boston, MA, Sep. 19, 2004 (3 pgs).

Moreau, T., "Payment by Authenticated Facsimile Transmission: a Check Replacement Technology for Small and Medium Enterprises," CONNOTECH Experts-conseils, Inc., Apr. 1995 (31 pgs).

Nelson, B. et al., "Remote deposit capture changes the retail landscape," Northwestern Financial Review, http://findarticles.com/p/articles/mi_qa3799/is_200607/ai_n16537250, 2006 (3 pgs).

NetBank, Inc., "Branch Out: Annual Report 2004," 2004 (150 pgs).

NetBank, Inc., "Quick Post: Deposit and Payment Forwarding Service," 2005 (1 pg).

NetDeposit Awarded Two Patents for Electronic Check Process. NetDeposit, Jun. 18, 2007, (1 pg).

Nixon, Julie et al., "Fiserv Research Finds Banks are Interested in Offering Mobile Deposit Capture as an," Fiserv, Inc. Brookfield, Wis., (Business Wire), (Feb. 20, 2009), 2 pgs.

Online Resources: Frequently Asked Questions, http://www.depositnow.com/faq.html, Copyright 2008 (1 pg).

Onlinecheck.com/Merchant Advisors, "Real-Time Check Debit", Merchant Advisors: Retail Check Processing Check Conversion, http://www.onlinecheck/wach/rcareal.htm, Cited in U.S. Pat. No. 7,900,822, as dated 2006 (3 pgs).

Oxley, Michael G., from committee on Financial Services; "Check Clearing for the 21st Century Act", 108th Congress, 1st Session House of Representatives report 108-132, Jun. 2003 (20 pgs).

Oxley, Michael G., from the committee of commerce; "Check Clearing for the 21st Century Act" 108th Congress, 1st Session Senate report 108-291, Oct. 1, 2003 (27 pgs).

Palacios, Rafael et al., "Automatic Processing of Brazilian Bank Checks". Cited in U.S. Pat. No. 7,900,822, as dated 2002 (28 pgs).

Patterson, Scott "USAA Deposit@Home—Another WOW moment for Net Banking", NextCU.com, Jan. 26, 2007 (5 pgs).

Public Law 108-100, 108 Congress; "An Act Check Clearing for the 21st Century Act", Oct. 28, 2003, 117 STAT. 1177 (18 pgs).

Rao, Bharat; "The Internet and the Revolution in Distribution: A Cross-Industry Examination"; Technology in Society; 1999; pp. 287-306; vol. 21, No. 3 (20 pgs).

Remotedepositcapture,     URL:www.remotedepositcapture.com, Cited in U.S. Pat. No. 7,900,822, as dated 2006 (5 pgs).

RemoteDepositCapture.com, "PNC Bank to Offer Ease of Online Deposit Service Integrated with QuickBooks to Small Businesses", Remote Deposit Capture News Articles from Jul. 24, 2006, (2 pgs).

RemoteDepositCapture.com, Remote Deposit Capture News Articles from Jul. 6, 2006, "BankServ Announces New Remote Deposit Product Integrated with QuickBooks" (3 pgs).

Remotedepositcapture.com, LLC, "Remote Deposit Capture Overview," ROC Overview, http://remotedepositcapture.com/overview/RDC_overview.htm, Cited in U.S. Pat. No. 7,900,822, as dated Mar. 12, 2007 (4 pgs).

Richey, J. C. et al., "EE 4530 Check Imaging," Nov. 18, 2008 (10 pgs).

Ritzer, J.R. "Hinky Dinky helped spearhead POS, remote banking movement", Bank Systems and Equipment, vol. 21, No. 12, Dec. 1984 (1 pg).

Rivlin, Alice M. et al., Chair, Vice Chair—Board of Governors, Committee on the Federal Reserve in the Payments Mechanism—Federal Reserve System, "The Federal Reserve in the Payments Mechanism", Jan. 1998 (41 pgs).

Rose, Sarah et al., "Best of the Web:The Top 50 Financial Websites", Money, New York, Dec. 1999, vol. 28, Iss. 12 (8 pgs).

Shelby, Hon. Richard C. (Committee on Banking, Housing and Urban Affairs); "Check Truncation Act of 2003", calendar No. 168, 108th Congress, 1st Session Senate report 108-79, Jun. 2003 (27 pgs).

SoyBank Anywhere, "Consumer Internet Banking Service Agreement," Dec. 6, 2004 (6 pgs).

Teixeira, D., "Comment: Time to Overhaul Deposit Processing Systems," American Banker, Dec. 10, 1998, vol. 163, No. 235, p. 15 (3 pgs).

Thailandguru.com: How and where to Pay Bills @ www.thailandguru.com/paying-bills.html (2 pgs).

The Automated Clearinghouse, "Retail Payment Systems; Payment Instruments Clearing and Settlement: The Automated Clearinghouse (ACH)", www.ffiec.gov/ffiecinfobase/booklets/retail/retail_02d.html, Cited in U.S. Pat. No. 7,900,822, as dated Dec. 2005 (3 pgs).

The Green Sheet 2.0: Newswire, "CO-OP adds home deposit capabilities to suite of check imaging products", www.greensheet.com/newswire.php?newswire_id=8799, Mar. 5, 2008 (2 pgs).

Tygar, J.D., Atomicity in Electronic Commerce, In ACM Networker, 2:2, Apr./May 1998 (12 pgs).

Valentine, Lisa, "Remote Deposit Capture Hot Just Got Hotter," ABA Banking Journal, Mar. 2006, p. 1-9.

Wade, Will, "Early Notes: Updating Consumers on Check 21" American Banker Aug. 10, 2004 (3 pgs).

Wallison, Peter J., "Wal-Mart Case Exposes Flaws in Banking-Commerce Split", American Banker, vol. 167. No. 8, Jan. 11, 2002 (3 pgs).

Wells Fargo 2005 News Releases, "The New Wells Fargo Electronic Deposit Services Break Through Banking Boundaries in the Age of Check 21". San Francisco Mar. 28, 2005, www.wellsfargo.com/press/3282005_check21Year=2005 (1 pg).

Wells Fargo Commercial, "Remote Deposit", www.wellsfargo.com/com/treasury_mgmt/receivables/electronic/remote_deposit, Copyright 2008 (1 pg).

White, J.M. et al., "Image Thresholding for Optical Character Recognition and Other Applications Requiring Character Image Extraction", IBM J. Res. Development, Jul. 1983, vol. 27, No. 4 (12 pgs).

Whitney et al., "Reserve Banks to Adopt DSTU X9.37-2003 Format for Check 21 Image Services", American Bankers Association, May 18, 2004, http://www.aba/com/NR/rdonlyres/CBDC1 A5C-43E3-43CC-B733- BE417C638618/35930/DSTUFormat.pdf (2 pages).

Wikipedia®, "Remote Deposit," http://en.wikipedia.org/wiki/Remote_deposit, 2007 (3 pgs).

Windowsfordevices.com, "Software lets camera phone users deposit checks, pay bills", www.windowsfordevices.com/news/NS3934956670.html, Jan. 29, 2008 (3 pgs).

Wolfe, Daniel, "Check Image Group Outlines Agenda," American Banker, New York, N.Y.: Feb. 13, 2009, vol. 174, Iss. 30, p. 12 (2 pgs).

Woody Baird Associated Press, "Pastor's Wife got Scammed—She Apparently Fell for Overseas Money Scheme," The Commercial Appeal, Jul. 1, 2006, p. A. 1.

Zhang, C.Y., "Robust Estimation and Image Combining" Astronomical Data Analysis Software and Systems IV, ASP Conference Series, 1995 (3 pgs).

Zions Bancorporation, "Moneytech, the technology of money in our world: Remote Deposit," http://www.bankjunior.com/pground/moneytech/remote_deposit.jsp, 2007 (2 pgs).

Application as filed Apr. 3, 2008 for U.S. Appl. No. 12/062,143 (27 pgs).

Application as filed Aug. 19, 2010 for U.S. Appl. No. 12/859,741 (235 pgs).

Application as filed Aug. 21, 2008 for U.S. Appl. No. 12/195,723 (38 pgs).

## US 9,818,090 B1

Page 10

(56)          **References Cited**

OTHER PUBLICATIONS

Application as filed Aug. 21, 2009 for U.S. Appl. No. 12/545,127 (45 pgs).
Application as filed Aug. 28, 2009 for U.S. Appl. No. 12/549,443 (41 pgs).
Application as filed Dec. 20, 2006 for U.S. Appl. No. 11/613,656 (21 pgs).
Application as filed Dec. 30, 2010 for U.S. Appl. No. 12/982,494 (280 pgs).
Application as filed Dec. 30, 2010 for U.S. Appl. No. 12/982,561 (275 pgs).
Application as filed Dec. 30, 2010 for U.S. Appl. No. 12/982,578 (274 pgs).
Application as filed Dec. 30, 2010 for U.S. Appl. No. 12/982,594 (275 pgs).
Application as filed Feb. 15, 2012 for U.S. Appl. No. 13/397,405 (19 pgs).
Application as filed Feb. 18, 2009 for U.S. Appl. No. 12/388,005 (37 pgs).
Application as filed Jan. 7, 2013 for U.S. Appl. No. 13/735,678 (30 pgs).
Application as filed Jul. 13, 2006 for U.S. Appl. No. 11/487,537 (23 pgs).
Application as filed Jul. 27, 2009 for U.S. Appl. No. 12/509,613 (48 pgs).
Application as filed Jul. 27, 2009 for U.S. Appl. No. 12/509,680 (41 pgs).
Application as filed Jun. 11, 2008 for U.S. Appl. No. 12/137,051 (29 pgs).
Application as filed Jun. 8, 2011 for U.S. Appl. No. 13/155,976 (352 pgs).
Application as filed Jun. 8, 2011 for U.S. Appl. No. 13/156,007 (356 pgs).
Application as filed Jun. 8, 2011 for U.S. Appl. No. 13/156,018 (353 pgs).
Application as filed Mar. 15, 2007 for U.S. Appl. No. 11/686,924 (34 pgs).
Application as filed Mar. 15, 2007 for U.S. Appl. No. 11/686,928 (36 pgs).
Application as filed Mar. 15, 2013 for U.S. Appl. No. 13/842,112 (62 pgs).
Application as filed Mar. 4, 2009 for U.S. Appl. No. 12/397,671 (40 pgs).
Application as filed Mar. 4, 2009 for U.S. Appl. No. 12/397,930 (37 pgs).
Application as filed May 10, 2007 for U.S. Appl. No. 11/747,222 (35 pgs).
Application as filed Oct. 17, 2008 for U.S. Appl. No. 12/253,278 (42 pgs).
Application as filed Oct. 23, 2007 for U.S. Appl. No. 11/876,925 (36 pgs).
Application as filed Oct. 23, 2007 for U.S. Appl. No. 11/877,335 (29 pgs).
Application as filed Oct. 25, 2007 for U.S. Appl. No. 11/923,839 (22 pgs).
Application as filed Oct. 29, 2007 for U.S. Appl. No. 11/926,388 (23 pgs).
Application as filed Oct. 30, 2007 for U.S. Appl. No. 11/928,297 (26 pgs).
Application as filed Oct. 31, 2006 for U.S. Appl. No. 11/590,974 (31 pgs).
Application as filed Oct. 31, 2006 for U.S. Appl. No. 11/591,008 (27 pgs).
Application as filed Oct. 31, 2006 for U.S. Appl. No. 11/591,227 (58 pgs).
Application as filed Oct. 31, 2006 for U.S. Appl. No. 11/591,273 (56 pgs).
Application as filed Oct. 31, 2007 for U.S. Appl. No. 11/930,537 (27 pgs).
Application as filed Oct. 31, 2007 for U.S. Appl. No. 11/931,670 (47 pgs).
Application as filed Oct. 8, 2007 for U.S. Appl. No. 11/868,884 (30 pgs).
Application as filed Sep. 28, 2007 for U.S. Appl. No. 11/864,569 (35 pgs).
Application as filed Sep. 8, 2008 for U.S. Appl. No. 12/205,996 (30 pgs).
Claims as filed Apr. 3, 2008 for U.S. Appl. No. 12/062,163 (3 pgs).
Claims as filed Apr. 3, 2008 for U.S. Appl. No. 12/062,175 (3 pgs).
Claims as filed Aug. 19, 2010 for U.S. Appl. No. 12/859,752 (5 pgs).
Claims as filed Dec. 15, 2011 for U.S. Appl. No. 13/327,478 (4 pgs).
Claims as filed Dec. 20, 2006 for U.S. Appl. No. 11/613,671 (3 pgs).
Claims as filed Dec. 20, 2012 for U.S. Appl. No. 13/722,576 (4 pgs).
Claims as filed Dec. 29, 2005 for U.S. Appl. No. 11/320,998 (3 pgs).
Claims as filed Dec. 29, 2005 for U.S. Appl. No. 11/321,027 (3 pgs).
Claims as filed Dec. 8, 2010 for U.S. Appl. No. 12/963,513 (7 pgs).
Claims as filed Feb. 12, 2013 for U.S. Appl. No. 13/765,412 (1 pg).
Claims as filed Feb. 15, 2012 for U.S. Appl. No. 13/397,437 (6 pgs).
Claims as filed Feb. 16, 2011 for U.S. Appl. No. 13/028,477 (3 pgs).
Claims as filed Feb. 19, 2013 for U.S. Appl. No. 13/770,048 (4 pgs).
Claims as filed Jan. 20, 2011 for U.S. Appl. No. 13/010,644 (9 pgs).
Claims as filed Jan. 31, 2011 for U.S. Appl. No. 13/017,865 (11 pgs).
Claims as filed Mar. 15, 2007 for U.S. Appl. No. 11/686,925 (5 pgs).
Claims as filed May 10, 2007 for U.S. Appl. No. 11/747,223 (4 pgs).
Claims as filed May 18, 2011 for U.S. Appl. No. 13/110,077 (9 pgs).
Claims as filed May 2, 2011 for U.S. Appl. No. 13/098,566 (10 pgs).
Claims as filed Nov. 20, 2012 for U.S. Appl. No. 13/682,268 (4 pgs).
Claims as filed Oct. 23, 2007 for U.S. Appl. No. 11/877,382 (6 pgs).
Claims as filed Oct. 24, 2008 for U.S. Appl. No. 12/257,471 (4 pgs).
Claims as filed Oct. 31, 2006 for U.S. Appl. No. 11/590,963 (3 pgs).
Claims as filed Oct. 31, 2006 for U.S. Appl. No. 11/590,995 (3 pgs).
Claims as filed Oct. 31, 2006 for U.S. Appl. No. 11/590,998 (4 pgs).
Claims as filed Oct. 31, 2007 for U.S. Appl. No. 11/931,804 (4 pgs).
Claims as filed Oct. 8, 2007 for U.S. Appl. No. 11/868,878 (4 pgs).
Claims as filed Sep. 14, 2012 for U.S. Appl. No. 13/619,026 (3 pgs).
Claims as filed Sep. 2, 2008 for U.S. Appl. No. 12/202,781 (4 pgs).
Claims as filed Sep. 8, 2008 for U.S. Appl. No. 12/206,001 (3 pgs).
Claims as filed Sep. 8, 2008 for U.S. Appl. No. 12/206,007 (3 pgs).
Doermann, David, et al., Progress in Camera-Based Document Image Analysis, Proceedings of the Seventh Int'l Conf. on Document Analysis and Recognition, 2003, 11 pages.
U.S. Appl. No. 12/545,127, Office Action dated Nov. 8, 2011, 7 pages.
U.S. Appl. No. 12/545,127, Office Action dated Apr. 4, 2012, 21 pages.
U.S. Appl. No. 12/545,127, Applicant's Appeal Brief dated Nov. 6, 2012, 21 pages.
U.S. Appl. No. 12/545,127, Office Action dated Oct. 9, 2013, 7 pages.
U.S. Appl. No. 12/549,443, Office Action dated May 8, 2012, 9 pages.
U.S. Appl. No. 12/549,443, Applicant's Office Action Response dated Aug. 28, 2012, 11 pages.
Aradhye, Hrishikesh B., "A Generic Method for Determining Up/Down Orientation of Text in Roman and Non-Roman Scripts," Pattern Recognition Society, Dec. 13, 2014, 18 pages.
Liang, Jian et al., Camera-Based Analysis of Text and Documents: A Survey, International Journal on Document Analysis and Recognition, Jun. 21, 2005, 21 pages.
Luo, Xi-Peng et al., "Design and Implementation of a Card Reader Based on Build-In Camera," Proceedings of the 17th International Conference on Pattern Recognition, 2004, 4 pages.
Zandifar, A., "A Video-Based Framework for the Analysis of Presentations/Posters," International Journal on Document Analysis and Recognition, Feb. 2, 2005, 10 pages.
Notice of Allowance from corresponding U.S. Appl. No. 12/545,127 dated Jan. 17, 2013 (7 pgs).
Office Action dated Oct. 9, 2013 from corresponding U.S. Appl. No. 12/545,127 (7 pgs).
Office Action from corresponding U.S. Appl. No. 12/545,127 dated Apr. 9, 2014 (6 pgs).

**US 9,818,090 B1**

Page 11

(56)            **References Cited**

OTHER PUBLICATIONS

Ex Parte Quayle Action from corresponding U.S. Appl. No. 12/545,127 dated Jun. 25, 2014 (6 pgs).
Notice of Allowance from corresponding U.S. Appl. No. 12/545,127 dated Oct. 15, 2014 (24 pgs).
U.S. Appl. No. 13/922,686, Office Action dated Oct. 16, 2013, 30 pages.
U.S. Appl. No. 13/922,686, Office Action dated Apr. 25, 2014, 50 pages.

* cited by examiner



*FIG. 1*

100

Case 2:18-cv-00245-JRG    Document 1-6    Filed 06/07/18    Page 14 of 32 PageID #:  198



200

*FIG. 2*

Case 2:20-cv-00245-JRG Document 1-6 Filed 06/07/18 Page 15 of 32 PageID #: 292





280

*FIG. 5*



300

*FIG. 6*

Appx289

U.S. Patent          Nov. 14, 2017          Sheet 5 of 8          US 9,818,090 B1



FIG. 7



810 — Receive request for access

820 — Initialize software object on camera

830 — Monitor image in field of view of camera with respect to monitoring criteria (e.g., light contrast, light brightness, positioning, dimensions, tolerances, character spacing, skewing, warping, corner detection, MICR line detection, etc.)

840 — Provide feedback to user regarding image

850 — Capture image when image passes monitoring criteria

860 — Transmit image

870 — Receive image; process image; process check; deposit funds into account

800

***FIG. 8***

910
User receives and endorses check
920
Open communication pathway between user and institution
930
User requests to deposit check
940
Receive, at institution system from camera, image in field of view of camera
950
Analyze image in field of view of camera with respect to monitoring criteria; provide feedback to user
960
Create digital image of check when image passes monitoring criteria
970
Upload digital image to institution; provide secondary data, if any, to institution
980
Institution receives digital image and processes digital image; processes check; deposits funds into account
900

*FIG. 9*

Case 2:18-cv-00245-JRG   Document 1-4   Filed 06/07/18   Page 29 of 32 PageID #: 214



1000

*FIG. 10*

US 9,818,090 B1

1

# SYSTEMS AND METHODS FOR IMAGE AND CRITERION MONITORING DURING MOBILE DEPOSIT

## CROSS REFERENCE TO RELATED APPLICATION(S)

This application is a continuation of U.S. patent application Ser. No. 13/922,686, filed Jun. 20, 2013, which is a continuation of U.S. patent application Ser. No. 12/545,127, filed Aug. 21, 2009 (issued as U.S. Pat. No. 8,977,571 on Mar. 10, 2015), all of which are hereby incorporated by reference herein in their entirety.

## BACKGROUND

Checks typically provide a safe and convenient method for an individual such as a payor to transfer funds to a payee. To use a check, the individual usually opens a checking account, or other similar account, at a financial institution and deposits funds, which are then available for later withdrawal. To transfer funds with a check, the payor usually designates a payee and an amount payable on the check. In addition, the payor often signs the check. Once the check has been signed, it is usually deemed negotiable, meaning the check may be validly transferred to the payee upon delivery. By signing and transferring the check to the payee, the payor authorizes funds to be withdrawn from the payor's account on behalf of the payee.

While a check may provide a payor with a convenient and secure form of payment, receiving a check may put certain burdens on the payee, such as the time and effort required to deposit the check. For example, depositing a check typically involves going to a local bank branch and physically presenting the check to a bank teller. To reduce such burdens for the payee, systems and methods have been developed to enable the remote deposit of checks. For example, the payee may capture a digital image of a check using a mobile device. The financial institution may then receive from the payee the digital image of the check. The financial institution may then use the digital image to credit funds to the payee. However, such a technique requires the efficient and accurate detection and extraction of the information pertaining to a check in the digital image. Capturing a digital image at a mobile device that allows for subsequent detection and extraction of the information from the digital image is difficult.

## SUMMARY

An image of a check that is in the field of view of a camera is monitored prior to the image of the check being captured. The camera is associated with a mobile device. The monitoring may be performed by the camera, the mobile device, and/or a financial institution that is in communication with the mobile device. When the image of the check in the field of view passes monitoring criteria, an image may be taken by the camera and provided from the mobile device to a financial institution. The check may be deposited in a user's bank account based on the image. Any technique for sending the image to the financial institution may be used.

In an implementation, the image capture may be performed automatically by the camera, the mobile device, and/or the financial institution as soon as the image of the check is determined to pass the monitoring criteria. In an implementation, feedback may be provided to the user of the camera regarding the image of the check in the field of view.

2

The user may reposition the check and/or the camera, for example, responsive to the feedback. Alternatively, the user may capture an image of the check responsive to the feedback.

This summary is provided to introduce a selection of concepts in a simplified form that are further described below in the detailed description. This summary is not intended to identify key features or essential features of the claimed subject matter, nor is it intended to be used to limit the scope of the claimed subject matter.

## BRIEF DESCRIPTION OF THE DRAWINGS

The foregoing summary, as well as the following detailed description of illustrative embodiments, is better understood when read in conjunction with the appended drawings. For the purpose of illustrating the embodiments, there are shown in the drawings example constructions of the embodiments; however, the embodiments are not limited to the specific methods and instrumentalities disclosed. In the drawings:

FIG. 1 is a block diagram of an implementation of a system in which example embodiments and aspects may be implemented;

FIG. 2 shows a high-level block diagram of an implementation of a system that may be used for the deposit of a check;

FIG. 3 is a diagram of an example image comprising a check image, a background image, and feedback;

FIG. 4 is a diagram of an example image divided into segments that may be used for monitoring the image;

FIG. 5 is a diagram of an example histogram for a segment of an image comprising check data and background data;

FIG. 6 shows a data flow diagram of a system for the deposit of a check, in accordance with an example embodiment;

FIG. 7 shows a block diagram of a client apparatus and a server apparatus for the deposit of a check, in accordance with an example embodiment;

FIG. 8 is an operational flow of an implementation of a method that may be used for deposit of a check using image monitoring of the check;

FIG. 9 is an operational flow of another implementation of a method that may be used for deposit of a check using image monitoring of the check; and

FIG. 10 is a block diagram of an example computing environment in which example embodiments and aspects may be implemented.

## DETAILED DESCRIPTION

In the following detailed description of example embodiments, reference is made to the accompanying drawings, which form a part hereof and in which is shown, by way of illustration, specific embodiments in which the example methods, apparatuses, and systems may be practiced. It is to be understood that other embodiments may be used and structural changes may be made without departing from the scope of this description.

FIG. 1 is a block diagram of an implementation of a system 100 in which example embodiments and aspects may be implemented. System 100 may include an account owner, referred to herein as a user 102, and financial institutions 130, 140, and 150, which may be any type of entity capable of processing a transaction involving a negotiable instrument. For example, financial institutions 130, 140, and 150 may be a retail bank, an investment bank, an investment

Case 2:19-cv-00245-JRG   Document 1-4   Filed 06/07/19   Page 22 of 31 PageID #: 116

US 9,818,090 B1

**3**

company, a regional branch of the Federal Reserve, a clearinghouse bank, and/or a correspondent bank.

A negotiable instrument typically includes a type of contract that obligates one party to pay a specified sum of money to another party. Negotiable instrument as used herein is an unconditional writing that promises or orders payment of a fixed amount of money. One example of a negotiable instrument is a check. The check may be taken by the receiving party and deposited into an account at a financial institution of the receiving party. The receiving party may endorse the check and then present it for deposit at a bank branch, via an automated teller machine (ATM), or by using remote deposit. Other examples of negotiable instruments include money orders, cashier's checks, drafts, bills of exchange, promissory notes, and the like. A money order is a trusted financial instrument that is a payment order for a pre-specified amount of money. A cashier's check (also known as a bank check, official check, teller's check, bank draft or treasurer's check) is a check guaranteed by a bank and may be purchased from a bank.

The user **102** may be an individual or entity who owns account **160** that may be held at financial institution **130**. Account **160** may be any type of deposit account for depositing funds, such as a savings account, a checking account, a brokerage account, and the like. The user **102** may deposit a check **108** or other negotiable instrument in the account **160** either electronically or physically. The financial institution **130** may process and/or clear the check **108** or other negotiable instrument. The user **102** may communicate with financial institution **130** by way of communications network **120** such as an intranet, the Internet, a local area network (LAN), a wide area network (WAN), a wireless fidelity (WiFi) network, a public switched telephone network (PSTN), a cellular network, a voice over Internet protocol (VoIP) network, and the like. The user **102** may communicate with financial institution **130** by phone, email, instant messaging, text messaging, web chat, facsimile, mail, and the like. Financial institutions **130**, **140**, and **150** also may communicate with each other by way of communications network **120**.

In an implementation, the user **102** may receive payment from another individual such as a payor in the form of a check **108** or other negotiable instrument that is drawn from account **170** at financial institution **150**. The user **102** may endorse the check **108** (e.g., sign the back of the check **108**) and indicate an account number on the check **108** for depositing the funds. It is noted that although examples described herein may refer to a check, the techniques and systems described herein are contemplated for, and may be used for, deposit of any negotiable instrument. Similarly, the techniques and systems described herein are contemplated for and may be used with any form or document whose image may be captured with a camera or other imaging device of a mobile device for subsequent storage and/or processing.

As described further herein, a digital image of a check or other negotiable instrument may be provided from a user to a financial institution, and the digital image may be processed and funds associated with the check or negotiable instrument in the digital image may be deposited in a user's bank account. The user **102** may deposit the check **108** into account **160** by making a digital image of the check **108** and sending the image file containing the digital image to financial institution **130**. For example, after endorsing the check **108**, the user **102** may use a mobile device **106** that comprises a camera to convert the check **108** into a digital image by taking a picture of the front and/or back of the

**4**

check **108**. The mobile device **106** may be a mobile phone (also known as a wireless phone or a cellular phone), a personal digital assistant (PDA), or any handheld computing device, for example. Aspects of an example mobile device are described with respect to FIG. **10**.

To increase the likelihood of capturing a digital image of the check **108** that may be readable and processed such that the check **108** can be cleared, the image is monitored for compliance with one or more monitoring criteria, prior to the image of the check **108** being captured. The monitoring criteria may be directed to proper lighting and/or framing of the check **108** in an image of the check **108** that will be captured and presented for clearing of the check **108**. An application may monitor whether the check **108** is sufficiently within the frame of the camera and has a high enough quality for subsequent processing. The monitoring is performed with respect to the image as it appears in the field of view of the camera of the mobile device **106**. The field of view is that part of the world that is visible through the camera at a particular position and orientation in space; objects outside the field of view when the image is captured are not recorded in the image. The monitoring criteria may be based on one or more of light contrast on the image, light brightness of the image, positioning of the image, dimensions, tolerances, character spacing, skewing, warping, corner detection, and MICR (magnetic ink character recognition) line detection, as described further herein. In an implementation, one or more histograms may be determined using the image being monitored. The histograms may be used in conjunction with monitoring criteria, as described further herein.

The monitoring may be performed by the camera, the mobile device **106**, and/or a financial institution that is in communication with the mobile device **106**. When the image of the check **108** in the field of view passes the monitoring criteria, an image may be taken by the camera and provided from the mobile device **106** to a financial institution. By ensuring that the image of the check passes monitoring criteria during pre-image capture monitoring, the number of non-conforming images of checks is reduced during presentment of the images to a financial institution for processing and clearing. In an implementation, feedback may be provided to the user **102** regarding the image of the check in the field of view. Based on the feedback, the user **102** may reposition the check **108** and/or the camera, for example, or may capture an image of the check **108**.

In an implementation, the image capture may be performed automatically by the camera, the mobile device **106**, and/or the financial institution as soon as the image of the check **108** is determined to pass the monitoring criteria. Alternatively, the user **102** may manually instruct the camera to perform the image capture (e.g., by pressing a button the camera or the mobile device **106**) after the user **102** receives an indication or other feedback that the image passes the monitoring criteria.

In an implementation, the user **102** may send the digital image(s) to financial institution **130** using the mobile device **106**. Any technique for sending a digital image to financial institution **130** may be used, such as providing a digital image to a website associated with financial institution **130** from storage, emailing a digital image to financial institution **130**, or sending a digital image in a text message or instant message, for example.

Financial institution **130** may receive a digital image representing the check **108** and may use any known image processing software or other application(s) to obtain the relevant data of the check **108** from the digital image.

Case 2:19-cv-00145-JRG    Document 1-4    Filed 06/07/18    Page 23 of 31 PageID #: 117

US 9,818,090 B1

5

Financial institution 130 may determine whether the financial information associated therewith may be valid. For example, financial institution 130 may include any combination of systems and subsystems such as electronic devices including, but not limited to, computers, servers, databases, or the like. The electronic devices may include any combination of hardware components such as processors, databases, storage drives, registers, cache, random access memory (RAM) chips, data buses, or the like and/or software components such as operating systems, database management applications, or the like. According to an embodiment, the electronic devices may include a network-based server that may process the financial information and may receive the digital image from the user 102.

The electronic devices may receive the digital image and may perform an analysis on the quality of the digital image, the readability of the data contained therein, or the like. For example, the electronic devices may determine whether the account number, amount payable, and the like may be readable such that it may be parsed or otherwise obtained and processed by the financial institution to credit an account 160 associated with the user 102 and debit an account associated with the payor. In an implementation, a representative 135 of financial institution 130 may provide assistance to the user 102 and may provide assistance in determining whether the financial information may be readable and/or of a good enough quality to be processed.

Upon receipt and approval of the digital image. financial institution 130 may credit the funds to account 160. Financial institution 130 may clear the check 108 by presenting a digital image of the check 108 captured from the digital image to an intermediary bank, such as a regional branch of the Federal Reserve, a correspondent bank, and/or a clearinghouse bank. For example, the check 108 may be cleared by presenting the digital image to financial institution 140, which may be a regional branch of the Federal Reserve, along with a request for payment. Financial institutions 130 and 150 may have accounts at the regional branch of the Federal Reserve. Financial institution 130 may create a substitute check using the image provided by the user 102 and present the substitute check to financial institution 140 for further processing. Upon receiving the substitute check, financial institution 140 may identify financial institution 150 as the paying bank (e.g., the bank from which the check 108 is drawn). This may be accomplished using a nine digit routing number located on the bottom left hand corner of the check. A unique routing number is typically assigned to every financial institution in the United States. Financial institution 140 may present the substitute check to financial institution 150 and request that the check be paid. If financial institution 150 verifies the check (i.e., agrees to honor the check), financial institution 140 may then settle the check by debiting funds from financial institution 150 and crediting funds to financial institution 130. Financial institution 150 may then debit funds from account 170.

It will be appreciated that the preceding examples are for purposes of illustration and explanation only, and that an embodiment is not limited to such examples. For example, financial institution 150 may be a correspondent bank (i.e., engaged in a partnership with financial institution 130). Thus, financial institution 130 may bypass the regional branch of the Federal Reserve and clear the check directly with financial institution 150. In addition, account 160 and account 170 may both be held at financial institution 130, in which case the check 108 may be cleared internally.

In an implementation, the mobile device 106 may comprise a video source such as a video camera, a web camera,

6

or a video-enabled phone, for example, to obtain a video of the check 108. A frame of the video may be obtained and monitored with respect to monitoring criteria, as described further herein. The mobile device 106 and/or the institution may obtain the frame and monitor the frame, depending on an implementation. Generation of a live video of the check 108 is not limited to a video camera, a web camera, and a video-enabled phone, and it is contemplated that any device that is capable of generating a live video may be used to make a video of the check 108 which may be monitored in real-time with respect to monitoring criteria. Additional devices that may be used in the generation and/or transmission of a live video include a web-enabled video computing device, a mobile phone, a camcorder, and a computer camera, for example.

FIG. 2 shows a high-level block diagram of an implementation of a system 200 that may be used for the deposit of a check, such as the check 108. As described further herein, the user 102 may deposit the funds of the check 108 using the camera functionality in the mobile device 106. In the example of one person giving a check to another person, this would enable the receiving party to deposit the funds at that time, without physically visiting an ATM or a bank branch.

In an implementation, the mobile device 106 may comprise a camera 207, such as a digital camera. Such a mobile device may be called a camera phone. The mobile device 106, through the camera 207, has the ability to take or capture a picture or digital image of the check 108 or other negotiable instrument. The camera 207 may take an image of the front of the check 108. Alternatively, the camera 207 may take an image of both the front and the back of the check 108. The back of the check may provide endorsement verification, such as the signature of the person or party the check is made out to.

In an implementation, prior to an image in the field of view of the camera 207 being captured by the camera 207, the image may be monitored with respect to monitoring criteria, e.g., using a software application running on the mobile device 106. Feedback based on the monitoring of the image may be provided to the user 102 to assist the user 102 in positioning the check 108 so that the image of the check 108 may be captured in such a manner that it may be more easily processed and cleared during subsequent operations, such as those involving one or more financial institutions.

A depository 204 may include a bank in which the user 102 has a deposit account; however, the present disclosure is not limited to just banks. Alternatively, a third party may act as the depository 204 providing functionality to a plurality of users without regard to the bank at which they have deposit accounts, or whether their individual bank allows for the methods and systems described herein. The depository 204, in an implementation, after receiving the image(s) of the check 108 from the user 102, may use a clearinghouse 210 to perform the check clearing operations. As described with respect to the system 100 of FIG. 1, check clearing operations are used by banks to do the final settlement of the check 108, such as removing funds from the account of the payor and transferring those funds to the user's bank. The user's bank may choose to make the funds available to the user 102 immediately and take on the risk that the check 108 does not clear. However, for various reasons, the bank may only make those funds available to the user 102 after the check 108 finally clears.

In an implementation, the user 102 may place the check 108 on a background and generate a digital image comprising an image of the check (e.g., a check image) and a portion

US 9,818,090 B1

7

of the background (e.g., a background image) using the camera 207. Any background may be used, although a dark background or a consistently colored background may provide more optimal results. It is noted that although examples and implementations described herein may refer to a check image and check data, the term "check image" may refer to any foreground image in a digital image (as opposed to the background image) and the term "check data" may refer to any foreground data in a digital image (as opposed to background data). Thus, the "check image" and the "check data" may refer to the foreground image and foreground data in implementations involving any negotiable instrument, form, or document.

In an implementation, the image being monitored in the field of view of the camera 207 comprises check data and background data. The check data pertains to the check image and the background data pertains to the background image (e.g., the background on which the check image is disposed).

FIG. 3 is a diagram of an example image 230 comprising a check image 247, a background image 250, and a feedback indicator 235 providing feedback to the user 102. The image 230 may be generated by an imaging device associated with the mobile device 106, such as the camera 207. An edge 245 separates the check image 247 from the background image 250. The edge 257 may be detected using any known technique(s). The image 230 may be provided in the field of view of the camera 207 prior to and during image capture of the check 108. The user 102 may adjust the camera 207, the check 108, and/or any light source so that the image 230 passes one or more monitoring criteria. For example, a light source from a specific angle can lead to poor light contrast. Light contrast may be a monitoring criterion, and poor light contrast may be corrected easily by moving the lens of the camera 207 to a different perspective, thereby allowing the image to pass the monitoring criterion.

Feedback regarding the image 230 in the field of view with respect to the monitoring criteria may be generated and provided to the user 102. In an implementation, the feedback may be provided visually, such as by text (e.g., "go closer", "go farther", "move the check to the right", "put the check on a darker background", "tilt the camera down", "take the picture now", etc.), arrows, or other visual indicators or cues (e.g., green lights, red lights, etc.) overlaid on the image 230, shown as feedback indicator 235. Alternatively or additionally, feedback may be provided to the user 102 aurally, such as through a speaker associated with the mobile device 106. The feedback may advise the user 102 to move the camera 207 or the check 108 or adjust the lighting or the background, for example. The feedback may also advise the user 102 when the image 230 passes the one or more monitoring criteria and to capture the image of the check 108.

One of the monitoring criteria may be based on the positioning of the check 180 in the image 230. The positioning of the check 108 may be determined from the image 230 and compared with predetermined dimensions (e.g., of a typical personal check, of a typical business check) and tolerances. If the dimensions are within a certain acceptable tolerance, then it may be determined that the check 108 is properly positioned. Such feedback may be generated and provided to the user 102.

In an implementation, the positioning of the check 108 in the image 230 may be compared with an alignment guide (which may or may not be visible to the user 102 in the field of view of the camera 207). For example, measurements may be made by a processor in the camera 207, the mobile device 106, or a computing device at the financial institution to determine the check's position with respect to the align-

8

ment guide. The measurements may be compared to predetermined measurements or values to determine whether the check's positioning in the image 230 is proper or sufficient for further processing of the image. Edge detection and/or corner detection may be used in such measurements (e.g., in measuring the distance from the check 108 in the image 230 to the alignment guide). Any known technique(s) for edge detection and/or corner detection may be used. In an implementation, corner detection itself may be a monitoring criterion, such that if corner detection of the check 108 in the image 230 is achieved, then it may be concluded that the image 230 may be properly processed and cleared by a depository (i.e., the image 230 passes the monitoring criteria).

The alignment guide may be overlaid on the camera feed of the mobile device 106, in an implementation. The alignment guide may take any shape such as a bounding rectangle or other bounding box or shape, horizontal and/or vertical bars, parallel lines, etc., for example. With a bounding rectangle, for example, such as the alignment guide, aligning the check 108, thereby passing this monitoring criterion, means enclosing the check 108 within the bounding rectangle. If the check 108 is outside of the alignment guide in the image 230, feedback may be generated and provided to the user 102 regarding this monitoring criterion with instructions for moving the check 108 or the camera 207 in order to properly align the check 108 in the field of view.

The operator of the camera 207 may introduce distortions in the image due to a perspective problem, specifically an angling of the camera vertically over the check, and the top of the check is smaller than the bottom, or the reverse. Monitoring criteria may also be directed to determining whether the image is skewed or warped. Skewing occurs when the check 208 is rotated from the horizontal in the image 230. By measuring the distance from the edge(s) of the check 208 in the image to an alignment guide or the edge of the field of view, it may be determined whether the check 208 is skewed (e.g., by comparing the distances to one another, by comparing the distances to predetermined values, etc.). If skewing is present in the image 230, feedback may be generated and provided to the user 102 with instructions for moving the check 108 or the camera 207 in order to properly align the check 108 in the field of view with respect to the horizontal.

Warping, as used herein, is meant to denote that the check 108 is tilted forward or back with respect to a plane that is perpendicular to a line drawn from the camera lens to the center of the check 108. Warping, or tilting, of the image may lead to incorrect optical detection of the check 108. In an implementation, a processor in the camera 207, the mobile device 106, or a computing device at the financial institution may determine whether warping is present in the image, and if so, may generate and provide feedback to the user 102. Such feedback may comprise instructions to the user 102 for moving the check 108 or the camera 207 such that the check 108 would appear to be perpendicular to an imaginary line drawn from the center of the camera lens to the center of the check 108 itself (e.g., dewarping instructions).

If user involvement is tolerated, the user may be queried to supply or identify one or more corners of the check 108 in the image 230. The perimeter of the check 108 may be determined using this information. Additionally, this information may be used for monitoring the image 230 for distortions.

In an implementation, a monitoring criterion may be whether the MICR line can be detected and/or read. Any

US 9,818,090 B1

9

known MICR line detection technique(s) may be used by the camera 207, the mobile device 106, and/or the financial institution (e.g., using an image processor, for example) to detect the MICR line on the check 108 in the image 230. If the MICR line can be detected, it may be determined that the image 230 may be captured and sent to the financial institution for processing and clearing of the check 108 (i.e., the image passes the monitoring criterion directed to MICR line detection). If the MICR line cannot be detected, feedback may be provided to the user 102, such as to reposition the check 108 and/or the camera 207 (i.e., the image fails to pass the monitoring criterion, perhaps because the image is out of focus or the lighting is inadequate, for example).

In an implementation, spacing between certain characters, points, or features (e.g., MICR number, "$" sign, signature line, courtesy amount line, legal amount line, etc.) may be determined and used as a monitoring criterion. For example, if the MICR line can be detected, then the spacing between the numbers in the MICR line may be determined using any known measuring and/or image processing technique(s). If the spacing is outside of a certain range corresponding to valid spacing between number in a MICR line, then it may be determined that the image 230 may be not properly processed if captured by the camera 207. In such a case, feedback may be generated and provided to the user 102, such as to reposition the check 108 and/or the camera 207.

Another monitoring criterion may be based on the light in the image 230, such as the light contrast and/or light brightness found on the image 230, such as in various regions of the image 230. For example, if the light contrast between the check image 247 and the background image 250 is less than a predetermined amount, then it may be determined that the image 230 may be not properly processed if captured by the camera 207. In such a case, instead of capturing the image 230, feedback may be generated and provided to the user 102 to adjust the camera 207, the check 108, and/or the lighting in order to bring the image 230 into compliance with the monitoring criteria.

As another example, the light brightness on various regions of the image may be determined and compared to each other and/or may be compared to a predetermined threshold. If the difference between the light brightness of the various regions is less than a predetermined amount (e.g., the light brightness does not vary significantly among the regions) or if the light brightness is less than a predetermined threshold, then it may be determined that the image 230 may be properly processed if captured by the camera 207. Otherwise, feedback may be generated and provided to the user 102 to adjust the camera 207, the check 108, and/or the lighting in order to change the light brightness on the image 230.

In an implementation, one or more histograms may be generated based on the image 230 and used in the determination of light contrast and/or light brightness monitoring criteria. A histogram is a well known graph and may be used to display where all of the brightness levels contained in an image are found, from the darkest to the brightest. These values may be provided across the bottom of the graph from left (darkest) to right (brightest). The vertical axis (the height of points on the graph) shows how much of the image is found at any particular brightness level.

Histograms may be used to monitor whether the light on the image 230 is uniform, not too bright, etc. For example, the mobile device 106 can monitor the histogram of the image 230 to ensure that there is a large contrast between the background image 250 and the check image 247. Feedback may be provided to the user 102 as to how to move or adjust

10

the camera, lighting, etc. in order to get a good image for subsequent processing (i.e., how to get an image that passes the monitoring criteria).

In an implementation, the image 230 may be divided into segments, such as those shown in FIG. 4. FIG. 4 is a diagram of the example image 230 of FIG. 3 divided into segments 260, 265, 270, 275 that may be used for monitoring the image 230. Although four segments are shown in FIG. 4, any number of segments may be used with techniques described herein. Although the segments 260, 265, 270, 275 are formed by dividing the image 250 into quadrants, the segments may be formed by any techniques, take any shape, and have any area, subject to a constraint that each segment comprises a portion of the check data 247 and a portion of the background data 250 separated by a portion of the edge 245. In this manner, distinct areas of density corresponding to the background of the image and the check data of the image may be provided in a histogram.

FIG. 5 is a diagram of an example histogram 280 for a segment of an image comprising check data and background data. The horizontal axis of the histogram 280 represents the grayscale level between 0 and 255, where 0 represents true black and 255 represents true white. The vertical axis represents the amount of the image at a particular grayscale level of the horizontal axis. Any known technique for generating a histogram for an image (such as a grayscale image of the image 230) may be used. The histogram 280 shows two distinct areas of density (i.e., two distinct density distributions). The density area 286 closer to the grayscale level of zero corresponds to the background of the image, and the density area 289 closer to the grayscale level of 255 corresponds to the check data.

The density distribution for each segment (or for the entire image 230) may be analyzed to determine whether the light contrast and/or light brightness is appropriate for processing and clearing of the check 108 in the image 230 (and thus passes that monitoring criterion) or whether the light contrast and/or light brightness does not pass the monitoring criterion and the camera 207, the check 108, and/or the light source should be adjusted or repositioned. For example, the density distributions for the segments may be compared with each other and/or may be compared to predetermined values or levels. If the differences are less than a predetermined difference amount, such as less than 1 percent different, less than 5 percent different, etc., then the image 230 may be captured and sent to the financial institution for processing. Otherwise, feedback may be generated and provided to the user 102 to reposition the camera 207, the check 108, and/or the light source.

When the image 230 passes the monitoring criteria (e.g., is positioned properly with respect to an alignment guide, is not warped, is not skewed, has adequate light brightness and/or light contrast, etc.), the image 230 may be captured either automatically (e.g., by the camera or the mobile device under direction of an application running on the camera 207 or the mobile device 106 or the financial institution) or manually (e.g., by the user 102 pressing a button or making a selection on the camera 207 or the mobile device 106). The digital image thus captured may be provided from the mobile device 106 to a financial institution. The check 108 may be deposited in a user's bank account based on the digital image. Any technique for sending the digital image to the financial institution may be used.

FIG. 6 shows a data flow diagram 300 of a system for the deposit of a check, in accordance with an example embodiment. In the data flow diagram 300, a client 320 is one

US 9,818,090 B1

11                                                                          12

example of the mobile device **106** of the user **102** described with respect to the systems **100** and **200** of FIGS. **1** and **2**, respectively. In an implementation, a server **322** may be a software component operable by the depository **204** of FIG. **2**. The client **320** may log in to a remote deposit system executed on the server **322**. The login **325** may serve to authenticate the user **102** as an authorized consumer of the depository **204**.

The server **322**, in one example, may send instructions **330** to the client **320** that execute an application on the client **320**. This may include instructions that cause a software object, which may have been previously downloaded and installed (e.g., pre-installed) on the client **320**, to be executed on the client **320**. The software object may analyze the image in the field of view of a digital camera (e.g., the image **230** shown in the field of view of the camera **207** associated with the mobile device **106**) with respect to one or more monitoring criteria and may generate and provide feedback to the user regarding the monitoring criteria and/or instructions for capturing an image of the check **108**.

In another example, the instructions **330** may include a wholly self-contained application that when delivered to the client **320** will execute and perform one or more operations described herein, such as those directed to analyzing the image in the field of view of the camera **207** with respect to monitoring criteria and providing feedback to the user **102**. In either example, the software object may be configured to make one or more software calls **310** to the camera **207**. This may be through specific software instructions to the camera **207**. In other words, the camera's functionality may not be abstracted through any software library. In such an example, software code may be written and delivered to every different camera-equipped mobile phone.

In an alternate example, the software object may operate through a software abstraction layer, such as an application programming interface (API). The software object developer may only insert code into the software object to call one or more APIs exposed by the software operating the mobile device **106**. One example of such software is Windows Mobile by Microsoft Corporation. In the context of a Windows Mobile device, the Windows Mobile operating system (OS) has one or more APIs exposed to application developers that will translate instructions from applications into instructions operable by the camera **207** on the mobile device **106**. A mobile operating system, also known as a mobile platform or a handheld operating system, is the operating system that controls a mobile device. Other mobiles OSs include Symbian OS, iPhone OS, Palm OS, BlackBerry OS, and Android.

The software object may cause the camera **207** to analyze an image in the field of view with respect to monitoring criteria, provide feedback, and/or take a picture or capture one or more images of the check **108** being deposited. These images may be captured sequentially, e.g., pursuant to the user **102** flipping the check **108** over after an image of the front of the check **108** has been captured after passing the monitoring criteria. However, each side of the check **108** may be captured by the camera **207** using similar API calls. The images may be stored in an image file **315**.

Once the images of one or both sides of the check **108** pass the monitoring criteria and are captured by the camera **207**, the image file **315** may be operated on by the software object of the client **320**. These operations may include any of the following: deskewing, dewarping, magnetic ink character recognition, cropping (either automatically, or having the user **102** manually identify the corners and/or edges of

the check **108** for example), reducing the resolution of the image, number detection, character recognition, and the like.

With respect to number and character recognition, commercial check scanners have used characteristics of the MICR encoding to detect information about the check, such as the bank's routing number and the account number. However, the characteristics that these scanners have used are the magnetic characteristic of the ink itself and these scanners have used methods similar to those of magnetic audio tape readers. In an implementation, a software object of the client **320** may optically recognize the characters on the MICR line, as a consumer mobile device such as the mobile device **106** will lack the magnetic reading ability of a commercial check scanner.

The image may be also down converted into a grayscale or black and white image, such as either in Joint Photographic Experts Group (JPEG) compliant format or in tabbed image file format (TIFF) for example. In an alternate example, the image may be formatted as a Scalable Vector Graphics (SVG) image. One of the benefits of an SVG file is a large size advantage over JPEG. In the former example, the image at some point before entry into the clearing system may be converted to TIFF format. This may be performed at the mobile device **106**, wherein the camera **207** captures the image in TIFF format. However, the camera **207** of the mobile device **106** may capture the image in JPEG format, which may then be converted into TIFF either at the mobile device **106** or at the server **322**. In the latter example, this may use the transmission of the TIFF image across a communications network which may be more advantageous as TIFF images are typically smaller in file size for the same size of picture as a JPEG formatted image.

The software object on the client **320** may operate by performing one or more of the operations described herein and then transmitting an image file **335** (e.g., based on image file **315** that has been processed) to the server **322** after the user **102** confirms that they do wish to deposit the check **108**. Alternately, the software object may capture the image of the check **108** and transmit that image to the server **322** that in turn may perform those operations, verifies that the image quality is within acceptable thresholds, and communicates that verification back to the client **320**, which can then instruct the user **102** to take a picture of the other side of the check **108**. In this example, the image transmitted to the server **322** may be in any format, such as JPEG or TIFF, insofar as the server software has the ability to convert that image into a Check 21 compliant format. Alternately, the bank may output an X9.37 file to the clearing system. The Check Clearing for the 21st Century Act (or Check 21 Act) is a United States federal law that allows the recipient of a paper check to create a digital version, thereby eliminating the need for further handling of the physical document. The Check 21 standard for electronic exchange is defined in the standard DSTU X9.37-2003 ("X9.37"). It is a binary interchange format.

The server **322** may confirm (e.g., using a process confirmation **340**) with the user **102** the transmission, reception, and processing of each side of the check **108** separately, or may confirm both sides at the same time. On the server side, more operations may be performed, such as signature verification. Where to perform these operations may be determined by the processing power of the mobile device **106** itself, which is typically limited in computational power. However, the present discussion is not limited in any way by discussion of where certain operations are described as operating. The operations of detecting and verifying information may be performed by the client **320** before the

US 9,818,090 B1

13

information is transmitted along with the image in the image file **335** to the server **322**. Alternately, the software object(s) operating on the mobile device **106** may perform no operation other then capturing images of the front and back of the check **108** after passing the monitoring criteria, receiving confirmation that the user **102** wishes to proceed, and transmitting those images to the server **322**, wherein the server **322** performs those operations.

In an implementation, after the image file **335** has been received by the server **322**, the server **322** may send a process confirmation **340** to the client **320**. The process confirmation **340** may request instructions from the client **320** to continue proceeding with the deposit now that the server **322** has received the image file **335**. In response, the client **320** may send a deposit confirmation **345** to the server **322**, instructing the server **322** to process the deposit of the check based on the image file **335** that had been received by the server **322**.

FIG. **7** shows a block diagram of a client apparatus **450** and a server apparatus **570** for the deposit of a check, in accordance with an example embodiment. The client apparatus **450** may include one or more software objects operating on a mobile device **106**, such as described above. The client apparatus **450** may include a communications module **452**, a check processing module **454**, and an image monitoring and capture module **456**. The client apparatus **450** may receive, in one example, one or more check images **458** as an input and output one or more processed images **460**.

In an implementation, the check images **458** may be received following a software call from the check processing module **454** to the image monitoring and capture module **456**. In such an implementation, the image monitoring and capture module **456** may include the camera **207** contained within the mobile device **106**. Alternately, the camera **207** may be detachably coupled to the mobile device **106** such as through a secure digital (SD) slot or over any suitable communications bus, such as USB (universal serial bus).

In an implementation, the image monitoring and capture module **456** may obtain an image and send the image to a financial institution (e.g., financial institution **130**, the server **322**, the server apparatus **570**, etc.) for processing. In an implementation, the client apparatus **450** may comprise a browser such as a web browser, for accessing a website on the Internet or other network associated with a financial institution. The user may access the website and select a "monitor and capture image" link or similar icon, button or link. for example, displayed on the browser. Such a selection may call the image monitoring and capture module **456** on the client apparatus **450**.

The communications module **452** may be configured, in one example, to receive and send data signals over a suitable communications network. This may include, without limitation, GSM/GPR3, HSDPA, CDMA, TDMA, 802.11, 802.16 and the like. While the bandwidth available to the mobile device **106** may be an implementation concern such discussion is outside the scope of the present discussion and any suitable wireless communications network is considered to be within the scope of the present discussion. With respect to the present discussion, the communications module **452** may receive one or more processed check images **460** from the check processing module **454** and may transmit them over the suitable communications network to the depository **204**, as described herein.

The check processing module **454** may be configured, in one example, to cause the image monitoring and capture module **456** to monitor an image of at least one side of a check provided in a field of view of the camera **207** and then

14

capture the image after it passes monitoring criteria. Compliance with the monitoring criteria is intended to ensure that the image of the check is suitable for one or more processing tasks. For instance, if the check is rotated 45 degrees clockwise when captured, the check processing module **454** or a software object operated on the server **322** described above may be unable to optically detect information on the check.

The check processing module **454** may perform one or more cleaning or processing operations on the captured image of the check. Such cleaning or processing may include dewarping and/or deskewing (if not part of the monitoring criteria, in an implementation), for example. Cleaning or processing may include down-converting the image received from the image capture module to a suitable size, such as 200 dots per inch (DPI) resolution or in a resolution range such as 200 DPI to 400 DPI, 300 DPI to 500 DPI, etc., and/or converting the image to grayscale or black and white. Such operation(s) may reduce the file size of the check image. Alternatively, the check processing module **454** may send instructions to the image monitoring and capture module **456** to cause the image monitoring and capture module **456** to capture an image of the check at a suitable resolution. The check processing module **454** may additionally perform any of the following operations, in further examples: convert from JPEG to TIFF, detect check information, perform signature detection on the image of the check, and the like. The check processing module **454** may, alternatively, send the captured check image to the server described herein for such processing, and receive confirmation that the operations were completed before further operations can proceed.

The size of the file sent between the mobile device and the server may be small. This runs counter with respect to automatic check detection against a background. If captured in color, the contrast between check and background becomes easier. However, the processed image sent over the communications network may need to be smaller, and if the detection operation is performed by the server, it may be advantageous to convert the captured image to grayscale, or even black and white, before transmission to the server. Grayscale images are compliant with the Check 21 Act.

While "flat" is a fairly well known term to users, each user's appreciation of flat with respect to the camera lens of the camera **207** associated with the mobile device **106** may result in a problem with needing to align the check image programmatically or risk rejecting a large number of check images. As the image captured is a set of pixels, a tilted image will result in a jagged polygon rather than a perfect rectangle. Using convex hull algorithms, the check processing modules may create a smooth polygon around the boundary and remove the concavity of the check image. Alternatively, a rotating calipers algorithm may be used to determine the tightest fitting rectangle around the check boundary, which can then be used to determine the angle of it, with that angle being used to align the check properly.

The server apparatus **570** may include one or more software objects operating on a server operated by the depository **204**. Aspects of an example server apparatus are described with respect to FIG. **10**. The server apparatus **570** may include a communications module **572**, a check processing module **574**, and a check clearance module **576**. The server apparatus **570** may receive one or more processed images **460** from a mobile device **106** or a client apparatus **450** as an input and may output a file such as a Check 21 compliant file **578**. The Check 21 compliant file **578** may be a file or entry in a record set that is compliant with the

Appx300

US 9,818,090 B1

15

clearinghouse rules set forth in the Check 21 Act and may include outputting an X9.37 file, in one example.

The communications module 572 may be configured to receive a wireless communication from the mobile device 106 over any suitable communications network, such as those described above. The communications module 572 may additionally receive a communication over a different communications network than the mobile device 106 communicated on, such as receiving the communication over a TCP/IP (Transmission Control Protocol/Internet Protocol) connection from the user's communication provider.

The check processing module 574 may be configured, in one example, to perform one or more check processing operations on the processed image(s) 460 that are received. In an implementation, these operations may include any of the operations described herein with respect to the check processing module 454. The operation of signature verification may be performed by the check processing module 574 of the server apparatus 570 as the server apparatus 570 may interface with other systems of the depository 204 that may maintain previously verified signature samples of the user 102. Performing signature verification at the client apparatus 450 may be computationally unfeasible; additionally, there may be a security risk if the signature sample is stored on the user's own device.

A cropped grayscale image may be sent to the server apparatus 570. The server apparatus 570 may extract information via a TIFF conversion and determine the DPI and re-scale to the proper DPI (e.g., convert to TIFF and detect the DPI that was used in the grayscale image). In an implementation, DPI detection may run on the client apparatus 450.

The check clearance module 576 may be configured, in one example, to receive a file from the check processing module 574 and may communicate with a check clearinghouse such that a Check 21 compliant file may be delivered to the check clearinghouse and funds may be received by the depository 204. The availability of the funds to the user 102 may be delayed by this operation such that the user 102 only has access to those funds when the depository 204 receives confirmation that the check has cleared.

FIG. 8 is an operational flow of an implementation of a method 800 that may be used for deposit of a check using image monitoring of the check. At 810, a request for access may be received from a user (e.g., the user 102). The user may request access to a deposit system operated by a depository (e.g., the depository 204) by way of a mobile device (e.g., the mobile device 106) such as a cellular phone, a PDA, a handheld computing device, etc. operated by the user. The access may be through some sort of user login, in some examples. The deposit system may be configured to receive a deposit of a negotiable instrument, such as a check, money order, cashier's check, etc. from the user and clear the negotiable instrument in a suitable clearinghouse system.

At 820, the system may initialize a software object on the mobile device. This may include sending instructions to the mobile device intended to execute a previously installed (i.e., pre-installed) software object. Alternatively, the system may send a software object to the mobile device that may execute the software object, carry out operations described herein by use of the software object, and terminate the software object. In an implementation, the system may instruct a camera associated with the mobile device to monitor and capture an image of the negotiable instrument in conjunction with monitoring criteria.

The user may use the camera to obtain an image in the field of view of the camera, and at 830, the image in the field

16

of view of the camera may be monitored with respect to one or more monitoring criteria, such as those described above. The monitoring may be performed by the camera, the mobile device, and/or a computing device associated with the depository, for example. The monitoring may be performed pursuant to instructions received at the camera or mobile device from the deposit system operated by a depository, the server 322, or the server apparatus 570, for example. In an implementation, the results of the monitoring may indicate that the camera and/or the check should be repositioned and/or the light source should be adjusted prior to an image capture in order to capture an image of the check that may be processed properly, e.g., to have the data from the check obtained without error from the image, so that that check can be cleared.

At 840, feedback based on the results may be generated and provided visually and/or aurally to the user via the camera and/or the mobile device. In an implementation, the feedback may be provided if the image fails to pass the monitoring criteria. The feedback may comprise instructions or guidance for the user to follow to obtain an image of the check in the field of view of the camera that will pass the monitoring criteria. Processing may continue at 830 with the image that is currently in the field of view of the camera (after the user has received and acted on the feedback) being monitored with respect to the monitoring criteria.

When the image in the field of view passes the monitoring criteria as determined at 830, the image in the field of view may be captured by the camera at 850. This may be accomplished through the software object accessing a camera associated with the mobile device (e.g., either comprised within the mobile device or separate from the mobile device). This may be done through an API exposed by the OS of the mobile device, or may be through software code customized for a specific phone and specific camera. With respect to the former, a developer of the software object may write code to the camera API(s), which may be specific to the OS and without regard to the camera on the device. The user may initiate the capture of the image (e.g., by pressing a button on the camera or the mobile device) or the image may be captured automatically, without user intervention, as soon as the image in the field of view is determined to have passed the monitoring criteria. In this manner, the occurrence of non-conforming images downstream (e.g., at a depository or financial institution) is reduced, and there is a high confidence that the image will be properly processed downstream.

In an implementation, when the image in the field of view is determined to pass the monitoring criteria, feedback may be generated and provided to the user indicating so. The feedback may instruct the user to capture the image now (e.g., by pressing a button on the camera or mobile device) or may advise the user that the image has been captured, for example.

At 860, the captured image may be transmitted to the depository, e.g. as a digital image file. At 870, the depository may receive the image of the check (along with financial information pertaining to the account for depositing funds, for example) and may process the image. Processing of the digital image file may include retrieving financial information regarding the check. The financial information may comprise the MICR number, the routing number, an amount, etc. Any known image processing technology may be used, such as edge detection, filtering to remove imagery except the check image or check data in the received digital image file, image sharpening, and technologies to distinguish between the front and the back sides of the check. The

US 9,818,090 B1

17

depository may identify and/or remove at least a portion of data that is extraneous to the check, such as background data.

After retrieving the financial information from the check in an electronic data representation form, the depository may determine whether the financial information such as the amount payable to the user, the account associated with the user to deposit funds, an account associated with a payor to debit funds, and an institution associated with the payor, etc., may be valid. For example, the depository may include electronic devices such as computers, servers, databases, or the like that may be in communication with each other. The electronic devices may receive an electronic data representation and may perform an analysis on the quality of the data representation, the readability of the data representation, or the like. For example, the electronic devices may determine whether the account number, amount payable, or the like may be readable such that they may be parsed and processed by the depository to credit an account associated with the user.

If the financial information is determined to be valid, the electronic data representation may be processed by the depository, thereby depositing the money in the user's account. If the financial information is determined to be invalid, then the user may be advised. For example, the depository may transmit an email, a web message, an instant message, or the like to the user indicating that the financial information associated with the electronic data representation may be invalid. The user may determine how to proceed by selecting an option on the web message, replying to the email, or the like.

Thus, in an implementation, instructions on how the user would like to proceed may be requested from the user, such as whether the user would like to try the deposit again (e.g., make another image of the check that pass the monitoring criteria and send it to the depository) or whether the user would like assistance from a representative, for example. The user may indicate how they would like to proceed. If the user would like assistance, the financial information may be transferred to a representative for further review. The representative may review the financial information associated with the electronic data representation to determine whether to allow the electronic data representation to be processed by the depository. If so, the electronic data representation of the financial information may be processed by the depository, thereby depositing the check in the user's account. The depository may send a notice to the user via email, facsimile, instant message, or mail, for example, that the check has been deposited into the selected account.

FIG. 9 is an operational flow of another implementation of a method 900 that may be used for deposit of a check using image monitoring of the check. A user (e.g., the user 102) may receive and endorse a check (e.g., the check 108) at 910, and open a communication pathway with an institution (e.g., the financial institution 130) at 920. In an implementation, the user may open a communication pathway with the institution by logging into a website of the institution, for example. There may be several ways in which a communication pathway may be established, including, but not limited to, an Internet connection via a website of the institution. The user may access the website and log into the website using credentials, such as, but not limited to, a username and a password.

At 930, the user may send a request to deposit the check and may select an account in which to deposit the check. In an implementation, the user may select a "deposit check" option provided on the website, and may enter details such

18

as check amount, date, the account the check funds should be deposited in, comments, etc.

At 940, an image in the field of view of the camera may be obtained and provided, via the communication pathway, to the institution. A still image may be provided or a video may be provided, such as a video stream generated by the camera.

At 950, the institution may receive the image or video stream and may analyze the image or a frame of the video stream with respect to one or more monitoring criteria, such as those described above. Feedback pertaining to the image with respect to the monitoring criteria may be generated and provided to the user over the communication pathway. Based on the feedback, the user may adjust the position the camera and/or the check and/or may adjust the light source until the image in the field of view of the camera is determined by the institution to pass the monitoring criteria.

When the image in the field of view passes the monitoring criteria, the image in the field of view may be captured (e.g., automatically without user intervention or pursuant to the user pressing a button) by the camera at 960, thereby creating a digital image of the check. In an implementation, the user may instruct the camera (e.g., by pressing a button on the camera or the mobile device) to create the digital image. In another implementation, the camera may automatically create the digital image as soon as the image of the check passes the monitoring criteria. In this manner, the user may point the camera at the check such that the image of the check appears in the field of view, and after image has been determined to pass the monitoring criteria, a digital image of the check may be created without further user intervention. Depending on the implementation, one or more digital images of the check (e.g., corresponding to the front and back of the check) may be created using such techniques.

At 970, the digital image(s) may be uploaded to the institution using any known image upload process. In an implementation, the upload may be augmented by secondary data which may be information relating to the deposit of the check, such as an account number and a deposit amount, for example. At 980, when the institution has received the digital images (e.g., of the front and back sides of the check), the institution may process the digital images to obtain an image of the check and to deposit the funds of the check in the user's account, as described herein. It is contemplated that processing such as grayscale conversion, image cropping, image compression, edge and/or corner detection, etc. may be implemented in the method 900. Such operations may be performed on one or more digital images created by the camera and may be performed on the image(s) by the mobile device and/or by the institution, as described further above.

Although the examples described herein may refer to uploading of images of checks to an institution, it is contemplated that any negotiable instrument or image (e.g., vehicle accident pictures provided to an insurance company) may be processed and/or transmitted using the techniques described herein. Additionally, one or more of the techniques described herein may be performed by the institution instead of the mobile device of the user.

FIG. 10 is a block diagram of an example computing environment in which example embodiments and aspects may be implemented. The computing system environment is only one example of a suitable computing environment and is not intended to suggest any limitation as to the scope of use or functionality. Numerous other general purpose or special purpose computing system environments or configurations may be used. Examples of well known computing

US 9,818,090 B1

19

20

systems, environments, and/or configurations that may be suitable for use include, but are not limited to, personal computers (PCs), server computers, handheld or laptop devices, multiprocessor systems, microprocessor-based systems, network PCs, minicomputers, mainframe computers, embedded systems, distributed computing environments that include any of the above systems or devices, and the like.

Computer-executable instructions, such as program modules, being executed by a computer may be used. Generally, program modules include routines, programs, objects, components, data structures, etc. that perform particular tasks or implement particular abstract data types. Distributed computing environments may be used where tasks are performed by remote processing devices that are linked through a communications network or other data transmission medium. In a distributed computing environment, program modules and other data may be located in both local and remote computer storage media including memory storage devices.

With reference to FIG. 10, a system 1000 includes a computer 1010 connected to a network 1014. The computer 1010 includes a processor 1020, a storage device 1022, an output device 1024, an input device 1026, and a network interface device 1028, all connected via a bus 1030. The processor 1020 represents a central processing unit of any type of architecture, such as a CISC (Complex Instruction Set Computing), RISC (Reduced Instruction Set Computing), VLIW (Very Long Instruction Word), or a hybrid architecture, although any appropriate processor may be used. The processor 1020 executes instructions and includes that portion of the computer 1010 that controls the operation of the entire computer. Although not depicted in FIG. 10, the processor 1020 typically includes a control unit that organizes data and program storage in memory and transfers data and other information between the various parts of the computer 1010. The processor 1020 receives input data from the input device 1026 and the network 1014 reads and stores code and data in the storage device 1022 and presents data to the output device 1024. Although the computer 1010 is shown to contain only a single processor 1020 and a single bus 1030, the disclosed embodiment applies equally to computers that may have multiple processors and to computers that may have multiple busses with some or all performing different functions in different ways.

The storage device 1022 represents one or more mechanisms for storing data. For example, the storage device 1022 may include read-only memory (ROM), RAM, magnetic disk storage media, optical storage media, flash memory devices, and/or other machine-readable media. In other embodiments, any appropriate type of storage device may be used. Although only one storage device 1022 is shown, multiple storage devices and multiple types of storage devices may be present. Further, although the computer 1010 is drawn to contain the storage device 1022, it may be distributed across other computers, for example on a server.

The storage device 1022 includes a controller (not shown in FIG. 10) and data items 1034. The controller includes instructions capable of being executed on the processor 1020 to carry out functions previously described herein with reference to FIGS. 1-9. In another embodiment, some or all of the functions are carried out via hardware in lieu of a processor-based system. In one embodiment, the controller is a web browser, but in other embodiments the controller may be a database system, a file system, an electronic mail system, a media manager, an image manager, or may include any other functions capable of accessing data items. The

storage device 1022 may also contain additional software and data (not shown), which is not necessary to understand the invention. Although the controller and the data items 1034 are shown to be within the storage device 1022 in the computer 1010, some or all of them may be distributed across other systems, for example on a server and accessed via the network 1014.

The output device 1024 is that part of the computer 1010 that displays output to the user. The output device 1024 may be a liquid crystal display (LCD) well-known in the art of computer hardware. In other embodiments, the output device 1024 may be replaced with a gas or plasma-based flat-panel display or a traditional cathode-ray tube (CRT) display. In still other embodiments, any appropriate display device may be used. Although only one output device 1024 is shown, in other embodiments any number of output devices of different types, or of the same type, may be present. In an embodiment, the output device 1024 displays a user interface. The input device 1026 may be a keyboard, mouse or other pointing device, trackball, touchpad, touch screen, keypad, microphone, voice recognition device, or any other appropriate mechanism for the user to input data to the computer 1010 and manipulate the user interface previously discussed. Although only one input device 1026 is shown, in another embodiment any number and type of input devices may be present.

The network interface device 1028 provides connectivity from the computer 1010 to the network 1014 through any suitable communications protocol. The network interface device 1028 sends and receives data items from the network 1014. The bus 1030 may represent one or more busses, e.g., USB, PCI, ISA (Industry Standard Architecture), X-Bus, EISA (Extended Industry Standard Architecture), or any other appropriate bus and/or bridge (also called a bus controller).

The computer 1010 may be implemented using any suitable hardware and/or software, such as a personal computer or other electronic computing device. Portable computers, laptop or notebook computers, PDAs, pocket computers, appliances, telephones, and mainframe computers are examples of other possible configurations of the computer 1010. For example, other peripheral devices such as audio adapters or chip programming devices, such as EPROM (Erasable Programmable Read-Only Memory) programming devices may be used in addition to, or in place of, the hardware already depicted.

The network 1014 may be any suitable network and may support any appropriate protocol suitable for communication to the computer 1010. In an embodiment, the network 1014 may support wireless communications. In another embodiment, the network 1014 may support hard-wired communications, such as a telephone line or cable. In another embodiment, the network 1014 may support the Ethernet IEEE (Institute of Electrical and Electronics Engineers) 802.3x specification. In another embodiment, the network 1014 may be the Internet and may support IP (Internet Protocol). In another embodiment, the network 1014 may be a LAN or a WAN. In another embodiment, the network 1014 may be a hotspot service provider network. In another embodiment, the network 1014 may be an intranet. In another embodiment, the network 1014 may be a GPRS (General Packet Radio Service) network. In another embodiment, the network 1014 may be any appropriate cellular data network or cell-based radio network technology. In another embodiment, the network 1014 may be an IEEE 802.11 wireless network. In still another embodiment, the network 1014 may be any suitable network or combination of net-

US 9,818,090 B1

21

works. Although one network **1014** is shown, in other embodiments any number of networks (of the same or different types) may be present.

It should be understood that the various techniques described herein may be implemented in connection with hardware or software or, where appropriate, with a combination of both. Thus, the methods and apparatus of the presently disclosed subject matter, or certain aspects or portions thereof, may take the form of program code (i.e., instructions) embodied in tangible media, such as floppy diskettes, CD-ROMs, hard drives, or any other machine-readable storage medium wherein, when the program code is loaded into and executed by a machine, such as a computer, the machine becomes an apparatus for practicing the presently disclosed subject matter. In the case of program code execution on programmable computers, the computing device generally includes a processor, a storage medium readable by the processor (including volatile and nonvolatile memory and/or storage elements), at least one input device, and at least one output device. One or more programs may implement or use the processes described in connection with the presently disclosed subject matter, e.g., through the use of an API, reusable controls, or the like. Such programs may be implemented in a high level procedural or object-oriented programming language to communicate with a computer system. However, the program(s) can be implemented in assembly or machine language, if desired. In any case, the language may be a compiled or interpreted language and it may be combined with hardware implementations.

Although exemplary embodiments may refer to using aspects of the presently disclosed subject matter in the context of one or more stand-alone computer systems, the subject matter is not so limited, but rather may be implemented in connection with any computing environment, such as a network or distributed computing environment. Still further, aspects of the presently disclosed subject matter may be implemented in or across a plurality of processing chips or devices, and storage may similarly be effected across a plurality of devices. Such devices might include personal computers, network servers, and handheld devices, for example. Although the subject matter has been described in language specific to structural features and/or methodological acts, it is to be understood that the subject matter defined in the appended claims is not necessarily limited to the specific features or acts described above. Rather, the specific features and acts described above are disclosed as example forms of implementing the claims.

What is claimed is:

1. A system comprising:
an image capture device;
a presentation device; and
a processor in communication with the image capture device and the presentation device, the processor configured to:
monitor a target document in a field of view of the image capture device with respect to a monitoring criterion;
control the presentation device to present feedback information describing an instruction for satisfying the monitoring criterion;
determine whether the monitoring criterion is satisfied based on the target document in the field of view of the image capture device; and
when the monitoring criterion is determined to be satisfied, control the image capture device to capture

22

an image depicting the target document in the field of view of the image capture device.

2. The system of claim 1, wherein the processor is configured to control the presentation device to present the feedback information by displaying a written instruction on a display screen for satisfying the monitoring criterion.

3. The system of claim 2, wherein the written instruction requests a user to position the target document in the field of view of the image capture device.

4. The system of claim 1, wherein the processor is further configured to control the presentation device to present the feedback information when the monitoring criterion is determined not to be satisfied.

5. The system of claim 1, wherein the processor is configured to control the presentation device to present the feedback information by displaying a non-alphanumeric visual indicator on a display screen for satisfying the monitoring criterion.

6. The system of claim 1, wherein the processor is configured to control the presentation device to present the feedback information by outputting an audible instruction through a speaker for satisfying the monitoring criterion.

7. The system of claim 1, where the processor is configured to control the image capture device to capture the image automatically upon determining the monitoring criterion is satisfied.

8. The system of claim 1, wherein to monitor the target document in the field of view of the image capture device with respect to the monitoring criterion, the processor is further configured to:
measure a distance from an edge of the target document in the field of view of the image capture device to an edge of the field of view of the image capture device; and
compare the distance to a predetermined value to determine whether skew is present in the image depicting the target document.

9. The system of claim 8, wherein the processor is further configured to control the presentation device to present a skew correction feedback information when the skew is determined to be present in the image depicting the target document.

10. The system of claim 1, wherein the monitoring criterion comprises whether a corner of the image depicting the target document is detectable.

11. A method for capturing an image of a target document by a mobile computing device, the method comprising:
monitoring a target document in a field of view of an image capture device with respect to a monitoring criterion, wherein the image capture device is included in the mobile computing device;
controlling a presentation device to present feedback information describing an instruction for satisfying the monitoring criterion, wherein the presentation device is included in the mobile computing device;
determining whether the monitoring criterion is satisfied based on the target document in the field of view of the image capture device; and
when the monitoring criterion is determined to be satisfied, controlling the image capture device to capture an image depicting the target document in the field of view of the image capture device.

12. The method of claim 11, wherein controlling the presentation device to present the feedback information comprises displaying a written instruction on a display screen for satisfying the monitoring criterion.

US 9,818,090 B1

23

**13**. The method of claim **12**, wherein the written instruction requests a user to position the target document in the field of view of the image capture device.

**14**. The method of claim **11**, wherein controlling the presentation device to present the feedback information comprises controlling the presentation device to present the feedback information when the monitoring criterion is determined not to be satisfied.

**15**. The method of claim **11**, wherein controlling the presentation device to present the feedback information comprises displaying a non-alphanumeric visual indicator on a display screen for satisfying the monitoring criterion.

**16**. The method of claim **11**, wherein controlling the presentation device to present the feedback information comprises outputting an audible instruction through a speaker for satisfying the monitoring criterion.

**17**. The method of claim **11**, wherein controlling the image capture device to capture the image depicting the target document comprises automatically capturing the image depicting the target document upon determining the monitoring criterion is satisfied.

**18**. The method of claim **11**, wherein monitoring the image of the target document in the field of view of the image capture device with respect to the monitoring criterion comprises:

24

measuring a distance from an edge of the target document in the field of view of the image capture device to an edge of the field of view; and

comparing the distance to a predetermined value to determine if skew is present in the image depicting the target document.

**19**. The method of claim **18**, further comprising controlling the presentation device to present a skew correction feedback information when the skew is determined to be present in the image depicting the target document.

**20**. A non-transitory computer-readable medium comprising computer-readable instructions for depositing a check that, when executed by a processor of a mobile computing device, cause the processor to:

monitor a target document in a field of view of an image capture device with respect to a monitoring criterion;

control a presentation device to present feedback information describing an instruction for satisfying the monitoring criterion;

determine whether the monitoring criterion is satisfied based on the target document in the field of view of the image capture device; and

when the monitoring criterion is determined to be satisfied, control the image capture device to capture an image depicting the target document in the field of view of the image capture device.

\* \* \* \* \*

## **CERTIFICATE OF SERVICE**

I, Brian Mack, hereby certify that on June 13, 2023, I will cause to be served

electronically on all counsel of record the foregoing Principal Brief of the Appellant.

Dated:  June 13, 2023

*/s/ Brian E. Mack*
Brian E. Mack
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111-4788

*Counsel for Mitek Systems, Inc.*